**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STATE OF CALIFORNIA,<br><br>   *Plaintiff,*<br><br>  v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *and* LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,<br><br>   *Defendants.* | Case No. 1:26-cv-02185-BAH |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
OR STAY UNDER 5 U.S.C. § 705**

**HEARING REQUESTED**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    I.     California Has Been Regulating Vehicle Emissions for More than Half a Century—Both Before the Clean Air Act and Then Pursuant to It .........................3

    II.    The Congressional Review Act Facilitates Disapproval of Federal Agency Rules .........................................................................................................................7

    III.   All Branches of The Federal Government Have Long Understood that Clean Air Act Preemption Waivers Are Adjudicatory Orders and Are Not Subject to the CRA ...............................................................................................8

    IV.   In 2025, The Executive and Legislative Branches Nonetheless Purported to Invoke the CRA to "Disapprove" Three Section 209(b) Waivers......................10

    V.    EPA Has Now Purported to Reclassify Four Additional Waivers from "Orders" Into "Rules" ...........................................................................................13

STANDARD OF REVIEW ...................................................................................................15

ARGUMENT.........................................................................................................................15

    I.     California Is Likely to Prevail on the Merits of Its Claims...................................15

         A.    California Is Likely to Prevail on Its APA Claims ..................................15

             1.    The Reclassifications are final agency action...............................15

             2.    The Reclassifications violate the APA .........................................18

                  a.    EPA's determination that these Section 209(b) waivers are "rules" is contrary to law ...............................18

                  b.    EPA's Reclassifications violate the APA in several other ways as well.............................................................20

             3.    The Submission are final and violate the APA ..............................23

         B.    California Is Likely to Succeed on Its *Ultra Vires* Claim........................24

         C.    The CRA's Preclusion-of-Review Provision Does Not Apply Here.........25

    II.    California Is Being Irreparably Injured...................................................................28

    III.   EPA Will Not Be Injured by an Injunction and The Balancing of the Equities Tips Sharply in Favor of Restoring the Status Quo ................................32

CONCLUSION......................................................................................................................33

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Adya LLC v. U.S. Drug Enf't Admin.*
No. 1:26-CV-141 (TNM), 2026 WL 797339 (D.D.C. Mar. 23, 2026)....................................31

*Akiachak Native Cmty. v. Jewell*
995 F. Supp. 2d 7 (D.D.C. 2014).........................................................................................30

*Alaska v. DOT*
868 F.2d 441 (D.C. Cir. 1989).............................................................................................29

*Am. Bar Ass'n v. DOE*
370 F. Supp. 3d 1 (D.D.C. 2019).........................................................................................16

*Am. Hosp. Ass'n v. Azar*
964 F.3d 1230 (D.C. Cir. 2020)...........................................................................................27

*Am. Rivers v. FERC*
895 F.3d 32 (D.C. Cir. 2018).........................................................................................23, 24

*Am. Wild Horse Campaign v. Bernhardt*
442 F. Supp. 3d 127 (D.D.C. 2020).....................................................................................17

*Amgen, Inc. v. Smith*
357 F.3d 103 (D.C. Cir. 2004).............................................................................................27

*Bennett v. Spear*
520 U.S. 154 (1997)...........................................................................................17, 18, 23

*Bowsher v. Merck & Co., Inc.*
460 U.S. 824 (1983)...............................................................................................................7

*Cameron v. EMW Women's Surgical Center, P.S.C.*
595 U.S. 267 (2022).............................................................................................................29

*Chamber of Com. of U.S. v. EPA*
642 F.3d 192 (D.C. Cir. 2011)..........................................................................................4, 9

*Ciba-Geigy Corp. v. EPA*
801 F.2d 430 (D.C. Cir. 1986).............................................................................................16

*COMSAT Corp. v. FCC*
114 F.3d 223 (D.C. Cir. 1997).............................................................................................27

*Council for Opportunity in Educ. v. DOE*
No. 25-CV-03491 (TSC), 2026 WL 1480903 (D.D.C. May 27, 2026)................................24

*Ctr. for Taxpayer Rts. v. IRS*
815 F. Supp. 3d 1 (D.D.C. 2025).....................................................................................21, 23

**TABLE OF AUTHORITIES**
**(continued)**

Page

*D.C. v. U.S. Dep't of Agric.*
444 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................................15, 31

*DHS v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020).......................................................................................................22, 23, 25

*Diamond Alt. Energy, LLC v. EPA*
606 U.S. 100 (2025)..............................................................................................................19

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016)..............................................................................................................22

*Engine Mfrs. Ass'n v. EPA*
88 F.3d 1075 (D.C. Cir. 1996)........................................................................................5, 19

*Escobar Molina v. DHS*
811 F. Supp. 3d 1 (D.D.C. 2025) ......................................................................................32

*FCC v. Fox Television Stations*
556 U.S.502 (2009)........................................................................................................22, 25

*Garcia v. San Antonio Metro. Transit Auth.*
469 U.S. 528 (1985)..............................................................................................................25

*Huisha-Huisha v. Mayorkas*
27 F.4th 718 (D.C. Cir. 2022)............................................................................................33

*Jose Eliezer Martinez v. DHS*
No. CV 26-1208 (BAH), 2026 WL 1801137 (D.D.C. June 23, 2026) ....................................16

*Kan. Nat. Res. Coal. v. DOI*
971 F.3d 1222 (10th Cir. 2020) .........................................................................................25

*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016).........................................................................................29, 32

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024)..............................................................................................................27

*Mach Mining, LLC v. EEOC*
575 U.S. 480 (2015)..............................................................................................................28

*Maine v. Taylor*
477 U.S. 131 (1986)..............................................................................................................29

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*)
627 F.2d 1095 (D.C. Cir. 1979).........................................................3, 4, 5, 8, 19, 20, 21

*Motor & Equip. Mfrs. Ass'n v. Nichols*
142 F.3d 449 (D.C. Cir. 1998) .............................................................................................5

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)........................................................................................................20

*Nat. Res. Def. Council v. EPA*
643 F.3d 311 (D.C. Cir. 2011)................................................................................16, 17

*Nat. Res. Def. Council v. Wheeler*
955 F.3d 68 (D.C. Cir. 2020)..................................................................................16, 23

*Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*)
583 U.S. 109 (2018)..........................................................................................25, 27, 28

*Nat'l Lifeline Ass'n v. FCC*
921 F.3d 1102 (D.C. Cir. 2019)..............................................................................21, 23

*New Jersey v EPA*
989 F.3d 1038 (D.C. Cir. 2021)......................................................................................29

*New York Stock Exch. LLC v. SEC*
962 F.3d 541 (D.C. Cir. 2020)........................................................................................21

*Nken v. Holder*
556 U.S. 418 (2009)........................................................................................................32

*NRC v. Texas*
605 U.S. 665 (2025)........................................................................................................24

*Ohio Telecom Ass'n v. FCC*
150 F.4th 694 (6th Cir. 2025) ........................................................................................26

*Ohio v. EPA*
603 U.S. 279 (2024)........................................................................................................22

*Ohio v. EPA*
98 F.4th 288 (D.C. Cir. 2024)...........................................................................................4

*Planned Parenthood of Greater New York v. DHHS*
No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025)........................................16

*R.I.L-R v. Johnson*
80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................................32

*Safari Club Int'l v. Jewell*
842 F.3d 1280 (D.C. Cir. 2016)................................................................................15, 16

*San Luis Obispo Mothers for Peace v. NRC*
789 F.2d 26 (D.C. Cir. 1986) (en banc)..........................................................................20

*Sherley v. Sebelius*
644 F.3d 388 (D.C. Cir. 2011)........................................................................................32

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Sherley v. Sebelius*
  689 F.3d 776 (D.C. Cir. 2012) ...................................................................................15

*Singh v. Berger*
  56 F.4th 88 (D.C. Cir. 2022) ....................................................................................32

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*
  357 F. Supp. 3d 30 (D.D.C. 2019) ...........................................................................22

*Sw. Airlines Co. v. DOT*
  832 F.3d 270 (D.C. Cir. 2016) .................................................................................16

*Transmission Agency of N. California v. FERC*
  495 F.3d 663 (D.C. Cir. 2007) .................................................................................20

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*
  578 U.S. 590 (2016) ............................................................................................18, 23

*United States v. Ruiz*
  536 U.S. 622 (2002) ..................................................................................................27

*W. Watersheds Project v. Haaland*
  850 F. App'x 14 (D.C. Cir. 2021) ............................................................................17

*Whitman-Walker Clinic, Inc. v. DHHS*
  485 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................31

*Widakuswara v. Lake*
  779 F. Supp. 3d 10 (D.D.C. 2025) ...........................................................................28

*Winter v. Natural Res. Def. Council*
  555 U.S. 7 (2008) ...............................................................................................15, 32

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

5 U.S.C.

§ 551(4) ...........................................................................................................7, 10

§ 551(5) ......................................................................................................7, 10, 18

§ 551(6) ...........................................................................................7, 10, 18, 19, 27

§ 551(7) ......................................................................................................7, 10, 18

§ 551(8) ..................................................................................................7, 10, 19, 27

§ 551(9) ..................................................................................................7, 10, 19, 26

§ 553 ..................................................................................................................21

§ 553(b) ......................................................................................................20, 21, 25

§ 553(c) ..............................................................................................................25

§ 554 ..................................................................................................................21

§ 558(c) .....................................................................................................17, 18, 28

§ 601(2) ................................................................................................................8

§ 603 ....................................................................................................................8

§ 705 ..........................................................................................................2, 14, 15, 33

§ 706 ............................................................................................................18, 20

§ 706(2)(D) ..........................................................................................................23

§§ 801-808 ..........................................................................................................25

§ 801(a)(1)(A) ...............................................................................................7, 24, 26

§ 801(a)(1)(D) ......................................................................................................26

§ 801(a)(2)(A) ......................................................................................................26

§ 801(c)(2) ..........................................................................................................25

§ 802(a) ......................................................................................................7, 26

§ 802(d) ................................................................................................................7

§ 802(d)(1) ............................................................................................................7

§ 802(d)(2) ............................................................................................................7

§ 804(2) ..............................................................................................................26

§ 804(3) ..................................................................................................7, 10, 24, 26

§ 804(3)(A) ....................................................................................................26, 27

§ 805 ....................................................................................................7, 25, 26, 27, 28

§ 808 ..................................................................................................................25

# TABLE OF AUTHORITIES
## (continued)

**Page**

42 U.S.C.
§ 7401.................................................................................................................22
§ 7408...................................................................................................................6
§ 7506(c)(1) .......................................................................................................23
§ 7507.............................................................................................................4, 27
§ 7509.................................................................................................................31
§ 7521(a)........................................................................................................8, 19
§ 7543(b)..........................................................................4, 8, 9, 10, 19, 20
§ 7543(b)(1)(A)..................................................................................................19
§ 7543(e)(1) ........................................................................................................5
§ 7543(e)(2)(A)............................................................................5, 6, 19, 20
§ 7543(e)(2)(A)(i)..............................................................................................19
§ 7543(e)(2)(B)................................................................................5, 13, 27

Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996) .................................................7

Pub. L. 108-199 § 428(c), 118 Stat. 3, 418 (2004) ..........................................13

Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965)..................................................3

Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967) ....................................3

H.R.J. Res. 35, 119th .........................................................................................7

H.R.J. Res. 87. 119th ........................................................................................12

H.R.J. Res. 88, 119th ........................................................................................12

H.R.J. Res. 89, 119th ........................................................................................12

Cal. Health & Safety Code § 43000(a) ...............................................................3

**REGULATIONS**

40 C.F.R. § 1074.110(b) ...................................................................................13

40 C.F.R. § 52.220a(c)......................................................................................22

40 C.F.R. Chapter I, at 614-15, 623-27 ...........................................................22

Cal. Code Regs., Title 13, § 1963(c)...................................................................6

**FEDERAL REGISTER**

36 Fed. Reg. 8,172 (Apr. 30, 1971) ...................................................................4

59 Fed. Reg. 36,969 (July 20, 1994).................................................................6, 9

69 Fed. Reg. 59,920 (Oct. 6, 2004)....................................................................8

72 Fed. Reg. 21,260 (Apr. 30, 2007) .......................................................9, 20, 21

73 Fed. Reg. 12,156 (Mar. 6, 2008)....................................................................8

**TABLE OF AUTHORITIES**
(continued)

**Page**

74 Fed. Reg. 32,744 (July 8, 2009) ...................................................................6, 13, 22, 33

77 Fed. Reg. 53,199 (Aug. 31, 2012) ........................................................................9, 20, 21

78 Fed. Reg. 2112 (Jan. 9, 2013) .........................................................................6, 9, 13, 22, 33

79 Fed. Reg. 23,414 (Apr. 28, 2014) ...................................................................................9

84 Fed Reg. 51,310 (Sept. 27, 2019) .................................................................................4, 8

87 Fed. Reg. 14,332 (Mar. 14, 2022) ..................................................................4, 6, 13, 22, 33

88 Fed. Reg. 33,143 (May 23, 2023) ........................................................................9, 20, 21

90 Fed. Reg. 640 (Jan. 6, 2025) ...............................................................................6, 13, 22, 33

90 Fed. Reg. 8353 (Jan. 29, 2025) .............................................................................14, 29

**CONGRESSIONAL RECORD**

142 Cong. Rec. S3114 (daily ed. Mar. 28, 1996) ..............................................................7

171 Cong. Rec. S3017 (daily ed. May 21, 2025) ...........................................................11, 12

171 Cong. Rec. S3099 (daily ed. May 22, 2025) ...............................................................12

**OTHER AUTHORITIES**

Attorney General's Manual on the Administrative Procedure Act 14 (1947) ...............................18

Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Clean Air Act
    Amendments Title II of 1990*, 21 Env't L. 1947, 1956 (1991)....................................................5

H.R. Rep. No. 104-500 (1996)........................................................................................7

Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1959 (2020) ..............................11

## INTRODUCTION

For nearly sixty years, California and the United States Environmental Protection Agency (EPA) have maintained parallel regulatory programs to control harmful emissions from vehicles and their engines, pursuant to Congress's explicit direction in the Clean Air Act. The first Trump Administration attempted to blow a hole in this two-program structure. The second Trump Administration wants to tear it down altogether.

Plaintiff California challenges the most recent actions in that campaign: EPA's June 12, 2026 announcement that it has reclassified four preemption waivers—granted to California as long ago as 2009—from adjudicatory orders into rules and submitted these waivers to Congress as though they are subject to the Congressional Review Act (CRA).[1] EPA's actions are manifestly unlawful and irreparably injure California. The State thus respectfully moves for a preliminary injunction or stay to restore the status quo that preceded the agency's June 12 actions.

From the original enactment of the Clean Air Act waiver provision in 1967 until 2025, EPA maintained that waiver proceedings are adjudications that produce orders, not rulemakings that produce rules. The Government Accountability Office—which interprets the CRA's definition of a "rule" for Congress—has twice agreed. EPA itself affirmed this position when it finalized each of the four preemption waivers at issue here, stating that each action was *not* a rule and was not subject to myriad requirements, like the CRA, that only apply to rules. EPA has no power to change the nature of these actions years after they became final and took effect. And it certainly has no power to do so without any public process and without acknowledging, much less explaining, the agency's change in position.

EPA's actions are irreparably injuring California. EPA's unequivocal intention is to threaten the State's authority to enforce its own laws. Specifically, EPA's reclassification of

---

[1] EPA, *EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress* (June 12, 2026), available at https://www.epa.gov/newsreleases/epa-fulfills-statutory-obligation-transmitting-four-california-waiver-rules-congress, last visited June 24, 2026. This press release can also be found as Exhibit 22 to the Declaration of M. Elaine Meckenstock concurrently filed with this memorandum.

these waivers into "rules" smooths not one, but two, pathways to rendering state enforcement preempted: invalidation of these preemption waivers through either congressional disapproval or administrative withdrawal. EPA's announcement suggests it hopes Congress will take up the agency's invitation, as Congress did in 2025 with three other California waivers. But the President and EPA have elsewhere indicated that the agency would take administrative action to withdraw these waivers, as the first Trump Administration sought to do. If EPA's reclassifications are allowed to stand, the agency may now initiate withdrawal proceedings without providing California with advance notice and the opportunity to correct alleged defects, as EPA was required to do before its reclassifications. While California cannot know which of these two pathways will be followed for any particular waiver, the State is not required to sit idly by, waiting for that other shoe to drop.

Nor can the State do so because the elevated risk to these waivers—and thus the enforceability of the underlying state regulations—is forcing California to spend funds and divert resources *now* to prepare for that eventuality. California is relying on the emissions controls provided by these state regulations to meet federal air quality standards and the State's own air pollution reduction plans. If that reliance unravels due to invalidation of these waivers, the State will need other measures to replace those controls. Identifying, developing, promulgating, and implementing such measures generally takes years, so California must begin that process now to mitigate the possibility that the State will fail to meet mandatory targets by the applicable deadlines—failures that can come with heavy sanctions, including the loss of federal highway funding. Moreover, EPA's actions will undermine the ability of the California Air Resources Board (CARB) to carry out its mission of protecting California's residents and natural resources from harmful pollution.

While a preliminary injunction or stay would prevent further harm to California, that relief would not injure the United States or have any adverse effects on the public interest. Neither the Federal Government nor the public has an interest in allowing patently unlawful agency actions, like these, to remain in effect. Moreover, California seeks only to restore the longstanding status

2

quo that existed for long periods before EPA's June 12 actions, which target waivers granted as far back as 2009 and 2013. And, while the reclassifications of these waivers are harming California, the purported change from orders to rules has not (yet) altered the enforceability of the State's laws. Thus, requiring EPA to revert back to its historical position would not alter private parties' obligations. It would simply mean that EPA would have to follow proper procedures if it wants to take administrative action, including if it wants to finalize a position that these waivers are rules. There is no harm to EPA or the public from that. California respectfully requests that the Court order EPA to withdraw its June 12 actions, returning these waivers to "orders"—the status they had when they were finalized and have held ever since—during the pendency of this litigation.

## BACKGROUND

### I. CALIFORNIA HAS BEEN REGULATING VEHICLE EMISSIONS FOR MORE THAN HALF A CENTURY—BOTH BEFORE THE CLEAN AIR ACT AND THEN PURSUANT TO IT

California has long faced severe air pollution challenges and resulting adverse impacts on public health. Declaration of M. Elaine Meckenstock ("Meckenstock Decl.") Ex. 1 at 1-2; Ex. 2 at 15-16.[2] Because motor vehicles are substantial sources of pollution, Cal. Health & Safety Code § 43000(a), California has been setting emission standards for vehicles since the 1950s. *See Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979) (describing history).

When Congress began requiring federal vehicle emission standards in 1965, it did not initially preempt the States. Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965). Two years later, manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory programs." *MEMA I*, 627 F.2d at 1109. Congress responded by generally preempting States from setting emission standards for new motor vehicles. Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967). But Congress also enacted a provision that requires EPA to waive that preemption for California, upon request, unless EPA makes one of three limited factual findings. *Id.*

---

[2] Unless otherwise indicated, "Ex." refers to exhibits attached to the Declaration of M. Elaine Meckenstock filed concurrently with this memorandum.

§ 208(b), 81 Stat. 501. With that provision, "Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation." *MEMA I*, 627 F.2d at 1111. Congress anticipated that allowing California to "improve on 'its already excellent program'" would benefit both the State and the Nation through "experiments in the field of emissions control" which "might 'require new control systems and designs,'" thereby facilitating reductions in harmful pollution. *Id.* at 1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)).[3]

The waiver provision—often referred to as Section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b)—operated as designed for nearly sixty years. Since 1967, California has requested, and EPA has granted, more than seventy-five preemption waivers, as the State has amended its regulatory program to further reduce pollution in light of technological advancements and improved understandings of the health and welfare threats from vehicular emissions. *See Ohio v. EPA*, 98 F.4th 288, 296 (D.C. Cir. 2024), *rev'd in part and remanded sub nom. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025). In fact, EPA has consistently granted the waivers California has requested, denying only one in full, in a decision that EPA promptly reversed. 87 Fed. Reg. 14,332, 14,337 & n.26 (Mar. 14, 2022) ("[I]n the history of EPA waiver decisions, it has only denied a waiver once"); *id.* (describing reversal of that denial); *see also Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 197 (D.C. Cir. 2011) (describing this history).[4] Congress has "expressed general approval of the Administrator's waiver decisions," including this practice of

---

[3] Although California is the only State that may request and obtain one of these waivers, *MEMA I*, 627 F.2d at 1109 n.1, the Clean Air Act allows other States to enforce state standards identical to California's, if the other States so choose and subject to certain conditions, 42 U.S.C. § 7507. Other States may not, however, enforce state standards that would create a different regulatory regime for manufacturers—beyond EPA's or California's. *Id.*

[4] EPA has, on rare occasions, *partially* denied California's waiver requests, finding that the State had provided inadequate lead time for manufacturers to meet the state standards and effectively postponing those requirements. *E.g.*, 36 Fed. Reg. 8,172 (Apr. 30, 1971). EPA also once purported to withdraw parts of a previously granted waiver. 84 Fed Reg. 51,310 (Sept. 27, 2019). But, as with the single full denial described above, EPA later reversed that action. 87 Fed. Reg. 14,332 (Mar. 14, 2022).

4

regularly granting California's requests. *See MEMA I*, 627 F.2d at 1122 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301 (1977)).

Pursuant to these waivers, California's state standards have operated continuously alongside EPA's federal standards for more than half a century, such that new motor vehicles have been "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996). As Congress anticipated, this two-program structure has allowed the federal government to "draw[] heavily on the California" program "to fashion and to improve the national efforts at emissions control." *MEMA I*, 627 F.2d at 1110. For example, "California first required automobile manufacturers to install" emission-system monitoring "in new cars sold in the state in 1988—two years before Congress mandated [such systems] in cars sold nationwide." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 454 (D.C. Cir. 1998). Similarly, the federal emission standards for passenger cars that were "phased in beginning in model year 1994" were "based on standards adopted in 1989 by the state of California." Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Env't L. 1947, 1956 (1991).

In fact, this two-program structure proved so successful for new motor vehicles that Congress effectively replicated it for off-road vehicles and engines—such as tractors, bulldozers, and ships. In 1990, when Congress decided emissions from off-road sources also needed to be controlled, it enacted a new provision that preempts all States (including California) from setting emission standards for two categories of new off-road vehicles and engines, 42 U.S.C. § 7543(e)(1), but requires EPA to authorize California to regulate emissions from all other off-road vehicles and engines, absent limited conditions, *id.* § 7543(e)(2)(A).[5] *See also Engine Mfrs. Ass'n*, 88 F.3d at 1081 ("In the case of any nonroad vehicles or engines other than those referred to in § 209(e)(1), the EPA was required in § 209(e)(2) to authorize California to adopt standards

---

[5] As with the original waiver provision, this off-road provision generally permits other States to choose to adopt and enforce California's emission standards. *Id.* § 7543(e)(2)(B).

and other requirements relating to emissions, under similar conditions to those governing the motor vehicle preemption waiver." (cleaned up)). In EPA's words, "Congress intended the preemption provisions of section 209, as applied to nonroad engines, to be analogous to the preemption provisions as applied to motor vehicles, except [as to the categorically preempted vehicles and engines]." 59 Fed. Reg. 36,969, 36,973-74 (July 20, 1994).[6]

Four waivers granted to California by EPA are directly relevant here. First, in 2009, EPA granted California a waiver authorizing enforcement of the State's first greenhouse gas (GHG) emissions standards for new motor vehicles. 74 Fed. Reg. 32,744 (July 8, 2009). Second, in 2013, EPA granted a waiver authorizing enforcement of the Advanced Clean Cars I regulation— a collection of amendments to California's program that, among other things, tightened the standards for "criteria" pollutants and GHGs and increased the percentage sales requirements under California's longstanding zero-emission-vehicle sales standards. 78 Fed. Reg. 2112 (Jan. 9, 2013).[7] Third, in 2022, EPA reinstated parts of that 2013 waiver that EPA had purported to withdraw in 2019—specifically, the parts of the 2013 waiver that authorized enforcement of California's more stringent GHG standards and zero-emission-vehicle sales requirements. 87 Fed. Reg. 14,332. Fourth, in 2024, EPA granted California a waiver authorizing enforcement of the State's amended Small Off-Road Engine (SORE) regulations—which apply to small equipment (such as leaf blowers and lawnmowers) and require manufacturers to transition to zero-emission equipment for their California sales. 90 Fed. Reg. 640 (Jan. 6, 2025) (action signed in December 2024).

---

[6] While non-road preemption waivers granted under Section 209(e)(2) are sometimes referred to as "authorizations" because of the statutory language, 42 U.S.C. § 7543(e)(2)(A), such waivers have the same effect on preemption as waivers under Section 209(b) for on-road regulations. Accordingly, this brief refers to actions under either section as waivers.

[7] "Criteria" pollutants are those for which EPA has established National Ambient Air Quality Standards. *See* 42 U.S.C. § 7408 (referring to "air quality criteria"). A zero-emission vehicle is one that produces zero exhaust emissions of any pollutant—e.g., a battery-electric vehicle. Cal. Code Regs., tit. 13, § 1963(c).

## II.   THE CONGRESSIONAL REVIEW ACT FACILITATES DISAPPROVAL OF FEDERAL AGENCY RULES

In 1996, Congress enacted the CRA, as part of a broad, bipartisan bill. Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996); 142 Cong. Rec. S3114 (daily ed. Mar. 28, 1996). The CRA was designed to "provide[] an expedited procedure whereby Congress may review rules to determine whether they should be 'vetoed' prior to taking effect." H.R. Rep. No. 104-500, at 3 (1996). To that end, the CRA requires a "Federal agency" that has promulgated a "rule"—as defined, 5 U.S.C. § 804(3)—to submit that rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[b]efore [the] rule can take effect." *Id.* § 801(a)(1)(A).[8] The CRA borrows (and then further limits) the definition of "rule" from the federal Administrative Procedure Act (APA), *id.* § 804(3), which classifies federal agency proceedings and actions into rulemakings that produce rules and adjudications that produce orders, *id.* § 551(4)-(9).

A federal agency's submission of a rule report triggers a 60 session-day window for Congress to adopt a resolution disapproving of that rule. 5 U.S.C. § 802(a). The text of these resolutions is prescribed in the statute as follows: "That Congress disapproves the rule submitted by the [agency name] relating to [title of rule], and such rule shall have no force or effect." *Id.*; *see e.g.,* H.R. J. Res. 35, 119th Congress. Consideration of CRA resolutions is highly expedited, especially in the Senate. The "filibuster" does not apply, meaning that CRA resolutions require only a simple majority to pass. 5 U.S.C. § 802(d). Motions, amendments, and even debate are all severely limited. *Id.* §§ 802(d)(1), 802(d)(2). The CRA also provides that "no determination, finding, action, or omission under [the CRA] shall be subject to judicial review." *Id.* § 805.

If an agency fails to submit an action, any member of Congress may ask the GAO for a determination as to whether the agency action is a "rule" subject to the CRA. Ex. 3 at 23. Congress has treated the GAO's conclusions as dispositive. *Id.* at 23, 26-27. If the GAO determines an unsubmitted agency action is a "rule," under the CRA's definition, that

---

[8] "The GAO is an independent agency within the Legislative Branch that exists in large part to serve the needs of Congress." *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983).

7

determination opens the 60 session-day window for resolutions. *Id.* at 23. On the other hand, if the GAO determines the action is *not* a rule, no resolutions are introduced. *Id.* at 23, App. B.

### III.    ALL BRANCHES OF THE FEDERAL GOVERNMENT HAVE LONG UNDERSTOOD THAT CLEAN AIR ACT PREEMPTION WAIVERS ARE ADJUDICATORY ORDERS AND ARE NOT SUBJECT TO THE CRA

From the enactment of the CRA in 1996 through February 2025, EPA maintained its consistent position that Clean Air Act preemption waivers are adjudicatory orders, not rules, and are thus not subject to a host of requirements that apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. §§ 601(2), 603), and the CRA. *E.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The [CRA] … does not apply because this action is not a rule …."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past waiver decisions, this action is not a rule …."); 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent with its previous actions on waiver requests….").

EPA's position concerning application of the CRA reflected its understanding—from the earliest days of waiver proceedings—that the agency's role under the waiver provision is "modest in scope" and does not encompass "authority to modify California regulations" or to promulgate federal rules. *MEMA I*, 627 F.2d at 1119. Instead, EPA's role is to adjudicate California's requests by determining whether the record supports one of the three, limited bases for denial. *Compare* 42 U.S.C. § 7543(b) (requiring EPA to waive application of preemption to California), *with id.* § 7521(a) (authorizing EPA to promulgate federal standards). For this reason, the D.C. Circuit had to decide who bears the burden of proof in a waiver proceeding—a question that would arise in an adjudication but not in a rulemaking. *MEMA I*, 627 F.2d at 1120-21. The Court concluded that "[t]he language of the statute and its legislative history indicate" that California is "presumed to satisfy the waiver requirements" and that "the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied." *Id.* at 1121. As the Court observed, EPA had "consistently adhered" to this adjudicatory practice since the enactment of the waiver provision in 1967, and "Congress expressed general approval" of EPA's practices ten years later. *Id.* at 1122. *See also Chamber of*

8

*Com.*, 642 F.3d at 198 (describing 2009 determination that "waiver opponents had not met their burden of demonstrating" basis for denial of California request).

Because Section 209(b) waivers are not rules, EPA has not followed rulemaking procedures when considering California's requests. For instance, instead of developing and issuing a notice of proposed rulemaking whenever the agency deems such action appropriate, EPA must wait for a waiver request from California, accompanied by the State's determination concerning the relative protectiveness of its regulations, in the aggregate. 42 U.S.C. § 7543(b)(1). Put another way, a California rulemaking occurs, according to the State's administrative procedures, and then California makes a determination concerning the protectiveness of its amended state program and submits a waiver request for EPA's adjudication. *See id.*; 59 Fed. Reg. at 36,982 ("EPA has consistently interpreted sections 209(a) and (b) to provide that the waiver process commences after state regulatory adoption."). When EPA receives such a request, it issues a notice that opens a public comment period, but that notice is not a proposal to promulgate rules (or even to take a particular action on California's request). Instead, EPA merely announces it is accepting comments. *E.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007) ("This notice announces that EPA has scheduled a public hearing concerning California's request and that EPA is accepting written comment on the request."); 77 Fed. Reg. 53,199 (Aug. 31, 2012) (same); 88 Fed. Reg. 33,143 (May 23, 2023) (same). And when EPA finalizes a waiver action, the result is not federal emission standards promulgated in the Code of Federal Regulations. *Compare* 78 Fed. Reg. 2112 ("The Environmental Protection Agency (EPA) is granting the California Air Resources Board's (CARB's) request for a waiver of Clean Air Act preemption…."), *with* 79 Fed. Reg. 23,414, 23,630-23,886 (Apr. 28, 2014) (finalizing EPA rule and identifying amendments to federal standards in Code of Federal Regulations). Instead, an EPA preemption decision operates similarly to a court order in a preemption case, determining whether preemption applies. 42 U.S.C. § 7543(b)(1) (directing EPA to "waive … application" of preemption provision).

In 2022, the GAO was asked to determine whether a Section 209(b) waiver was a "rule" subject to the CRA. Ex. 4 at 1. The GAO agreed with EPA's longstanding view and concluded the waiver met "the statutory definition of an order," rather than a rule. *Id.* at 5. The GAO recognized that the APA's definitions (which the CRA incorporates, 5 U.S.C. § 804(3)), classify agency action as either "rule[s]" produced through "rule making," *id.* § 551(4), (5), or "order[s]" produced through "adjudication," *id.* § 551(6), (7). Ex. 4 at 4. The GAO then observed that the "APA defines an order as 'the whole or a part of a final disposition … in a matter other than rule making but including licensing'"; that a waiver decision is "a 'final disposition'" of a request from a single party (California); and that a waiver "grant[s] California a 'form of permission,'" meaning it is a "license" and thus an "order," not a rule. *Id.* at 4-5 (quoting 5 U.S.C. § 551(6), (8), (9)). Indeed, under the APA, "the grant" of a "statutory exemption" constitutes a "license," 5 U.S.C. § 551(8), (9); Section 209(b) directs EPA to exempt California from statutory preemption, 42 U.S.C. § 7543(b)(1); and "licensing" proceedings are categorically "adjudication[s]" that produce "order[s]," not "rule[s]," 5 U.S.C. § 551(6), (7), (9). Thus, the GAO concluded, the CRA had no application to the 2022 Section 209(b) waiver action. Ex. 4 at 7.

Members of Congress adopted the GAO's conclusion. In fact, some members introduced legislation based on it. Senator Mike Lee—and five co-sponsors—introduced a bill to repeal the Clean Air Act's waiver provision, arguing the bill was needed on the ground that Section 209(b) waivers "cannot be reviewed under the Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the CRA." Ex. 5; Request for Judicial Notice (RJN) ¶ 6. The author of the companion bill in the House—which had nine co-sponsors—similarly asserted that "none of [California's waivers] are subject to congressional review." Ex. 6; RJN ¶ 8.

## IV.    IN 2025, THE EXECUTIVE AND LEGISLATIVE BRANCHES NONETHELESS PURPORTED TO INVOKE THE CRA TO "DISAPPROVE" THREE SECTION 209(B) WAIVERS

After the change in Presidential Administrations in January 2025, both the Executive and Legislative branches of the Federal Government charted a different—and unprecedented—

10

course, purporting to invoke the CRA to disapprove three Section 209(b) preemption waivers that had been granted to California in 2023 and 2024. President Trump and EPA Administrator Zeldin announced that EPA would transmit three waivers to Congress, as though they were "rules" subject to the CRA. Ex. 7. In so doing, the President and EPA Administrator appeared to be following a plan first publicized a month earlier as to "how the incoming Trump administration" could purportedly use the CRA to "stop" the State's efforts to reduce vehicular pollution, without following "the administrative process" which could "take years" and without employing "ordinary legislation" which "would have to overcome the 60-vote filibuster in the Senate." Ex. 8, 9.

Neither the Administration's announcement nor the submissions to Congress provided an explanation for EPA's change in position. Nor was there any opportunity for public comment or participation. *See* Ex. 7, 10, 11. Indeed, neither the announcement nor the submissions even acknowledged that EPA had always understood Section 209(b) waiver decisions to be adjudicatory orders, although the agency had reiterated that position when it finalized the very waivers EPA was now claiming were "rules." *See Ex.* 7, 10, 11.

When asked for its opinion, the GAO concluded that these three Section 209(b) waivers, like the one considered earlier, are not "rules" and are not subject to the CRA. Ex. 10. The Senate Parliamentarian—"the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber, Ex. 12 at 18; *see also* Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1959 (2020)—agreed. *See* 171 Cong. Rec. S3020 (daily ed. May 21, 2025) (Sen. Schumer); *id*. at S3048 (parliamentary inquiry from Senator Schumer and response from Presiding Officer Senator Capito); Ex. 13, 14. Nonetheless, first the House and then the Senate passed resolutions purporting to disapprove the three waivers, employing expedited, CRA-like procedures to do so. Throughout, the members who advocated for these resolutions credited EPA's submissions of the waivers as "rules" as the basis for invoking those CRA-like procedures. Ex. 15 at 1 (crediting "Trump EPA" with "giving Congress the opportunity to reject California's" regulations); Ex. 16 at 2 ("Once they submitted it to us, it's a rule. Zeldin did. Then

11

we can take it down.") (quoting Senator Capito); Ex. 17 at 2 (crediting "Administrator Zeldin [with] ensuring Congress has oversight"); Ex. 19 at 1 (same).

Indeed, the Senate went so far as to change its internal procedural rules so that an Executive Branch denomination as a "rule" in a submission to Congress would now suffice to trigger CRA-like procedures, whether or not the action *was* a rule. 171 Cong. Rec. S3099, S3140 (daily ed. May 22, 2025) (Sen. Lankford). Put another way, the Senate modified its rules to substitute the term "Agency-submitted rule," 171 Cong. Rec. S3018 (Sen. Barrasso); *accord id.* at S3088 (Sen. Capito), in place of "rule" as defined (still) in the CRA. The Senate chose to do so because it had never previously "overruled the Parliamentarian regarding the CRA," 171 Cong. Rec. S3031) (Sen. Durbin), and Senate leadership did not want to do so here. Ex. 18 at 2-3, Ex. 20 at 4; *see* 171 Cong. Rec. S3047-48 (Sen. Thune); *id.* at S3087-88 (Sen. Capito). *See also* Gould, *supra* at 1958 ("[I]n the ordinary course of business, Congress's procedural rules—and the parliamentarians' interpretations of those rules—are as good as binding."). So, instead of over-ruling the Parliamentarian's interpretation of the Senate's internal procedural rules, the Senate changed the rules so that any action an agency submits to Congress as a "rule" is a "rule" for purposes of "what qualifies for [a] fast-track procedure" in the Senate, *see* 171 Cong. Rec. S3048 (Sen. Thune), although the statutory definition remains unchanged. The Senate then voted to enact three resolutions of disapproval—one for each of the three waivers EPA had purported to reclassify and submit—*"pursuant to the precedent just established"* by the Senate procedural rule change. 171 Cong. Rec.  S3052 (Sen. Capito as presiding officer) (emphasis added).

On June 12, 2025, the President signed the Resolutions. H.R.J. Res. 87. 119th Congress, H.R.J. Res. 88, 119th Congress, H.R.J. Res. 89, 119th Congress; *see also* RJN ¶ 23. At the signing ceremony, President Trump stated "[I]n a few moments, I'll sign three pieces of legislation that will kill, totally kill [California's regulations], can't do anything about it; they can't take us to court…." RJN ¶ 24. Administrator Zeldin hailed the resolutions, noting that he and President Trump had initiated the process. Ex. 21.

California and ten other States filed suit in the Northern District of California, alleging that the Resolutions violate separation of powers and federalism principles and that EPA's reclassification and submission of the waivers violated the APA or were ultra vires. *California v. United States*, Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025), ECF 1 (complaint), 157 (amended complaint).[9]

## V.   EPA HAS NOW PURPORTED TO RECLASSIFY FOUR ADDITIONAL WAIVERS FROM "ORDERS" INTO "RULES"

On Friday, June 12, 2026, EPA issued a press release announcing that it had "determined" that four additional Clean Air Act preemption waivers granted to California were "rule[s] under the CRA" (Reclassifications) and that EPA had "transmitted" these four waivers to Congress (Submissions). Exh. 22. The four waivers are:

- A 2009 waiver authorizing enforcement of California's first greenhouse gas (GHG) emissions standards for new motor vehicles, 74 Fed. Reg. 32,744 (July 8, 2009);

- A 2013 waiver authorizing enforcement of California's Advanced Clean Cars I regulation—a collection of regulatory amendments that, among other things, tightened existing emission standards for passenger cars and light trucks (across a range of pollutants) and increased existing requirements that manufacturers sell zero-emission vehicles in California, 78 Fed. Reg. 2112 (Jan. 9, 2013);

- A 2022 waiver action that reinstated parts of the 2013 waiver referenced above that EPA had purported to withdraw in 2019 under the first Trump Administration— specifically, the parts that authorized enforcement of amendments to California's GHG standards and zero-emission-vehicle requirements for passenger cars and light trucks, 87 Fed. Reg. 14,332 (Mar. 14, 2022);

- A 2024 waiver authorizing enforcement of the State's amended Small Off-Road Engine (SORE) regulations—which apply to small equipment (such as leaf blowers

---

[9] On February 19, 2026, the Northern District of California court heard oral argument in *California* on the Federal Government's motion to dismiss all claims. *See California*, ECF 234. That court took the motion under submission. *See California*, ECF 234.

and lawnmowers) and require manufacturers to transition to zero-emission equipment as to their California sales, 90 Fed. Reg. 640 (Jan. 6, 2025) (signed December 2024).[10]

EPA's actions, and other actions and statements by Executive Branch officials, appear designed to open up two fronts of attack against these waivers—one in Congress and one in the agency. EPA's press release makes clear it is inviting Congress to disapprove these waivers, as it did with three others last year. Ex. 22 at 1. And the Senate Majority Whip has suggested Congress will likely take up that invitation. Ex. 23 at 1 (Senator Barrasso asserting the "fight" against California's waivers would "continue"). EPA's actions also suggest it is intending to pave the way to administrative withdrawal of these waivers by removing barriers—specifically, procedural protections to which California is entitled as a licensee—to taking such actions. *See infra* at 17-18.

Indeed, the President and EPA have indicated that administrative action to withdrawal the waivers is likely, perhaps especially if Congress does not take up EPA's invitation quickly. In a day-one Executive Order, President Trump announced "[i]t is the policy of the United States" to, *inter alia*, "promote true consumer choice … by terminating, where appropriate, state emissions waivers." 90 Fed. Reg. at 8353 (Jan. 29, 2025). EPA and other agencies were directed to "develop and begin implementing action plans to suspend, revise, or rescind all [identified] agency actions" and to request stays or delays in litigation to allow those administrative actions to be completed. *Id.* at 8354. EPA has not made its "actions plan" public. However, EPA has requested delays in litigation challenging the 2022 and 2024 waivers it now claims to have reclassified. Ex. 24 at 2 ¶ 6; Ex. 25. And the press release announcing those actions claims one purpose was to "promot[e] consumer choice." Ex. 22 at 1. The actions challenged here thus appear to be part of the never-published actions plan to administratively attack California's waivers.

---

[10] By statute, the SORE regulation cannot be adopted and enforced by other States, Pub. L. 108-199 § 428(c), 118 Stat. 3, 418 (2004); 40 C.F.R. § 1074.110(b), although other States may adopt other California off-road regulations pursuant to Section 209(e)(2)(B).

California filed this suit challenging EPA's actions on June 22, 2026. It now seeks a preliminary injunction or stay under 5 U.S.C. § 705 to restore the status quo that existed—for many years—before EPA took the challenged actions.

## STANDARD OF REVIEW

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). To obtain a preliminary injunction, the plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

Under the Administrative Procedure Act, a reviewing court may "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016); *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

## ARGUMENT

I. **CALIFORNIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS**

   A. **California Is Likely to Prevail on Its APA Claims**

      1. **The Reclassifications are final agency action**

Under the APA, courts may generally only review a final agency action that "meets two conditions." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016). The action "must 'mark the consummation of the agency's decisionmaking process,' *i.e.*, it is not 'merely tentative or interlocutory.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The action must also "be one by which rights or obligations have been determined, or from which legal

15

consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178). This "finality inquiry is a pragmatic and flexible one." *Id.* (cleaned up). The Reclassifications satisfy both prongs of this inquiry.[11]

As to the first prong, EPA itself announced the agency "*has determined* that each of these waivers is a rule under the CRA." Ex. 22 at 1 (emphasis added). That is quintessential consummation. When the U.S. Fish and Wildlife Service "had determined and publicly announced" its position on certain permits, the D.C. Circuit easily concluded that was the agency's final conclusion. *Safari Club*, 842 F.3d at 1285 (describing agency action); *id.* at 1289 ("As explained above, … the findings represented the agency's final decision" as to the permits). Similarly, when EPA "unequivocally stated [its] position on the question whether [pesticide] registrants were entitled to a cancellation hearing before labeling changes could be required," that was the consummation of the agency's decisionmaking. *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). The same is true here.

There is nothing "tentative," *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020), about EPA's "determine[ation]" that these four waivers are rules, Ex. 22 at 1; *Am. Bar Ass'n v. DOE*, 370 F. Supp. 3d 1, 20 (D.D.C. 2019) (focusing on "the relevant language of the challenged agency decision"); *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (first prong satisfied where action's "language supports the conclusion that EPA has definitively interpreted" a statutory term). Nor has EPA given any "indication that the [Administrator] intends to reconsider this decision or to vacate" it. *Wheeler*, 955 F.3d at 79 (D.C. Cir. 2020) (quoting *Clean Air Act Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017)) (modification in original). To the contrary, EPA has already implemented the Reclassifications, asserting they required the agency to "transmit" the waivers to Congress. Ex. 22 at 1; *see also Sw. Airlines Co. v. DOT*, 832 F.3d 270, 275 (D.C. Cir. 2016) (courts "look[] to the way in which the agency subsequently treats the challenged action" when considering finality's first prong). EPA cannot

---

[11] That EPA announced this action in a press release does not undermine finality. *Jose Eliezer Martinez v. DHS*, No. CV 26-1208 (BAH), 2026 WL 1801137, at *14 (D.D.C. June 23, 2026) ("[A]agency action may be final despite expression in a more 'informal' form.").

now credibly argue it "contemplate[s] further deliberation or subsequent iteration." *Planned Parenthood of Greater New York v. DHHS*, No. CV 25-2453, 2025 WL 2840318, at *18 (D.D.C. Oct. 7, 2025).

The Reclassifications also had legal consequences and determined rights and obligations, satisfying the second finality prong. EPA itself asserts these actions created "statutory obligation[s]" for the agency that would not exist without the purported Reclassifications. Ex. 2 at 1. "*Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); *see also Bennett*, 520 U.S. at 169 (second prong satisfied where action "alter[ed] the legal regime to which the action *agency* is subject") (emphasis added). For example, the Bureau of Land Management's "conversion of the Caliente Complex HMAs [herd management areas] into HAs [herd areas]," *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 147, met the second prong because it "determined the Bureau's obligation to round up the wild horses," *W. Watersheds Project*, 850 F. App'x at 15. Here, EPA asserts that its Reclassifications—its conversion of these waivers from order to rules—determined its *obligations* to transmit these waivers to Congress. It cannot then argue that the Reclassifications were of no consequence. *See also Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 319 (D.C. Cir. 2011) (second prong satisfied where action left agency with no discretion); *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 150 (same).

If that were not enough (and it is), the Reclassifications changed California's rights under the APA. An agency that wants to withdraw a previously granted license must provide the licensee with "notice … in writing of the facts or conduct which may warrant the action," as well as "opportunity to demonstrate or achieve compliance with all lawful requirements," "*before the institution of agency proceedings.*" 5 U.S.C. § 558(c) (emphasis added). Prior to EPA's Reclassifications, these four waivers were licenses, *infa* Sec. I.A.2.a, and the licensee (California) was entitled to notice and an opportunity to correct should EPA intend to withdraw. If the waivers are now rules, California has lost those rights. This is an irreparable injury to

17

California, particularly given the threat that EPA may soon seek to administratively invalidate one or more of these waivers and would now attempt to do so without affording advance notice and a correction opportunity to California. *See infra* Sec. II. But it also establishes finality, as EPA's actions would determine California's rights and EPA's obligations under 5 U.S.C. § 558(c) with respect to these waivers. *See Bennett*, 520 U.S. at 178.

Finally, the Reclassifications have "deprived" California of the "safe harbor" afforded to waivers as orders by their exclusion from the CRA. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016). In *Hawkes*, the Court concluded that negative "jurisdictional determinations" or JDs under the Clean Water Act satisfied the second finality prong because a negative JD would reduce a property owner's litigation risk by "narrow[ing] the field of potential plaintiffs and limit[ing] the potential liability." *Id.* at 599. "It follow[ed] that affirmative JDs have legal consequences as well: They represent the denial of the safe harbor that negative JDs afford." *Id.* The same is true here: EPA's original (and correct) conclusion that these waivers are not rules, and thus not subject to the CRA, narrowed the pathways to potential invalidation. EPA's Reclassification is expressly designed to eliminate that safe harbor.

### 2. The Reclassifications violate the APA

California is likely to prevail on its claims that the Reclassifications are not in accordance with the law, are outside EPA's authority, and are arbitrary and capricious. *See* 5 U.S.C. § 706.

### a. EPA's determination that these Section 209(b) waivers are "rules" is contrary to law

EPA is simply wrong that Section 209 preemption waivers are "rules." The APA splits all federal-agency proceedings into rulemakings and adjudications. Attorney General's Manual on the Administrative Procedure Act 14 (1947) (AG's Manual) ("[T]he entire Act is based upon a dichotomy between rule making and adjudication."). The result of a "rule making" is a "rule," 5 U.S.C. § 551(5), and the result of an adjudication is an "order," *id.* § 551(7); *see also id.* § 551(6) (defining "order" as "a final disposition … *in a matter other than rulemaking*" (emphasis added)). These waivers are licenses—a type of order.

18

*First*, the APA defines an "order" as "a final disposition … in a matter … *including licensing*." 5 U.S.C. § 551(6) (emphasis added). Licensing is, as its name suggests, an "agency process respecting the grant, … denial, [or] revocation … of a license." *Id.* § 551(9). Thus, Congress explicitly defined all licenses as orders. *Id.* § 551(6); *see also* AG's Manual 41 ("Licensing proceedings constitute adjudication by definition."). Waivers that EPA issues under Section 209 of the Clean Air Act fit the APA definition of "license" to a T.

A "'license' includes [a] statutory exemption or other form of permission," 5 U.S.C. § 551(8), and a "licensing" proceeding is one "respecting the grant … of a license," *id.* § 551(9). When it issues California a waiver under Sections 209(b) or 209(e), EPA is indisputably granting California a statutory exemption from preemption with its "approval" of the States' request. *See id.* § 551(8); *see also* 42 U.S.C. § 7543(b)(1) (directing EPA to waive statutory preemption for California); *id.* § 7543(e)(2)(A); *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 105 (2025) ("The Act's preemption provision exempts California."); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996) (same). As the GAO correctly concluded, waivers are licenses. Ex. 4 at 5.

*Second*, apart from waivers' ready fit with the APA's definition of "license," EPA's waiver proceedings have all the hallmarks of adjudications, not rules. This is clear from the outcome of a waiver proceeding which, like a court decision in a preemption case, determines whether enforcement of certain state laws is preempted. EPA's adjudicatory role is also clear from the fact that EPA does not make policy when it takes action on California's waiver requests. *Cf.* AG's Manual 14 ("Rule making … is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy consideration."). Congress instructed that EPA "shall" exempt the individual, named party requesting the waiver (California) from the application of Clean Air Act preemption, 42 U.S.C. § 7543(b)(1), unless "certain facts exist," *MEMA I*, 627 F.2d at 1120. EPA's action is not policy prescription. *Compare* 42 U.S.C. § 7521(a). Underscoring the point, one of the statutory criteria requires EPA to apply "arbitrary and capricious" review to California's fact-finding, 42 U.S.C.

§ 7543(b)(1)(A), (e)(2)(A)(i)—a standard that courts typically apply and one that does not implicate policymaking. 5 U.S.C. § 706; *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

Underscoring the point, California's requests "are presumed to satisfy the waiver requirements and … the burden of proving otherwise is on whoever attacks them." *MEMA I*, 627 F.2d at 1121. *Compare San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc) ("[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof."). No such analog or burdens of proof are to be found in rulemakings. Indeed, EPA issues no proposed determination, as would be required for a substantive rule. *See* 5 U.S.C. § 553(b). Instead, the agency only provides notice that it received California's request before holding a hearing. 42 U.S.C. § 7543(b)(1), (e)(2)(A); *e.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007); 77 Fed. Reg. 53,199 (Aug. 31, 2012); 88 Fed. Reg. 33,143 (May 23, 2023). EPA must then grant the waiver unless "parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended denial of the waiver." *MEMA I*, 627 F.2d at 1122. In short, "the purposes of the statute involved and the considerations which the agency is required to weigh in granting or withholding its approval," AG's Manual 14, confirm that Section 209 waivers are adjudicatory orders, not rules. *See also E*x. 4 at 5-6.

EPA's newfound "rules" position is untenable, and the Reclassification determinations are unlawful. *E.g.*, *Transmission Agency of N. California v. FERC*, 495 F.3d 663, 673 (D.C. Cir. 2007) (holding "FERC acted contrary to law" where action was based on "impermissible" interpretation of statute).

#### b. EPA's Reclassifications violate the APA in several other ways as well

EPA's Reclassifications are contrary to law and outside EPA's authority for another reason. No statute—not the APA, the CAA, or the CRA—gives EPA the power to reclassify

20

already final actions, much less to do so *years* after finalization. *New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015)). To the contrary, where the relevant statutory framework provides agencies with a choice between rulemaking and adjudication, the distinct procedural requirements for these two types of proceedings require agencies to decide *at the beginning* how they intend to act. *E.g.*, *Compare* 5 U.S.C. § 553 *with id.* § 554. Here, the waiver provision provides no such discretion, limiting EPA to adjudicating whether waiver opponents have met their burden of proof and established one of the limited bases for denying a California request. *MEMA I*, 627 F.2d at 1121-22. But, even if EPA did have discretion to engage in rulemaking *at the outset* of a Section 209(b) proceedings, EPA did not do so here. EPA did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment. *Cf.* 5 U.S.C. § 553(b). Instead, EPA followed its traditional practice, simply announcing that it had received a waiver request from California and was "accepting written comment on the request." *E.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007); *see also* 77 Fed. Reg. 53,199 (Aug. 31, 2012); 88 Fed. Reg. 33,143 (May 23, 2023). EPA cannot now alter the nature of its actions, many years later, by simple fiat.

The Reclassifications are also manifestly arbitrary and capricious. "An agency 'acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so.'" *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 55 (D.D.C. 2025) (quoting *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001)). Here, as in *Center for Taxpayer Rights*, the agency "did not even display an awareness that it was changing its position." *Id.* at 56. EPA's announcement fails to mention that it had consistently maintained that Section 209 waivers are *not* rules, but orders, for decades or that it had reaffirmed that position in these very waiver decisions. Having failed to acknowledge its prior position, EPA could not, and did not, "provid[e] a reasoned explanation for its change of policy that is supported by record evidence." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1105–

21

06 (D.C. Cir. 2019)—much less one that passes the higher bar where reliance interests are at stake, *FCC v. Fox Television Stations*, 556 U.S.502, 515 (2009). Indeed, EPA provided *no* explanation at all. Ex. 22.[12] *Ohio v. EPA*, 603 U.S. 279, 292 (2024) ("An agency must always "offer a satisfactory explanation for its action." (cleaned up)). The omission of any explanation further underscores that waivers are not rules. *See supra* Sec. I.A.2.a. It is also independently arbitrary and capricious. *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 36 (D.D.C. 2019) ("A central principle of administrative law is that, when an agency decides to depart from ... past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it.") (quoting *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017)); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (cleaned up)).

Further, "[w]hen an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," *Regents of the Univ. of California*, 591 U.S. at 30 (cleaned up), yet EPA failed to consider the States' reliance interests at all. EPA cannot claim it was unaware of these interests. EPA itself approved several state regulations authorized by these waivers into California's plan to meet federal air quality standards, 40 C.F.R. § 52.220a(c); reprinted at 40 C.F.R. ch.I, at 614-15, 623-27 (July 2025 ed.), and EPA recited the California emission reduction benefits of these state regulations when it granted the waivers, 74 Fed. Reg. at 32,750 n.38; 78 Fed. Reg. at 2114, 2122; 87 Fed. Reg. at 14,335-36, 14,363-66; 90 Fed. Reg. at 641. EPA can hardly claim it had no idea the State was relying on these regulations for those benefits. Nor can EPA claim that emission reduction benefits are unimportant both because reducing harmful pollution is the purpose of the Clean Air Act, 42 U.S.C. § 7401, and because Congress has expressly instructed federal agencies

---

[12] Thus, any explanation EPA might now offer as to why it believes Section 209 waivers fit the statutory definition of a "rule" will be impermissible post-hoc rationalizations. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).

(including EPA) not to interfere with the States' efforts to meet federal air quality standards, *id.* § 7506(c)(1) ("No department, agency, or instrumentality of the Federal Government shall engage in [or] support in any way … any activity which does not conform to an implementation plan after it has been approved."). "It was arbitrary and capricious for the [EPA] to ignore these significant reliance interests." *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 58.

Finally, EPA's failure to provide *any* process at all for its decision is also unlawful. Even assuming that EPA could plausibly interpret the APA as categorizing waivers as "rules" *and* that EPA could reclassify an already-final action from an order into a rule, it could not do so without accepting and considering public comment. 5 U.S.C. § 706(2)(D) (requiring "observance of procedure required by law"). Indeed, courts have found "non-harmless procedural deficiencies" when agencies failed to provide *enough* process, such as when the comment period was inadequate. *E.g.*, *Nat'l Lifeline Ass'n*, 921 F.3d at 1105–06. Providing *no* process at all even more obviously crosses that line.

### 3.    The Submission are final and violate the APA

EPA's Submissions are also unlawful final actions. They are final because, as with the Reclassifications, there is no indication of any further step EPA plans to take and "no indication that the [Administrator] intends to reconsider" its Submissions or vacate them. *Wheeler*, 955 F.3d at 79. The Submissions also "deprive[d]" these waivers of "safe harbor" from the CRA, *Hawkes*, 578 U.S. at 600, and "alter[ed] the legal regime to which [each waiver] is subject, *Bennett*, 520 U.S. at 178—subjecting them to the 2025 Senate rule that treats "Agency-submitted rules" as rules, regardless of whether the action meets the statutory definition. *See supra* Background Sec. IV. The Submissions are unlawful because the errors in the Reclassifications "fatally infect[]" actions, like the Submissions, that rest on them. *Am. Rivers v. FERC*, 895 F.3d 32, 55 (D.C. Cir. 2018).[13] The Submissions are also independently unlawful because the obligation EPA claims it had to transmit these waivers only arises with respect to "rules," as that

---

[13] For the same reason, should the Court determine that California is entitled to injunctive relief as to the Reclassifications, the scope of that relief should extend to the Submissions because they implement the unlawful Reclassifications. *See id.*

term is defined in the CRA. 5 U.S.C. § 801(a)(1)(A); *id.* § 804(3). Section 209 preemption waivers are not rules. *Supra* Sec. I.A.2. Indeed, the GAO—the non-partisan entity on which Congress relies for CRA applicability determinations—concluded the very 2022 waiver action at issue is not a rule under either the APA or the CRA, Ex. 4 at 1, and reached the same conclusion about three other Section 209 waivers, Ex. 10 at 4, 9. EPA cannot hide behind its predicate Reclassifications because those were also unlawful and provide no authority or reasoned basis for the Submissions. *Am. Rivers*, 895 F.3d at 55. EPA's transmittal of actions finalized as orders in a report erroneously characterizing the actions as "rules" is in excess of its authority and not in accordance with the law.

## B. California Is Likely to Succeed on Its *Ultra Vires* Claim

California is also likely to succeed on its *ultra vires* claim, perhaps especially so if APA review is unavailable because the Reclassifications or Submissions are not final agency action. *Council for Opportunity in Educ. v. DOE*, No. 25-CV-03491 (TSC), 2026 WL 1480903, at *3 (D.D.C. May 27, 2026) ("It is well established that ultra vires review is only available where there is no alternative procedure for review." (cleaned up)); *see also NRC v. Texas*, 605 U.S. 665, 680-81 (2025). This "nonstatutory review [is] available" where "an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *NRC*, 605 U.S. at 681 (emphasis original, cleaned up). Both criteria are met here.

First, no law delegates to EPA the power to declare by fiat that actions finalized years ago as "orders" through adjudicatory procedures are instead "rules." Nor does any law delegate to EPA the power to submit documents to Congress purporting to be "report[s]" under 5 U.S.C. § 801(a)(1)(A) of the CRA based on an *ultra vires* reclassification. That provision only applies to a "rule," *id.*, and EPA's unlawful post-hoc Reclassifications cannot bring these licensing orders within the provision's ambit. The CRA likewise does not empower EPA to submit actions that have been in effect for up to seventeen years. *Id.* (requiring submission "[b]efore a rule can take effect"). Put simply, no statute empowers EPA to target state regulations in this way—and that is far from surprising given that the Federal Government was designed to be "disinclined to invade

24

the rights of the individual States, or the prerogatives of their governments." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985).

Second, EPA's actions are specifically prohibited by the APA. That statute prohibits agencies from claiming a finalized "order" is suddenly a "rule" because that classification determination controls which procedures the agency must follow and therefore cannot be made after the fact. For example, to promulgate a rule, the agency must provide notice of the proposed rule that satisfies 5 U.S.C. § 553(b) and a final rule that satisfies 5 U.S.C. § 553(c). The APA thus prohibits agencies from revisiting its classification after the procedures are complete and the action is final, all the more so because the statute prohibits agencies from creating "a moving target" for judicial review through post-hoc alterations. *DHS*, 591 U.S. at 23. Finally, the APA prohibits an agency from "depart[ing] from a prior policy *sub silentio*," *Fox Television*, 556 U.S. at 515, as EPA did here.

EPA's Reclassifications are thus *ultra vires*. And, because the Reclassifications are the sole basis for the Submissions, those actions are *ultra vires* as well.

### C.    The CRA's Preclusion-of-Review Provision Does Not Apply Here

Section 805 of the CRA provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. This preclusion-of-review provision does not foreclose California's claims here.

Section 805 applies solely to activities "under this chapter." When used in a jurisdictional or venue statute, the best reading of the phrase "under this chapter" is "'pursuant to' or 'by reason of the authority of'" that chapter. *Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*), 583 U.S. 109, 124 (2018) (citing *St. Louis Fuel & Supply Co. v. FERC*, 890 F.2d 446, 450 (D.C. Cir. 1989) (R.B. Ginsburg, J.)). Here, because "this chapter" is the CRA, *see* 5 U.S.C. ch. 8 (5 U.S.C. §§ 801-808), "'[u]nder this chapter' refers to duties the CRA imposes on various actors," *Kan. Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1235 (10th Cir. 2020)—i.e., "determination[s]," "finding[s]," or "action[s]" the CRA requires, 5 U.S.C. § 805. For instance, the President or a promulgating agency may "determine[]" that a rule will take effect sooner than usual, 5 U.S.C.

§§ 801(c)(2), 808; the Office of Management and Budget may "find" that the rule is "major," *id.* § 804(2); or GAO may take action by "report[ing] each major rule" to Congress, *id.* § 801(a)(2)(A). Section 805 stops judicial review of those steps (or the failure to perform them) because each step is "taken as part of the … legal obligations and requirements" the CRA imposes. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 722 (6th Cir. 2025).

No legal obligation or requirement "under" the CRA is at issue here, and thus Section 805 has no applicability. First, the CRA is triggered only by a "rule," and *waivers are not rules, supra* Sec I.A.2.a. Second, the CRA does not apply to any agency action—rule or otherwise—of "particular applicability," 5 U.S.C. § 804(3)(A), and waivers are particularly applicable to California. Third, the CRA does not direct, much less empower, EPA to reclassify agency actions finalized long ago, so EPA's Reclassifications are outside the scope of the CRA and its preclusion-of-review provision in any event.

**1.** The CRA does not impose any duty or requirement on anyone unless and until a federal agency issues a rule. It is a rule that triggers the issuing agency's duty to send Congress and the GAO a report including "a copy of the rule," "a concise general statement relating to the rule," and "the proposed effective date of the rule." 5 U.S.C. § 801(a)(1)(A). The agency's submission of a report about that rule then triggers, *inter alia*, the agency's duty to submit a further report "if the rule is made ineffective," *id.* § 801(a)(1)(D), as well as the window for Congress to pass the special type of "joint resolution" to "disapprove[] the rule" that the CRA contemplates, *id.* § 802(a). But there can be no "determination, finding, action, or omission under [the CRA]," *id.* § 805, absent a rule.

The CRA provides that, "[f]or purposes of this chapter," "[t]he term 'rule' has the meaning given such term in section 551 [of the APA], except" for certain categories of rules that the CRA exempts. 5 U.S.C. § 804(3). As shown above, Section 209 waivers fit the APA (and thus the CRA) definition of an "order," not a "rule." *Supra* Sec I.A.2.a. Waiver proceedings are "licensing[s]" because they "respect[] the grant … of a license," 5 U.S.C. § 551(9)—i.e., a

"statutory exemption or other form of permission," *id.* § 551(8). And "licensing[s]" produce only "order[s]," not "rules." *Id.* § 551(6).[14]

EPA's Reclassification press release does not change the scope of the CRA or Section 805. The Court "always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002). It must exercise that jurisdiction to determine what Section 805 means, and whether the Reclassifications and Submissions are shielded from review. "Otherwise, [EPA] could characterize reviewable or unauthorized action as falling within the scope of [Section 805,] whose application to such action Congress did not intend." *Amgen*, 357 F.3d at 113.

EPA has not attempted to explain why these four waivers are rules under the APA, or the CRA. The agency's "mere [re]designation" of waivers as rules does not "control [a court's] interpretive inquiry." *NAM*, 583 U.S. at 125 n.8. Neither the CRA's nor the APA's definition of a "rule" depends on the label an agency attaches to its action. The Court "must exercise independent judgment" in interpreting and applying those definitions, which do not "delegate[] discretionary authority" to the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 395 (2024). EPA's view is not entitled even to *Skidmore* respect. EPA is not "responsible for implementing" the APA or the CRA, and its classification of these exact waivers has not "remained consistent over time." *Id.* at 394. The CRA—including Section 805—has no application to these preemption waivers or any actions concerning them.

**2.** Waivers are also actions "of particular applicability" that, even if they were rules, fall outside the CRA's ambit. 5 U.S.C. § 804(3)(A) (exempting "rule[s] of particular applicability"). California is, and only California can be, the recipient of EPA's Section 209 waivers. To be sure, in most cases (SORE is an exception, *see supra*, 13 n.10) certain other States can adopt and enforce standards identical to California's. *See* 42 U.S.C. §§ 7507, 7543(e)(2)(B). But those

---

[14] This overlap of jurisdictional and merits issues is a common feature of cases that involve preclusion-of-review provisions. *E.g.*, *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020); *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004); *COMSAT Corp. v. FCC*, 114 F.3d 223, 226–27 (D.C. Cir. 1997). In this case, the overlap is a consequence of the language, structure, and relationship of the CRA and the APA.

other States act of their own accord and do not receive waivers from EPA, either directly or indirectly. *See* Ex. 4 at 6.

**3.** EPA's Reclassifications are not determinations or other actions "under" the CRA in any event. *See* 5 U.S.C. § 805. Nothing in that statute directs, much less empowers, EPA or any other agency to change the character of an action years after finalizing it as something else. The Reclassifications are thus not "pursuant to or by reason of the authority of" the CRA. *See NAM*, 583 U.S. at 124 (cleaned up). To conclude otherwise would put EPA's "compliance with the law … in [the agency's] hands alone"—which would directly conflict with "the strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 488-99 (2015).

Section 805 has no application to California's claims.

## II.    CALIFORNIA IS BEING IRREPARABLY INJURED

California is already being irreparably injured by EPA's actions, and those injuries will continue and worsen absent interim relief from the Court.[15]

**1.** EPA's actions are designed to smooth two pathways to the invalidation of these waivers in order to prevent the State from enforcing its laws and protecting its residents and resources. First, EPA invites Congress to repeat its 2025 actions and "review"—i.e., disapprove—these four waivers, purportedly under the CRA, as it did with three others. Ex. 22 at 1. EPA itself points to this history as context for these new actions, noting that EPA has done this once—and only once—before and that Congress disapproved of all three of the waivers EPA targeted. *Id.* at 2-3. Second, if, as EPA claims, the four waivers at issue are now "rules," and are no longer licenses, EPA will likely initiate administrative proceedings to withdraw these waivers without affording the licensee (California) the opportunity to correct any alleged defects. *See* 5 U.S.C. § 558(c). This may well be part of the "action plan[]" EPA was directed to "develop and begin implementing … to suspend, revise, or rescind all agency actions identified as unduly

---

[15] For the same reasons, California has at least "a substantial likelihood of standing." *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 26 (D.D.C. 2025) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

burdensome" by a presidential Executive Order in January 2025, 90 Fed. Reg. 8353, 8354 § 3(b) (Jan. 29, 2025), where the allegedly burdensome actions included unspecified "state emissions waivers," *id.* at 8353 § 2(e). Notably, the press release announcing EPA's latest Reclassifications claims the four waivers at issue interfere with "consumer choice," Ex. 22 at 1, and the "action plans" required by the Executive Order are intended to target waivers that allegedly do so, 90 Fed. Reg. at 8353 § 2(e).[16]

Efforts at "[f]ederal nullification of a state [law]" present "a grave matter," *Maine v. Taylor*, 477 U.S. 131, 135 (1986), and injure the targeted State (here, California). There can be no question that California would be injured if EPA succeeds in rendering California's regulations unenforceable. *Id.* at 137 ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *see also Alaska v. DOT*, 868 F.2d 441, 443 (D.C. Cir. 1989) (recognizing "sovereignty interests" in power "to enforce state law"). California is also injured by agency actions that make the State's "task of complying with the Clean Air Act"—i.e., meeting federal air quality standards—"more difficult and onerous." *New Jersey v EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021) (cleaned up).

California need not stand by while a federal agency takes concrete steps to upend the state's long-standing regulatory programs. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction."). Indeed, both the Court and Congress has recognized that a "State's opportunity to defend its laws in federal court should not be lightly cut off." *Cameron v. EMW Women's Surgical Center, P.S.C.*, 595 U.S. 267, 277 (2022); *see id.* at 278 ("The importance of ensuring that States have a fair opportunity to defend their laws in federal court has been recognized by Congress.").

---

[16] On May 14, 2026, EPA asked the Ninth Circuit for a 60-day extension to file its brief in litigation challenging the SORE waiver because "EPA is currently considering taking action that could obviate the need for further litigation here." Ex. 24 at ¶¶ 1, 6. The possibility that EPA might initiate a proceeding to attempt to withdraw that waiver—without affording California the procedural rights to which it is entitled as a licensee—within the requested 60-day period further demonstrates that California cannot wait-and-see.

Consistent with those principles, this court held that Alaska was being irreparably injured when a court order "opened the possibility" of adverse agency action against the State's sovereign interests and "there [was] arguably nothing to stop" the agency from taking that action. *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014). California is likewise being irreparably injured here by the possibilities EPA's actions have opened; and—particularly if EPA's Reclassification has stripped California of its right to a pre-initiation correction opportunity—there is likewise arguably nothing stopping those adverse possibilities from materializing.

**2.** Because EPA's actions have significantly elevated the risk to these waivers, California must now prepare for the possibility that the underlying regulations may become unenforceable by developing alternative ways to reduce emissions. Declaration of Austin Hicks, ¶¶ 13-14, 19. Those efforts cost the State money and divert resources intended to support other priorities, imposing opportunity costs on the State as well. *Id.* ¶ 20; *see also id.* ¶ 16.

The State is relying on the emission reductions that these underlying regulations require——or the backstop against emission increases they provide—to achieve multiple pollution control objectives, including protecting public health and welfare and meeting federal air quality standards. For example, the SORE regulation is anticipated to reduce emissions of oxides of nitrogen and reactive organic gases (smog precursors) by 60,000 and 400,000 tons, respectively. Hicks Decl., ¶ 19. CARB has requested that EPA approve this regulation into California's State Implementation Plan (SIP) because it is relying on those emission reductions (and others) to meet federal air quality standards. *Id.* EPA has already approved several regulations covered by the 2009, 2013, and 2022 waiver actions into California's SIP. *Id.* Those regulations are older than SORE and manufacturers have been complying for some time. *See id.* These regulations are thus playing more of a backstop role—e.g., preventing manufacturers from backsliding and producing dirtier vehicles—than driving further emission reductions as SORE is anticipated to do. *Id.* If these regulations become unenforceable, California will be unable to meet its pollution objectives—including compliance with federal air quality standards—unless it identifies,

30

develops, and adopts different measures that can produce the same emission reductions and provide the same anti-backsliding function. *Id.* ¶¶ 12-13, 19-21.

Identifying, developing, and adopting pollution control measures can take years, so California cannot afford to wait and see whether or when Congress or EPA will act to invalidate these waivers. *Id.* ¶¶ 13-14, 19. California must begin, and is beginning, these processes now. *Id.* ¶¶ 19-22. To wait would risk the possibility that these regulations become unenforceable while the State has no Plan B. That would mean increased emissions and adverse consequences to public health and welfare and to the States' natural resources and would also risk sanctions, such as the loss of highway funds, for failing to meet federal air quality standards. *Id.* ¶¶ 10-11, 14; 42 U.S.C. § 7509. Those risks are too high, so California must begin the time-consuming and costly development of a Plan B now. The monetary costs to do so are irreparable, as California cannot recover those funds from the Federal Government. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) ("[E]conomic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims."); *Adya LLC v. U.S. Drug Enf't Admin.*, No. 1:26-CV-141 (TNM), 2026 WL 797339, at *10 (D.D.C. Mar. 23, 2026) ("[B]ecause sovereign immunity would likely render any damages unrecoverable … [plaintiff's] economic loss claim has more bite….").[17]

**3.** EPA's actions also "make it more difficult" for CARB "to accomplish [its] primary mission"—to reduce harmful pollution and protect the State's residents and natural resources. *See Whitman-Walker Clinic, Inc. v. DHHS*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (alteration in original). The diversion of resources to develop a Plan B to backfill for enforcement authority that might be lost detracts from CARB's work to make *additional* pollution reduction progress. Hicks Decl., ¶ 20. CARB also anticipates a decrease in engagement with CARB from regulated parties and other stakeholders, based on experience with the prior round of purported waiver

---

[17] California also anticipates unrecoverable costs from responding to questions concerning the uncertainty EPA's actions have already produced about the enforceability of the underlying state regulations. Hicks Decl., ¶ 23. The diversion of resources to this outreach also irreparably injures the State's pocketbook and CARB's ability to carry out its mission.

reclassifications. *Id.* ¶ 24. This engagement provides important information to CARB that is useful in both existing program implementation (and improvement) and new program development. *Id.* The loss of such information constrains CARB's ability to develop and implement the most effective regulations and other programs. *Id.*; *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 50-51 (D.D.C. 2025) ("[H]arm is shown if the actions taken by [the defendant] have perceptibly impaired the [organization's] programs, including by making the organization's *activities* more difficult." (cleaned up, modification and emphasis in original)).

### III. EPA WILL NOT BE INJURED BY AN INJUNCTION AND THE BALANCING OF THE EQUITIES TIPS SHARPLY IN FAVOR OF RESTORING THE STATUS QUO

Lastly, the balance of the equities and the public interest support California here. *Winter*, 555. U.S. at 20. "[W]hen the [federal] Government is the opposing party," as it is in this case, the balance-of-equities and public-interest factors "merge," and courts address those factors together. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022).

To start, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ("The public interest is served when administrative agencies comply with their obligations under the APA"). As established above, *supra* Sec. I, EPA's actions here are clearly unlawful and thus serve no public interest.

Moreover, the balance of equities favors California because the preliminary injunction will preserve the longstanding status quo for these four waivers. *See Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) (considering the status quo when balancing the equities of a preliminary injunction). "The status quo is the last *uncontested* status which preceded the pending controversy," and "[t]he traditional goal of a preliminary injunction is to preserve *that* status

32

quo." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (quoting *District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969) (cleaned up)); *see also* 5 U.S.C. § 705. In cases challenging an agency action, like this one, the "status quo is the regime in place before [the agency action]." *Huisha-Huisha*, 27 F.4th at 733. The last uncontested status of the four waivers was as adjudicatory orders—licenses granted to the State of California—which is the status they had during the proceeding to consider them and in the final actions granting them. 90 Fed. Reg. at 642 (SORE waiver grant "not a rule"); 78 Fed. Reg. at 2145 (Advanced Cleans Cars I); 87 Fed. Reg. at 14379 (2022 reinstatement); 74 Fed. Reg. at 32784 (first greenhouse gas standards). There is no harm from a preliminary injunction that restores an agency action to the status it held for years (up to seventeen) after it was finalized, particularly when no public proceeding to change that status has occurred. Moreover, EPA's attempt to change the nature of these long-ago finalized actions adversely affects California but effectuates no change (yet) to the enforceability of the underlying state regulations. Thus, restoring these waivers to orders will have little to no effect on private parties and only positive effects on California.

With no credible harm argument available to Defendants, the balance of the equities and the public interest clearly favor granting the preliminary injunction and preserving the status quo.

## CONCLUSION

California respectfully requests that the Court restore the status quo by enjoining EPA to withdraw the Reclassifications, including its press release, and its Submissions to Congress.

33

Dated: June 25, 2026

Respectfully Submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
DAVID ZAFT
Supervising Deputy Attorneys General


*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
NATALIE COLLINS
KATHERINE GAUMOND
*Deputy Attorneys General*
Office of the Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone: (510) 879-0299
Email: Elaine.Meckenstock@doj.ca.gov

*Counsel for Plaintiff State of California*

34