**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF CALIFORNIA,

      *Plaintiff,*

   v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *and* LEE ZELDIN, in his official
capacity as Administrator of the U.S.
Environmental Protection Agency,

      *Defendants.*

Case No. 1:26-cv-02185-BAH

**DECLARATION OF AUSTIN HICKS**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR**
**STAY UNDER 5 U.S.C. § 705**

I, Austin Hicks, declare as follows:

**Relevant Background and Knowledge**

1.     I make this declaration based upon my knowledge and expertise in the matters within, my review of the relevant rulemakings, reports, and other documents discussed below, and (where indicated) information provided by my colleagues at the California Air Resources Board (CARB).

2.     I submit this declaration in support of the Plaintiff California's Motion for Preliminary Injunction or Stay.

1

3.      I am an Air Pollution Specialist of the Air Quality Planning & Science Division at CARB. I have held this position since May 2014 and have previously served in a variety of other positions at the California Department of Transportation since 2009.

4.      A State Implementation Plan (SIP) is required by the Clean Air Act for areas that do not meet federal National Ambient Air Quality Standards (NAAQS). *See generally* 42 U.S.C., section 7401, et seq. A SIP describes how the State plans to meet those air quality standards by the applicable deadlines to do so. SIPs thus generally include state regulations and other measures that the State anticipates will reduce emissions of the relevant pollutant(s).

5.      I am a lead staff contributing to CARB's Clean Air Act SIP planning, including developing and submitting SIP revisions and identifying control strategies and rules necessary throughout the State to meet NAAQS for different pollutants and with different deadlines.

6.      I was lead staff on the development of CARB's 2022 State SIP Strategy, which is California's comprehensive blueprint of measures and commitments to reduce emissions from State-regulated sources to support attainment of the 70 parts per billion (ppb) 8-hour ozone and 12 $\mu g/m^3$ fine particulate matter (PM2.5) NAAQS.

7.      Prior to this, I was lead staff at CARB along with our air district partners on the development of SIPs for nonattainment areas and reviewing CARB regulations and air district rules for submittal as revisions to the California SIP. In these roles, I coordinated with our regulation development staff and our air district partners to ensure that SIP submittal requirements were achieved.

8.      I have a Bachelor of Arts (B.A.) in Economics from California State University, Sacramento.

9. In fulfilling my responsibilities as a lead staff for CARB's Clean Air Act SIP planning throughout the State, I routinely review relevant requirements under the Clean Air Act, and have developed, presented to the Board for approval, and submitted various revisions to the California SIP.

**California's Air Pollution Reduction Planning Obligations**

10. The federal Clean Air Act requires the U.S. Environmental Protection Agency (EPA) to set NAAQS for six "criteria" pollutants. The Act also requires states to develop and enforce implementation plans for "nonattainment" areas, i.e., areas of the State that do not meet the NAAQS or that contribute to a nearby area that does not meet the NAAQS. Nonattainment areas have air pollution surpassing levels EPA has deemed requisite to protect public health and the environment.

11 California also has its own state Clean Air Act, under which CARB has established state ambient air quality standards, also for "criteria" pollutants. These standards are generally more stringent than federal standards for the same pollutant, and CARB and the local air districts are mandated to meet and maintain the state standards[1] as well. Control measures developed to meet federal Clean Air Act requirements also contribute to regions' progress towards the California air quality standards.

12. Additionally, California has other air pollution reduction targets, including statewide limits on greenhouse gas emissions. Under the authority of the California Global Warming Solutions Act of 2006 (AB 32) as amended by SB 32, CARB is required to ensure statewide greenhouse gas emissions are reduced to 40 percent below 1990 levels by 2030. Further, AB 1279 establishes the policy of the state to achieve carbon neutrality as soon as

---

[1] *E.g.*, Cal. Health & Safety Code §§ 39606, 40910–40930.

possible, but no later than 2045; to maintain net negative greenhouse gas emissions thereafter; and to ensure that by 2045 statewide anthropogenic greenhouse gas emissions are reduced at least 85 percent below 1990 levels.

13.    While California has made substantial progress in reducing criteria pollution (such as ozone (or smog) and fine particulate matter) and in reducing the State's contribution to greenhouse gas emissions, California still has more work to do to meet many federal and state ambient air quality standards, as well as other air pollution targets. For example, in the South Coast Air Quality Management District (which includes Los Angeles), smog-forming pollution must be reduced by 82% below 2018 levels in order to meet the 70 parts per billion 8-hour ozone standard in 2037.

12.    CARB and California have historically received waivers granted by EPA pursuant to Section 209 of the Clean Air Act to enforce certain emission standards applicable to vehicles and engines sold or operated in California. CARB has relied on these waivers, and the regulations they authorize CARB to enforce, as significant components of broader plans to meet federal and state air quality standards, and the State's other air pollution reduction objectives.

**CARB Faces Immediate Harm Because It Must Expend And Redirect Resources Now**

13.    There are long time horizons to develop plans or plan amendments to meet these air pollution targets. It generally takes years to identify measures to reduce emissions, model the impacts of those measures, prepare SIP and other planning documents, and put the measures in place in time to meet statutory and other deadlines. For these reasons, EPA's escalation of the threat to the four Section 209 waivers at issue in this case immediately requires CARB to devote significant resources toward SIP and other plan revisions.

4

14.     Failure to submit sufficient SIP revisions to attain the NAAQS could put the State at risk of sanctions, including a loss of federal highway funds. As noted, if CARB does not begin to identify and develop sufficient alternative measures that could be included in those SIP revisions, it would run out of time and be at risk of such sanctions.

**The Air Pollution Planning Actions CARB Has Had To Take In Response To EPA's Earlier Attack On Other Waivers**

15.     In 2025, EPA purportedly reclassified three Section 209 preemption waivers from "orders" into "rules" and transmitted them to Congress, labeling them as such. Congress later passed three resolutions purporting to disapprove of the three waivers, which authorized enforcement of CARB's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulation. The President signed those resolutions in June 2025. California, and other States, have challenged the constitutionality of those resolutions, and that litigation remains on-going.

16.     These events in 2025 have required many revisions to the State's air pollution plans. The work to develop those revisions would not otherwise have been required and diverted staff and resources from other priorities. For example, approximately one year's worth of staff time for myself and the equivalent of one other full-time employee, or approximately 4,160 staff hours, have been spent thus far on planning and preparing necessary SIP revisions to fill the gaps in our emission reduction measures that will remain if the resolutions stand. Those hours had to be diverted and away from other obligations and efforts to reduce emissions and protect public health and the State's natural resources.

**If CARB Cannot Rely On The Four Waivers At Issue Here, It Must Identify Other Ways To Reduce Emissions And Cannot Wait To Begin Doing So**

17.     EPA's recent purported reclassification of four additional waivers, and EPA's transmittal of those additional waivers to Congress, is causing CARB to have to plan now for the possibility that it will be unable to enforce the underlying state regulations.

18.     The four waivers granted CARB permission to enforce our Greenhouse Gas Emission Standards for 2009 and subsequent model years of cars and light-duty trucks adopted in 2004, CARB's emissions standards for cars and light-duty trucks adopted in 2012 (also known as Advanced Clean Cars I or ACC I) (through the original 2013 waiver and the 2022 reinstatement), and the Small Offroad Engine (SORE) regulations adopted in 2021.

19.     CARB has relied on these waivers, and the underlying regulations, as parts of broader plans to reduce air pollution to targeted levels. If CARB can no longer rely on these waivers, it will need additional measures to compensate for lost emission-reduction benefits. For example, CARB is relying on the SORE regulation for reductions of nearly 60,000 tons of NOx emissions and more than 400,000 tons of reactive organic gas emission reductions to meet the ozone and PM2.5 requirements. CARB has requested that EPA approve the SORE regulation into the State's SIP. CARB is also relying on the SORE regulation as part of its plans to meet state air quality requirements. Based on prior plans, it is not yet obvious what regulations would result in sufficient emissions reductions to replace those emissions reductions, or what regulations would replace the anti-backsliding benefits of some of the earlier-adopted regulations covered by the waivers at issue (several of which have been approved into the SIP). And CARB cannot wait to begin to identify or develop those additional measures because, as described above, the timeline from beginning to end of the process of adopting additional measures and incorporating them into plans is long.

20.     Preparing for the increased possibility that these four waivers might be invalidated is anticipated to require 12 additional SIP revisions, including for each of the 70 parts per billion 8-hour ozone nonattainment areas (South Coast Air Basin, San Joaquin Valley, Coachella Valley, West Mojave Desert, Sacramento Metro Area, Eastern Kern County, and Ventura County), the 12ug/m3 annual PM2.5 nonattainment areas (South Coast Air Basin and San Joaquin Valley), and maintenance plans (Chico PM2.5, Yuba City-Marysville PM2.5, and Mammoth Lakes PM10), and will likewise result in significant regulatory delays that CARB must now anticipate and immediately prepare for, including by diversion of staff and resources away from other regulatory efforts and other obligations.

21.     I estimate that the additional 12 SIP revisions would require approximately 5 full-time employees working for three years to develop. Because of the planning and long lead times required, staff must begin this work now due to the escalated threat created by EPA's actions.

22.     If the Court preliminarily enjoins EPA's actions, CARB could significantly reduce this revision work because the immediate threat to these waivers would likewise be significantly reduced. For example, as I understand it, EPA would be required to give California notice and opportunity to correct alleged defects before initiating any effort to administratively withdraw these waivers.

**CARB Anticipates That EPA's Actions Will Soon Cause Other Harms As Well**

23.     Left unchecked, EPA's efforts to reclassify, and thereby escalate risk to, these four additional waivers will decrease regulatory certainty and confidence in CARB's authority as a regulator. CARB staff will likely spend many hours (redirected from other work) to attempt to counteract this harm through informal communications, public workshops, and other interactions with regulated parties, community members, and other stakeholders.

7

24.     While I expect the volume of certain kinds of communications to increase (as described above), I expect other kinds of communication to decrease, including information-sharing from manufacturers and other stakeholders. In my experience, these communications decrease in the face of uncertainty about CARB's authority to regulate, and EPA's actions have elevated that uncertainty. These communications are necessary for CARB to gather information, implement its programs, and be a responsive regulator. Declines in such communications are impacting and will impact program implementation and long-term planning.

25.     I declare, under penalty of perjury, that the foregoing to be true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 25, 2026.

Sacramento, California

AUSTIN HICKS

8