**EXHIBIT 12**

**Case No. 1:26-cv-02185-BAH**



*Congressional Research Service*
Informing the legislative debate since 1914

# The Congressional Review Act (CRA): Frequently Asked Questions

Updated November 12, 2021

Congressional Research Service

https://crsreports.congress.gov

R43992

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

The Congressional Review Act (CRA) is a tool that Congress may use to overturn rules issued by federal agencies. The CRA was included as part of the Small Business Regulatory Enforcement Fairness Act (SBREFA), which was signed into law on March 29, 1996. The CRA requires agencies to report on their rulemaking activities to Congress and provides Congress with a special set of procedures under which to consider legislation to overturn those rules.

Under the CRA, before a rule can take effect, an agency must submit a report to each house of Congress and the comptroller general containing a copy of the rule; a concise general statement describing the rule, including whether it is a major rule; and the proposed effective date of the rule. After receiving the report, Members of Congress have specified time periods during which they must submit and act on a joint resolution of disapproval to take advantage of the CRA's special "fast track" procedures. If both houses pass the resolution, it is sent to the President for signature or veto. If the President were to veto the resolution, Congress could vote to override the veto.

If a joint resolution of disapproval is submitted within the CRA-specified deadline, passed by Congress, and signed by the President, the CRA states that the disapproved rule "shall not take effect (or continue)." The rule would be deemed not to have had any effect at any time, and even provisions that had become effective would be retroactively negated.

Furthermore, if a joint resolution of disapproval is enacted, the CRA provides that a rule may not be issued in "substantially the same form" as the disapproved rule unless it is specifically authorized by a subsequent law. The CRA does not define what would constitute a rule that is "substantially the same" as a nullified rule. Additionally, the statute prohibits judicial review of any "determination, finding, action, or omission under" the CRA.

Since its enactment, the CRA has been used to overturn a total of 20 rules: 1 in the 107th Congress (2001-2002), 16 in the 115th Congress (2017-2018), and 3 in the 117th Congress (2021-2022).

This report discusses the most frequently asked questions received by the Congressional Research Service about the CRA. It addresses questions relating to the applicability of the act, the requirements for submission of rules, the procedural requirements that must be met for Congress to file and act upon a CRA joint resolution of disapproval, and the effects of an enacted CRA joint resolution of disapproval. This report also discusses potential advantages and disadvantages of using the CRA to disapprove rules, as well as other options available to Congress to conduct oversight of agency rulemaking.

For further questions not addressed here, please contact Maeve P. Carey (questions regarding history, scope, and agency compliance with the CRA), Christopher M. Davis (questions regarding congressional procedures and day counts under the CRA), or Valerie C. Brannon (questions regarding legal issues under the CRA).

# Contents

Overview of the Congressional Review Act (CRA) .................................................................. 1
  What Is the CRA? ................................................................................................................ 1
  What Are Advantages and Disadvantages of Using the CRA? ........................................... 1
  How Many Rules Have Been Overturned Using the CRA? ................................................. 6
Definitions Under the CRA ...................................................................................................... 6
  What Is a Covered Rule Under the CRA? ........................................................................... 6
    Does the CRA Apply to Guidance Documents? ............................................................ 7
    Does the CRA Apply to Interim Final Rules? ............................................................... 8
    Does the CRA Apply to Proposed Rules? ..................................................................... 8
    Does the CRA Apply to Executive Orders? .................................................................. 9
  What Is a Major Rule Under the CRA? ............................................................................... 9
    What Happens When a Rule Is Designated as Major? ................................................. 10
    Who Determines Whether a Rule Is Major? ................................................................ 11
  Does the CRA Apply to Non-Major Rules? ...................................................................... 11
Agency Submission of Rules ................................................................................................. 12
  When Does an Agency Have to Submit a Rule to Congress and GAO? ............................ 12
  How Do I Check If a Rule Has Been Submitted Under the CRA? .................................... 12
  What Happens If an Agency Does Not Submit a Rule to Congress? ................................. 12
Congressional Procedures Under the CRA ............................................................................. 14
  How Do I Introduce a Joint Resolution of Disapproval? .................................................. 14
    Can a Joint Resolution of Disapproval Contain a Preamble? ...................................... 15
    How Is a Joint Resolution of Disapproval Different from a Bill? ................................ 15
    Can a Joint Resolution of Disapproval Be Used to Invalidate Part of a Rule or
      More Than One Rule? ............................................................................................ 15
  What Are the CRA "Fast Track" Procedures? ................................................................... 15
    What Are the CRA "Fast Track" Procedures for Senate Committee
      Consideration? ....................................................................................................... 16
    What Are the CRA "Fast Track" Procedures for Senate Floor Consideration? ............ 16
    For How Long Are the "Fast Track" Procedures Available? ........................................ 17
  Do Disapproval Resolutions Have to Be Submitted in Both Chambers of Congress? ........ 17
  What Happens If Congress Adjourns Before the CRA Initiation or Action Periods
    Conclude? ................................................................................................................... 18
  Is It Possible to Ascertain When the Periods for Submission, Discharge, and Action
    on a Resolution to Disapprove a Given Rule Begin and End? ...................................... 18
Effect of a Resolution of Disapproval .................................................................................... 18
  What Is the Effect of Enacting a CRA Joint Resolution of Disapproval? ......................... 18
    When Is a New Rule "Substantially the Same" as a Disapproved Rule? ...................... 19
    How Is the "Substantially the Same" Prohibition Enforced? ...................................... 21
  What Is the Effect of a CRA Joint Resolution Disapproving an Amendment to a
    Previously Issued Rule? .............................................................................................. 22
  What Is the Effect of a CRA Joint Resolution Disapproving a Rule that Repeals a
    Previous Rule? ........................................................................................................... 22
  What Happens If a Rule That Is Already Effective Is Overturned? ................................... 23
Is There Judicial Review Under the CRA? ............................................................................. 23

What Other Tools Are Available to Congress for Conducting Oversight of Federal
  Regulations?.................................................................................................................26

## Appendixes

Appendix A. Rules Overturned Using the Congressional Review Act ....................................28
Appendix B. Government Accountability Office (GAO) Opinions on Whether Certain
  Agency Actions Are "Rules" Under the CRA...................................................................30

## Contacts

Author Information .............................................................................................................33

# Overview of the Congressional Review Act (CRA)

## What Is the CRA?

The Congressional Review Act (CRA) is a tool that Congress may use to pass legislation overturning a rule issued by a federal agency. When Congress passes a law, it often grants rulemaking authority to federal agencies to implement provisions of the law. That delegation of rulemaking authority, and the rules issued by federal agencies under this authority, is a crucial component of the policymaking process. Congress has an interest in ensuring that federal agencies, when issuing rules, are faithful to congressional intent. To conduct oversight of federal agency actions, Congress has a number of tools available, including the CRA.[1]

The CRA was enacted in 1996 as part of the Small Business Regulatory Enforcement Fairness Act.[2] Under the CRA, before a rule can take effect, an agency must submit the rule to Congress and the Government Accountability Office (GAO).[3] Upon receipt of the rule by Congress, Members of Congress have a specified time period during which to submit and take action on a joint resolution of disapproval overturning the rule. If both houses pass the joint resolution, it is sent to the President for signature or veto. If the President were to veto the joint resolution, Congress could vote to override the veto. Enactment of the joint resolution would take the rule out of effect or prevent it from going into effect, and the agency would be prohibited from issuing a rule that is "substantially the same" without further authorization from Congress.[4]

## What Are Advantages and Disadvantages of Using the CRA?

The CRA contains several notable features that could be seen as advantages and/or disadvantages to disapproving rules using the CRA, rather than through regular legislation.

### *Procedural*

The most notable feature of the CRA is its special set of parliamentary procedures for considering a joint resolution disapproving an agency's final rule. These procedures make it easier for Congress to pass a joint resolution of disapproval, particularly in the Senate. Perhaps most significantly, when a joint resolution of disapproval meets certain criteria, it cannot be filibustered in the Senate. In addition, when 20 calendar days have elapsed after the receipt and publication of a rule, a petition, signed by 30 Senators, can be presented on the floor to discharge a Senate committee of the further consideration of a disapproval resolution.[5] Once the committee is discharged, any Senator can make a nondebatable motion to proceed to consider the disapproval resolution. Should a majority of the Senate vote to consider the disapproval resolution, debate on it is limited, and a final vote would be all but guaranteed.[6]

Not all of the CRA's procedures are advantageous, however—a joint resolution of disapproval may still face some procedural challenges. First, one might argue that the likelihood of a

---

[1] For a broader discussion of Congress's oversight tools, see CRS Report RL30240, *Congressional Oversight Manual*; and CRS Report R45442, *Congress's Authority to Influence and Control Executive Branch Agencies*, by Todd Garvey and Daniel J. Sheffner.

[2] Title II, Subtitle E, P.L. 104-121, 5 U.S.C. §§601 *et seq.*

[3] 5 U.S.C. §801(a)(1)(A).

[4] 5 U.S.C. §801(b)(2).

[5] 5 U.S.C. §802(c).

[6] 5 U.S.C. §802(d).

presidential veto (discussed in detail below) means that most CRA disapproval resolutions are likely to be subject to a *de facto* supermajority requirement. Second, the CRA does not establish any "fast track" procedures for initial consideration of a disapproval resolution in the House of Representatives. As a result, unless the House majority party is willing to schedule the measure for consideration, in all likelihood it will not be considered. Third, unlike the regular legislative process, which is available to Congress at any time, the CRA disapproval mechanism is available in the Senate only during certain statutorily specified time periods. Fourth, calculating the periods established by the CRA for submitting and acting on a disapproval resolution can be complicated, especially in cases where the act provides for additional submission and action periods in a subsequent session of Congress. Fifth, unlike regular legislation, which can overturn or amend more than one rule at time, each CRA disapproval resolution can be aimed only at a single final rule in its entirety. Multiple disapproval resolutions cannot be "bundled" together and still maintain their privileged parliamentary status.[7] Relatedly, because the stipulated text of CRA disapproval resolutions refer to a rule as a whole, the law does not give Congress the opportunity to expressly disapprove only specific aspects of a rule. Finally, if either chamber rejects a CRA disapproval resolution on a major rule, it appears that it could have the effect of putting a regulation in force sooner than would otherwise be the case.[8]

## Prohibition on Issuance of "Substantially the Same" Rules

If a joint resolution of disapproval is enacted, it not only invalidates the rule in question; it also bars the agency from issuing another rule in "substantially the same form" as the disapproved rule unless Congress authorizes the agency to do so in a subsequent law.[9] Thus, enactment of a joint resolution of disapproval has the immediate effect of taking the rule out of effect or preventing it from taking effect, but it also has a more long-term effect on the agency's ability to issue a substantially similar rule. (See "When Is a New Rule "Substantially the Same" as a Disapproved Rule?" below for more discussion.) For Members who want to disapprove a rule, this restriction on future agency behavior could be seen as an advantage of using the CRA to overturn the rule. On the other hand, some might argue that the prohibition on "substantially the same" rules is actually a disadvantage of the CRA, as it creates uncertainty and could restrict the agency's ability to act going forward. This can potentially create a difficult situation for an agency if Congress uses the CRA to disapprove rules that were specifically required by law, as the CRA overturns the rule itself but does not remove the underlying statutory requirement for the rule.[10]

---

[7] At the end of the 114th Congress and at the start of the 115th Congress, the House of Representatives passed legislation to amend the CRA and allow the bundling of disapproval resolutions in this way for "midnight rules"—rules issued late in the final year of an outgoing administration. Companion bills in the Senate were not adopted. See the Midnight Rules Relief Act, H.R. 21 (115th Congress), H.R. 5982 (114th Congress), S. 34 (115th Congress), and S. 3483 (114th Congress).

[8] 5 U.S.C. §801(a)(5). In practice, however, it is unclear how or whether this would occur. See "What Happens When a Rule Is Designated as Major?" below.

[9] 5 U.S.C. §801(b)(2). For a discussion of the prohibition on promulgating another substantially similar rule, see "When Is a New Rule "Substantially the Same" as a Disapproved Rule?" below; CRS Report R46690, *Congressional Review Act Issues for the 117th Congress: The Lookback Mechanism and Effects of Disapproval*, by Maeve P. Carey and Christopher M. Davis; and CRS Insight IN10660, *What Is the Effect of Enacting a Congressional Review Act Resolution of Disapproval?*, by Maeve P. Carey.

[10] To date, two final rules have been reissued after having been overturned under the CRA: a Department of Labor (DOL) rule and a Securities and Exchange Commission (SEC) rule. Both of those reissued rules were statutorily required. For more information, see "When Is a New Rule "Substantially the Same" as a Disapproved Rule?" below.

### Requirement for Reporting to Congress on Rulemaking Activities

Not only can Congress use the CRA to overturn agency rules, but certain provisions of the CRA may be viewed as helping to increase congressional awareness of federal agency actions. The requirement for agencies to submit their rules to Congress,[11] and the subsequent referral of each rule to the committee of jurisdiction,[12] functions as a notification mechanism through which committees and Members can be made aware of agencies' rulemaking activities. Although Members may be likely to become aware of high-profile rules through other means, the referral of each rule upon receipt in Congress provides an additional notification for rules that may be of a more narrow interest.

### Additional Information Publicly Available on Federal Rules

Another benefit of the CRA, for Members of Congress as well as for the public, is that it has resulted in a publicly available database of rules and set of reports on major rules compiled by GAO. Since the CRA's enactment, GAO has posted a record of receipt of the rules agencies submitted under the CRA to a database on its website.[13] The database can be used to search for final rules by elements such as the title, issuing agency, type of rule (major or non-major), and effective date. The website also contains GAO's reports, required under the CRA and discussed below, on major rules. Each major rule report contains summary information and an assessment of the agency's completion of certain cost-benefit and other analytical requirements.[14]

### Drawing Attention to a Rule

Another potential advantage of the CRA is that it provides a method for Members of Congress to draw attention to a particular rule. The required language of a joint resolution of disapproval, which is stipulated in the CRA, provides for a relatively straightforward process through which a Member can make clear his or her opposition to a rule.[15] Indeed, while the CRA has been used to overturn 20 rules, many more joint resolutions of disapproval have been introduced since the CRA's enactment. Members of Congress have introduced well over 200 joint resolutions of disapproval under the CRA, pertaining to more than 130 rules.[16]

In addition, the threat of submission or passage of a disapproval resolution may provide a mechanism through which a Member can pressure an agency to reach a particular outcome, either related to that specific rule or on another matter.[17] Prior to the 115th Congress, Congress had rarely used the CRA to disapprove a rule, so arguably, the CRA may not have been a credible threat to agencies and thus was not likely to influence agency behavior. However, Congress's

---

[11] 5 U.S.C. §801(a)(1)(A).

[12] 5 U.S.C. §801(a)(1)(C).

[13] GAO's federal rules database is available at https://www.gao.gov/legal/other-legal-work/congressional-review-act.

[14] See "What Happens When a Rule Is Designated as Major?" for more information on these reports.

[15] See "How Do I Introduce a Joint Resolution of Disapproval?" below for the stipulated text.

[16] Data obtained by CRS from Congress.gov based on bill text searches using the CRA's stipulated text. A list of all joint resolutions of disapproval introduced under the CRA can be provided to congressional clients upon request from the authors of this report.

[17] See Allan Freedman, "GOP's Secret Weapon Against Regulations: Finesse," *CQ Weekly*, September 5, 1998; and Steven J. Balla, "Organization and Congressional Review of Agency Regulations," *Journal of Law, Economics, and Organization*, vol. 16, no. 2 (October 2000), pp. 426-429.

more frequent use of the CRA in recent years could suggest otherwise—particularly for Administrations that may be nearing the end of a term.[18]

### Increased Oversight of Independent Regulatory Agencies

For two reasons, the CRA may present an opportunity for more political control over independent regulatory agencies' rulemaking activities. First, as discussed more below (see "Presidential Veto/De Facto Supermajority Requirement"), enactment of a CRA resolution of disapproval is considered to be unlikely in most circumstances, because a President would be expected to veto a joint resolution disapproving a rule issued by the President's own Administration. However, a President may be more likely to sign a joint resolution disapproving a rule that has been issued by an independent regulatory agency, a type of agency over which the President has less control.[19] Unlike executive agencies, independent regulatory agencies do not submit their regulations to the Office of Management and Budget (OMB) for review under Executive Order 12866, which seeks in part to ensure that federal agencies' regulations are in line with the President's policy priorities.[20] As such, the independent regulatory agencies' regulations are considered to be more removed from presidential control than executive agencies' regulations, because the President— through OMB—has less influence over the content of their rules. The CRA presents an opportunity for Congress and the President to exercise more control over those agencies' rules by overturning them.

Second, under the CRA, the administrator of the Office of Information and Regulatory Affairs (OIRA) in OMB is responsible for determining which rules are "major." Prior to 2019, OIRA had largely deferred to independent regulatory agencies in making these determinations about their own rules.[21] In April 2019, the Trump Administration announced a procedural change for the independent regulatory agencies, which had previously not submitted their rules to OMB for review.[22] Under the 2019 policy, all agencies, including independent regulatory agencies, are required to submit their regulations to OIRA for a determination of whether the rules met the CRA's statutory definition of *major*. Arguably, this procedure potentially provides a point of leverage for the White House (through OMB and OIRA) over independent regulatory agencies' rules if OIRA chooses to use this mechanism to influence the substance of the rules in any way.[23]

---

[18] See section below entitled "Presidential Veto/De Facto Supermajority Requirement" for a discussion of why the CRA is generally more effective for overturning rules issued at the end of a President's term.

[19] Congress created a number of federal agencies with certain characteristics to make them independent from the President and, in some cases, from Congress itself. Those agencies, generally referred to as independent regulatory agencies or independent regulatory commissions, are listed at Title 44, Section 3502(5) of the *United States Code* and include agencies such as the Federal Reserve Board and the Securities and Exchange Commission. The President generally has limited ability to remove officials from those agencies, for example, and those agencies' budget requests may be submitted directly to Congress without modification by the President. In addition, some agencies may receive their funding outside the annual appropriations process. For a discussion of the characteristics that make a subset of those agencies independent from Congress and the President, see CRS Report R43391, *Independence of Federal Financial Regulators: Structure, Funding, and Other Issues*, by Henry B. Hogue, Marc Labonte, and Baird Webel.

[20] Executive Order 12866, "Regulatory Planning and Review," 58 *Federal Register* 51735, October 4, 1993.

[21] Cass R. Sunstein, "Trump White House Seeks New Power Over Agencies," *Bloomberg*, April 23, 2019, https://www.bloomberg.com/opinion/articles/2019-04-23/trump-seeks-more-control-of-fed-sec-and-other-agencies. See also "Who Determines Whether a Rule Is Major?" below for further discussion.

[22] Russell T. Vought, acting director, OMB, "Guidance on Compliance with the Congressional Review Act" (M-19-14), memorandum to the heads of executive departments and agencies, April 11, 2019, https://www.whitehouse.gov/wp-content/uploads/2019/04/M-19-14.pdf. See also CRS Insight IN11122, *OMB Issues New CRA Guidance, Potentially Changing Relationship with Independent Agencies*, by Maeve P. Carey.

[23] See CRS Insight IN11122, *OMB Issues New CRA Guidance, Potentially Changing Relationship with Independent*

The status of this 2019 policy under the Biden Administration is unclear, but no rescission or change to the policy has been publicly announced.

### *Failure of a CRA Joint Resolution of Disapproval Could Make a Major Rule Take Effect Faster Than Otherwise Allowed Under the CRA*

In the case of some major rules, it appears that use of the CRA mechanism could make the rule go into effect *more quickly* than it otherwise would. Under the requirements of the CRA, agencies must delay the effective date of major rules by at least 60 days.[24] This is essentially an expansion of the Administrative Procedure Act's (APA) requirement that agencies delay the effective date of most rules by at least 30 days.[25] Should either chamber choose to consider a joint resolution disapproving a major rule and then vote to reject the resolution, under one provision of the CRA, the rule in question could go into force immediately, notwithstanding any layover period in its effective date established by the CRA.[26] No rule would go into effect under such a scenario, however, until the effective date set by the agency in the rule itself has been reached.

### *Disapproval of an Entire Rule*

A CRA resolution can be used only to invalidate a single final rule in its entirety. A CRA joint resolution of disapproval cannot be used to modify or restructure a rule in order to make it acceptable to Congress. If Congress were to use the regular legislative process instead of the CRA, however, Congress could invalidate part of a rule or instruct the agency to amend or repeal part of a rule. However, regular legislation would not be eligible for the same expedited procedures in the Senate in the same way a CRA resolution of disapproval would. It would not enjoy expedited procedures for floor consideration and might be subject to filibuster.

### *Presidential Veto/De Facto Supermajority Requirement*

One of the biggest challenges for using the CRA to overturn rules is that a President can generally be expected to veto a joint resolution of disapproval attempting to overturn a rule issued by the President's own Administration. A joint resolution of disapproval requires the signature of the President to become law—a very unlikely prospect if the President's own Administration issued the rule. If the President were to veto the measure, Congress could attempt to override the veto. A two-thirds majority of both houses of Congress is required to override a President's veto. This creates a *de facto* supermajority requirement for a CRA joint resolution to be enacted in most cases.

---

*Agencies*, by Maeve P. Carey. See also Bridget C. E. Dooling, "How Independent Are Government Agencies? OMB's Move on 'Major' Rules May Tell Us," *The Hill*, April 13, 2019, https://thehill.com/opinion/white-house/438756-how-independent-are-government-agencies-ombs-move-on-major-rules-mat; and William Funk, "OMB Leveraging the CRA to Add to Its Oversight of Independent Regulatory Agencies," Yale Journal on Regulation Notice and Comment Blog, April 18, 2019, https://yalejreg.com/nc/omb-leveraging-the-cra-to-add-to-its-oversight-of-independent-regulatory-agencies-by-william-funk/.

[24] 5 U.S.C. §801(a)(3).

[25] Under the APA, agencies must generally allow at least 30 days to elapse between the publication of a rule and its effective date, though there are some exceptions (5 U.S.C. §553(d)). In many cases, agencies allow additional time beyond the required 30 days before making a rule effective. Similarly, with major rules, agencies often allow for more than the 60 days required under the CRA.

[26] 5 U.S.C. §801(a)(5), states, "Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802."

During a transition period following the inauguration of a new President of a different party than the outgoing President, however, the CRA is more likely to be used successfully.[27] Because of the structure of the time periods during which Congress can take action under the CRA, there is a period at the beginning of each new Administration during which rules issued near the end of the previous Administration are eligible for consideration under the CRA.[28] This period is sometimes referred to as a "lookback" period.[29] The vast majority of the instances in which the CRA was used to overturn a rule took place during such a period.

## How Many Rules Have Been Overturned Using the CRA?

As of November 12, 2021, the CRA had been used to overturn a total of 20 rules. One of those rules was overturned in the 107th Congress (2001-2002), 16 were overturned in the 115th Congress (2017-2018), and 3 were overturned in the 117th Congress (2021-2022). For a list of the 20 overturned rules, see **Appendix A**.

# Definitions Under the CRA

## What Is a Covered Rule Under the CRA?

The CRA adopts the definition of *rule* that appears in Section 551 of the APA, with three exceptions.[30] Section 551 of the APA defines *rule* as

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.[31]

The first exception in the CRA definition of *rule* is for rules of particular applicability, including a rule that "approves or prescribes for the future rates, wages, prices, services, or allowances therefor, corporate or financial structures, reorganizations, mergers, or acquisitions thereof, or accounting practices or disclosures bearing on any of the foregoing."[32] Second, the CRA's definition of *rule* excludes "any rule relating to agency management or personnel."[33] Finally, the CRA also excludes "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties."[34]

---

[27] See CRS Report R46690, *Congressional Review Act Issues for the 117th Congress: The Lookback Mechanism and Effects of Disapproval*, by Maeve P. Carey and Christopher M. Davis.

[28] The rules issued near the end of an Administration are often referred to as "midnight rules." See CRS Insight IN11539, *Presidential Transitions: Midnight Rulemaking*, by Maeve P. Carey; and CRS Report R42612, *Midnight Rulemaking: Background and Options for Congress*, by Maeve P. Carey, for more information about the history, practice, and oversight of midnight rulemaking.

[29] For information on the lookback mechanism, see CRS Report R46690, *Congressional Review Act Issues for the 117th Congress: The Lookback Mechanism and Effects of Disapproval*, by Maeve P. Carey and Christopher M. Davis.

[30] 5 U.S.C. §804(3). For an in-depth discussion of the definition of rule under the CRA, see CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

[31] 5 U.S.C. §551(4).

[32] 5 U.S.C. §804(3)(A). The CRA definition of *rule* does not specifically exclude facilities or appliances, which are also listed in the APA definition of a *rule* (5 U.S.C. §551(4)).

[33] 5 U.S.C. §804(3)(B).

[34] 5 U.S.C. §804(3)(C).

Notably, the CRA adopts the broadest definition of *rule* contained in the APA, which is broader than the category of rules subject to the APA's notice-and-comment rulemaking procedures.[35] Therefore, some agency actions that are not subject to notice-and-comment rulemaking procedures under the APA may still be considered a rule under the CRA.

For a more detailed discussion of what agency actions are considered rules and are eligible to be overturned under the CRA, see CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

## Does the CRA Apply to Guidance Documents?

The CRA applies to some guidance documents and other agency actions taken outside of the APA's notice-and-comment rulemaking procedures. Because the broad scope of the CRA's definition of *rule* includes some agency actions such as policy statements and interpretive rules—which are sometimes referred to as guidance documents—the CRA may be available to overturn those types of actions. Whether any particular agency action is a rule covered by the CRA depends on the specific facts involved—that is, the nature of the action and its effect.[36]

A practical challenge for using the CRA to overturn guidance documents is that agencies often do not submit covered guidance documents to Congress, despite the CRA's requirement for them to do so. However, in recent years, Congress has developed a practice under which it can still review covered actions under the CRA, even if the action was not submitted under the statute. For a discussion of how the CRA may still be used in these instances, see "What Happens If an Agency Does Not Submit a Rule to Congress?" below.[37]

Although the CRA was clearly intended to cover some agency guidance documents,[38] the practical effect of overturning any particular guidance document may not always be clear. In particular, the effect of a disapproval resolution may be limited because guidance documents, by their nature, already lack the force of law or any legal effect.[39]

---

[35] 5 U.S.C. §553. Generally, the requirements for notice-and-comment rulemaking procedures do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" or "when the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

[36] For an in-depth discussion of the definition of *rule* under the CRA and the types of agency actions that are covered, see CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

[37] See also CRS In Focus IF11096, *The Congressional Review Act: Defining a "Rule" and Overturning a Rule an Agency Did Not Submit to Congress*, by Maeve P. Carey and Valerie C. Brannon; and CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

[38] A statement inserted into the *Congressional Record* after the CRA's enactment by its sponsors states that the CRA was intended to encompass some agency statements that would not be subject to the APA's notice-and-comment rulemaking requirements: "The committees intend this chapter to be interpreted broadly with regard to the type and scope of rules that are subject to congressional review. The term 'rule' in subsection 804(3) begins with the definition of a 'rule' in subsection 551(4) and excludes three subsets of rules that are modeled on APA sections 551 and 553. This definition of a rule does not turn on whether a given agency must normally comply with the notice-and-comment provisions of the APA…. The definition of 'rule' in subsection 551(4) covers a wide spectrum of activities." Representative Henry Hyde, *Congressional Record*, daily edition, vol. 142, (April 19, 1996), p. E578.

[39] In determining whether an agency action is subject to the notice-and-comment rulemaking requirements in the APA, reviewing courts may ask whether an agency action such as a guidance document has the force of law. If it lacks the force of law, it likely will not be subject to these procedures. See, for example, Gen. Elec. v. EPA, 290 F.3d 377, 382

## Does the CRA Apply to Interim Final Rules?

Yes. Interim final rules are considered final rules that carry the force and effect of law, and an interim final rule that satisfies the CRA's definition of *rule* will be subject to the CRA.[40] Agencies use interim final rules to promulgate rules without providing the public with notice and an opportunity to comment before publication of the final rule, while offering the possibility of modifying the rule following a post-promulgation comment period.[41] Agencies must generally assert a valid "good cause" under the APA to issue any interim final rule, or they must be statutorily authorized to forego notice-and-comment procedures.[42]

## Does the CRA Apply to Proposed Rules?

No, it does not appear that the CRA applies to proposed rules. Although the CRA does not expressly provide that a rule must be final before it may be reviewed by Congress,[43] a proposed rule arguably does not satisfy the CRA definition of *rule*. GAO specifically advises agencies not to submit proposed rules to Congress or GAO under the CRA, stating on its website that "Agencies should only submit major, non-major, and interim final rules."[44]

In 2014, GAO published a legal opinion determining that the CRA does not apply to proposed rules.[45] GAO suggested that the statutory scheme indicates that the CRA applies only to final

---

(D.C. Cir. 2002); Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C. Cir. 1993).

[40] See Career College Ass'n v. Riley, 74 F.3d 1265 (D.C. Cir. 1996) ("The key word in the title 'Interim Final Rule,' unless the title is to be read as an oxymoron, is not interim, but *final*. 'Interim' refers only to the Rule's intended duration—not its tentative nature.")

[41] While there are numerous examples of the use of interim final rules prior to 1995, the practice of post-promulgation comments appears to have its genesis in a 1995 recommendation of the Administrative Conference of the United States (ACUS), which suggested the procedure whenever the "impracticable" or "contrary to the public interest" prongs of the "good cause" exemption were invoked. See ACUS Recommendation 95-4, *Procedures for Noncontroversial and Expedited Rulemaking*, 60 *Federal Register* 43110, August 18, 1995. See also Michael R. Asimow, "Interim-Final Rules: Making Haste Slowly," *Administrative Law Review* vol. 51, no. 3 (Summer 1999).

[42] 5 U.S.C. §553(b)(B) ("Except when notice or hearing is required by statute, this subsection does not apply... when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.") See also Jeffrey S. Lubbers, *A Guide to Federal Agency Rulemaking*, 6th ed. (2018), pp. 114-116; and CRS Report R44356, *The Good Cause Exception to Notice and Comment Rulemaking: Judicial Review of Agency Action*, by Jared P. Cole.

In limited cases, agencies have been provided specific statutory authorization to issue interim final rules. For example, see Title 42 U.S.C. §300gg-92, stating, "The Secretary [of Health and Human Services] may promulgate any interim final rules as the Secretary determines are appropriate to carry out this subchapter." Such authority would allow an agency to issue an interim final rule without citing good cause.

[43] By contrast, 5 U.S.C. §704 provides that, generally, courts may review only "final agency action."

[44] GAO, "Congressional Review Act (CRA) FAQs," https://www.gao.gov/legal/other-legal-work/congressional-review-act. ("[Question:] Should agencies submit proposed rules to GAO? [Answer:] No. Agencies should only submit major, non-major, and interim final rules to GAO.")

[45] Susan A. Poling, general counsel, GAO, letter to the Honorable Harry Reid, Mitch McConnell, Barbara Boxer, and Thomas Carper, May 29, 2014 (regarding GAO's Role and Responsibility Under the Congressional Review Act), p. 1. This opinion was written in response to a request from Senator Mitch McConnell, who asked GAO to analyze whether an EPA proposed rule satisfied the definition of *rule* in the CRA. Senator Mitch McConnell, letter to Gene L. Dodaro, comptroller general of the United States, January 16, 2014. Senator McConnell specifically argued that the manner in which the EPA issued the proposed rule gave it "immediate legal effect," which distinguished this proposed rule from other proposed rules, which have no immediate legal effect. In its response opinion, GAO did not specifically address the argument that this proposed rule was different than other proposed rules, instead concluding that "the issuance of a proposed rule is an interim step in the rulemaking process intended to satisfy APA's notice requirement, and, as such, is not a triggering event for CRA purposes." Poling, p. 6.

rules, noting that proposed rules are only "an interim step in the rulemaking process,"[46] and cited legislative history supporting the opinion that the CRA applies only to final rules.[47]Furthermore, GAO stated that its prior decisions had found that an agency action constituted a rule for CRA purposes if "the action imposed requirements that were both certain and final."[48] Since proposed rules "are proposals for future agency action that are subject to change … and do not have a binding effect on the obligations of any party," GAO concluded they should not be considered "a triggering event for CRA purposes."[49] Ultimately, however, GAO also noted that because the CRA's expedited procedure for review of agency rules was enacted pursuant to Congress's constitutional authority to establish its own procedural rules, it is for "Congress to decide whether [the] CRA would apply to a resolution disapproving a proposed rule."[50]

## Does the CRA Apply to Executive Orders?

No, the CRA does not apply to actions of the President such as executive orders and other types of presidential directives. The CRA imports the definition of *agency* from the APA, and courts have interpreted the APA's definition of *agency* not to cover the President.[51] Accordingly, GAO has interpreted the CRA also not to cover actions taken by the President.[52] In some circumstances, however, the CRA may be available to overturn agency actions taken in response to presidential directives.

# What Is a Major Rule Under the CRA?

The CRA defines *major rule* as

> any rule that the Administrator of the Office of Information and Regulatory Affairs [OIRA] of the Office of Management and Budget [OMB] finds has resulted in or is likely to result in—
>
> > (A) an annual effect on the economy of $100,000,000 or more;
> >
> > (B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or
> >
> > (C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

---

[46] Poling, p. 6.

[47] Poling, p. 5.

[48] Poling, p. 8.

[49] Poling, pp. 6, 8.

[50] U.S. Const., art. I, §5, cl. 2; Poling, p. 9.

[51] The CRA applies to "rules" promulgated by a "federal agency" (5 U.S.C. §804(1)) and refers to the definition of "agency" provided in the APA (5 U.S.C. §551(1)). That APA definition broadly defines an agency as "each authority of the Government of the United States" with limited exceptions, and, accordingly, the CRA generally covers rules issued by most executive branch entities. In the context of the APA, however, courts have held that this definition excludes actions of the President; see *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (holding that the President's actions may not be reviewed under the APA and declining to hold that the President is an "agency" within the APA's definition).

[52] Letter from U.S. General Accounting Office (GAO, now Government Accountability Office) to Senator Conrad Burns on whether the American Heritage River Initiative, created by Executive Order 13061, is a "rule" under the CRA, November 10, 1997 (GAO B-278224), p. 3 (concluding that an executive order "need not have been submitted to Congress" because the President is not an "agency" under the CRA).

The term does not include any rule promulgated under the Telecommunications Act of 1996 and the amendments made by that Act.[53]

Rules can meet the economic threshold for classification as a major rule ($100 million effect on the economy) for a variety of reasons, including because they involve compliance costs, result in transfers of funds, prompt consumer spending, establish user fees, or result in cost savings for consumers and taxpayers.[54]

## What Happens When a Rule Is Designated as Major?

When a rule is designated as major, the CRA subjects it to two additional procedural steps. The first is that the comptroller general is required to prepare and submit to the House and Senate committees of jurisdiction a report on each major rule within 15 calendar days of its submission or publication date.[55] This report is to contain "an assessment of the agency's compliance with procedural steps" required for the rule, including any cost-benefit or other analysis under certain executive orders or statutes such as the Regulatory Flexibility Act and the Unfunded Mandates Reform Act.[56]

Second, the CRA contains provisions that may delay the effective dates of major rules.[57] Specifically, if the rule is major, the statute provides that it "shall take effect on the latest of":

- 60 days after the date that the rule is published in the *Federal Register* or received by Congress, whichever is later;
- if Congress passes a joint resolution of disapproval and the President vetoes it, the date on which either house of Congress votes and fails to override the veto or 30 session days after the date Congress received the veto, whichever is earlier; or
- the date the rule would have otherwise taken effect, if not for this provision of the CRA.[58]

The APA requires most rules to have a 30-day delay in their effective dates.[59] The CRA requirement for a 60-day delay essentially extends that APA requirement by an additional 30 days for major rules. This additional delay for major rules allows Congress additional time to consider whether to overturn a major rule—the type of rule that is most economically impactful—before it goes into effect.[60]

---

[53] 5 U.S.C. §804(2).

[54] See CRS Report R41651, *REINS Act: Number and Types of "Major Rules" in Recent Years*, by Maeve P. Carey and Curtis W. Copeland.

[55] 5 U.S.C. §801(a)(2)(A). The major rule reports are posted on GAO's website at https://www.gao.gov/legal/other-legal-work/congressional-review-act.

[56] P.L. 96-354; P.L. 104-4. For more information about cost-benefit requirements in rulemaking, see CRS Report R41974, *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process*, coordinated by Maeve P. Carey.

[57] The CRA has two exceptions to this delay. See "**Error! Reference source not found.**" below.

[58] 5 U.S.C. §801(a)(3). For a more detailed discussion about how the CRA may alter the effective date of major rules, see "**Error! Reference source not found.**" below.

[59] 5 U.S.C. §553(d).

[60] Congress can overturn a rule under the CRA regardless of whether it has gone into effect—the CRA states that a rule "shall not take effect (or continue [in effect]), if the Congress enacts a joint resolution of disapproval" (5 U.S.C. §801(b)).

For certain types of major rules, these effective date requirements may not apply. The CRA states that, notwithstanding the provisions outlined above, the following rules will take effect on the date the promulgating agency chooses:

> (1) any rule that establishes, modifies, opens, closes, or conducts a regulatory program for a commercial, recreational, or subsistence activity related to hunting, fishing, or camping, or

> (2) any rule which an agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.[61]

If the rule is not major, the CRA states that the rule "shall take effect as otherwise provided by law after submission to Congress."[62]

### Who Determines Whether a Rule Is Major?

The administrator of OIRA is responsible for determining whether a rule is major under the CRA.[63] The CRA does not specifically require agencies to submit their rules to OIRA so that such a determination can be made. In April 2019, however, the Trump Administration issued guidance directing agencies, including independent regulatory agencies, to submit their rules to OIRA for this determination.[64] Prior to 2019, executive agencies had already routinely submitted their rules to OIRA for review pursuant to executive order,[65] but OIRA had largely deferred to independent regulatory agencies' own major rule determinations.[66]

## Does the CRA Apply to Non-Major Rules?

Yes. The CRA can be used to overturn any final rule, regardless of whether the rule is major.

---

[61] 5 U.S.C. §808. The "good cause" language in the second category of rules in Section 808 refers to an exception to the notice-and-comment rulemaking requirements of the APA. That exception allows agencies to publish final rules without seeking comments from the public on an earlier proposed rule (5 U.S.C. §553(b)(B)). When agencies invoke this good cause exception, the APA requires that they explicitly say so and provide a rationale for the exception's use when the rule is published in the *Federal Register*. A federal agency's invocation of the APA's good cause exception is subject to judicial review (see CRS Report R44356, *The Good Cause Exception to Notice and Comment Rulemaking: Judicial Review of Agency Action*, by Jared P. Cole).

[62] 5 U.S.C. §801(a)(4).

[63] 5 U.S.C. §804(2).

[64] Vought, "Guidance on Compliance with the Congressional Review Act."

[65] Executive Order 12866, "Regulatory Planning and Review," §3(b). For more on OIRA review, see CRS Report RL32397, *Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs*, coordinated by Maeve P. Carey.

[66] See CRS Insight IN11122, *OMB Issues New CRA Guidance, Potentially Changing Relationship with Independent Agencies*, by Maeve P. Carey for further discussion of this OMB guidance, and "Increased Oversight of Independent Regulatory Agencies" above.

# Agency Submission of Rules

## When Does an Agency Have to Submit a Rule to Congress and GAO?

The CRA does not specify when an agency must submit a rule. However, a rule cannot become effective until after it is submitted.[67] In practice, agencies generally submit rules around the time the rule is finalized and published in the *Federal Register*, if such publication is required.

## How Do I Check If a Rule Has Been Submitted Under the CRA?

### *Submissions to Congress*

When final rules are submitted to Congress pursuant to the CRA, notice of each chamber's receipt and referral appears in the respective House and Senate sections of the daily *Congressional Record* devoted to "Executive Communications." They are also entered into a database that can be searched using the main search page of Congress.gov at https://www.congress.gov.[68]

### *Submissions to GAO*

GAO also maintains a database on its website tracking rules it receives under the CRA. The database can be accessed at https://www.gao.gov/legal/other-legal-work/congressional-review-act. The GAO database also contains links to the reports GAO produces on major rules.

Among other things, the GAO database lists the date the final rule was received by GAO. The date a rule was received by GAO is irrelevant for the calculation of the various CRA time periods for review and action, however. Rather, the dates of receipt by the House and Senate, which often differ from the date received by GAO, are used for calculating these time periods. See "How Do I Introduce a Joint Resolution of Disapproval?" for a discussion of how the date of receipt by Congress is determined for purposes of estimating the time periods governing the CRA disapproval mechanism.

## What Happens If an Agency Does Not Submit a Rule to Congress?

In some instances, an agency has considered an action not to be a rule under the CRA and has not submitted the action to Congress, even though the action arguably met the CRA's broad definition of *rule*. Typically, this has occurred when the agency was not required to follow the APA's notice-and-comment rulemaking procedures to take the action.[69] If an action meets the CRA's definition of *rule*, however, regardless of whether it is subject to notice-and-comment procedures, it should be submitted under the CRA and is subject to disapproval using the CRA's expedited procedures.

---

[67] 5 U.S.C. §801(a)(1)(A).

[68] The search page at Congress.gov offers a number of searches from its home page. See the categories entitled "House Communications" and "Senate Communications" on the left side of the page.

[69] See "What Is a Covered Rule Under the CRA?" above. See also CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

Because the CRA's special procedures are not available until rules are submitted to Congress, if an agency does not submit a rule to Congress, this could potentially frustrate Congress's ability to review rules under the act. Furthermore, because the CRA contains a provision barring judicial review,[70] most courts have declined to review claims challenging an agency's failure to submit a rule, making it unlikely that a court would compel an agency to submit a rule under the CRA even if it met the definition of *rule*.[71]

Consequently, Congress (and more specifically, the Senate) has developed a practice that allows it to employ the CRA's review mechanism even when an agency does not submit a covered rule.[72] Specifically, Members of Congress who thought a particular agency action should have been submitted have asked GAO for a formal opinion on whether the specific action satisfies the CRA definition of *rule*. GAO has issued several opinions of this type since the CRA's enactment in 1996.[73] In some of these opinions, GAO determined that the agency action satisfied the CRA definition of *rule*; in others, GAO determined the agency action did not satisfy the CRA definition of *rule* either because it fell under one of the exceptions or was outside the scope of the statute altogether. Under current Senate practice, a GAO opinion concluding that an agency action is a rule can essentially substitute for the agency's submission of the rule and still allow Congress to use the CRA's fast-track procedures for disapproval.

To avail themselves of the CRA's disapproval mechanism following such an opinion, Senators have sometimes published the GAO opinions in the *Congressional Record*.[74] It appears that, in these cases, the Senate has considered the date of publication of the GAO opinion in the *Congressional Record* to be the beginning of the periods for congressional review.[75] Normally, when agencies submit their rules to Congress under the CRA, a record of each rule's receipt is published in the *Congressional Record*. The publication of the GAO opinion in the *Congressional Record* fulfills this same purpose: notifying Congress that a rule is now available for review under the CRA.

The 115th Congress used this alternative process for the first time to initiate consideration of a resolution of disapproval overturning an agency guidance document that had not been submitted under the CRA.[76] To date, this is the only instance when Congress disapproved a rule that was not

---

[70] 5 U.S.C. §805 ("No determination, finding, action, or omission under this chapter shall be subject to judicial review.") See "Is There Judicial Review Under the CRA?" below.**Error!  Reference source not found.**

[71] See, for example, Wash. Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec., 892 F.3d 332, 346 (D.C. Cir. 2018). See "Is There Judicial Review Under the CRA?**Error!  Reference source not found.**" for further discussion of this provision.

[72] See CRS In Focus IF11096, *The Congressional Review Act: Defining a "Rule" and Overturning a Rule an Agency Did Not Submit to Congress*, by Maeve P. Carey and Valerie C. Brannon.

[73] For a list of these opinions, see **Appendix B**. The opinions are available on GAO's website at https://www.gao.gov/legal/other-legal-work/congressional-review-act. For a summary of each of the opinions and for a more in-depth discussion of the types of agency actions that are covered by the CRA, see CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

[74] It is up to a Senator, not GAO, to submit the opinion for publication in the *Congressional Record*. As explained by one Senator, "Based on Senate precedent, my understanding is that the publication of the GAO legal opinion in today's *Record* will start the 'clock' for congressional review under the provisions of the CRA." Statement of Senator Ron Wyden, *Congressional Record*, daily edition, vol. 165 (July 17, 2019), p. S4901. For additional examples of GAO opinions published in the *Congressional Record*, see *Congressional Record*, daily edition, vol. 163 (October 24, 2017), p.S6760; *Congressional Record*, daily edition, vol. 163 (November 27, 2017), p.S7330; and *Congressional Record*, daily edition, vol. 158 (September 10, 2012), p.S6047.

[75] For a discussion of these periods and their triggers, see "How Do I Introduce a Joint Resolution of Disapproval?" and "What Are the CRA "Fast Track" Procedures?" below.

[76] See S.J.Res. 57, which was signed into law on May 21, 2018, and became P.L. 115-172. P.L. 115-172 overturned the

---

submitted. In all of the other 19 instances in which the CRA has been used to overturn agency actions, the disapproved actions were regulations that were adopted through the APA's rulemaking process, published in the *Federal Register*, and submitted to Congress under the CRA.[77]

# Congressional Procedures Under the CRA

## How Do I Introduce a Joint Resolution of Disapproval?

In most respects, submitting a CRA joint resolution of disapproval is the same as introducing any other House or Senate measure. There is, however, a specific time period during which a qualifying joint resolution can be submitted, and its text must read exactly as laid out in the law.[78]

The receipt of a final rule by Congress begins a period of 60 "days of continuous session" during which any Member of either chamber may submit a joint resolution disapproving the rule under the CRA.[79] Although not required by the statute, it appears that the Senate has established the additional requirement that the rule be published in the *Federal Register* (if such publication is required) before a qualifying joint resolution of disapproval may be submitted. Accordingly, for purposes of the act, a rule is practically considered to have been "received by Congress" on the later date of its receipt in the Office of the Speaker of the House, its referral to Senate committee, or its publication in the *Federal Register.* In calculating "days of continuous session," every calendar day is counted, including weekends and holidays, and the count is paused only for periods where either chamber (or both) is gone for more than three days—that is, pursuant to the adoption of a concurrent resolution of adjournment.[80] In order to qualify for the special parliamentary procedures of the CRA, a joint disapproval resolution must be submitted during this 60-day period—not before and not after.[81]

Under Section 802(a) of the act, the text of a CRA joint disapproval resolution is stipulated. It states the matter after the resolving clause must read:

> "That Congress disapproves the rule submitted by the ____ relating to ____, and such rule shall have no force or effect." (The blank spaces being appropriately filled in).

The first blank would identify the agency promulgating the final rule and the second the name of the rule itself.

---

Bureau of Consumer Financial Protection, Indirect Auto Lending and Compliance with the Equal Credit Opportunity Act, March 21, 2013, https://files.consumerfinance.gov/f/201303_cfpb_march_-Auto-Finance-Bulletin.pdf.

[77] For a complete list of the disapproved rules, see **Appendix A**.

[78] 5 U.S.C. §802(a).

[79] 5 U.S.C. §802(a).

[80] In recent sessions, Congress has not adopted adjournment resolutions during periods of extended absence, opting instead to hold periodic *pro forma* sessions. Under such circumstances, a period of 60 days of continuous session is equal to 60 calendar days.

[81] 5 U.S.C. §802(a). It appears that, in some cases, if the deadline for introduction expires when the Senate is in a period of *pro forma* session, that chamber may permit a qualifying joint resolution to be submitted on the day the Senate returns to regular session. Members and staff are encouraged to consult with the Senate Parliamentarian or his or her assistants to determine the precise deadline for submitting a joint resolution aimed at any specific agency final rule.

## Can a Joint Resolution of Disapproval Contain a Preamble?[82]

While the CRA procedure does not explicitly bar a joint resolution of disapproval from having a preamble (as some other expedited procedure statutes do), it is believed that including one raises a number of questions about House and Senate consideration of the measure and that, as such, the practice should be avoided. In the Senate, the preamble to a joint resolution is voted on after the passage of the resolution itself and is separately amendable. Would the consideration of a preamble fall under the "fast track" Senate procedures banning amendments and limiting debate? Does the inclusion of a preamble eliminate the privileged status of the measure in the view of either chamber? Because of these and other ambiguities, Members are advised to consult with the House and Senate Parliamentarians to obtain their definitive review of the measure's text prior to submission. Members may consider laying out the reasons for and intent of a disapproval resolution in ways other than a preamble by, for example, publishing a statement in the *Congressional Record* upon introduction of the measure or in floor debate.

## How Is a Joint Resolution of Disapproval Different from a Bill?

The CRA requires that the disapproval measure be introduced as a joint resolution. Bills and joint resolutions each have traditional uses, but for purposes of the legislative process, the two types of legislation are generally interchangeable. In order to be enacted, a bill or joint resolution has to pass the House and Senate with identical text in both chambers and be signed by the President, enacted over his veto, or become law without his signature.[83]

## Can a Joint Resolution of Disapproval Be Used to Invalidate Part of a Rule or More Than One Rule?

No. Each CRA joint resolution of disapproval can be used to invalidate only a single final rule in its entirety.[84]

# What Are the CRA "Fast Track" Procedures?

The CRA contains "fast track" procedures (sometimes called "expedited parliamentary procedures") for both committee consideration and floor consideration of a CRA disapproval resolution in the Senate.[85]

The CRA does not contain "fast track" procedures for committee and initial floor consideration of a joint resolution of disapproval in the House. In every case in which the House has considered a CRA disapproval resolution on the floor, it has done so under the terms of a closed special rule reported by the Rules Committee and adopted by the House.[86] When considered under the terms of a special rule, the House minority leader or his designee is guaranteed the opportunity to offer a nondebatable motion to recommit the joint resolution. The CRA also provides expedited

---

[82] A preamble is a series of "whereas" clauses found before the resolving clause describing the reasons for and intent of a measure.

[83] Constitutional amendments are traditionally introduced as joint resolutions, but are not presented to the President following passage by Congress.

[84] See 5 U.S.C. §802(a) (requiring the text of a CRA resolution of disapproval to cite a rule in its entirety).

[85] 5 U.S.C. §802(c), (d).

[86] When a measure is considered under the terms of a closed special rule, no floor amendments are in order.

procedures that govern the consideration by either the House or Senate of a disapproval resolution received from the other chamber.

## What Are the CRA "Fast Track" Procedures for Senate Committee Consideration?

Any time after the expiration of a 20-calendar-day period that begins after a final rule is received by Congress and published in the *Federal Register* (if it is required to be published), a Senate committee can be discharged from the further consideration of a CRA joint resolution disapproving the rule.[87] This discharge occurs upon the filing on the Senate floor of a petition signed by at least 30 Senators.[88] While the act does not specify the text of a CRA discharge petition, those that have been used in the past resemble the language used to file a cloture motion in the Senate:

> We, the undersigned Senators, in accordance with chapter 8 of title 5, United States Code, hereby direct that the Senate Committee on Commerce, Science, and Transportation be discharged of further consideration of S.J. Res. 6, a resolution on providing for congressional disapproval of a rule submitted by the Federal Communications Commission relating to the matter of preserving the open Internet and broadband industry practices, and, further, that the resolution be immediately placed upon the Legislative Calendar under General Orders.[89]

## What Are the CRA "Fast Track" Procedures for Senate Floor Consideration?

Once a CRA joint resolution of disapproval is reported or the committee of jurisdiction discharged, any Senator may make a nondebatable motion to proceed to consider the disapproval resolution on the floor.[90] This motion to proceed requires a simple majority for adoption. If the motion to proceed is successful, the CRA disapproval resolution would then be pending and subject to up to 10 hours of debate.[91] A nondebatable motion to limit debate below 10 hours is in order. No amendments are permitted.[92] Upon the using or yielding back of the allotted time, the Senate would vote on the measure. A CRA disapproval resolution requires a simple majority in order to pass. Because the measure is debate-limited, cloture (and its accompanying requirement for supermajority support) is unnecessary.

The CRA "fast track" procedures governing the each chamber's consideration of a joint resolution of disapproval are considered to be rules of the House and Senate, despite being enacted in law. As such, the chambers may suspend these rules in whole or in part by unanimous consent, suspension of the rules, or special rule.

---

[87] 5 U.S.C. §802(c). It is important to note that the 20-day period after which a discharge petition may be presented in the Senate is calculated from the receipt and publication of the rule, not from the submission of a disapproval resolution aimed at the rule. Accordingly, if a disapproval resolution were to be submitted later than the 20th calendar day after receipt and publication of the final rule, it would be ripe for immediate discharge.

[88] 5 U.S.C. §802(c).

[89] *Congressional Record*, daily edition, vol. 157 (November 3, 2011), p. S7141.

[90] 5 U.S.C. §802(d)(1). The motion to proceed to consider contained in the CRA, like the motion to proceed to consider, contained in the standing rules of the Senate, can be made by any Senator. In practice, however, with rare exception, Senators generally defer to the majority leader or his or her designee to make such scheduling motions or consult closely with him or her on the timing of such actions.

[91] 5 U.S.C. §802(d)(2).

[92] 5 U.S.C. §802(d)(2).

### For How Long Are the "Fast Track" Procedures Available?

In order to be eligible for the "fast track" procedures for Senate consideration, that body has to act on a properly introduced disapproval resolution during a period of 60 days of Senate session that begins when the rule is received by Congress and published in the *Federal Register* (if it is required to be published). After this "action" period has expired, the joint resolution could still be considered, but would have to be called up and debated under normal Senate procedures. There is no deadline specified in the CRA on House consideration. The House can presumably act on a joint resolution of disapproval at any point during the life of the two-year Congress.

## Do Disapproval Resolutions Have to Be Submitted in Both Chambers of Congress?

No. The CRA does not technically require that "companion" disapproval resolutions be submitted in both the House and Senate. Under certain circumstances, however, doing so may be procedurally or politically desirable.

Under the terms of the CRA "fast track" procedure, if one chamber receives a disapproval resolution passed by the other chamber, the receiving chamber may take up and debate its own disapproval resolution but, at the point of disposition, is to take the final vote on the disapproval resolution received from the other house. This automatic "hookup" provision guarantees that both chambers are acting on the same joint resolution, and, as such, it can be sent directly to the President following second-chamber passage. The mechanism also ensures that there will be no need to resolve legislative differences between the chambers even in cases where the House and Senate disapproval resolutions have slightly different texts.[93]

If the House passes a joint resolution of disapproval, for example, and messages it to the Senate, the House measure would automatically be placed on the Calendar of Business. The Senate could then directly consider the House measure under the fast track procedures without first taking up its own disapproval resolution.[94] If the Senate acts first, the received joint resolution would be held at the desk in the House. The House could take up the received Senate measure, should it choose to do so, under its normal parliamentary mechanisms without having a companion resolution submitted in the House.

Having disapproval resolutions submitted in both chambers, however, would preserve the option of having either chamber act first.[95] Submitting companion measures might also be desirable from a political standpoint in that having a designated champion of the repeal in each chamber might be viewed as increasing support for its passage and increasing the visibility of the issue.

---

[93] While, as discussed, the CRA stipulates the text of the joint resolution after the resolving clause, it is possible that each chamber could submit companion resolutions which have filled in the "blanks" in the stipulated text with slightly different language.

[94] 5 U.S.C. §802(f).

[95] It is also possible, at least theoretically, that a joint resolution disapproving an agency final rule could be viewed as a revenue-affecting measure, necessitating that the resolution presented to the President originate in the House.

## What Happens If Congress Adjourns Before the CRA Initiation or Action Periods Conclude?

If, within 60 days of session in the Senate or 60 legislative days in the House after the receipt by Congress of a rule,[96] Congress adjourns its annual session *sine die*, the periods to submit and act on a disapproval resolution "reset" in their entirety in the next session of Congress.[97] This mechanism is sometimes referred to as the CRA "lookback" period.

In the subsequent session of Congress, the renewed periods for CRA review begin on the 15th day of session in the Senate and the 15th legislative day in the House. If the new session is the second session of the same Congress, a disapproval resolution submitted in the first session remains available for expedited action in the Senate during its new action period of 60 days of session.[98] The intent of the lookback mechanism is to prevent an agency from waiting until the closing days of a congressional session to submit a rule to Congress, thus denying the House and Senate adequate time to review the rule; the provision guarantees that Congress will have the full periods contemplated by the act to disapprove a rule regardless or when that rule is submitted.[99]

## Is It Possible to Ascertain When the Periods for Submission, Discharge, and Action on a Resolution to Disapprove a Given Rule Begin and End?

Yes. CRS can provide congressional clients with unofficial estimates of the periods to submit, discharge, and act on a joint resolution of disapproval under the CRA once a given rule has been received by Congress and published in the *Federal Register*. It is important to stress, however, that CRS estimates are always unofficial and nonbinding. The House and Senate Parliamentarians are the sole definitive arbiters of the CRA parliamentary mechanism, including time periods involved, and should be consulted for authoritative guidance on its operation.

# Effect of a Resolution of Disapproval

## What Is the Effect of Enacting a CRA Joint Resolution of Disapproval?

Enactment of a CRA joint resolution disapproving a rule has two primary effects. First, a rule subject to a disapproval resolution will not take effect if it had not taken effect by the time the

---

[96] A legislative day begins when the House reconvenes following an adjournment (of whatever length) and concludes when that chamber next adjourns. A day of Senate session is any calendar day on which the Senate meets, including in brief *pro forma* session,

[97] 5 U.S.C. §801(d)(1).

[98] 5 U.S.C. §801(d)(2)(A).

[99] For a brief discussion of the mechanics of the "lookback" period, see CRS In Focus IF10023, *The Congressional Review Act (CRA)*, by Maeve P. Carey and Christopher M. Davis.

disapproval was enacted.[100] If a rule has taken effect by the time it is disapproved, it is not to continue in effect and "shall be treated as though such rule had never taken effect."[101]

Second, the CRA provides that an agency may not reissue the rule in "substantially the same form" or issue a "new rule that is substantially the same" as the disapproved rule "unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."[102]

## When Is a New Rule "Substantially the Same" as a Disapproved Rule?

The CRA does not define the meaning or scope of *substantially the same*.[103] Looking to the ordinary meaning of the text may not provide much guidance for agencies looking to reissue specific rules.[104] The word *substantially* has been defined as "being largely but not wholly that which is specified,"[105] "to a great extent or degree," or "in essentials."[106] This leaves ambiguity, however, in how to determine whether a new rule is largely the same as a disapproved rule. Sameness could be determined by a number of factors and would likely depend on the rule in question.[107] Under these definitions, it could be measured simply by comparing the language of the two rules or by attempting to determine which portions of the rule were essential and comparing the rules on that basis. For example, if the legislative history of the joint resolution of disapproval suggests that Congress objected to a specific section of a rule that was ultimately disapproved, would a rule that removed only that language be considered "substantially the same" as the original, even if the text is otherwise the same? If the agency reissued a rule in which it changed one standard listed in the original regulation, would that be "substantially the same"? If it changed the number of categories to which a standard applied, would the rule still be

---

[100] 5 U.S.C. §801(b)(1).

[101] 5 U.S.C. §801(f).

[102] 5 U.S.C. §801(b)(2). A CRA disapproval resolution has another related effect in certain circumstances: Where an agency is under a statutory, regulatory, or court-imposed deadline to promulgate a rule, the deadline will be extended for one year from the enactment of the joint resolution of disapproval (5 U.S.C. §803).

[103] Nor is there a particular definition of *substantially the same* in the *U.S. Code* that would apply to this section. The *Code* contains over 270 provisions that include the terms *substantially similar* or *substantially the same*. See, for example, 15 U.S.C. §57a; 26 U.S.C. §§83, 168, 246; 49 U.S.C. §§30141, 30166. At least one other law has prohibited an agency from issuing "substantially similar" regulations, which is also undefined in the text (Federal Trade Commission Improvements Act of 1980, P.L. 96-252, 94 Stat. 391-92).

[104] Courts frequently look to dictionaries to determine a word's ordinary meaning, although dictionary definitions are generally not conclusive. See, for example, Yates v. United States, 574 U.S. 528, 537 (2015) ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.").

[105] Merriam Webster, "substantial," accessed February 11, 2021, at https://www.merriam-webster.com/dictionary/substantially.

[106] Oxford English Dictionary, "substantially, *adv.,*" accessed February 11, 2021, at https://www.oed.com/view/Entry/193055#eid20113890.

[107] Two scholars have argued that "if a reissued rule has a substantially different cost-benefit equation than the vetoed rule, then it cannot be regarded as 'substantially similar.'" Adam M. Finkel and Jason W. Sullivan, "A Cost-Benefit Interpretation of the 'Substantially Similar' Hurdle in the Congressional Review Act: Can OSHA Ever Utter the E-Word (Ergonomics) Again?" *Administrative Law Review*, vol. 63, no. 4 (Fall 2011), p. 710. The authors identified a number of other possible interpretations of *substantially the same*, including standards that ask whether external conditions have changed, whether the agency has addressed the "specific problems Congress identified," or whether the agency has devised "a wholly different regulatory approach." Ibid., pp. 734-37. Others have suggested that the "legislative history surrounding the disapproval of a rule under the CRA" should be given "predominant weight" in an evaluation of whether a rule is "substantially the same." See Sam Batkins and Adam J. White, "Should We Fear 'Zombie' Regulations?" *Regulation*, Summer 2017, pp. 16-21.

"substantially the same"? These questions highlight the ambiguity in the meaning of *substantially the same*.

The CRA seems to contemplate that an agency may reissue a rule related to the rule that was disapproved or within the same policy area, so long as the new rule is not substantially similar to the disapproved rule. In other words, it does not appear that disapproving a rule under the CRA prevents an agency from reissuing a rule—it merely places a condition on the agency's ability to do so. Section 803 of the CRA stipulates that where an agency is under a statutory, regulatory, or court-imposed deadline to promulgate a rule, the deadline will be extended for one year from the enactment of the joint resolution of disapproval. This provision strongly suggests that the text of the CRA itself contemplates that at least some rules would be reissued.

Although the text alone is arguably ambiguous, the legislative history and subsequent agency practice may shed some light on the meaning of *substantially the same*.[108] A statement inserted into the *Congressional Record* by the sponsors of the CRA following its enactment described various factors an agency may take into consideration in deciding whether to reissue a rule, stating that the "substantially the same" prohibition "may have a different impact on the issuing agencies depending on the nature of the underlying law that authorized the rule."[109] Factors the statement identified included the amount of discretion the agency has under the authorizing law to change the substance of the rule and whether the rule was mandatory or discretionary in the first place. The statement also specified, "The committees intend the debate on any resolution of disapproval to focus on the law that authorized the rule and make the congressional intent clear regarding the agency's options or lack thereof after enactment of a joint resolution of disapproval."[110] In other words, the CRA's sponsors appear to have envisioned that the debate over a disapproval resolution would provide some guidance to the agency on next steps, helping inform the agency's decision about whether and how to reissue the rule—among other factors, such as the nature of the authorizing statute. In light of this legislative history, agencies considering reissuing rules may look to the reasons Congress gave, if any, for striking down the rule in the first place.

As of November 2021, two rules that had previously been struck down under the CRA have been reissued. Both overturned rules had originally been issued in 2016, in the final months of the Barack Obama Administration, and were among the 16 rules Congress overturned in the 115th Congress (2017-2018).[111] The first rule was reissued by the Department of Labor (DOL) in October 2019, and the second was reissued by the Securities and Exchange Commission (SEC) in

---

[108] For example, in *Pierce v. Underwood*, the Supreme Court looked to a committee report to help define the statutory phrase *substantially justified*, noting "the broad range of interpretations" possible in ordinary usage and given by dictionaries. 487 U.S. 552, 563-66 (1988). Post-enactment agency practice can also inform statutory interpretation inquiries. See, for example, FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 144-46 (2000).

[109] Rep. Henry Hyde, *Congressional Record*, daily edition, vol. 142, (April 19, 1996), p. E577. In the *Congressional Record* statement, the sponsors observed that "no formal legislative history was prepared to explain" the CRA and that this statement was "intended to cure this deficiency." Ibid., pp. E574-575. Courts generally disfavor the use of post-enactment legislative history under the assumption that, by definition, it "could have had no effect on the congressional vote." Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011) (quoting District of Columbia v. Heller, 554 U.S. 570, 605 (2008)) (internal quotation marks omitted). However, this does not preclude Congress or executive agencies from looking to such legislative history if they believe it is persuasive.

[110] Rep. Henry Hyde, *Congressional Record*, daily edition, vol. 142, (April 19, 1996), p. E577.

[111] The overturned rules were Securities and Exchange Commission, "Disclosure of Payments by Resource Extraction Issuers," 81 *Federal Register* 49359, July 27, 2016; and U.S. Department of Labor, "Federal-State Unemployment Compensation Program; Middle Class Tax Relief and Job Creation Act of 2012 Provision on Establishing Appropriate Occupations for Drug Testing of Unemployment Compensation Applicants," 81 *Federal Register* 50298, August 1, 2016.

January 2021.[112] Both agencies were under a statutory mandate to regulate on the topic of the disapproved rule and had to determine how to draft a rule that fulfilled these separate regulatory requirements but was not substantially similar to the disapproved rule.

In both of the reissued rules, the agencies provided an explanation of how, in their view, the reissued version of the rule was different enough from the original version that it did not violate this provision of the CRA. For example, DOL stated that in its view, the final rule was not "substantially the same" as the disapproved rule because the new rule had a "substantially different scope and fundamentally different approach" and cited some floor statements from the debate over the joint resolution of disapproval.[113] In its reissued rule, the SEC also cited some of the statements of Members during the debate over the 2017 disapproval resolution and further explained that in its view, "the agency should exercise its reasoned judgment in shaping new rules, evaluating a reasonable range of potential responses, including by considering the statutory provision that compels the rulemaking, the administrative record, and the CRA's requirements, among other things."[114] Both agencies sought to determine the "central" issue at the heart of the disapproved rule and concluded that they had to change that aspect of the rule rather than change solely their original justifications or more ancillary provisions.[115]

## How Is the "Substantially the Same" Prohibition Enforced?

The CRA is also silent on the question of who would make the determination as to whether a new rule is "substantially the same" as a disapproved rule. Congress and agencies themselves might be ultimately responsible for making that determination rather than a court. As discussed more in the following section, the CRA contains a prohibition on judicial review, stating that "no determination, finding, action, or omission under this chapter shall be subject to judicial review."[116] Courts have generally—but not universally—interpreted this provision to mean that they may not consider any claims alleging that an agency has failed to comply with the CRA.[117] As yet, no court has ruled on the precise question of whether an agency's compliance with the "substantially the same" prohibition could be subject to judicial review.[118] If a court believed that

---

[112] See CRS Insight IN10996, *Reissued Labor Department Rule Tests Congressional Review Act Ban on Promulgating "Substantially the Same" Rules*, by Maeve P. Carey. The two reissued rules were DOL, "Federal-State Unemployment Compensation Program; Establishing Appropriate Occupations for Drug Testing of Unemployment Compensation Applicants Under the Middle Class Tax Relief and Job Creation Act of 2012," 84 Federal Register 53037, October 4, 2019; and SEC, "Disclosure of Payments by Resource Extraction Issuers," 86 Federal Register 4662, January 15, 2021.

[113] DOL, "Federal-State Unemployment Compensation Program," p. 53038.

[114] SEC, "Disclosure of Payments by Resource Extraction Issuers," p. 4664.

[115] DOL, "Federal-State Unemployment Compensation Program," p. 53038; SEC, "Disclosure of Payments by Resource Extraction Issuers," p. 4665.

[116] 5 U.S.C. §805. See "Is There Judicial Review Under the CRA?" below.

[117] See, for example, Tugaw Ranches, LLC v. U.S. Dep't of Interior, 362 F. Supp. 3d 879, 884, (D. Idaho 2019) (noting that "numerous" courts have "found that under a plain reading interpretation § 805 precludes judicial review," but holding that "§ 805 does not clearly prohibit judicial review of agency action under the CRA").

[118] Some scholars have argued that the question of whether a rule is "substantially the same" is different from other types of questions arising under the CRA because a court would be analyzing the validity of the subsequent rule rather than Congress's actions reviewing the prior rule. Finkel and Sullivan, "A Cost-Benefit Interpretation," p. 732, footnote 122. See also, for example, Michael J. Cole, "Interpreting the Congressional Review Act: Why the Courts Should Assert Judicial Review, Narrowly Construe 'Substantially the Same,' and Decline to Defer to Agencies Under Chevron," *Administrative Law Review*, vol. 70, no. 1 (Winter 2018), pp. 53-108. The post-enactment legislative history may suggest that Congress did not believe that this provision would prohibit courts "from determining whether a rule is in effect." Rep. Henry Hyde, *Congressional Record*, daily edition, vol. 142 (April 19, 1996), p. E577. Some courts have read this statement to support the conclusion that subsequent agency action would be judicially reviewable. See, for example, Tugaw Ranches, LLC v. U.S. Dep't of Interior, 362 F. Supp. 3d 879, 883 (D. Idaho 2019).

the CRA barred judicial review of the question of whether a rule is "substantially the same," it would likely not reach a decision on the issue of whether to invalidate a reissued rule on the basis that it violates this "substantially the same" prohibition.

If courts continue to bar all judicial challenges under the CRA, Congress itself would arguably be the arbiter of whether a reissued rule clears the "substantially the same" standard. As occurred in the DOL and SEC reissued rules, if an agency decides to reissue a rule, the agency would likely explain the changes it made in light of this CRA provision, providing a justification for why in its view the rule is sufficiently different from the version that was overturned. Such an explanation is not required under the CRA, but it may be in the agency's interest to provide one. The agency does not face any other additional requirements under the CRA for a reissued rule—the new rule would be subject to the regular procedural requirements of the federal rulemaking process, including submission to Congress under the CRA—but in reissuing a rule, the fact that the original rule was disapproved under the CRA does not trigger any additional requirements. When the reissued rule is received in Congress, Congress could then disapprove the rule on the basis of it being too similar to the disapproved version (or for other reasons). Thus, the most likely enforcement mechanism for the "substantially the same" question is Congress's ability to use the CRA again on the reissued rule. As a practical matter, one might argue that this leaves an agency in a fairly strong position to reissue a disapproved rule, given that the CRA is at its most effective during the relatively narrow window following a presidential transition.

## What Is the Effect of a CRA Joint Resolution Disapproving an Amendment to a Previously Issued Rule?

Agencies often promulgate rules that substantively amend or make technical corrections to previously issued rules. An amendment to a rule is considered to be a "rule" under the APA and the CRA.[119] If a CRA joint resolution of disapproval were enacted regarding such an amendment, it would prevent the amendment from going into effect or continuing in effect. However, the joint resolution of disapproval would have no effect on the previously existing rule that was being amended.

## What Is the Effect of a CRA Joint Resolution Disapproving a Rule that Repeals a Previous Rule?

Generally, the effect of using the CRA to overturn a rule that repealed a prior rule would be essentially to undo the repeal—in other words, overturning the rule under the CRA may have the effect of reinstating the prior rule.[120] However, the specifics may depend on the particular phrasing of the relevant rules and any intervening developments.

---

[119] The APA defines *rulemaking* as the "agency process for formulating, amending, or repealing a rule" (5 U.S.C. §551(5)).

[120] This question was raised, for example, following the 2017 disapproval of the Federal Communications Commission's ISP Privacy Order (Federal Communications Commission, "Protecting the Privacy of Customers of Broadband and Other Telecommunications Services," 81 *Federal Register* 87274, December 2, 2016). As stated by one district court, "An expression of congressional disapproval under the CRA simply makes it 'as though such rule had never taken effect,' 5 U.S.C. § 801, returning to the status quo ante. Here, the Joint Resolution 'disapproved' of the FCC's ISP Privacy Order, bringing back into force rules the ISP Privacy Order had itself repealed." (ACA Connects—America's Communs. Ass'n v. Frey, 471 F. Supp. 3d 318, 324 (D. Me. 2020)).

## What Happens If a Rule That Is Already Effective Is Overturned?

If a rule had already taken effect before it was disapproved, the CRA provides that the rule shall not continue in effect[121] and "shall be treated as though such rule had never taken effect."[122] This provision appears to have the effect of retroactively negating actions that were taken under the rule while it was in effect.

# Is There Judicial Review Under the CRA?[123]

Section 805 of the CRA states: "No determination, finding, action, or omission under this chapter shall be subject to judicial review."[124] Accordingly, courts will not weigh in on matters falling within the scope of Section 805, but will instead leave the resolution of these CRA-related issues to the political branches. However, there has been some judicial disagreement regarding which CRA-related matters are within Section 805's scope. On its face, this provision appears to bar judicial review of a broad swathe of claims. While most reviewing courts have interpreted Section 805 to broadly prohibit judicial review of claims alleging CRA violations, a few courts have taken the view that certain types of CRA-related claims are not barred, as discussed in more detail below. In particular, some courts have concluded that Section 805 allows review of agencies' compliance with the CRA.[125]

First, one appellate court drew a distinction between statutory and constitutional claims, concluding that Section 805 barred it from reviewing a claim premised on compliance with the CRA, but did not prevent it from considering a constitutional challenge to a joint resolution of disapproval enacted under the CRA.[126] As a general rule, statutes that would deny courts the ability to review constitutional claims raise constitutional concerns, and accordingly, courts will interpret laws barring judicial review to allow constitutional challenges "unless Congress explicitly directs otherwise."[127] Citing this general interpretive principle, the appellate court noted that Section 805 does not expressly foreclose review of constitutional claims.[128] Accordingly, the court ruled that Section 805 did not bar its review of the plaintiff's constitutional challenge— although the court ultimately rejected the claim on its merits.[129]

---

[121] 5 U.S.C. §801(b)(1).

[122] 5 U.S.C. §801(f).

[123] This section was authored by Valerie C. Brannon, Legislative Attorney.

[124] 5 U.S.C. §805. "This chapter" refers to the CRA. See 5 U.S.C. §§801 *et seq.*

[125] Tugaw Ranches, LLC v. U.S. Dep't of Interior, 362 F. Supp. 3d 879, 889 (D. Idaho 2019); United States v. S. Ind. Gas & Elec. Co., No. IP99-1692-C-M/S, 2002 U.S. Dist. LEXIS 20936, at *18 (S.D. Ind. Oct. 24, 2002).

[126] Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 561 (9th Cir. 2019). Cf. *id.* at 563 ("[W]e join our sister circuits which have … held that federal courts do not have jurisdiction over statutory claims that arise under the CRA.").

[127] Elgin v. Dep't of the Treasury, 567 U.S. 1, 9 (2012).

[128] *Ctr. for Biological Diversity*, 946 F.3d at 561.

[129] *Id.* at 561–62. Specifically, the plaintiffs argued that the joint resolution of disapproval failed to comply with the constitutional requirements of bicameralism and presentment, and that the allegedly improperly enacted joint resolution interfered with the executive branch's constitutional duty under the Take Care Clause to ensure that laws are faithfully executed. *Id.* at 561. The court rejected both of these arguments, noting first that the joint resolution had been passed by both houses of Congress and signed by the President. *Id.* at 562. Second, the court held that this validly enacted resolution changed substantive law, amending the agency's authority so that the executive branch subsequently had the duty to execute the joint disapproval resolution. *Id.*

But most lawsuits involving the CRA are premised on noncompliance with the statute, rather than constitutional issues. Most courts that have considered the issue, including multiple federal appellate courts, have held that the CRA prohibits courts from reviewing congressional and agency actions for compliance with the CRA.[130] For example, courts have dismissed lawsuits alleging that rules are invalid because agencies failed to submit them as required under the CRA.[131] These courts have primarily relied on the plain text of Section 805, noting the broad sweep of the language and lack of any qualifications.[132] For example, the U.S. Court of Appeals for the D.C. Circuit in 2009 described the language of Section 805 as "unequivocal," holding that it "denies courts the power to void rules on the basis of agency noncompliance with the Act."[133]

But a few federal trial courts have held that, while Section 805 may bar adjudication of *congressional* actions taken pursuant to the CRA, it does not bar courts from reviewing *agency* actions.[134] First, a federal trial court in Indiana ruled in 2002 that "Congress only intended to preclude judicial review of Congress' own determinations, findings, actions, or omissions made under the CRA after a rule has been submitted to it for review."[135] The court noted that a prior district court had ruled otherwise, emphasizing that Section 805 "provides for no judicial review of any 'determination, finding, action, or omission *under this chapter*,' not '*by Congress under this chapter.*'"[136] The Indiana court disagreed, ruling that prohibiting judicial review of agency action "would be at odds with the purpose of the CRA, which was to provide a check on

---

[130] See, for example, Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 229 (D.C. Cir. 2009); Via Christi Reg'l Med. Ctr. v. Leavitt, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007). Cf. *Ctr. for Biological Diversity*, 946 F.3d at 563 (dismissing a challenge to an agency rescission based on a joint resolution of disapproval—a congressional action—but stating more broadly that "federal courts do not have jurisdiction over statutory claims that arise under the CRA").

[131] See, for example, *Montanans for Multiple Use*, 568 F.3d at 229; Forsyth Mem'l Hosp., Inc. v. Sebelius, 667 F. Supp. 2d 143, 150 (D.D.C. 2009). See also, for example, Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec., 892 F.3d 332, 346 (D.C. Cir. 2018) (dismissing claim alleging that agency improperly published a rule prior to the passage of the CRA's "mandatory 60-day delay" for major rules).

[132] See, for example, Kan. Nat. Res. Coal. v. U.S. Dep't of Interior, 971 F.3d 1222, 1235 (10th Cir. 2020); United States v. Carlson, Crim. No. 12-305, 2013 U.S. Dist. LEXIS 130893, at *43 (D. Minn. July 25, 2013); United States v. Am. Elec. Power Serv. Corp., 218 F. Supp. 2d 931, 949 (S.D. Ohio 2002); Tex. Sav. & Cmty. Bankers Assoc. v. Fed. Hous. Fin. Bd., No. A 97 CA 421 SS, 1998 U.S. Dist. LEXIS 13470, *27 (W.D. Tex. 1998).

[133] *Montanans for Multiple Use*, 568 F.3d at 229. See also, for example, *Kan. Nat. Res. Coal.*, 971 F.3d at 1235−36 ("The CRA contemplates determinations, findings, actions, and omissions by agencies, the Comptroller General, the President, and Congress…. There is nothing in the text of the CRA to suggest that § 805 applies only to a subset of these determinations, findings, actions, and omissions, depending on the actor who performs them.")

[134] Tugaw Ranches, LLC v. U.S. Dep't of Interior, 362 F. Supp. 3d 879, 889 (D. Idaho 2019); United States v. S. Ind. Gas & Elec. Co., No. IP99-1692-C-M/S, 2002 U.S. Dist. LEXIS 20936, at *18 (S.D. Ind. Oct. 24, 2002). Cf. Ctr. for Biological Diversity v. Zinke, 313 F. Supp. 3d 976, 991 and n.89 (D. Alaska 2018) (holding that Section 805 did not bar review of a private organization's claim that agency acted *ultra vires*, or in excess of the authority granted by the CRA, but ultimately dismissing the claim on its merits), *aff'd* Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 563 (9th Cir. 2019) (holding that Section 805 barred review of this statutory claim because it "challenge[d] Congress's enactment of … a joint resolution of disapproval," which the court said was "an action under the CRA"). In two other cases, federal appellate courts enforced the CRA's 60-day delay for major rules without considering the effect of Title 5, Section 805, of the *U.S. Code*. NRDC v. Abraham, 355 F.3d 179, 201−02 (2d Cir. 2004); Liesegang v. Sec'y of Veterans Affairs, 312 F.3d 1368, 1376 (Fed. Cir. 2002). In addition, one trial court concluded that a criminal defendant could challenge an agency's failure to submit an alleged "rule" to Congress because a separate statute—Title 21, Section 811(h) of the *U.S. Code*—allowed for judicial review. United States v. Reece, 956 F. Supp. 2d 736, 743−44 (W.D. La. 2013).

[135] *S. Ind. Gas & Elec. Co.*, 2002 U.S. Dist. LEXIS 20936, at *13.

[136] *Id.* at *12 (emphasis added) (quoting Tex. Sav. & Cmty. Bankers Assoc. v. Fed. Hous. Fin. Bd., No. A 97 CA 421 SS, 1998 U.S. Dist. LEXIS 13470, *27 n.15 (W.D. Tex. 1998), *aff'd*, 201 F.3d 551 (5th Cir. 2000)).

administrative agencies' power."[137] The court also concluded that the text of the statute supported its opinion, noting that Section 805 bars review of a "determination, finding, action, or omission."[138] In the court's view, "agencies do not make findings and determinations under this chapter; Congress, on the other hand," does.[139] Consequently, the court reviewed the plaintiff's claim that the EPA had violated the CRA by failing to submit a rule—but ultimately rejected the suit on its merits, holding that the EPA was not required to report the action.[140]

In 2019, an Idaho district court agreed with the Indiana court's conclusion while noting that most other courts had since rejected that view.[141] The Idaho court pointed to a post-enactment statement from the CRA's sponsors entered into the *Congressional Record*.[142] The sponsors' statement said that major rule determinations made by OIRA and OMB would not be reviewable and that courts could not review Congress's compliance with the congressional review procedures.[143] However, the sponsors also believed that Section 805 "does not bar a court from giving effect to a resolution of disapproval that was enacted into law" and, accordingly, stated that this provision "in no way prohibits a court from determining whether a rule is in effect."[144] In the court's view, this legislative history demonstrated that Congress "understood that actions taken by certain actors would not be reviewable, but that this non-reviewability did not extend to all CRA actors and that specifically agency action would be reviewable."[145] In addition, the Idaho court emphasized "general policy concerns," concluding that "[r]eading judicial review out of the CRA" and barring judicial enforcement "foils its primary purpose"—to enhance agency accountability.[146] Consequently, the court held that it had jurisdiction to hear the plaintiff's suit, which alleged that executive branch agencies had violated the CRA by failing to submit alleged rules for review.[147]

The scope of the CRA's bar on judicial review likely will be subject to further litigation, and the current majority view interpreting this prohibition broadly could shift. And as mentioned above,[148] there is very little case law interpreting, and thus uncertainty regarding, Section 805's

---

[137] *Id.* at *14.

[138] *Id.* (quoting 5 U.S.C. §805) (internal quotation marks omitted).

[139] *Id.*

[140] *Id.* at *29–30.

[141] Tugaw Ranches, LLC v. U.S. Dep't of Interior, 362 F. Supp. 3d 879, 884–86 (D. Idaho 2019). However, the court questioned whether this majority view was as predominant as it seemed, noting that (at the time) only two U.S. Circuit Courts of Appeals had weighed in on the question and saying that "some of the [courts'] references to §805 were simply in footnotes without any analysis or explanation." *Id.* at 885–86. Subsequently, the U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit), the appellate circuit with jurisdiction over Idaho, also held "that federal courts do not have jurisdiction over statutory claims that arise under the CRA," Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 563 (9th Cir. 2019). The broad language of that decision may suggest the Ninth Circuit believed the CRA barred challenges to agency actions and thus could implicitly contradict the Idaho court's decision in *Tugaw Ranches, LLC*, although the specific ruling in the Ninth Circuit case involved a congressional action under the CRA.

[142] *Tugaw Ranches, LLC*, 362 F. Supp. 3d at 887.

[143] *Id.* (quoting Senators Don Nickles, Harry Reid, and Ted Stevens, *Congressional Record*, daily edition, vol. 142, [April 18, 1996], p. S3686) (internal quotation marks omitted).

[144] *Id.* (quoting Senators Don Nickles, Harry Reid, and Ted Stevens, *Congressional Record*, daily edition, vol. 142, [April 18, 1996], p. S3686) (internal quotation marks omitted).

[145] *Id.* at 888.

[146] *Id.* at 888–89.

[147] *Id.* at 889.

[148] See "When Is a New Rule "Substantially the Same" as a Disapproved Rule?" above.

applicability to agency actions subsequent to a disapproval resolution.[149] In the absence of case law on the subject, some scholars have argued that Section 805 should not bar courts from reviewing whether a reissued agency rule is substantially similar to a disapproved rule.[150]

# What Other Tools Are Available to Congress for Conducting Oversight of Federal Regulations?

Although the CRA offers a number of advantages, most of which are procedural, Congress also has many other tools available to overturn and conduct oversight of federal agency rulemaking.[151] These tools include Congress's general legislative power; appropriations language; oversight hearings on proposed or finalized rules; meetings with agency officials or OMB during the rulemaking process; and public communications with agency officials, such as a letter. Each of these is briefly discussed below.

Congress can use its legislative power to oversee the issuance and implementation of rules or to require that an agency repeal a rule. Every rule issued by a federal agency must be based upon a grant of authority given to that agency by Congress in statute,[152] and it is Congress's prerogative to ensure that agencies issue rules in a manner consistent with congressional intent. Congress can make a change to the underlying statute authorizing a rule or enact legislation that simply overrides the rule. Such a change could remove or change the agency's authority to issue the rule, or it could prescribe more specifically in law what the rule should contain. The advantage of using the CRA is that the fast-track procedures it provides for, particularly in the Senate, can make it easier to pass a joint resolution of disapproval than to pass a regular bill. However, as discussed, Members must submit and act on a CRA resolution of disapproval within a particular time period following issuance of a rule, whereas Congress can use its general legislative power to act on a rule at any time.

Another use of Congress's legislative power over regulations involves its power of the purse: Congress has frequently used appropriations legislation to restrict an agency's use of funds to promulgate or implement particular regulations.[153] However, unlike CRA joint resolutions of

---

[149] *Center for Biological Diversity v. Bernhardt* involved a challenge to a joint resolution of disapproval passed under the CRA, but did not involve a subsequent agency rule or the substantially similar provision of the CRA. See 946 F.3d at 556. However, those judges that have concluded that Section 805 should be construed narrowly and should not bar review of agency action have noted, as part of this analysis, that Section 805 should not be construed to bar review of claims challenging subsequent agency rules as substantially similar. See Tugaw Ranches, LLC v. U.S. Dep't of Interior, 362 F. Supp. 3d 879, 883 (D. Idaho 2019); see also Kan. Nat. Res. Coal. v. U.S. Dep't of Interior, 971 F.3d 1222, 1250–51 (10th Cir. 2020) (Lucero, J., dissenting).

[150] See, for example, Cole, "Interpreting the Congressional Review Act," p. 68 (arguing that Section 805 bars review only of congressional actions, not "findings or determinations made *by an agency* that a reissued rule is not substantially the same as the prior version of the rule"); Finkel and Sullivan, "A Cost-Benefit Interpretation," p. 732 fn. 122 (arguing that Congress intended to bar review of congressional procedures, but not whether rules are in effect).

[151] For a more detailed discussion of oversight tools that are available to Congress, see CRS Report RL30240, *Congressional Oversight Manual*. See also CRS Report R45442, *Congress's Authority to Influence and Control Executive Branch Agencies*, by Todd Garvey and Daniel J. Sheffner.

[152] See, for example, Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").

[153] For example, Congress used appropriations legislation to delay the issuance of the ergonomics rule that was later overturned using the CRA. Such provisions were put into place after the Occupational Safety and Health Administration issued the proposed rule in 1995 and expired on September 30, 1998. See, for example, P.L. 104-134, which contained the following provision: "None of the funds made available in this Act may be used by the

---

disapproval, provisions of this type do not nullify an existing regulation, nor do they remove the agency's underlying statutory authority to issue a regulation. Therefore, any final rule that has taken effect will continue to be binding law—even if an appropriations restriction prohibits the agency from using funds to enforce the rule. In addition, restrictions on the use of funds in appropriations acts, unless otherwise specified, are binding only for the period of time covered by the measure (i.e., a fiscal year or a portion of a fiscal year). In these instances, any restriction that is not repeated in the next relevant appropriations act or enacted as part of another measure no longer binds the relevant agency or agencies.[154]

Members of Congress also may choose to use other, non-legislative tools to exert political pressure on agencies, such as by holding a hearing on a proposed rule or a rule that has been finalized. Congressional committees can hold oversight hearings focusing on the development or implementation of a particular rule or set of rules that fall under their jurisdiction. Oversight hearings can give Members a chance to directly ask agency officials questions about rules, extract commitments from agency officials, and communicate their views.

Members of Congress can also request a meeting with the rulemaking agency while a rule is under development to communicate his or her views to the agency, or they can make their views publicly known by writing a letter to an agency head or other agency officials about a rule. In addition, a Member can request to meet with OIRA, the entity within OMB that reviews most agency regulations prior to their publication. Such meetings are sometimes referred to as "12866 meetings," a reference to Executive Order 12866, which governs OIRA review of agency rulemaking.[155] During the OIRA review process, OIRA can play a significant role in the content of a proposed or final rule.[156] Therefore, Members may want to make their views known to OIRA while the rule is under review.[157]

---

Occupational Safety and Health Administration to promulgate or issue any proposed or final standard regarding ergonomic protection before September 30, 1998." See also Julie A. Parks, "Comment: Lessons in Politics: Initial Use of the Congressional Review Act," *Administrative Law Review*, vol. 55 (2003), pp. 192-94.

[154] Rules in each chamber restrict the use of provisions in appropriations bills that include language causing them to be effective for more than one fiscal year or permanently (e.g., the use of the term *hereafter* or other words of futurity). For additional information on the use of appropriations language to control agency actions, see CRS Report R41634, *Limitations in Appropriations Measures: An Overview of Procedural Issues*, by James V. Saturno.

[155] Executive Order 12866, "Regulatory Planning and Review."

[156] For more information about the role of OIRA review in the rulemaking process, see CRS Report RL32397, *Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs*, coordinated by Maeve P. Carey.

[157] Members and staff (and the public) can submit a request for a 12866 meeting on OIRA's website at https://www.reginfo.gov/public/do/eom12866Search.

# Appendix A. Rules Overturned Using the Congressional Review Act

Through November 12, 2021

| Department and/or Agency Issuing Rule | Cong. | Title of Rule | Date Rule Was Published<br><br>*Federal Register* Citation | Public Law Number<br><br>Date Enacted |
|---|---|---|---|---|
| Department of Labor, Occupational Safety and Health Administration | 107th (2001-2002) | Ergonomics Program | November 14, 2000<br>65 F.R. 68261 | P.L. 107-5<br><br>March 20, 2001 |
| Securities and Exchange Commission | 115th (2017-2018) | Disclosure of Payments by Resource Extraction Issuers | July 27, 2016<br>81 F.R. 49359 | P.L. 115-4<br>February 14, 2017 |
| Department of the Interior, Office of Surface Mining Reclamation and Enforcement | 115th (2017-2018) | Stream Protection Rule | December 20, 2016<br>81 F.R. 93066 | P.L. 115-5<br>February 16, 2017 |
| Social Security Administration | 115th (2017-2018) | Implementation of the NICS Improvement Amendments Act of 2007 | December 19, 2016<br>81 F.R. 91702 | P.L. 115-8<br>February 28, 2017 |
| Department of Defense; General Services Administration; and National Aeronautics and Space Administration | 115th (2017-2018) | Federal Acquisition Regulation; Fair Pay and Safe Workplaces | August 25, 2016<br>81 F.R. 58562 | P.L. 115-11<br>March 27, 2017 |
| Department of the Interior, Bureau of Land Management | 115th (2017-2018) | Resource Management Planning | December 12, 2016<br>81 F.R. 89580 | P.L. 115-12<br>March 27, 2017 |
| Department of Education, Office of Elementary and Secondary Education | 115th (2017-2018) | Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act-Accountability and State Plans | November 29, 2016<br>81 F.R. 86076 | P.L. 115-13<br>March 27, 2017 |
| Department of Education, Office of Postsecondary Education | 115th (2017-2018) | Teacher Preparation Issues | October 31, 2016<br>81 F.R. 75494 | P.L. 115-14<br>March 27, 2017 |
| Department of Labor, Employment and Training Administration | 115th (2017-2018) | Federal-State Unemployment Compensation Program; Middle Class Tax Relief and Job Creation Act of 2012 Provision on Establishing Appropriate Occupations for Drug Testing of Unemployment Compensation Applicants | August 1, 2016<br>81 F.R. 50298 | P.L. 115-17<br>March 31, 2017 |

| Department and/or Agency Issuing Rule | Cong. | Title of Rule | Date Rule Was Published Federal Register Citation | Public Law Number Date Enacted |
|---|---|---|---|---|
| Department of the Interior, Fish and Wildlife Service | 115th (2017-2018) | Non-Subsistence Take of Wildlife, and Public Participation and Closure Procedures, on National Wildlife Refuges in Alaska | August 5, 2016 81 F.R. 52247 | P.L. 115-20 April 3, 2017 |
| Department of Labor, Occupational Safety and Health Administration | 115th (2017-2018) | Clarification of Employer's Continuing Obligation to Make and Maintain an Accurate Record of Each Recordable Injury and Illness | December 19, 2016 81 F.R. 91792 | P.L. 115-21 April 3, 2017 |
| Federal Communications Commission | 115th (2017-2018) | Protecting the Privacy of Customers of Broadband and Other Telecommunications Services | December 2, 2016 81 F.R. 87274 | P.L. 115-22 April 3, 2017 |
| Department of Health and Human Services, Office of Population Affairs, Office of the Secretary | 115th (2017-2018) | Compliance with Title X Requirements by Project Recipients in Selecting Subrecipients | December 19, 2016 81 F.R. 91852 | P.L. 115-23 April 13, 2017 |
| Department of Labor, Employee Benefits Security Administration | 115th (2017-2018) | Savings Arrangements Established by Qualified State Political Subdivisions for Non-Governmental Employees | December 20, 2016 81 F.R. 92639 | P.L. 115-24 April 13, 2017 |
| Department of Labor, Employee Benefits Security Administration | 115th (2017-2018) | Savings Arrangements Established by States for Non-Governmental Employees | August 30, 2016 81 F.R. 59464 | P.L. 115-35 May 17, 2017 |
| Bureau of Consumer Financial Protection | 115th (2017-2018) | Arbitration Agreements | July 19, 2017 82 F.R. 33210 | P.L. 115-74 November 1, 2017 |
| Bureau of Consumer Financial Protection | 115th (2017-2018) | Indirect Auto Lending and Compliance with the Equal Credit Opportunity Act (CFPB Bulletin 2013-02) | March 21, 2013 N/A | P.L. 115-172 May 21, 2018 |
| Equal Employment Opportunity Commission | 117th (2021-2022) | Update of Commission's Conciliation Procedures | January 14, 2021 86 F.R. 2974 | P.L. 117-22 June 30, 2021 |
| Environmental Protection Agency | 117th (2021-2022) | Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review | September 14, 2020 85 F.R. 57018 | P.L. 117-23 June 30, 2021 |
| Department of the Treasury, Office of the Comptroller of the Currency | 117th (2021-2022) | National Banks and Federal Savings Associations as Lenders | October 30, 2020 85 F.R. 68742 | P.L. 117-24 June 30, 2021 |

**Source:** Congressional Research Service, using information from the *Federal Register* and http://www.congress.gov.

# Appendix B. Government Accountability Office (GAO) Opinions on Whether Certain Agency Actions Are "Rules" Under the CRA

Table Lists GAO Opinions on Actions not Submitted to Congress, 1996—November 12, 2021

| Agency Action | GAO Citation | Date | Requested By | GAO Determination |
|---|---|---|---|---|
| Department of Agriculture memorandum concerning the Emergency Salvage Timber Sale Program | B-274505 | September 16, 1996 | Senator Larry Craig | Agency action is a rule under the CRA. |
| U.S. Forest Service Tongass National Forest Land and Resource Management Plan | B-275178 | July 3, 1997 | Senator Ted Stevens<br><br>Senator Frank Murkowski<br><br>Representative Don Young | Agency action is a rule under the CRA. |
| American Heritage River Initiative, created by Executive Order 13061 | B-278224 | November 10, 1997 | Senator Conrad Burns | Action is not a rule under the CRA because the President is not an agency under the CRA. |
| Environmental Protection Agency "Interim Guidance for Investigating Title VI Administrative Complaints Challenging Permits" | B-281575 | January 20, 1999 | Representative David McIntosh | Agency action is a rule under the CRA. |
| Farm Credit Administration national charter initiative | B-286338 | October 17, 2000 | Representative James Leach | Agency action is a rule under the CRA. |
| Department of the Interior Record of Decision "Trinity River Mainstem Fishery Restoration" | B-287557 | May 14, 2001 | Representative Doug Ose | Agency action is a rule under the CRA. |
| Department of Veterans Affairs (VA) memorandum regarding the VA's marketing activities to enroll new veterans in the VA health care system | B-291906 | February 28, 2003 | Representative Ted Strickland | Agency action is not a rule under the CRA because it falls under the exception in 5 U.S.C. §804(3)(C). |
| Department of Veterans Affairs memorandum terminating Vendee Loan Program | B-292045 | May 19, 2003 | Representative Lane Evans | Agency action is not a rule under the CRA because it falls under the exception in 5 U.S.C. §804(3)(B) or (C). |
| Centers for Medicare and Medicaid Services Letter on the State Children's Health Insurance Program | B-316048 | April 17, 2008 | Senator John D. Rockefeller, IV<br><br>Senator Olympia Snowe | Agency action is a rule under the CRA. |

| Agency Action | GAO Citation | Date | Requested By | GAO Determination |
|---|---|---|---|---|
| Department of Health and Human Services Information Memorandum concerning the Temporary Assistance to Needy Families Program | B-323772 | September 4, 2012 | Senator Orrin Hatch<br><br>Representative Dave Camp | Agency action is a rule under the CRA. |
| Environmental Protection Agency proposed rule on Standards of Performance for Greenhouse Gas Emissions from New Stationary Sources: Electric Utility Generating Units | B-325553 | May 29, 2014 | Senator Mitch McConnell | Agency action is not a rule because "the precedent provided in our prior opinions underscores that proposed rules are not rules for CRA purposes, and GAO has no role with respect to them." |
| Office of the Comptroller of the Currency, Federal Reserve Board, and Federal Deposit Insurance Corporation Interagency Guidance on Leveraged Lending | B-329272 | October 19, 2017 | Senator Pat Toomey | Agency action is a rule under the CRA. |
| U.S. Forest Service 2016 Amendment to the Tongass Land and Resource Management Plan | B-238859 | October 23, 2017 | Senator Lisa Murkowski | Agency action is a rule under the CRA. |
| Bureau of Land Management Eastern Interior Resource Management Plan | B-329065 | November 15, 2017 | Senator Lisa Murkowski | Agency action is a rule under the CRA. |
| Consumer Financial Protection Bureau bulletin on Indirect Auto Lending and Compliance with the Equal Credit Opportunity Act | B-329129 | December 5, 2017 | Senator Pat Toomey | Agency action is a rule under the CRA. |
| U.S. Agency for International Development fact sheet on global health assistance and revisions to standard provisions for U.S. nongovernmental organizations | B-329206 | May 1, 2018 | Senator Jeanne Shaheen<br><br>Senator Benjamin Cardin<br><br>Senator Richard Blumenthal<br><br>Senator Patty Murray<br><br>Representative Nita M. Lowey<br><br>Representative Diana DeGette<br><br>Representative Eliot L. Engel<br><br>Representative Barbara Lee | Agency actions are not rules under the CRA because "federal courts have held that agencies' implementation of presidential policy-making does not constitute a rule." |

| Agency Action | GAO Citation | Date | Requested By | GAO Determination |
|---|---|---|---|---|
| Internal Revenue Service statement on health care reporting requirements | B-329916 | May 17, 2018 | Representative Mark Meadows | Agency action is not a rule under the CRA because it falls under the exception in Title 5, Section 804(3)(C), of the *U.S. Code.* |
| Social Security Administration Hearings, Appeals, and Litigation Law Manual ("HALLEX") | B-329926 | September 10, 2018 | Representative Jason Smith | Agency action is not a rule under the CRA because it falls under the exception in Title 5, Section 804(3)(C), of the *U.S. Code.* |
| Internal Revenue Service Revenue Procedure 2018-38 | B-330376 | November 30, 2018 | Senator Orrin Hatch | Agency action is eligible for review under the CRA "because IRS submitted the revenue procedure as a rule" and "IRS's submission triggered Congress's review and oversight powers under CRA." |
| Department of Justice memorandum to federal prosecutors along the southwest border of the United States | B-330190 | December 19, 2018 | Senator Edward Markey | Agency action is not a rule under the CRA because it falls under the exception in Title 5, Section 804(3)(C), of the *U.S. Code.* |
| Department of Commerce memorandum regarding a citizenship question on the 2020 Census | B-330288 | February 7, 2019 | Senator Brian Schatz | Agency action is not a rule under the CRA because "it was not designed to implement, interpret, or prescribe law or policy." |
| Departments of Health and Human Services and Treasury guidance entitled "State Relief and Empowerment Waivers" | B-330811 | July 15, 2019 | Senator Ron Wyden  Representative Frank Pallone Jr. | Agency action is a rule under the CRA. |
| Board of Governors of the Federal Reserve System Supervision and Regulation Letters 12-17, 14-8, 15-7 | B-330843 | October 22, 2019 | Senator Thom Tillis  Senator Mike Crapo  Senator David Perdue  Senator Michael Rounds  Senator Kevin Cramer | Two of the three agency actions (SR Letters 12-17 and 14-8) are rules under the CRA.  The third agency action (SR Letter 15-7) is not a rule under the CRA because it falls under the exception in Title 5, Section 804(3)(C), of the *U.S. Code.* |

| Agency Action | GAO Citation | Date | Requested By | GAO Determination |
|---|---|---|---|---|
| Board of Governors of the Federal Reserve System Supervision and Regulation Letter 11-7 | B-331324 | October 22, 2019 | Senator Thom Tillis | Agency action is a rule under the CRA. |
| Board of Governors of the Federal Reserve System Supervision and Regulation Letter 15-8 | B-331560 | April 16, 2020 | Senator Thom Tillis | Agency action is a rule under the CRA. |
| Federal Communications Commission order entitled "LightSquared Technical Working Group Report, et al." | B-332233 | August 13, 2020 | Senator James Inhofe<br>Senator Jack Reed | Agency action is not a rule under the CRA because it "falls within the APA definition of an order and not a rule, and CRA adopts the APA definition of a rule." |
| Internal Revenue Service Notice 2020-65 | B-332517 | September 15, 2020 | Senator Chuck Schumer<br>Senator Ron Wyden | Agency action is eligible for review under the CRA because "IRS has submitted the document as a non-major rule to GAO for purposes of CRA." |
| Department of Housing and Urban Development guidance entitled "Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act" | B-331171 | December 17, 2020 | Representative Steve King | Agency action is a rule under the CRA. |

**Source:** Congressional Research Service. Opinions are available on the GAO website at https://www.gao.gov/legal/other-legal-work/congressional-review-act.

**Notes:** This table lists agency actions for which Members of Congress asked GAO's opinion as to whether the action falls under the definition of *rule* under the CRA. For a more in-depth discussion of this issue and for summaries of each of the opinions listed in this table, see CRS Report R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, by Valerie C. Brannon and Maeve P. Carey.

# Author Information

Maeve P. Carey
Specialist in Government Organization and Management

Christopher M. Davis
Analyst on Congress and the Legislative Process

# Acknowledgments

Questions from congressional clients regarding legal issues addressed in this report may be directed to Valerie C. Brannon, Legislative Attorney, who contributed to portions of this report.

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.