**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STATE OF CALIFORNIA,<br><br><br>*Plaintiff*,<br><br>v.<br><br><br>LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator, and U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br><br>*Defendants*. | Case No. 1:26-cv-02185-BAH |

**PROPOSED INTERVENOR-DEFENDANTS
AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS AND
AMERICAN PETROLEUM INSTITUTE'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................2

STANDARD OF REVIEW ..............................................................................................4

ARGUMENT..................................................................................................................5

    I.   California is unlikely to succeed for numerous procedural and substantive reasons.......................................................................................................... 5

        A.  The CRA's jurisdiction-stripping provision bars review of California's claims........................................................................................................... 6

        B.  California's claims implicate political questions and are therefore nonjusticiable.......................................................................................... 9

        C.  California identifies no reviewable agency action. ............................... 11

            1.  EPA's transmittal did not determine legal rights or established legal consequences......................................................................... 12

            2.  Both of California's pathways depend on independent future action............. 12

            3.  California's cases confirm, rather than undermine, the absence of finality. ................................................................................... 14

            4.  California's reliance on Section 558 is misplaced in any event. ................... 16

        D.  California's requested relief is unavailable and would not redress its alleged injury. ................................................................................... 16

        E.  EPA properly treated the waivers as rules............................................. 20

        F.  EPA was not required to conduct notice-and-comment before treating the waivers as CRA-covered rules and submitting them to Congress. ........ 24

    II.  California has not shown irreparable harm. .................................................. 26

    III.  The balance of equities and public interest favor denying relief. ................................. 28

CONCLUSION....................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska v. DOT*,
868 F.2d 441 (D.C. Cir. 1989) ................................................................................................28

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .................................................................................................................5

*American Wild Horse Campaign v. Bernhardt*,
442 F. Supp. 3d 127 (D.D.C. 2020) ........................................................................................15

*Ansara v. Eastland*,
442 F.2d 751 (D.C. Cir. 1971) ................................................................................................20

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ................................................................................................30

*Ass'n of Civilian Technicians, P.R. Army Chapter v. FLRA*,
269 F.3d 1112 (D.C. Cir. 2001) ..............................................................................................24

*Bean LLC v. John Doe Bank*,
291 F. Supp. 3d 34 (D.D.C. 2018) ..........................................................................................29

*Bennett v. Spear*,
520 U.S 154 (1997) ...........................................................................................................11, 13

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) .................................................................................................................8

*Califano v. Sanders*,
430 U.S. 99 (1977) ...................................................................................................................5

*California v. Texas*,
593 U.S. 659 (2021) ...............................................................................................................19

*Caminetti v. United States*,
242 U.S. 470 (1917) .................................................................................................................8

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ............................................................................................5, 27

*Citizens for Const. Integrity v. United States*,
57 F.4th 750 (10th Cir. 2023) ............................................................................................10, 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...............................................................................................................28

*Common Cause v. Biden*,
748 F.3d 1280 (D.C. Cir. 2014) ..............................................................................................14

*Connecticut v. Massachusetts*,
    282 U.S. 660 (1931) ................................................................................................30

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
    482 F.3d 1157 (9th Cir. 2007) .................................................................................10

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006) ................................................................................12

*Ctr. for Biological Diversity v. Bernhardt*,
    946 F.3d 553 (9th Cir. 2019) ....................................................................................8

*Delta Data Sys. Corp. v. Webster*,
    744 F.2d 197 (D.C. Cir. 1984) ................................................................................24

*Demore v. Kim*,
    538 U.S. 510 (2003) ..................................................................................................8

*Doe 1 v. Apple Inc.*,
    96 F.4th 403 (D.C. Cir. 2024) .................................................................................18

*Escobar Molina v. DHS*,
    811 F. Supp. 3d 1 (D.D.C. 2025) ............................................................................28

*Exxon Corp. v. FTC*,
    589 F.2d 582 (D.C. Cir. 1978) ................................................................................30

*Hubbard v. United States*,
    496 F. Supp. 2d 194 (D.D.C. 2007) ........................................................................30

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ................................................................................12

*Int'l Union, Sec., Police & Fire Pros. v. Faye*,
    828 F.3d 969 (D.C. Cir. 2016) ..................................................................................5

*Kansas Nat. Res. Coal. v. DOI*,
    971 F.3d 1222 (10th Cir. 2020) .................................................................................7

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
    909 F.3d 446 (D.C. Cir. 2018) ................................................................................17

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375 (1994) ..................................................................................................5

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ..................................................................................................9

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ..................................................................................................19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................13, 14, 18

*Made in the USA Found. v. United States*,
  242 F.3d 1300 (11th Cir. 2001) ................................................................................10

*Maine v. Taylor*,
  477 U.S. 131 (1986)..................................................................................................28

*Metzenbaum v. FERC*,
  675 F.2d 1282 (D.C. Cir. 1982).................................................................................9

*Montanans for Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009)...................................................................................7

*Murthy v. Missouri*,
  603 U.S. 43 (2024)....................................................................................................14

*Nat. Res. Def. Council v. Pena*,
  147 F.3d 1012 (D.C. Cir. 1998)................................................................................17

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  417 F.3d 1272 (D.C. Cir. 2005)................................................................................21

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014)..................................................................................12

*National Biodiesel Bd. v. EPA*,
  843 F.3d 1010 (D.C. Cir. 2016).................................................................................23

*New Jersey v. EPA*,
  989 F.3d 1038 (D.C. Cir. 2021).................................................................................28

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................................29

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974)..................................................................................................22

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)....................................................................................................20

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S. 665 (2025)....................................................................................................5

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)....................................................................................................26

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003)..................................................................................13

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017).................................................................21, 22, 23, 24

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976)....................................................................................................18

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ...................................................................................................................19

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.,*
1998 WL 842181 (W.D. Tex. June 25, 1998) ...........................................................................7

*Texas v. United States,*
523 U.S. 296 (1998) .................................................................................................................28

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,*
578 U.S. 590 (2016) ...........................................................................................................15, 16

*United States v. Am. Electric Power Serv. Corp.,*
2002 WL 1900067 (S.D. Ohio July 16, 2002) ..........................................................................7

*United States v. Ballin,*
144 U.S. 1 (1892) ..............................................................................................................10, 11

*United States v. Fla. E. Coast Ry. Co.,*
410 U.S. 224 (1973) .................................................................................................................21

*United States v. S. Ind. Gas & Electric Co.,*
2002 WL 31427523 (S.D. Ind. Oct. 24, 2002) ..........................................................................7

*Via Christi Reg'l Med. Ctr., Inc. v. Leavitt,*
509 F.3d 1259 (10th Cir. 2007) .................................................................................................7

*Vt. Yankee Nuclear Power Corp. v. Nuclear Regul. Comm'n, Inc.,*
435 U.S. 519 (1978) .................................................................................................................26

*Webster v. Doe,*
486 U.S. 592 (1988) ...................................................................................................................8

*Whitman-Walker Clinic, Inc. v. DHHS,*
485 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................................28

*Winter v. Nuclear Regul. Comm'n, Inc.,*
555 U.S. 7 (2008) .......................................................................................................................5

*Wis. Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985) ...........................................................................................27, 28

*Yesler Terrace Cmty. Council v. Cisneros,*
37 F.3d 442 (9th Cir. 1994) ...............................................................................................23, 24

STATUTES

42 U.S.C. § 7409 ...............................................................................................................................2

42 U.S.C. § 7410 ...............................................................................................................................2

42 U.S.C. § 7411 ...............................................................................................................................2

42 U.S.C. § 7507 .........................................................................................................................3, 22

42 U.S.C. § 7521 ...................................................................................................... 2, 21

42 U.S.C. § 7543 ............................................................................................... 2, 3, 21, 22

42 U.S.C. §§ 7401, *et seq.* ............................................................................................ 2

5 U.S.C. § 551 .............................................................................................. 4, 21, 24, 26

5 U.S.C. § 553 .......................................................................................................... 26

5 U.S.C. § 558 .......................................................................................................... 16

5 U.S.C. § 704 .......................................................................................................... 11

5 U.S.C. § 705 .......................................................................................................... 19

5 U.S.C. § 801 .................................................................................................. *passim*

5 U.S.C. § 802 ...................................................................................................... 3, 17

5 U.S.C. § 803 ............................................................................................................ 3

5 U.S.C. § 804 ................................................................................................... 3, 4, 21

5 U.S.C. § 805 .................................................................................................. *passim*

5 U.S.C. § 806 ............................................................................................................ 3

5 U.S.C. § 807 ............................................................................................................ 3

5 U.S.C. § 808 ............................................................................................................ 3

## OTHER AUTHORITIES

74 Fed. Reg. 32744 (July 8, 2009) .................................................................................. 3

78 Fed. Reg. 2112 (Jan. 9, 2013) .................................................................................... 3

87 Fed. Reg. 14332 (Mar. 14, 2022) ............................................................................... 3

90 Fed. Reg. 640 (Jan. 6, 2025) ...................................................................................... 3

Congressional Research Service (CRS), *The Congressional Review Act (CRA): A Brief Overview*, CRS Report IF10023 (Aug. 29, 2024), https://perma.cc/Y6D7-Z7AD ...................... 4

EPA, *EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress* (June 12, 2026), https://perma.cc/TZL3-Z2EH ............................................. 3

Fed. R. Civ. P. 65 ..................................................................................................... 18

U.S. Const. art. I § 5, cl. 2 ............................................................................................ 20

**INTRODUCTION**

A preliminary injunction is an extraordinary remedy, and California has not met its burden to show that this Court can or should claw back EPA's transmission of four waiver rules to Congress under the Congressional Review Act ("CRA"). California's Motion for Preliminary Injunction never clears threshold obstacles that must be resolved before the Court could reach the merits analysis. And its arguments fail on the merits in any event.

As for the initial procedural issues, Congress expressly provided that "[n]o determination, finding, action, or omission" under the CRA "shall be subject to judicial review." 5 U.S.C. § 805. EPA's transmittal of waiver rules to Congress is precisely the type of agency action the statute places beyond judicial review. California's effort to recast that challenge as one arising under the Administrative Procedure Act ("APA") cannot avoid Congress's unmistakable command. In addition, EPA's transmittal neither altered California's legal rights nor imposed any new obligations. Any future consequence depends on discretionary actions by Congress, the President, or EPA that have not occurred and may never occur. California therefore identifies neither final agency action nor an imminent, irreparable injury that this Court could review. Even more, California has a redressability problem: The relief California requests does not redress the asserted harm because the challenged submissions have already been transmitted to Congress and the Court cannot direct or unwind Congress's legislative processes.

California would still lose if the Court chose to address the merits. EPA reasonably determined that its waiver decisions qualify as rules for purposes of the CRA. And nothing in either the CRA or the APA required notice-and-comment procedures before transmitting those actions to Congress.

1

Because California cannot establish a likelihood of success on the merits, irreparable harm, or any of the remaining requirements for preliminary relief, its Motion should be denied.

## BACKGROUND

The Clean Air Act creates a comprehensive national framework for regulating emissions from new motor vehicles and engines. *See* 42 U.S.C. §§ 7401, *et seq.* Congress directed EPA to set national air quality standards to protect public health and welfare, *see id.* § 7409, and to regulate emissions of pollutants from both stationary sources, like power plants and factories, and mobile sources, like cars and trucks. *See id.* §§ 7411, 7521. Congress also explicitly directed EPA to set the standards for new vehicles and engines. *See id.* §§ 7410.

To preserve national uniformity, Congress generally preempted States from adopting or enforcing their own emissions standards for new motor vehicles. *Id.* § 7543(a). Congress included one narrow exception: California, and California alone, may request a federal waiver to enforce its own emissions standards if certain criteria are met. *Id.* § 7543(b) (detailing exception for California). A waiver determines whether California may enforce otherwise preempted state standards. If California receives a waiver, other states may then adopt California's standards in place of the federal standards, if certain conditions are met, but such standards must be identical to the California standards for which a waiver has been granted for such model year. *See id.* § 7507.

Between 2009 and 2025, EPA granted California several waivers under § 7543(b), including waivers authorizing California's mobile source greenhouse-gas standards, Advanced Clean Cars I program, reinstatement of portions of that program, and Small Off-Road Engine regulations. *See* 74 Fed. Reg. 32744 (July 8, 2009); 78 Fed. Reg. 2112 (Jan. 9, 2013); 87 Fed. Reg. 14332 (Mar. 14, 2022); 90 Fed. Reg. 640 (Jan. 6, 2025). These waivers, and the state regulations they authorize,

2

establish, in the form of electric and zero-emissions vehicle mandates, with national impacts. Several other states have adopted many of California's waived standards, exporting California's policies beyond its borders and coercing nationwide compliance in the absence of federal legislation or uniform federal rulemaking. *See* Dkt. 1 ¶ 32 n.8 ("Compl."). Nonetheless, until now, EPA has not submitted these waivers to Congress for CRA review.

On June 12, 2026, EPA decided to submit four EPA waiver decisions covering the four California standards discussed above to Congress under the CRA, 5 U.S.C. §§ 801–808.[1] EPA concluded the waiver decisions fall within the CRA's broad definition of "rule," and therefore EPA had a statutory obligation to transmit them. EPA did not reopen the underlying waiver proceedings or alter the substance of any previously granted waiver. Instead, EPA transmitted four existing waiver decisions to Congress, correcting its previous failure to adhere to the CRA.

Congress enacted the CRA in 1996 to strengthen its control over federal agency rulemaking. The CRA incorporates the APA's broad definition of "rule." *See* 5 U.S.C. § 804(3) (incorporating 5 U.S.C. § 551(4)). The CRA process is simple. Before new rules can take effect, federal agencies must submit them to both Congress and the Government Accountability Office (GAO), creating a formal window for review. *See id.* § 801(a).[2] Congress then has 60 days to pass a "joint resolution of disapproval" for the President's signature. *Id.* §§ 801(a)(3), (d), 802(a). This allows Congress to act swiftly to check regulations it views as inconsistent with public policy. If Congress takes no action, the rule goes into effect. *See id.* §§ 801(a)(3), (b)(1) (conditioning disapproval

---

[1] EPA, *EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress* (June 12, 2026), https://perma.cc/TZL3-Z2EH.

[2] The CRA "applies to final rules, including major rules, non-major rules, and interim final rules." Congressional Research Service (CRS), *The Congressional Review Act (CRA): A Brief Overview* 1, CRS Report IF10023 (Aug. 29, 2024), https://perma.cc/Y6D7-Z7AD; *see* 5 U.S.C. § 804(3).

on affirmative action by Congress). But if it passes as a joint resolution of disapproval and the President signs that resolution, then the rule "shall not take effect (or continue)," and "may not be reissued in substantially the same form . . . unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(1)–(2).

California now seeks an injunction ostensibly directed at EPA but that actually seeks to prevent Congress from reviewing the four waivers. *See* Compl. California alleges that EPA violated the APA and acted in excess or contravention of its authority. *See generally id.* None of these claims can succeed as each faces insurmountable procedural and substantive obstacles.

Proposed Intervenors, American Fuel & Petrochemical Manufacturers and American Petroleum Institute (jointly, "Proposed Intervenors"), seek to intervene to protect their members' rights, which are independent of and not represented by Defendants. In so doing, Proposed Intervenors simultaneously submit this Response in Opposition to Plaintiff's Motion for Preliminary Injunction.

## STANDARD OF REVIEW

Courts evaluating ultra vires claims apply a "strictly limited" standard of review, and in the limited instances where review proceeds, the standard is extraordinarily deferential to the agency's determination. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). That is because "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citations omitted). "Absent statutory intent to create a cause of action, none exists, and 'courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.'" *Int'l Union, Sec., Police & Fire*

4

*Pros. v. Faye*, 828 F.3d 969, 972 (D.C. Cir. 2016) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)); *see also Califano v. Sanders*, 430 U.S. 99, 107 (1977) (holding that the APA does not confer subject-matter jurisdiction and that judicial review exists only where Congress has provided a statutory basis for review).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nuclear Regul. Comm'n, Inc.*, 555 U.S. 7, 24 (2008). The movant bears the burden and must make a "clear showing" that it is entitled to relief by establishing four factors: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ARGUMENT

California cannot satisfy any of the requirements for the extraordinary relief it seeks. It cannot overcome the CRA's jurisdictional bar nor can it satisfy standing. Moreover, it is unlikely to succeed on the merits for multiple independent reasons. California also cannot demonstrate irreparable harm because its asserted injury depends on a speculative chain of future events that may never occur. Nor do the balance of equities or the public interest support an injunction. California's Motion for Preliminary Injunction should be denied.

## I. California is unlikely to succeed for numerous procedural and substantive reasons.

California has not met its burden of demonstrating a likelihood of success on the merits. Its claims fail at the outset because its claims are jurisdictionally barred, nonjusticiable, directed at no reviewable final agency action, and seek relief that Article III courts cannot provide. Even still, California's claims fail on the merits: EPA properly treated the waivers as rules subject to the CRA, and neither the CRA nor the APA required notice-and-comment procedures before EPA

5

transmitted the waiver rules to Congress. Each of those defects independently forecloses the extraordinary relief California seeks.

### A.    The CRA's jurisdiction-stripping provision bars review of California's claims.

The jurisdictional bar in 5 U.S.C. § 805 broadly precludes judicial review of actions taken under the CRA. The section expressly provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. "The chapter" is 5 U.S.C. §§ 801–805. Section 801 itself speaks directly to the actions of an *agency*, stating, "Before a rule can take effect, *the Federal agency* promulgating such rule *shall submit to each House of Congress* and to the Comptroller General . . . ." 5 U.S.C. § 801 (emphasis added). The agency's decision to "submit to each House of Congress" the four waivers at issue here is a "determination, finding, [and] action . . . under this chapter," and is therefore *not* "subject to judicial review." 5 U.S.C. § 805.

Courts interpreting this provision agree. In *Kansas Natural Resources Coalition v. DOI*, 971 F.3d 1222, 1235–36 (10th Cir. 2020), an organization of county governments filed an APA claim against the Department of the Interior and Fish and Wildlife Service seeking declaratory and injunctive relief. They claimed that a rule establishing criteria for evaluating state and private conservation plans under the Endangered Species Act was unlawfully withheld or unreasonably delayed from submission under the CRA. *Id*. at 1230. The United States District Court for the District of Kansas granted the defendants' motion to dismiss for lack of subject matter jurisdiction, and the Tenth Circuit affirmed. *Id.* at 1230–31. It held that "the CRA unambiguously prohibits judicial review of any omission by any of the specified actors," which include as relevant here, "agencies" in addition to "the Comptroller General, the President, and Congress." *Id.* at 1236; *see also Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (holding CRA precludes review of agency compliance with submission requirements); *Via Christi Reg'l Med. Ctr.,*

6

*Inc. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007) (noting CRA precludes judicial review of failure to submit a rule); *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 1998 WL 842181, at *7 n.15 (W.D. Tex. June 25, 1998), *aff'd*, 201 F.3d 551 (5th Cir. 2000) (Section 805 barred judicial review of agency omission to submit rule); *United States v. Am. Electric Power Serv. Corp.,* 2002 WL 1900067, at *14 (S.D. Ohio July 16, 2002) (same); *but see United States v. S. Ind. Gas & Electric Co.*, 2002 WL 31427523, at *4–5 (S.D. Ind. Oct. 24, 2002) (Section 805 jurisdictional bar applies only to congressional action). Just as those courts have determined they lack jurisdiction to review an agency's failure to submit, this Court lacks jurisdiction to review EPA's decision to submit.

Notably, California's memorandum in support of its preliminary injunction does not grapple with any of this precedent. Rather than addressing these authorities, California simply asserts that the CRA is triggered only by a "rule" and that waivers are not rules. Dkt. 13-1 at 26 ("Mem.") (emphasis in original). But that is merely an ipse dixit recitation of California's APA argument and does not address the plain language of the CRA's jurisdiction-stripping provision. Asking this Court to review EPA's determination that the waivers are rules and its decision to transmit them to Congress in order to then find that the Court has jurisdiction is exactly backward and would impermissibly write section 805 out of the statute. When the statutory language is plain, the "sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917).

A thinly reasoned portion of a Ninth Circuit decision suggests that courts retain jurisdiction over *constitutional claims*. *See Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019). First, the conclusion in *Bernhardt*—that Section 805's broad jurisdictional bar did not apply to constitutional claims—did not engage with the CRA's text or its legislative history and

7

merely invoked the general canon from *Webster v. Doe*, 486 U.S. 592, 603 (1988), requiring a "clear statement" before Congress can foreclose judicial review of constitutional claims. *See Bernhardt*, 946 F.3d at 561. But the clear statement principle articulated in *Webster* stems from concerns over *individual* rights not at issue here. *See* 486 U.S. at 596; *see also Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986) (same in case where individuals raised equal protection and due process claims); *Demore v. Kim*, 538 U.S. 510, 517 (2003) (noting that a clear statement is needed to bar review of habeas claims and indicating that the underlying constitutional concern arises from an inability to review constitutional claims related to liberty interests). That principle ensures that Congress cannot insulate review of infringements of core rights like liberty, due process, or habeas corpus. But that concern has no application where, as here, no such rights are at stake. This case does not involve individual liberty. It involves institutional power—California objects not to any personal deprivation, but to EPA's transmission and Congress's potential disapproval.

Second, California's ultra vires claim is not a constitutional claim. A constitutional ultra vires claim challenges the agency's action as unauthorized because the Constitution itself withholds the asserted power or because the action violates a constitutional limitation on government authority. *See Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958) (recognizing review where an agency "plainly" acted "in excess of its delegated powers and contrary to a specific prohibition in the Act"). But California does not allege that EPA violated a constitutional command or infringed a constitutional right. *See, e.g.*, Compl. ¶¶ 118–27. California essentially alleges that EPA erred by categorizing the waivers as rules and transmitting them to Congress for review under the CRA, though California frames its claim as EPA "exceeding" its statutory authority under the APA.

Because California does not raise a constitutional claim, *Bernhardt*'s special clear-statement concerns do not apply.

> **B.    California's claims implicate political questions and are therefore nonjusticiable.**

California attempts to frame its challenge narrowly as one directed at EPA's action only. The problem for California is that the waivers are presently in the hands of Congress. Any order directed toward EPA will have no effect. And there is no process—statutory or otherwise—for EPA to recall the waivers. Ultimately, any "remedy" would need to direct Congressional procedures and Congress's deliberative process, which this Court lacks jurisdiction to do. *See Metzenbaum v. FERC*, 675 F.2d 1282, 1287–88 (D.C. Cir. 1982) (indicating courts have declined to resolve questions about internal Congressional proceedings because it is "impossibl[e]" for them to "undertak[e] independent resolution" in situations such as this "without expressing lack of the respect due to coordinate branches of government." (citation modified)); *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1311–12 (11th Cir. 2001) (holding that political branches' choices of how to handle an international agreement—i.e., whether to have the Senate review and approve it as a "treaty"—was a nonjusticiable political question).

This is because disputes over legislative action or inaction, including how and whether Congress chooses to exercise its oversight powers, raise nonjusticiable political questions. *See, e.g., Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171–72 (9th Cir. 2007) ("In short, the Constitution textually commits the question of legislative procedural rules to Congress. Thus, whether Congress decides to hold a hearing on legislation applicable to the general public is a non-justiciable political question beyond our power to review."); *United States v. Ballin*, 144 U.S. 1, 5 (1892) ("The constitution empowers each house to determine its

rules of proceedings."). The act of maintaining and potentially reviewing the waivers is a quintes-sential legislative function, and courts may not entangle themselves in that process.

Courts have recognized that the political question doctrine does not apply when Congress "ignore[s] constitutional restraints or violate[s] fundamental rights." *Id.* at 5–6. California, how-ever, does not contend that in accepting the waivers for review, Congress has somehow ignored a constitutional restraint or violated fundamental rights.

And although one court has mentioned the *Ballin* exception in the CRA context, it ulti-mately found the plaintiffs' claims to be nonjusticiable. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768–69 (10th Cir. 2023). In that case, plaintiffs challenged Congress's use of the CRA to repeal the Stream Protection Rule, a regulation aimed at strengthening environmental standards for surface coal mining. *Id.* at 756. The plaintiffs argued that the CRA, combined with the Senate's Cloture Rule, allowed Congress to nullify agency regulations by a simple majority vote, but a supermajority was required to enact or restore similar agency regulatory authority. *Id.* They contended that this procedural structure effectively impaired executive authority and under-mined democratic accountability. *See id.* at 756–57, 763.

The court found no constitutional violation. Instead, it held that CRA disapproval resolu-tions complied with bicameralism and presentment and did not violate any explicit constitutional limit. *See id.* at 764–65. It found no deprivation of fundamental rights and no structural violation. *See id.* at 763–69. The court emphasized that complaints about how Congress exercises its legis-lative authority, or not, are not grounds for judicial intervention. The observation in *Citizens for Constitutional Integrity* holds true here—a plaintiff may believe "that some other way would be better, more accurate, or even more just," but "that is not for [it]—or [the court]—to decide." *Id.* at 769 (quoting *Ballin*, 144 U.S. at 5). The court dismissed the claim as nonjusticiable.

10

*Ballin*'s narrow exception does not apply here. California cannot use litigation to override EPA and Congress's invocation of the CRA. The CRA reflects a decision by Congress about how it will oversee agency rulemaking. That decision does not violate any constitutional command. Nor does it trigger any judicially enforceable right.

### C.  California identifies no reviewable agency action.

In addition to the jurisdictional barriers to review, California's APA claim also fails at the threshold because there has been no "final agency action." The APA permits review only of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. California must show that the challenged action both marks the "consummation" of EPA's "decisionmaking process" and that it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S 154, 177–78 (1997) (citation modified). Those requirements are independent.

California's claims fail on the second requirement for a simple reason. Nothing happens unless and until someone else acts. California itself frames EPA's June 12 actions as creating two possible future "pathways" to the "harm" California wishes to prevent—invalidating the waivers: (1) future congressional disapproval, or (2) future EPA withdrawal proceeding. *See* Mem. at 13, 28 (noting EPA's transmittal was intended to "smooth two pathways to the invalidation of these waivers," not that the transmittal does anything to change or invalidate the waivers). Both pathways depend entirely on independent action that has not occurred. *See id.* Congress has not passed a resolution. The President has not signed one. EPA has not opened a withdrawal proceeding. Until one of these separate, contingent events happens, the waivers remain exactly as they were before June 12. That gap between EPA's June 12 transmittal of the waivers to Congress and any actual legal effect is fatal to California's theory.

1.    **EPA's transmittal did not determine legal rights or established legal consequences.**

EPA did not revoke the waivers. It did not suspend them. It did not amend them. It did not preempt California's regulations. It did not relieve any regulated party of any obligation imposed by law. And it did not require California manufacturers, or anyone else to alter their conduct. The waivers remain in effect unless and until some legally operative event occurs in the future.

The D.C. Circuit has repeatedly distinguished legal consequences from practical consequences, uncertainty, or pressure to adjust behavior. Agency statements, guidance, letters and other informal communications are not final agency action merely because regulated parties may take them seriously or because they clarify how the agency views the law. *See, e.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427–28 (D.C. Cir. 2004); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806–08 (D.C. Cir. 2006); *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–53 (D.C. Cir. 2014). The relevant question is whether the challenged action itself imposes obligations, denies rights, fixes legal relationships, or otherwise changes the legal regime governing the plaintiffs. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731–32 (D.C. Cir. 2003). EPA's June 12 transmittal of the waivers to Congress did none of those things.

2.    **Both of California's pathways depend on independent future action.**

A submission under the CRA is a communication to Congress. It does not bind California, regulated parties, EPA, or Congress and instead simply places materials before a coordinate branch of government for whatever action that branch may choose to take under its own procedures. The CRA itself confirms that submission is not the legally operative event. Legal consequences are fixed, if at all, only if Congress passes and the President signs into law, a joint resolution of disapproval. 5 U.S.C. § 801(b). Until then, the waivers continue in effect.

That gap defeats California's theory in two distinct ways. First, it confirms that EPA's submission is not final agency action under the APA. As explained above, *Bennett* requires an agency action "from which legal consequences will flow." 520 U.S. at 178 (citation modified). But any legal consequence here would flow from later legislation, not from EPA's submission.

Second, even apart from APA finality, the same gap creates an Article III traceability problem. To establish standing, California must show that its alleged injury is fairly traceable to EPA's challenged conduct rather than to the independent conduct of Congress or the President. An injury is not fairly traceable to a defendant's conduct when it results from the "independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).

Congress's choice whether to introduce, debate, and pass a resolution of disapproval is exactly that kind of independent action. So is the President's choice whether to sign it. Courts have repeatedly held that "unfettered choices made by independent actors" break the causal chain between an agency's conduct and a plaintiff's claimed injury. *Id.* at 562; *see also Murthy v. Missouri*, 603 U.S. 43, 60 (2024) (the "exercise [of] independent judgment" by a third party severs traceability); *Common Cause v. Biden*, 748 F.3d 1280, 1284–85 (D.C. Cir. 2014) (injury "caused not by any of the defendants, but by an 'absent third party'"). Because Congress and the President hold the levers that could transform the reclassification and submission into a binding legal consequence, California's injury is traceable to those independent actors, not to EPA.

California cannot avoid this problem by speculating about what those actors, or EPA itself, might do next. Its own Motion frames the alleged harm as two possible future "pathways"—congressional disapproval or administrative withdrawal—and acknowledges that "California cannot know which of these two pathways will be followed." Mem. at 2. It likewise characterizes its

13

present injury as an "elevated risk" requiring preparation for a future "eventuality," and relies on prediction that Congress "will likely" and that EPA may later pursue administrative withdrawal. *Id.* at 14. As already explained, none of the events that would need to occur before California suffers any concrete harm have occurred, and each remains a matter of discretion for an actor that is not before this Court. That chain of potential future events, even if likely, cannot supply final agency action or a traceable injury today.

### 3. California's cases confirm, rather than undermine, the absence of finality.

The cases California relies on fail to support its theory. Each cited case involved a consequence that was immediate and self-executing, or it involved an agency action that eliminated the agency's own future discretion. None involved a consequence that depended on a later act by a separate branch. Here, by contrast, nothing is fixed. Any consequence depends on an act of Congress and then the President, or on EPA commencing a separate proceeding.

California leans first on *American Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020), and *Nuclear Regul. Comm'n v. EPA*, 643 F.3d 311, 319 (D.C. Cir. 2011). Both found the legal consequences prong satisfied where the challenged action left the agency with no remaining discretion. In *American Wild Horse Campaign*, Bureau of Land Management's conversion of herd management areas into herd areas eliminated the agency's own discretion. 442 F. Supp. 3d at 150. Once an area became a herd area, the statute no longer permitted Bureau of Land Management to sustain a wild horse population there. The agency's legal obligation to round up the wild horses followed automatically. No other actor needed to intervene. EPA's actions here were nothing like that. The reclassification and submission did not eliminate any future decision by any actor. Congress remains free to disapprove the waivers. Or not. The President remains free

14

to sign any resolution. Or not. And EPA retains full discretion whether to ever initiate a withdrawal proceeding. EPA has bound no one's hands, including its own.

California also invokes *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590 (2016). Mem. at 18. There, the Corps issued an affirmative jurisdictional determination, finding that the landowner's property contained "waters of the United States" under the Clean Water Act. *Hawkes*, 578 U.S. at 596–97. The Supreme Court held the determination was final because it directly and immediately altered the landowner's legal position. It denied the landowner a five-year safe harbor from civil enforcement that a negative determination would have supplied, and it left the landowner facing "the risk of significant criminal and civil penalties" the moment it acted without a permit. *Id.* at 600; *see id.* 598–600. That consequence attached the instant the Corps issued its determination. No further act by any other branch stood between the determination and that risk.

California attempts this same safe-harbor rationale here. It argues that its waivers previously enjoyed a comparable safe harbor from CRA coverage that EPA's reclassification stripped away. Mem. at 17-18. But the consequences in *Hawkes* were self-executing. The moment the Corps acted, the landowner's legal position changed. *See Hawkes*, 578 U.S. at 598 ("The definitive nature of approved [jurisdictional determinations] . . . g[ave] rise to 'direct and appreciable legal consequences,' thereby satisfying the second prong of *Bennett*."). No further action by a coordinate branch was required. Here, by contrast, nothing is self-executing. The waivers will stay in force unless and until Congress and the President act, or until EPA opens and completes a withdrawal proceeding. Whatever safe harbor California believes it lost, it is nothing a court can presently measure. Rather, the purported loss is contingent on events that have not occurred and that lie outside EPA's control.

15

None of California's cases involved a chain of independent, contingent, or future acts by separate branches. Unlike here, each case California cites involved a consequence that attached immediately with no gap between the agency action and the legal effect. This difference is fatal to California's claims.

### 4.    California's reliance on Section 558 is misplaced in any event.

California argues that EPA's reclassification altered its rights because, if the waivers are treated as rules rather than licenses, California has "lost" the § 558(c) notice-and-correction process it says would apply before withdrawal by EPA. Mem. at 17. That theory does not supply final agency action either. Section 558(c) provides procedures that may apply before an agency withdraws, suspends, revokes, or annuls a license. 5 U.S.C. § 558(c). But EPA has not instituted a withdrawal proceeding, and it has not denied California any process in any such proceeding. At most, California identifies a possible future dispute about what process EPA must provide if EPA later seeks administratively to withdraw a waiver. That hypothetical future dispute does not transform EPA's present communication to Congress into final agency action.

### D.    California's requested relief is unavailable and would not redress its alleged injury.

The relief California requests fails for a separate and independent reason. When the requested relief would have no practical effect on the plaintiff's alleged injury, the Court lacks any basis to consider it. *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) ("It is well-settled that courts lack jurisdiction to hear cases in which the plaintiff fails to identify a redressable injury."); *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1021–22 (D.C. Cir. 1998).

That principle resolves California's request here. California asks the Court to order EPA to withdraw or retract its June 12 submissions to Congress and related public statements. Mem. at

16

3; *see also* Compl. at 28-29. Setting aside that there is no statutory or regulatory procedure for doing so, such an order would not prevent the injuries California fears. It would not bind Congress. It would not make Congress unreceive the waivers it already has received. It would not (and cannot as explained above) prevent Congress from deciding how to treat those waivers under its own rules. It would not prevent the President from signing any resolution Congress might pass. And it would not prevent EPA from later initiating a separate administrative proceeding, subject to whatever procedural and substantive requirements apply.

First, the CRA contains no mechanism for withdrawing a submission once Congress receives it. The statute directs agencies to submit covered rules to Congress and the Comptroller General. 5 U.S.C. § 801(a)(1)(A). It then prescribes the process by which Congress may consider a joint resolution of disapproval. *Id.* § 802. And it specifies the legal consequences if such a resolution is enacted into law. *Id.* § 801(b). But California identifies no provision authorizing an agency to erase, nullify, or retract a submission once made. Nor does the CRA, or any other statute, rule, or other source of authority, authorize a court to create such a mechanism. On the contrary, as noted above, Congress specifically shielded any act or omission under the CRA from judicial review. 5 U.S.C. § 805; *see also supra* § I.A. Congress designed a reporting-and-review process. It did not create a post-submission clawback procedure.

Second, an injunction against EPA would not bind Congress for a number of reasons but first and foremost because Congress is not a party to this case. Rule 65 only authorizes injunctions that bind parties, their officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them. Fed. R. Civ. P. 65(d)(2). Thus, even if EPA were ordered to "withdraw" its submission, Congress would remain free to determine how to treat the materials

17

already before it. California's feared injury from congressional disapproval depends on independent constitutional actors whom the Court cannot control through an injunction directed at EPA.

That defect is fatal. Redressability is not satisfied where relief depends on speculation about how independent actors not before the Court will respond. *See Lujan*, 504 U.S. at 562; *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42–43 (1976). The D.C. Circuit has applied that principle in rejecting relief that would be merely hortatory because it would not bind the actors whose conduct determines whether the plaintiff is actually harmed. *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 414 (D.C. Cir. 2024). The same is true here. California's asserted injury would result from Congress and the President, not EPA. A court order requiring EPA to somehow retract the transmission, were that even possible, would not stop either branch from proceeding exactly as if no retraction had been sent.[3]

Third, the requested injunction would not redress California's asserted Section 558(c) concern. Ordering EPA to retract its CRA submission would not prevent EPA from later initiating an administrative proceeding, subject to whatever procedures the APA requires at that time. If EPA later acts to withdraw a waiver, California may challenge that action then and make its Section 558(c) arguments in the context of a concrete agency proceeding. Right now, the requested relief preserves no Section 558(c) process at all. It merely hopes to prevent Congress from considering materials already before it, relief that has nothing to do with Section 558(c).

---

[3] Put differently, any declaration or order that does not bind Congress or the President would "amount to 'an advisory opinion without the possibility of any judicial relief.'" *California v. Texas*, 593 U.S. 659, 673 (2021) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 129 (1983) (Marshall, J., dissenting)). Courts lack authority to grant relief that would do no more than declare past conduct unlawful without redressing the plaintiff's injury. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Fourth, California's reliance on 5 U.S.C. § 705 does not cure these defects. Section 705 allows a reviewing court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "postpone the effective date of an agency action" or "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. But there is no effective date of a completed transmission to Congress. Nor is there any operative change in status to stay. The waivers remain in effect. California's regulations remain enforceable. And Congress already has the materials. Section 705 does not authorize the Court to invent a CRA retraction mechanism or to order an ineffectual remedy that would not preserve any concrete right.

Fifth, ordinary equitable principles confirm that California's requested relief is unavailable. California is not asking the Court merely to freeze EPA's current position. It asks the Court to compel EPA to take affirmative action by withdrawing submissions already made to Congress and retracting public statements already issued. That is mandatory relief. Such relief is especially in-appropriate where California identifies no statute or regulation authorizing EPA to perform the requested "withdrawal" and cannot show that the order would redress its alleged injury. Courts may compel agency action under the APA only when a plaintiff identifies a discrete agency action that the agency is legally required to take. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004).

Finally, California's requested injunction would create unnecessary institutional friction with Congress. The order would be nominally directed at EPA, but it's evident purpose would be to affect Congress's treatment of materials already transmitted to it. Courts exercise particular caution before granting extraordinary relief that would interfere with, or create needless friction in, the legislative process. *See Ansara v. Eastland,* 442 F.2d 751, 753–54 (D.C. Cir. 1971). That caution is especially appropriate here. Congress has already received the materials. And each

19

House remains responsible for determining how to treat materials before it under its own rules and procedures. *See* U.S. Const. art. I § 5, cl. 2.

At minimum, these remedial and separation-of-powers concerns counsel strongly against granting the mandatory injunction California seeks. California asks the Court to order EPA to perform an act the CRA does not authorize, to undo a completed communication to Congress, and to influence congressional proceedings the Court cannot control. Equity does not require, and Article III does not permit, such ineffectual relief. California's Motion should be denied for this reason as well.

### E.   EPA properly treated the waivers as rules.

California is also unlikely to prevail because EPA properly treated the waivers as rules for purposes of the CRA. The CRA incorporates the APA's definition of "rule," subject to certain exceptions not relevant here. 5 U.S.C. § 804(3). The APA, in turn, defines a rule broadly as an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). That definition is functional. It does not turn on the label EPA used when it acted, whether EPA called the action a "decision," or whether the proceeding shared some features with an adjudication. Instead, "an agency may not escape the requirements of [notice-and-comment rulemaking] by labeling its rule an 'adjudication.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (citation omitted); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1284–85 (D.C. Cir. 2005) ("[R]ules is rules, no matter their gloss." (citation modified)). What matters is the action's effect.

The waivers fit that definition. A rule is an agency action that is "'used in the formulation of basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts.'" *Safari Club*, 878 F.3d at 320–21 (quoting *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973)). The waivers determined whether California may

20

prospectively enforce state standards that otherwise would be preempted by the Clean Air Act. They govern future model years for cars and engines, future sales, future fuel use, and future manufacturer compliance obligations. Indeed, the Clean Air Act's lead-time requirements confirm the prospective character of the waiver regime. *See* 42 U.S.C. §§ 7521(a)(2), 7543(b)(1)(C). That prospective effect is the hallmark of a rule, not a backward-looking adjudication of past conduct. *See Safari Club*, 878 F.3d at 333 ("[R]ules generally only have 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions." (citation omitted)).

The waivers also implement and prescribe law and policy. Without a waiver, Section 209(a) preempts California's standards. 42 U.S.C. § 7543(a). With a waiver, California may enforce an alternative state regulatory program. And the statute gives that alternative program legal significance under federal law. For instance, compliance with California's waived standards "shall be treated as compliance with applicable Federal standards." *Id.* at 7543(b)(3). A waiver therefore does not merely resolve an individualized concern between EPA and California. It establishes whether a state regulatory program may operate as an alternative federal-law.

Nor are the waivers limited in practical or legal effect to California alone. Once EPA grants California a waiver, other States may adopt California's standards under Section 177 of the Clean Air Act. 42 U.S.C. § 7507. Those States need not obtain separate waivers, and EPA does not conduct separate waiver actions for each adopting State. The result is a regulatory regime that can govern vehicles and engines not only in California, but also every State that chooses to adopt California's standards. That breadth is characteristic of rulemaking, not adjudication. The D.C. Circuit has explained that "most legislative rules are generally applicable," framing "'generalized standard[s]'" for an open class, whereas orders are "'individual' and 'case-by-case.'" *Safari Club*, 878 F.3d at 332–33 (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293–94 (1974)). The

21

waivers here plainly fall on the "generalized standard" side of that line, given their effect on every State that opts to adopt California's program, on every manufacturer selling vehicles nationally, and every fuel supplier affected by their impacts.

*Safari Club* itself illustrates why California's framing fails. There, the Fish and Wildlife Service issued "enhancement findings" governing the import of elephant trophies, and the agency insisted those findings were adjudications. 878 F.3d at 320. The D.C. Circuit disagreed, holding that the findings "fit these definitions of 'rule' to a tee" because they applied "across the board" to all future imports rather than adjudicating "a particular set of disputed facts." *Id.* at 321, 333 (citation omitted). The court distinguished *National Biodiesel Board v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016), where EPA's approval of a single Argentine producer group's compliance plan was a genuine adjudication because "'[t]he approval, by its own terms, applie[d] only to [that] program'" and no other entity could invoke it without a separate application. *Safari Club*, 878 F.3d at 334 (quoting *Nat'l Biodiesel Bd.*, 843 F.3d at 1018). EPA's waivers here look nothing like the single-applicant approval in *National Biodiesel Board*. They look like the across-the-board finding in *Safari Club*. The waivers each involved a determination that, once made, control an open-ended set of future actors, i.e., every adopting state, every manufacturer, and countless fuel producers, not a single applicant.

The Ninth Circuit's decision in *Yesler Terrace Community Council v. Cisneros* further illustrates this point. There, HUD determined that Washington's public housing authority could substitute state eviction procedures for federally required ones. 37 F.3d 442, 448–49 (9th Cir. 1994). Although the agency's action had features resembling adjudication, the court held that the action "has all the hallmarks of a rule" because it had prospective effect and affected a broad category of not-yet-identified individuals. *Id.* The same is true here. EPA's waivers prospectively

22

permit California—and through Section 177, other States—to substitute California's standards for the otherwise applicable federal regime, thereby affecting manufacturers and consumers across a broad future market.

California's contrary argument rests heavily on EPA's past practice of describing waiver decisions as orders and on procedural features of the waiver process. But the label an agency attaches to its own action does not control whether it is a rule. *Safari Club*, 878 F.3d at 332. An agency action can share features with adjudication and still operate as a rule when it prospectively changes the governing legal regime for broad categories of future conduct. The relevant question is not whether California was the applicant, or whether EPA evaluated a record, but what legal effect the waiver has once granted. *Yesler Terrace*, 37 F.3d at 449; *Safari Club*, 878 F.3d at 332–34.

Nor does it matter that California characterizes the waivers as licenses. Even if the waivers have features California associates with licenses, they do far more than grant individualized permission to a single regulated party. They allow California's standards to displace otherwise applicable federal preemption, permit other States to adopt the same standards, and create an alternative federal-law compliance pathway for manufacturers. That is the approval of a regulatory regime with prospective effect across a substantial portion of the national vehicle and engine market. And that is precisely the kind of "generalized standard" of "general . . . applicability and future effect" that the APA defines as a rule. 5 U.S.C. § 551(4); *Safari Club*, 878 F.3d at 332-33 (citation omitted).

GAO's contrary view does not establish that California is likely to succeed. GAO's CRA views are not binding on EPA, Congress, or this Court. *See Ass'n of Civilian Technicians, P.R. Army Chapter v. FLRA*, 269 F.3d 1112, 1115–16 (D.C. Cir. 2001) (courts have no obligations to

23

defer to GAO/Comptroller General views); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 & n. 1 (D.C. Cir. 1984) (noting that "[s]ince the GAO has been thought to be 'an arm of the legislature,' there might be a constitutional impediment to such binding effect" (citation omitted)). And GAO's analysis understates critical features of the Clean Air Act's waiver scheme, especially Section 177's mechanisms allowing other States to adopt California standards and Section 209(b)(3)'s rule that compliance with California's standards counts as compliance with federal standards. Those statutory consequences confirm that EPA reasonably treated the waivers as rules subject to the CRA.

At minimum, California cannot show that EPA's position is clearly wrong, much less that it is likely to succeed on the merits. The statutory definition of "rule" is broad; the waivers operate prospectively; they implement an alternative regulatory regime; and they have consequences for manufacturers, fuel producers, consumers, and other States well beyond California. EPA therefore properly treated the waivers as rules, and California is unlikely to succeed on the merits.

### F.    EPA was not required to conduct notice-and-comment before treating the waivers as CRA-covered rules and submitting them to Congress.

California is also unlikely to succeed on its theory that EPA could not treat the waivers as CRA-covered rules and submit them to Congress without first accepting and considering public comment. That theory misunderstands both the CRA and the APA. EPA's June 12 action was not a legislative rulemaking. EPA did not promulgate a new rule, amend an existing rule, repeal a rule, or impose any new obligation on California or regulated parties. It transmitted already-issued waivers to Congress pursuant to the CRA.

Nothing in the CRA requires notice and comment before an agency makes that submission. The statute provides that, before a covered rule may take effect, the agency "shall submit" to each House of Congress and the Comptroller General a report containing the rule, a concise general

24

statement relating to the rule, and the rule's proposed effective date. 5 U.S.C. § 801(a)(1)(A). Congress did not require agencies to issue a notice of proposed CRA submission, solicit comments, respond to comments, or create a new administrative record before making that report. Instead, the CRA establishes a reporting mechanism for Congress's benefit, not a new agency rulemaking process.

The APA does not supply a missing requirement here. Section 553 applies to "rule making," which the APA defines as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5); *see id.* § 553. A CRA submission does none of those things. It does not formulate a new legal standard. It does not amend the waivers. It does not repeal them. And it does not itself alter the legal obligations of California, manufacturers, or any other party. It is a communication to Congress about an already-final agency action. That is not the kind of agency action for which § 553 requires notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (agencies need not use notice-and-comment procedures except where the APA itself requires them). And courts may not graft additional procedural requirements onto a statute that does not impose them. *See Vt. Yankee Nuclear Power Corp. v. Nuclear Regul. Comm'n, Inc.*, 435 U.S. 519, 524 (1978) (federal courts lack authority to impose procedural requirement on agencies beyond those Congress specified). California's theory asks this Court to do exactly that.

Even setting aside statutory text, California's theory makes no structural sense. Congress enacted the CRA to ensure that Congress receives agency rules and may promptly decide whether to review them through the statutory process. Imposing a judge-made notice-and-comment prerequisite before submission would delay the very congressional review the CRA was designed to facilitate. It would also make little practical sense. The question whether Congress should receive

a rule for possible review is not a separate substantive rulemaking in which EPA sets policy after public comment. It is a statutory reporting step.

Nor can California transform the CRA's "concise general statement" requirement into a full APA notice-and-comment obligation. *See* 5 U.S.C. § 801(a)(1)(A). The CRA requires a concise statement relating to the rule, not another full rulemaking. And even if California believed EPA's submission could have included more explanation, that would not support the extraordinary relief California seeks. The supposed defect would not change the fact that the Court cannot redress California's alleged injury by ordering EPA to retract a completed submission or by preventing Congress from acting. *See supra* § I.D.

California's procedural theory therefore fails. EPA was not required to conduct notice and comment before transmitting the waivers to Congress, and the alleged absence of such process does not make California likely to succeed on the merits.

## II.      California has not shown irreparable harm.

For California to carry its burden to show irreparable harm, its "injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The movant must provide proof that the alleged harm is "certain to occur in the near future," *id.,* and that it is beyond remediation, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006). California asserts that EPA's transmission of the waivers to Congress under the CRA causes it various harms: that EPA transmitting the waivers "smooth[ed] two pathways to the invalidation of these waivers"; that "California must now prepare for the possibility that the underlying regulations may become unenforceable"; and that "EPA's actions also make it more difficult for [the California Air Resources Board] to accomplish its primary mission." *See* Mem. at 28–32 (citation modified). These alleged injuries fall well short of the standard.

26

First, California's asserted injuries begin from a false premise: that EPA's June 12 submissions presently threaten the enforceability of California's regulations. *See* Mem. at 1. But California's waivers remain fully in effect. EPA's June 12 actions neither revoked, suspended, nor modified any waiver. California retains every waiver it possessed before the challenged actions, and regulated entities remain subject to the same California requirements that existed before EPA transmitted the waivers to Congress. California's claimed injury is therefore not a present legal injury flowing from EPA's action, but rather a prediction about what other actors may do later.

California's sovereign-injury cases do not support preliminary relief here. *Maine v. Taylor*, 477 U.S. 131, 135 (1986), involved a State intervening after a federal court had already invalidated its statute. Success on appeal would immediately restore enforceability. *Alaska v. DOT*, 868 F.2d 441, 443 (D.C. Cir. 1989), involved the Department of Transportation's assertion that federal law preempted state consumer-protection statutes. And *New Jersey v. EPA*, 989 F.3d 1038, 1047–48 (D.C. Cir. 2021), involved agency action that immediately made the State's compliance with federal air-quality obligations more difficult. EPA has done nothing comparable here. California continues enforcing its regulations exactly as it did before June 12.

Second, as noted above, California's theory depends on a speculative chain of future events involving independent actors. Congress would have to introduce, consider, and pass resolutions of disapproval. The President would have to sign them. Or EPA would have to initiate and complete a separate administrative withdrawal proceeding. None of that has happened. A claim resting on "contingent future events that may not occur as anticipated or indeed may not occur at all" simply cannot support preliminary judicial intervention. *Texas v. United States,* 523 U.S. 296, 300 (1998) (citations omitted). Nor do allegations of possible future injury satisfy the irreparable harm standard. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Wis. Gas*, 758 F.2d at 674.

27

Third, California's asserted impairment of CARB's mission is likewise insufficient. California's cited cases involved changed policies that had already altered legal protections or already subjected plaintiffs to ongoing legal consequences. In *Whitman-Walker Clinic, Inc. v. DHHS*, 485 F. Supp. 3d 1, 1 (D.D.C. 2020), the challenged rule had already altered governing legal protections, immediately affecting providers' operations. In *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 1 (D.D.C. 2025), plaintiffs challenged an ongoing policy that allegedly subjected them to continuing warrantless arrests. EPA's submissions, by contrast, altered no legal rights or obligations. Any current diversion of CARB resources reflects California's own decision to prepare for possible future events rather than any present legal consequence of EPA's actions.

California therefore has not shown the kind of certain, imminent, and irreparable injury required for preliminary relief. Its claimed harms depend on future legislative or administrative action that has not occurred, may never occur, and would not be prevented by the injunction California seeks.

## III.      The balance of equities and public interest favor denying relief.

California likewise cannot satisfy the remaining equitable factors. When the federal government is the opposing party, the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Those considerations overwhelmingly favor denying relief here. California seeks an injunction that would interrupt an ongoing process established by Congress and carried out by the political branches. *See* Compl. ¶ 9 (discussing EPA having transmitted its waiver decisions to Congress under the CRA in early June); Mem. at 13 (same). The public has a substantial interest in the faithful execution of federal law, the orderly operation of the statutory scheme Congress enacted, and the proper functioning of the coordinate branches of government. Even more, where a legal theory is as fundamentally flawed as California's, the equities weigh decisively against granting relief.

California asks this Court to order EPA to withdraw submissions that have already been transmitted to Congress pursuant to a federal statute. That extraordinary relief would inject the Judiciary into an ongoing Congressional process. The public interest does not favor such judicial intervention into Congress's deliberative processes. *See Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 49 n.11 (D.D.C. 2018) (discussing the "strong public interest" in allowing Congress to complete its own investigative and deliberative processes).

In addition, the equities favor denying relief because California has not shown imminent irreparable injury. "Injunctions . . . will not issue to prevent injuries neither extant nor presently threatened, but only merely 'feared.'" *Exxon Corp. v. FTC*, 589 F.2d 582, 594 (D.C. Cir. 1978) (citing *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)). The challenged waiver decisions remain in effect unless and until Congress and the President complete the process established in the CRA. And California will only suffer an injury if Congress grants and the President signs resolutions of disapproval thus nullifying EPA's waivers.

Finally, the public interest favors denying relief because California is unlikely to succeed on its claims. "It is in the public interest to deny injunctive relief when the relief is not likely deserved under law." *Hubbard v. United States*, 496 F. Supp. 2d 194, 203 (D.D.C. 2007) (citation modified); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 335 (D.C. Cir. 2018) (denying preliminary injunction and holding that because the Archdiocese had not demonstrated a likelihood that its constitutional rights were being violated, its public interest argument—that the public interest favors protection of constitutional rights—was unavailing). As explained above, California's Motion is barred by multiple procedural and substantive defects. California's Motion should be denied.

29

## CONCLUSION

Plaintiff's Motion for Preliminary Injunction should be denied.

Dated: July 10, 2026

Respectfully submitted,

*/s/ Michael B. Schon*

Michael B. Schon
mike@lehotskycohn.com
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW
 Suite 700
Washington, DC 20001
Tel.: (512) 693-8350
Fax: (512) 727-4755

Katherine C. Yarger* (CO 40387)
LEHOTSKY COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lehotskycohn.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

*Counsel for American Fuel & Petrochemical Manufacturers and American Petroleum Institute*

* Application for admission to D.D.C. forthcoming.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document complies with Local Civil Rule 7(e) because it does not exceed 45 pages.


Dated: July 10, 2026                                          Respectfully submitted,

                                                             */s/ Michael B. Schon*
                                                             Michael B. Schon

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2026, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Dated: July 10, 2026                                 Respectfully submitted,

                                                          */s/ Michael B. Schon*
                                                          Michael B. Schon