**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>        *Plaintiff*,<br><br>      v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>        *Defendants*. | Case No. 1:26-cv-02185-BAH |

**<u>REPLY IN SUPPORT OF EPA'S MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

I.     Congress expressly barred judicial review of the determination that
       California seeks to challenge here. ..........................................................................2

II.    California lacks standing to challenge EPA's determination or its reports to
       Congress under the Congressional Review Act.......................................................11

III.   Neither EPA's determination nor its submission of reports to Congress is
       final agency action................................................................................................19

CONCLUSION...................................................................................................................... 22

## TABLE OF AUTHORITIES

**Constitution**

U.S. Const. art. I, § 5.............................................................................................. 12

U.S. Const. art. I, § 7.............................................................................................. 12

**Cases**

*Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020) ..................... 21, 22

*Ardelyx, Inc. v. Kennedy*,
179 F.4th 947 (D.C. Cir. 2026)............................................................................ 7, 9

*Bennett v. Spear*,
520 U.S. 154 (1997)............................................................................................ 20

*Biden v, Texas*,
597 U.S. 785 (2022)............................................................................................ 20

\**CBD v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019) ............................................................................... 5

\**Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)................................................................................. 12, 13, 18

\**Coll. Sports Council v. GAO*,
421 F. Supp. 2d 59 (D.D.C. 2006)................................................................... 2, 6, 7

*Common Cause v. Biden*,
909 F. Supp. 2d 9 (D.D.C. 2012), *aff'd on other grounds,* 748 F.3d 1280 (D.C. Cir. 2014) ... 11

*COMSAT Corp. v. F.C.C.*,
114 F.3d 223 (D.C. Cir. 1997)........................................................................... 7, 8

\**Dalton v. Specter,*
511 U.S. 462 (1994)............................................................................................ 19

\**Defs. of Wildlife v. Perciasepe*,
714 F.3d 1317 (D.C. Cir. 2013)....................................................................... 13, 15

*Equal Rts. Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011)........................................................................... 19

\**FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)................................................................................. 12, 18, 19

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025)............................................................................................ 16

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)..................................................................................................... 20

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..................................................................................................... 18

*In re Murray Energy Corp.*,
   788 F.3d 330 (D.C. Cir. 2015)................................................................................ 14, 19

*Ivy Sports Med., LLC v. Burwell*,
   767 F.3d 81 (D.C. Cir. 2014)........................................................................................ 8

*Kan. Nat. Res. Coal. v. DOI*,
   971 F.3d 1222 (10th Cir. 2020) ................................................................................. 3, 4

*Latif v. Obama*,
   677 F.3d 1175 (D.C. Cir. 2012).................................................................................. 16

*Lockhart v. Coastal Int'l Sec., Inc.*,
   905 F. Supp. 2d 105 (D.D.C. 2012)............................................................................ 12

*Loving v. DOD*,
   550 F.3d 32 (D.C. Cir. 2008)...................................................................................... 17

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................... 15, 17

*Montanans For Multiple Use v. Barbouletos*,
   568 F.3d 225 (D.C. Cir. 2009).............................................................................. 3, 6, 9

*Mullin v. Doe*,
   609 U.S. __, 146 S. Ct. 2121 (2026)..................................................................... 3, 4, 5

*Murthy v. Missouri*,
   603 U.S. 43 (2024)...................................................................................................... 13

*Nat'l Ass'n of Mfrs. v. DOD*,
   583 U.S. 109 (2018)....................................................................................................... 3

*Nixon v. United States*,
   506 U.S. 224 (1993)..................................................................................................... 11

*NRDC v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988)........................................................... 1, 2, 7, 9, 10, 20

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
   962 F.2d 27 (D.C. Cir. 1992).............................................................................. 13-14, 15

iii

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
　45 F.4th 353 (D.C. Cir. 2022)................................................................................................ 21

*Safari Club Int'l v. Zinke*,
　878 F.3d 316 (D.C. Cir. 2017)............................................................................................... 21

*Simon v. E. Ky. Welfare Rights Org.*,
　426 U.S. 26 (1976)................................................................................................................. 12

*Trump v. CASA, Inc.*,
　606 U.S. 831 (2025)............................................................................................................... 10

*Trump v. Mazars USA, LLP*,
　591 U.S. 848 (2020)............................................................................................................... 10

*Trump v. New York*,
　592 U.S. 125 (2020)............................................................................................................... 17

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
　578 U.S. 590 (2016)......................................................................................................... 20, 21

*USPS v. Gregory*,
　534 U.S. 1 (2001)................................................................................................................... 16

*Wash. All. of Tech. Workers v. DHS*,
　892 F.3d 332 (D.C. Cir. 2018)............................................................................................. 6, 9

*Whitman-Walker Clinic, Inc. v. HHS*,
　485 F. Supp. 3d 1 (D.D.C. 2020)........................................................................................... 19

*Whitmore v. Arkansas*,
　495 U.S. 149 (1990)............................................................................................................... 14

**Statutes**

5 U.S.C. § 558(c) ....................................................................................................................... 16

5 U.S.C. § 706(1) ......................................................................................................................... 8

5 U.S.C. § 801(a)(1)(A) ..................................................................................................... 3, 5, 8, 22

5 U.S.C. § 802(a) ....................................................................................................................... 13

5 U.S.C. § 802(g) ..................................................................................................................... 9, 12

5 U.S.C. § 805............................................................................................................................ 2, 6, 8

16 U.S.C. § 1333(a) ................................................................................................................... 21

iv

16 U.S.C. § 1333(b)(2) .......................................................................................................... 21

42 U.S.C. § 7543(b)(1) .......................................................................................................... 16

42 U.S.C. § 7607(b)(1) .......................................................................................................... 17

**Federal Register**

83 Fed. Reg. 42986 (Aug. 24, 2018).................................................................................... 16

84 Fed. Reg. 51310 (Sep. 27, 2019) .................................................................................... 16

**Dictionary**

Black's Law Dictionary (6th ed. 1990).................................................................................... 3

Webster's Third New Int'l Dictionary (Philip Babcock Gove ed., 1986) ...................................... 3

**INTRODUCTION**

The Court should reject California's invitation to step into the minefield of policing agency compliance with the Congressional Review Act. Through a comprehensive jurisdiction-stripping provision, Congress made perfectly clear that oversight of the CRA is for Congress and Congress alone. California lacks any plausible argument for ignoring the plain text of the CRA's jurisdictional bar, and the context of congressional oversight makes an overwhelming case for declining judicial review because "congressional reporting" is "quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *NRDC v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988) (R.B. Ginsburg, J.).

This Court lacks jurisdiction for an additional, independent reason: California doesn't come close to showing it has Article III standing. It relies on injury from a hypothetical future statute and, even spotting California's speculation that Congress might pass a joint resolution, injury from Congress enacting a statute is attributable to the unfettered choice of Congress, a third party not before the Court. Nor is the injury redressable because no proper use of the equitable power would allow a court to enjoin a communication between an agency and Congress. More still, even if the Court were to order EPA to rescind its reports, Congress could pass a joint resolution anyway, as California now concedes by substantially walking back its lead standing theory.

California's backup standing arguments fare no better. It offers the entirely speculative contention that EPA's CRA determinations and submissions to Congress are part of a secret plan to administratively rescind California's preemption waivers, and that *that* hypothetical future action would cause it harm. In reality, California offers no factual basis for this assertion, and no legal basis for the confused assumption that EPA's CRA actions change (in any respect) the procedures that California may (or may not be) entitled to in a hypothetical future agency proceeding to withdraw a waiver.

California also fails to state a claim for which relief can be granted. Among other reasons, for now it suffices to say California alleges no final agency action. While the complaint purports

1

to identify two final actions, neither has *any* present effect on California, EPA, or the waivers at issue in this case. Whether those waivers are properly subject to the CRA's legislative procedures are questions for Congress to decide, and any legal consequences for California would flow from Congress's or the EPA's hypothetical future actions—not anything EPA has done to date.

This Court should dismiss the complaint in full.

## I.    Congress expressly barred judicial review of the determination that California seeks to challenge here.

The CRA mandates that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. California nevertheless seeks judicial review of EPA's "determin[ation] that each of [four] waivers is … a rule … under the Congressional Review Act." Compl. ¶ 9 (citation modified), Dkt. No. 1. To avoid the jurisdictional bar, California asks this Court to rewrite the provision to say, effectively, "[n]o determination, except for a determination that an agency action is a rule, under this chapter, shall be subject to judicial review." This Court should reject that invitation out of hand.

Not only is the statute's text dispositive, but so is its context. At bottom, California complains that EPA over-complied with a congressional reporting requirement. But the presumption of reviewability "is inapplicable" to "congressional reporting requirements," and it is doubtful that "an interbranch reporting requirement can ever be reviewable in the absence of an express provision for judicial review," let alone when, as here, the statute expressly bars review. *Hodel*, 865 F.2d at 318 & n.33. As one court saw it: "The District of Columbia Circuit has expressly held that congressional reporting statutes … are not reviewable under the APA, and the Court must adhere to that holding." *Coll. Sports Council v. GAO*, 421 F. Supp. 2d 59, 67 (D.D.C. 2006) (citing *Hodel*, 856 F.2d at 319).

**1.**  The core textual issue is whether EPA's determination that its preemption waivers are rules under the CRA is a "determination … under" the CRA. If so, then all agree that § 805 bars this suit. To decide that question, this Court must interpret the words "determination" and "under."

2

*Determination.* The word "determination" is a "synonym for 'decision'" and can also "describe the chain of events leading up to a decision." *Mullin v. Doe*, 609 U.S. __, 146 S. Ct. 2121, 2133 (2026). *Under.* "[T]he word 'under' is a chameleon that must draw its meaning from its context." *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 124 (2018) (quotation marks omitted). In § 805, "under" most naturally means "pursuant to," *Nat'l Ass'n of Mfrs.*, 583 U.S. at 124, "according to," Black's Law Dictionary 1525 (6th ed. 1990), or "subject to the … authority of," Webster's Third New Int'l Dictionary 2487 (Philip Babcock Gove ed., 1986), the CRA.

The phrase "'under this chapter' modifies 'determination,'" and "other parts of the CRA expressly contemplate various determinations." *Kan. Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1235 (10th Cir. 2020). One of those "other parts of the CRA" is the requirement that each agency submit every "rule" to Congress for review. 5 U.S.C. § 801(a)(1)(A). To fulfill that responsibility, agencies must determine whether each agency action is a rule under the CRA. *See* U.S.Br. 3-4, Dkt. No. 20-1.

Here, EPA decided that its preemption waivers are reportable under the CRA. That is a "determination … under" the CRA. Because California's claims are based entirely on its request for judicial review of that determination, the claims must be dismissed. *See Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.). Indeed, the challenge to that determination is California's only basis for challenging EPA's reports submitted to Congress. So the only question this Court needs to decide is whether EPA's determination is a determination under the CRA.

Although unnecessary to resolve this case, EPA's reports to Congress are also an "action" "under" the CRA. Submitting the reports is an "action" because it is "a thing done." Webster's at 21. And the submission was "under" the CRA because EPA sent the reports to Congress for the stated purpose of congressional review under the CRA, which is exactly what the CRA itself requires. 5 U.S.C. § 801(a)(1)(A).

EPA explained all of this in its opening brief. U.S.Br. 10-11.

**2.**   In response, California tilts at windmills, strenuously insisting that this Court "has jurisdiction to determine its own jurisdiction." Cal.Reply 3, Dkt. No. 26. Of course it does. To assess its jurisdiction, this Court should interpret § 805, including the words "determination" and "under," just as the Supreme Court did in *Mullin* and *National Association of Manufacturers*. EPA has never argued that "this Court lacks jurisdiction to determine whether Section 805 applies." *Id.* at 1. EPA does not argue "for a different approach." *Id.* at 4.

California, though, does propose a different approach. What California wants is not for the Court to interpret the jurisdiction-stripping provision, but to first decide the *merits* of whether EPA *correctly* determined that its preemption waivers are rules under the CRA. To get there, California contends that "the presence of a federal agency's 'rule'" is a "predicate element[]" to "trigger the jurisdiction-stripping provision." Cal.Reply 2-3; *see also id.* at 5 ("predicated on the presence of a 'rule'"). According to California, although § 805 bars review when agencies make determinations "of various kinds," *id.* at 6, it is inapplicable when they determine whether an agency action is a rule because that is a special "predicate element."

California's convenient and atextual gloss has no basis in the statute that Congress actually enacted. The jurisdiction-stripping provision says nothing at all about a threshold determination of the presence of a rule—indeed, it does not use the term "rule." Instead, it categorically says that no "determination" "under" the CRA is subject to review. The CRA contemplates "various determinations," and "[t]here is nothing in the text of the CRA to suggest that § 805 applies only to a subset of these determinations." *Kan. Nat. Res. Coal.*, 971 F.3d at 1235-36 (rejecting argument that § 805 applies only to Congress's determinations).

The Supreme Court rejected similar attempts to contort the meaning of "determination" just last month in *Mullin*. There, a statute barred judicial review of "any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 146 S. Ct. at 2133. "This text is clear," the Court explained, "and its plain meaning very broad." *Id.* The Court rejected arguments that "determination" applied "only to substantive claims," not "procedural errors"; that it applied only

4

"to determinations about conditions in the [foreign] country"; and that it applied only to the "ultimate determination," "not any subsidiary decision." *Id.* at 2134-37. When a statute bars review of any "determination," the statute means what it says, and "challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering." *Id.* at 2136.

As in *Mullin*, California's attempt at clever lawyering should be rejected. Other than its desire to obtain judicial review, there is no reason to give special treatment to the one determination California seeks to challenge. A plaintiff could just as well point to any other CRA provision as a "predicate element." Indeed, that is what the plaintiff argued in *CBD v. Bernhardt*, 946 F.3d 553, 562-63 (9th Cir. 2019). According to that plaintiff, the trigger for Congress to act "under" the CRA was that an agency must submit a rule to Congress before it takes effect, "in accordance with" § 801(a)(1)(A). *Id.* at 562. Because the agency allegedly submitted its wildlife regulation in violation of the CRA's timing requirements, the plaintiff argued, that predicate element was not met. *Id.* at 563. The rule was therefore supposedly "not eligible for disapproval," and Congress's joint resolution was not enacted "under" the CRA for purposes of § 805. *Id.* The Ninth Circuit straightforwardly rejected that argument, holding that "enacting a joint resolution of disapproval is an action under the CRA," regardless of whether the supposed predicate element of a rule submitted "in accordance with" the CRA was satisfied. *Id.*

That reasoning applies here. Just as there was no judicial review of whether the wildlife regulation was properly "eligible for disapproval" under the CRA in *Bernhardt*, there is no judicial review of whether the preemption waivers are "eligible for disapproval" under the CRA.

California ignores all of this and then contends that EPA "misreads" *Bernhardt* because it "did not decide that Section 805 forbids courts from interpreting Section 805." Cal.Reply 7-8. Again, that is not EPA's argument. California also contends that *Bernhardt* addressed claims alleging "violations of the CRA" rather than claims "that rest on basic administrative-law precepts." *Id.* But *Bernhardt* addressed an "ultra vires" claim, just as California alleges here. 946 F.3d at 563. And California's complaint, including both its APA and ultra vires claims, is based entirely on its allegation that EPA incorrectly determined that its preemption waivers are rules

under the CRA. Compl. ¶ 9. Just as in *Bernhardt*, California's claims are inextricably intertwined with determinations under the CRA. U.S.Br. 15; *see also Coll. Sports Council*, 421 F. Supp. 2d at 67 (dismissing APA claim seeking review of GAO report required by statute).

For all of these same reasons, California fails to distinguish the D.C. Circuit's holdings in *Montanans* and *Washington Alliance* by claiming that "the CRA is not triggered" because there is no rule. Cal.Reply 7. The D.C. Circuit has twice applied § 805's "unequivocal" language to reject claims based on violating the CRA. *Montanans*, 568 F.3d at 229; *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018). This Court should do the same.

**3.** California next attacks another strawman it calls "EPA's Bootstrapping Argument." Cal.Reply 5. In California's telling, "EPA says that when it concludes its Reclassification" is an "action" under the CRA, "that conclusion is itself a 'determination' that Section 805 shields from review." *Id.* EPA says no such thing.

To begin, when California says "Reclassification," it means "determination." As alleged in its complaint, the reclassification occurred when EPA "determined that each of these waivers is … a rule … under the Congressional Review Act." Compl. ¶ 9. Next, that determination is the "action" California refers to. Cal.Reply 5. Finally, EPA has never argued that "when it concludes" that its determination is an action under the CRA, "that conclusion itself is a 'determination' that Section 805 shields from review." *Id*. EPA instead simply points out the obvious: the thing California seeks to challenge is EPA's determination that its preemption waivers are rules under the CRA. It is for this Court to decide whether that is a "determination" "under" the CRA. 5 U.S.C. § 805. EPA's argument is "unassailable," Cal.Reply 5, not because of any impermissible bootstrapping, but because it straightforwardly applies the statute's plain text.

Although unnecessary to resolve this case, the same is true if the focus is on the act of sending the report to Congress, rather than on the determination embodied in the report. EPA does not argue that *it concluded* that submitting the reports to Congress is an action under CRA, much less that any such conclusion "is itself" a determination that is unreviewable. EPA simply points out that it in fact submitted the waivers to Congress for purposes of facilitating Congress's review

under the CRA. It is for this Court to decide whether that submission is an "action" "under" the CRA. The answer to that question is easy—particularly because California itself argues that, by EPA's sending Congress the preemption waivers, Congress is more likely to invalidate them through "congressional resolutions of disapproval" that Congress says are enacted under the CRA. Cal.Reply 22; PI Mot. 28, Dkt. No. 13-1.

California's two cited cases lend its bootstrapping argument no support. Cal.Reply 5 (citing *COMSAT Corp. v. F.C.C.*, 114 F.3d 223, 227 (D.C. Cir. 1997); *Ardelyx, Inc. v. Kennedy*, 179 F.4th 947 (D.C. Cir. 2026)). Both cases address statutes with different text and context than § 805, and both are readily distinguishable. Most glaringly, "congressional reporting requirements" are "an entirely different sort of agency action" than the imposition of regulatory fees and allocation of healthcare costs addressed in those cases. *Hodel*, 865 F.2d at 318. Reporting requirements are "singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements." *Id.* In this context, not only is the "presumption of reviewability … inapplicable," *id.*, but the D.C. Circuit has "expressly held that congressional reporting statutes … are not reviewable under the APA." *Coll. Sports Council*, 421 F. Supp. 2d at 67 (discussing *Hodel*).

Next, the Supreme Court's decision in *Mullin* is far more relevant than *COMSAT* or *Ardelyx* for interpreting § 805. The text of the provision in *Mullin* prohibits review of any "determination," just as § 805 does. By contrast, neither *COMSAT* nor *Ardelyx* address that key term.

Separately, unlike in *COMSAT* and *Ardelyx*, federal agencies indisputably have authority under the CRA to make determinations as to whether their promulgated actions are rules or orders within the meaning of the CRA. If they get that determination wrong, it doesn't mean they didn't have authority to make the determination in the first place.

To explain, the jurisdiction-stripping provision in *COMSAT* provided that "[i]ncreases or decreases in fees made by amendments pursuant to this paragraph shall not be subject to judicial review." 114 F.3d at 227 (emphases omitted). Because the language specifically referenced a particular type of agency action, the court concluded that this provision applied only "where the

Commission has acted within the scope of its authority" under "this paragraph." *Id.* Accordingly, the scope of the jurisdictional provision "merge[d]" with whether the agency acted within its statutory authority "under this paragraph." *Id.*

Compare that to § 805: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." Applying the reasoning in *COMSAT*, this provision applies only where an agency acts within its authority to make a determination, finding, or action under the CRA. That is surely the case here. After all, every time an agency issues an agency action, the CRA *requires* it to decide whether to send that action to Congress. 5 U.S.C. § 801(a)(1)(A); U.S.Br. 2-3. To do so, the agency must determine whether the action is a rule or an order under the CRA. Because the statute requires agencies to send rules to Congress, it necessarily requires agencies to determine whether an action is a rule that must be sent to Congress. And because the text of § 805 says "No determination" under the CRA, rather than "No correctly decided determination" under the CRA, the question is not whether the agency got the determination right, but whether it made a determination.

As for California's argument that an agency gets only one shot at determining whether an action is a rule and can never revisit that determination, Cal.Reply 5; PI Mot. 28, it offers no plausible statutory or legal basis for that position. Agencies can and should fix past errors, particularly when doing so facilitates congressional oversight. *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) ("power to reconsider is inherent in the power to decide").

More still, *COMSAT*'s reasoning about "scope of … authority" does not apply to the text of § 805. Consider that § 805 also prohibits judicial review of any "omission" under the CRA. An "omission" is the failure to do a required act. Agencies lack authority to fail to do a required act. *See* 5 U.S.C. § 706(1) (agency action "unlawfully withheld"). Thus, even where the agency's omission is unequivocally not "within the scope of its authority under" the CRA, *COMSAT*, 114 F.3d at 227, Congress precluded courts from reviewing that unauthorized "omission." Far from "preposterous," Cal.Reply 5, this makes perfect sense in the CRA context, where Congress enacted a broad jurisdiction-stripping provision to protect its exclusive prerogative to conduct

8

congressional oversight of agency action. Indeed, the D.C. Circuit has declined to review a claim asserting unauthorized omissions under the CRA. *Montanans*, 568 F.3d at 229; *see also Wash. All.*, 892 F.3d at 346.

*Ardelyx* is similarly inapposite. *Ardelyx*, 179 F.4th at 945-56. There, the statute barred review of an agency's "identification of renal dialysis services" in a Medicare payment, and the court held that this jurisdiction-stripping provision applied only after the court first "decide[s] whether the agency's actions qualify as an 'identification of renal dialysis services' within the meaning" of that provision. *Id.* at 955. As applied to § 805, that simply means this Court must decide for itself whether EPA's determination that these preemption waivers are rules under the CRA is a determination under the CRA.

**3.** California offers no response at all to the dispositive point that the CRA is a tool for congressional oversight, and that it seeks to challenge an agency's compliance with a congressional reporting requirement. *compare* Cal.Reply 10-11, *with* U.S.Br. 16. Compliance with "congressional reporting requirement[s]" is "committed to *congressional* discretion" rather than judicial oversight. *Hodel*, 865 F.2d at 318. It is solely "within the province of the political branches to resolve as part of their ongoing relationships." *Id.* at 319.

*Hodel* applies to the CRA with full force. The consequence of any agency overcompliance with the CRA is that Congress stays more informed about agency activities. *See* U.S.Br. 3-4. That is a good thing. The CRA must be interpreted to give agencies broad latitude to report actions to Congress out of an abundance of caution, as agencies frequently do. U.S.Br. 4. By contrast, the consequence of California's position is that courts would be the arbiters of congressional oversight. Courts would determine what agency actions Congress is permitted to review, notwithstanding a plain-as-day jurisdictional bar and a statutory scheme expressly adopted as an exercise of Congress's exclusive, nonjusticiable rulemaking power. 5 U.S.C. § 802(g).

Adopting California's interpretation of § 805 would raise constitutional concerns by putting courts in the untenable position of interfering with "on-going relationships between the two political branches in our system of separated powers." *Hodel*, 865 F.2d at 319; *id.* at 317

9

(questioning whether "the veritable cornucopia of federal reporting requirements, involving basic interrelationships between the Article I and Article II branches, are appropriate grist for the judicial mill"); *cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) ("The congressional power to obtain information is broad and indispensable. It encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.") (citation modified).

Relatedly, California's position would lead to misuse of equitable power. California asks this Court to compel an agency to withdraw reports it sent to Congress and to enjoin that agency from sending future reports to Congress. Equitable authority is "not freewheeling," and using that authority to order an agency to retract a communication from Congress would be extraordinarily inappropriate. *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025); *Hodel*, 865 F.2d at 318-19. If Congress thinks EPA's preemption waivers are not rules, it can ignore the submission entirely, or consider legislation on the subject *without* using the CRA's streamlined procedures.

But Congress undoubtedly thinks EPA's preemption waivers are in fact within the scope of the CRA because it used the CRA last year to invalidate three preemption waivers. U.S.Br. 17. In response to this, California attacks yet another strawman. It recasts EPA's argument as a "contention that Congress amended the CRA in 2025." Cal.Reply 10. No, EPA did not argue that Congress "amended the CRA" when it used the CRA to invalidate EPA's preemption waivers. EPA argued instead that "Congress already made the relevant determination" that EPA's waivers are "rules for purposes of the CRA." U.S.Br. 17. Congress already conclusively resolved the issue by determining that EPA's waivers are subject to the CRA. *Id.* at 6 (citing OMB Letter, https://perma.cc/T5L3-USQV). This Court has no jurisdiction to second-guess that determination or EPA's determination about the four waivers at issue here, which is fully consistent with Congress's view.

California protests that Congress somehow did not really decide that the preemption waivers "are properly subject to the CRA" when Congress voted to subject the preemption waivers to the CRA. Cal.Reply 11; *see* U.S.Br. 17. That is not just wrong, but it stumbles right into a

separate political-question problem. This Court cannot exercise oversight over congressional lawmaking procedures, as (in other parts of their filings) California seems to recognize. *See* Cal.Reply 20 ("California does not seek an order from this Court that would require 'second-guessing' procedures or motivations 'of legislators'") (citation modified and quoting U.S.Br. 23). California's contention that the Senate "lacked the filibuster-proof super-majority to pass ordinary legislation," so it "executed an extraordinary procedural maneuver" because it "did not want to overrule the Senate Parliamentarian's decision that EPA's waivers are not rules," *id.* at 11 (emphasis omitted), is the stuff of a nonjusticiable political question, through and through, *see Nixon v. United States,* 506 U.S. 224, 228 (1993); *Common Cause v. Biden*, 909 F. Supp. 2d 9, 30 (D.D.C. 2012), *aff'd on other grounds,* 748 F.3d 1280 (D.C. Cir. 2014). California's arguments should be rejected, and the Court should dismiss the complaint.

## II.    California lacks standing to challenge EPA's determination or its reports to Congress under the Congressional Review Act.

EPA's opening brief explained why, even if California could somehow get around the plain text of 5 U.S.C. § 805, this Court still lacks subject-matter jurisdiction for more conventional reasons: in particular, California's failure to demonstrate Article III standing. In response, California doubles down on a remarkable theory of standing that relies on some combination of (1) an "elevated risk" of possible future actions (either by EPA or by Congress) that might cause future harm, or (2) its own decisions to "divert[] resources to start planning now for the heightened possibility that certain state regulations may become unenforceable." Cal.Reply 21-23. All of these theories lack merit.

**1.** California's complaint (as well as its motion for a preliminary injunction) first sought to establish cognizable harm on the theory that EPA's interpretation of the Congressional Review Act will "ease the path to congressional invalidation" of its preemption waivers. Compl. ¶ 84; *see also id.* ¶ 89 (alleging that "EPA's actions are intended to draw the enforceability of California's regulations into question and, ultimately, to facilitate an end to that enforceability," including "through expedited congressional action"); PI Mot. 28 ("EPA invites Congress to repeat its 2025

11

actions and 'review'—i.e., disapprove—these four waivers, purportedly under the CRA, as it did with three others.").

EPA's opening brief, however, explained why that theory is baseless. *See* U.S.Br. 18-23. In short, bare speculation about the possible future actions of an independent third party not before the Court—much less the actions of the United States Congress, a co-equal branch of government—cannot support standing. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-11 (2013); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). And setting aside California's reliance on speculation, "Congress can pass laws disapproving of these waivers without *any* involvement from EPA," using whatever procedures it sees fit. U.S.Br. 23. As long as it complies with the constitutional minimum of bicameralism and presentment, *see* U.S. Const. art. I, § 7, cls. 2-3, Congress's procedures are up to Congress. *See* U.S. Const. art. I, § 5, cl. 2. ("Each House may determine the Rules of its Proceedings . . . ."); 5 U.S.C. § 802(g) (reaffirming in the CRA itself "the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House").

In response, California retreats—now disclaiming any effort to "'base its injury on Congress enacting a joint resolution,' or allege 'injury from a hypothetical future statute.'" Cal.Reply 20 (quoting U.S.Br. 20, 22) (citation modified). Indeed, California now concedes that "Congress can pass legislation 'regardless of whether EPA withdraws the reports.'" *Id.* at 21 (quoting U.S.Br. 22). And California offers no further argument in support of this theory, other than dubiously resisting the premise that they ever made the argument in the first place. *But see supra* at 11. It is thus abandoned. *See Lockhart v. Coastal Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 118 (D.D.C. 2012) ("The law is also well-settled in this jurisdiction that 'when a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.'") (Howell, J.).

Regardless, the concession was appropriate. In addition to the obvious speculative injury and redressability problems set forth above and in EPA's opening brief, it would also raise significant and needless separation-of-powers questions for this Court to order EPA not to submit information to Congress, as explained above. *Supra* at 9-10. And in any event, this theory would seem to have a short shelf-life, even if California still relied on it. The CRA's expedited procedures for consideration of a joint resolution of disapproval generally require action within 60 days (excluding certain adjournments). *See* 5 U.S.C. § 802(a). And so, as California itself alleges (correctly), "the clock is already ticking" for any possibility of "expedited congressional action" using CRA procedures. Compl. ¶ 89.

**2.** California's second theory is that, now that these waivers have been "reclassified," *EPA* (rather than Congress) is more likely to take some future action that causes harm to California. In particular, California hypothesizes that "EPA is likely considering administrative withdrawal" of the relevant waivers and asserts that the challenged "Reclassifications streamline that process," which in turn "escalat[es] the risk" of the future harm that California fears it will suffer, if and when EPA one day actually withdraws the waivers in question. Cal.Reply 18; *see also id.* at 22 (similar). And, as part of what California describes as EPA's "undisclosed plan to rescind these waivers," California further predicts that EPA will not only revoke the relevant waivers, but will at some as-yet-unidentified future moment do so without "notice and an opportunity to correct before initiating any withdrawal proceeding." *Id.* at 18 (emphasis omitted). This theory is meritless.

First, and perhaps most obviously, this theory again suffers from an insurmountable speculation problem. *See Clapper*, 568 U.S. at 409, 411-14; *Murthy v. Missouri*, 603 U.S. 43, 70 (2024). Ultimately, California's argument is that some *future* agency action might cause it harm, if and when that future agency action—which undisputedly has not happened—actually *does* happen. But "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013); *see also, e.g.*, *Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir.

1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990)). That principle is straightforwardly fatal to this theory of standing.

Consider the implications of California's contrary position—that is, that anyone can file a lawsuit to challenge any step that leads to an "elevated risk" of possible future regulatory action that *itself* would cause future harm. Cal.Reply 21. Under that regime, one could presumably challenge a whole host of inchoate steps towards some possible future agency action—press releases, policy announcements, website updates, and so on. For one particularly telling example, consider a notice of proposed rulemaking. A proposed rule published in the Federal Register typically provides very strong evidence—much stronger than anything that California has offered here—that an agency is considering (or perhaps even likely to take) a future final action that may cause someone a concrete Article III injury in the future. After all, a final rule often reads similarly to a proposed rule. But it is nonetheless black-letter law that courts "do not have authority to review proposed agency rules." *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.); *see also, e.g.*, Order, *NAACP v. U.S. Postal Serv.*, No. 26-5257 (D.C. Cir. July 17, 2026), Dkt. No. 2183853 (granting motion to stay pending appeal because a "proposed rule is likely neither constitutionally nor prudentially ripe for review"). That is because the cognizable Article III injury, if any, comes only from the final rule—while "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334.

Here, California's theory is even more speculative than a challenge to a proposed rule and thus cannot support standing *a fortiori*. Future agency proceedings relating to rescission of the waiver in question remain entirely hypothetical. In other words, EPA has not announced any actual or proposed future action to withdraw these waivers—instead, California merely speculates that EPA has an "undisclosed plan" to do so. Cal.Reply 18. But even if California had firmly established the existence of such a plan, under D.C. Circuit precedent, California lacks standing to challenge government action A (which causes no harm itself) on the theory that it suggests that

14

government action B (which *would* cause Article III injury) is now more likely to follow. *See Perciasepe*, 714 F.3d at 1324-25, *Platte River*, 962 F.2d at 35.

Second, even if California could establish injury-in-fact with speculation about the increased likelihood of some *other* future agency action that is not before the Court, California also faces an entirely independent causation and redressability problem. That is because, whatever the "risk" is that EPA will take some future administrative action to rescind the waivers at issue, any injury would be caused by that future agency action—not by any of the actions that are currently before the Court. The lack of "a causal connection between the injury and the conduct complained of" is straightforwardly fatal to Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

What's more, even accepting the premise that there is some "risk" of a future EPA action rescinding these waivers, that risk is entirely unaffected by (1) EPA's determination that the waivers are "rules" rather than "orders" within the meaning of the CRA; or (2) EPA's submission of a copy of those waivers to Congress, consistent with the procedures set forth in the CRA. EPA's authority to rescind a waiver under the provisions of the Clean Air Act is independent of the Congressional Review Act. Indeed, EPA's recission authority would still exist even if California prevails on every claim in this lawsuit. In other words, the risk of a future administrative withdrawal of these waivers (insofar as there is any risk) exists regardless of EPA's determination that the waivers are "rules" rather than "orders" for purposes of the Congressional Review Act— and would likewise exist regardless of a ruling from this Court on that abstract legal question. That reality further confirms the absence of either traceability or redressability.

As for California's conclusory suggestion that EPA's purported interpretation of the CRA "streamlines" EPA's possible future withdrawal of the waivers, California offers no explanation for why that would be true. Cal.Reply 18. And it is not—EPA's interpretation of the CRA has nothing to do with the legal process that is (or is not) required for a hypothetical future action rescinding a Clean Air Act preemption waiver. The procedural protections that California is (or is

15

not) guaranteed before withdrawal of a waiver are entirely unchanged by EPA's interpretation—or even *this Court's* interpretation—of the CRA.

California does repeatedly imply (without much explanation) that, under 5 U.S.C. § 558(c), these waivers are "license[s] required by law," and California asserts that this provision would entitle it to notice and an opportunity to respond "before the institution of agency proceedings" to withdraw that "license." That may or may not be correct—for example, California ignores the language in the cited provision that provides a broad exception any time the "public health, interest, or safety requires otherwise," 5 U.S.C. § 558(c)—but this Court need not opine on any of those questions now. Indeed, EPA *itself* need not opine (and has not opined) on those questions now—because it has not taken any steps to withdraw any of the waivers (or alleged "license[s]" at issue), much less made any decisions about what sort of process to offer to California if it one day takes that step.

Even if this Court wishes to indulge in speculation about EPA's future actions, at the very least, the Court should presume that EPA will *follow* the law—not violate it. Government agencies are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025); *see USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies."); *Latif v. Obama*, 677 F.3d 1175, 1178-79 (D.C. Cir. 2012). And California offers nothing to overcome that presumption here. Indeed, to *issue* a Clean Air Act preemption waiver, it is undisputed that EPA may do so only after providing notice and an opportunity for comment. 42 U.S.C. § 7543(b)(1). And in the past, EPA has also offered notice (as part of rulemaking proceedings) well in advance of efforts to *withdraw* a Clean Air Act waiver—whether or not doing so was legally required. *See* 83 Fed. Reg. 42986 (Aug. 24, 2018); 84 Fed. Reg. 51310 (Sep. 27, 2019).

Although it (concededly) never raised this argument in the past, *see* Cal.Reply 13 n.9, now, it seems that California takes the position that even full notice-and-comment rulemaking would be insufficient "notice" before revoking a preemption waiver. *See id.* at 13. But again, the Court need not (and should not) decide hypothetical legal questions about hypothetical future disputes. For

16

current purposes, all that matters is that if California is one day dissatisfied by the amount (or form) of process that it receives in a hypothetical future proceeding to withdraw one of its waivers, California will be free, at that time, to file a petition for review in the Court of Appeals, *see* 42 U.S.C. § 7607(b)(1), and argue in that petition for review that EPA has violated the law. The courts can consider those arguments in the normal course. But the fact that the parties *might* one day have a dispute over a possible future agency action cannot provide Article III standing now. *See, e.g.*, *Trump v. New York*, 592 U.S. 125, 131 (2020) (no standing and no ripeness to challenge an Executive Order because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time").

Finally, when it comes to the *factual* question of EPA's current intent, California asserts that EPA "could have … established that it has no such plan … with a declaration." Cal.Reply 18. But it is California that bears the burden to make an affirmative showing of Article III standing, not EPA's burden to disprove it. *Lujan*, 504 U.S. at 561. California cannot carry that burden with baseless speculation about "undisclosed plan[s]." Cal.Reply 18. And EPA has no obligation to disclose its deliberations (if any) about agency actions that have not yet been taken and may never be taken—especially not to refute baseless allegations that themselves were accompanied by no evidence. Indeed, an agency's "undisclosed plan[s]" are at the heartland of what the deliberative-process privilege is designed to protect. *See, e.g.*, *Loving v. DOD*, 550 F.3d 32, 38 (D.C. Cir. 2008). That is why, although the judges in this District routinely adjudicate APA cases against the federal government, those cases never decide the legality of "undisclosed plan[s]"—or, for that matter, even *fully disclosed* "plans"—they decide the legality of actual (and final) agency actions, *see infra* at 19-22, which cause some actual or imminent (rather than theoretical) harm.

**3.** Finally, California continues to devote significant attention to (largely unsupported) assertions that it is "expending state funds and diverting resources to start planning now for the heightened possibility that certain state regulations may become unenforceable." Cal.Reply 23. Even accepting all of those facts as true at the motion-to-dismiss stage, they also fail to establish Article III standing, for at least two reasons.

17

First, California "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. That is so even if California's "fear" could fairly be described as "nonparanoid" or "not fanciful, irrational, or clearly unreasonable." *Id.* Such "fear[s]," reasonable or not, do not support a case or controversy under Article III. And so, because the speculative "possibility that certain state regulations may become unenforceable" as a result of some future government action is not itself enough to support standing, Cal.Reply 23; *see supra* at 11-17, the fact that California claims to be *planning* for that speculative possibility gets it no closer.

Second, even setting aside the speculation problem, California's diversion-of-resources theory has its genesis in a broad reading of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)—a reading that was explicitly rejected by *Alliance for Hippocratic Medicine*. Although the Supreme Court did not formally overrule *Havens* in its entirety, it clarified that "*Havens* was an unusual case" and emphasized that courts should be "careful not to extend the *Havens* holding beyond its context." *All. for Hippocratic Medicine*, 602 U.S. at 396.

California wants this Court to ignore that warning. Indeed, it repeatedly asserts that it has "expend[ed]" and "divert[ed]" resources in response to EPA's actions here. Cal.Reply 23; *see id.* at 19 (asserting that the State "must expend—and is already expending—state funds" and that it is "divert[ing] agency resources to plan for the possibility that these waivers … will be invalidated"); *id.* at 23 (explicitly discussing "diversion" of "resources"). But *Alliance* explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and confirmed that "*Havens* does not support such an expansive theory of standing." 602 U.S. at 395. Nor does it help that California asserts that its alleged diversion-of-resources "hamper[s] the California Air Resources Board's mission to protect public health." Cal.Reply 1. After all, in *Alliance* itself, "the medical associations" also alleged that "FDA ha[d] 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Alliance*, 602 U.S. at 394. That wasn't enough.

18

To be sure, California wisely did not cite *Havens* itself. But instead, it relies entirely on a 2020 district-court opinion that *did* rely explicitly on *Havens*, and the broader body of pre-*Alliance* case law that *Alliance* itself rejected. *See* Cal.Reply 23 (citing *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020)). In that opinion, after citing *Havens*, Judge Boasberg explained that "as long as the organization will expend resources 'to counteract the effects of the defendant's' challenged conduct, that diversion can suffice for Article III purposes." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 19 (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (discussing *Havens* at length)). Whether or not that was a correct statement of the law in 2020, it is not the law today. *See Alliance*, 602 U.S. at 395. California's resource-diversion theory of standing should be rejected.

### III.    Neither EPA's determination nor its submission of reports to Congress is final agency action.

As EPA showed in its opening brief, neither the purported "reclassification" of the waivers from orders to rules nor the submission of those waivers to Congress qualify as final agency action under the APA. *See* U.S. Br. 24-27. This conclusion follows ineluctably from *Dalton v. Specter*, in which the Supreme Court held that reports submitted to the President by the Secretary of Defense and a commission regarding proposed military base closings are not final agency actions because only the President could actually close the relevant bases; the reports, therefore, were more like "tentative recommendation[s] than … final and binding determination[s]." 511 U.S. 462, 469 (1994). In this case, just like in *Dalton*, EPA's legal conclusion and report to Congress have "no direct consequences" on the waivers at issue in this case. *Id.* Rather, Congress has the final word here, and speculation regarding EPA's possible future agency action (much less *congressional* action) are not final agency action within the meaning of the APA. *See, e.g.*, *In re Murray Energy Corp.*, 788 F.3d 330, 336 (D.C. Cir. 2015) ("[E]ven if EPA's position on its legal authority is set in stone, the agency's statements about its legal authority—unconnected to any final rule or other final agency action—do not impose any legal obligations or prohibitions on

19

petitioners."); *Hodel*, 865 F.2d at 318 (holding an executive response to a congressional reporting requirement unreviewable).

In attempting to distinguish this case from *Dalton*, California points to three "consequences" that, it claims, "have already occurred." Cal.Reply 14 (emphasis omitted). According to California, by concluding that the waivers at issue in this case are rules under the CRA, EPA has (1) triggered its obligation to transmit the waivers to Congress and (2) deprived California of certain procedural rights under the APA. *Id.* at 12. And, in California's telling, EPA's legal conclusion and its reports to Congress have rendered the waivers subject to the CRA. *Id.* at 13-15. But all of California's asserted consequences flow directly from the CRA or the APA and not from any purported action by EPA.

Rather, the legal regime remains the same regardless of whether EPA considers the waivers rules or orders and whether the Agency transmits the waivers to Congress or fails to do so.[1] Congress can (and often does) disagree with an agency's characterization of its own action and can act under the CRA even if the agency does not send that action to Congress. *See* U.S.Br. 3-4. Here, EPA's legal conclusion[2] and reports to Congress have no impact on the legal regime, and so are not final agency action. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (contrasting biological opinion issued under the Endangered Species Act, which "alter[s] the legal regime" to which another agency is subject and is therefore final agency action, with the transmissions to Congress in *Dalton* and *Franklin v. Massachusetts*, 505 U.S. 788 (1992), "which were purely advisory and in no way affected the legal rights of the relevant actors," which were not). California's attempt to analogize this case to *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590 (2016),

---

[1] California incorrectly argues that EPA forfeited any argument that EPA's conclusion and transmission imposed legal obligations on EPA. *See* Cal.Reply 12. However, in its motion to dismiss, EPA argued that California's asserted actions have "no legal consequences for the waivers at issue in this case," and did not bind EPA, unlike the action at issue in *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016). U.S.Br. 26. EPA did not forfeit these arguments.

[2] Additionally, a court may not review "an abstract decision apart from specific agency action." *Biden v. Texas*, 597 U.S. 785, 809 (2022).

therefore, fails. *See* Cal.Reply 13. Unlike in *Hawkes*, in which the agencies bound themselves to provide a safe harbor under the Clean Water Act, 578 U.S. at 598-600, here EPA cannot bind Congress or contract or expand any purported "safe harbor" from congressional disapproval.

EPA's legal conclusion similarly did not deprive California of any procedural rights in some hypothetical future proceeding under the APA. *See* Cal.Reply 12-13. EPA's views about the CRA have no bearing on whatever rights California possesses: if EPA one day decides to administratively rescind the waivers and in doing so provides what California considers to be insufficient procedural protections, California can (of course) petition for review of EPA's (hypothetical) future decision and make those very arguments. And a court will then decide whether EPA provided sufficient process in that (currently hypothetical) future proceeding. *Cf. Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (concluding that agency action was a rule, notwithstanding the Agency's contrary determination). But today, EPA's interpretation of the CRA has no present, independent legal effect on California. *See Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353 (D.C. Cir. 2022) (agency action imposes no direct and appreciable legal consequences when it "has no independent legal force").

The case on which California principally relies shows why. In *America Wild Horse Campaign v. Bernhardt*, the Court considered a land use plan by the Bureau of Land Management to convert certain public lands from "herd management areas," which are managed for wild horses, to "herd areas," which are not and on which the appropriate number of wild horses is typically zero. *See* 442 F. Supp. 3d 127, 139, 147-51 (D.D.C. 2020) (Howell, J.), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021). The Wild Free-Roaming Horses and Burros Act requires the Secretary of the Interior to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," 16 U.S.C. § 1333(a), including by "remov[ing] excess animals … to achieve appropriate management levels," *id.* § 1333(b)(2). And the Bureau of Land Management must conduct that removal of excess animals in accordance with its land use plan and the appropriate management levels that plan establishes. *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 150. This

21

Court held that the land use plan at issue qualified as final agency action because in setting the appropriate management level of horses on the lands at issue at zero, the agency constrained its future discretion in conducting wild horse gathers. *See id.* In that case, the classification of the public lands as a herd area and the setting of the appropriate management level of the horses *by the agency* altered the legal regime. *See id.* In this case, by contrast, the *CRA* imposes the obligations to send rules to Congress and subjects them to congressional oversight. *See* 5 U.S.C. § 801(a)(1)(A).

Because the purported agency actions California identifies have no effect on EPA, California, or the waivers at issue in this case, they are not final agency action.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the complaint in full.

Dated: July 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. PEZZI
(DC Bar #995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
stephen.pezzi@usdoj.gov
(202) 305-8576

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney*
*General*
ROBERT N. STANDER
(DC Bar #1028454)
*Deputy Assistant Attorney General*

<u>*/s/ Jeffrey Hughes*</u>
MARTHA C. MANN
(FL Bar #155950)
JEFFREY HUGHES
(NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources
Division
P.O. Box 7611
Washington, D.C. 20044
(202) 717-7067 (Stander)
(202) 353-5900 (Mann)
(202) 532-3080 (Hughes)
robert.stander@usdoj.gov
martha.mann@usdoj.gov
jeffrey.hughes@usdoj.gov

23