**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

STATE OF CALIFORNIA,


*Plaintiff*,


v.


LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator, and U.S. ENVIRONMENTAL PROTECTION AGENCY,

    *Defendants*,

and

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS AND AMERICAN PETROLEUM INSTITUTE,

*Intervenor-Defendants*.

</td><td>

Civil Action No.: 1:26-cv-02185-BAH

</td></tr>
</table>

**REPLY IN SUPPORT OF AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS AND AMERICAN PETROLEUM INSTITUTE'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Introduction.................................................................................................................. 1

Argument .................................................................................................................... 2

   I.   California lacks standing.................................................................................. 2

      A.  California has not identified a cognizable injury caused by EPA's determinations that is sufficient to support standing under Article III..............................................................................................................2

      B.  California cannot establish redressability because this Court cannot undo Congress's review process. ...............................................................4

   II.  The CRA's jurisdiction-stripping provision bars review of California's claims. ..................................................................................................... 8

   III.  EPA acted consistently with the CRA, and California identifies no reviewable agency action.............................................................................. 10

      A.  EPA's waiver determinations are rules subject to CRA review............................11

      B.  California identifies no reviewable agency action. .................................................13

Conclusion ............................................................................................................... 16

CERTIFICATE OF COMPLIANCE............................................................................. 17

CERTIFICATE OF SERVICE ................................................................................... 18

**INTRODUCTION**

California asks this Court to use the Administrative Procedure Act and an ultra vires theory to prevent Congress from reviewing EPA waivers under a process that Congress established for itself in the Congressional Review Act ("CRA"). But several threshold jurisdictional bars and substantive flaws stand in the way of the relief California seeks.

California lacks standing. Most fundamentally, California has not shown that the relief it seeks would redress its alleged injuries. The waivers are already before Congress, and California concedes that Congress may legislate regardless of whether EPA withdraws its reports. Dkt. 26 at 21. Thus, even an order giving California every form of relief it seeks, whether it is framed as an order to "set aside" or something else, would not prevent Congress from reviewing and potentially disapproving the waivers. Article III does not permit a court to issue relief that will have no effect. And California has not identified a cognizable injury in any event. California's waivers remain in effect. EPA's action did not revoke, suspend, or alter them. The risk to their enforceability depends on what Congress and the President do next.

Even apart from Article III, Section 805 independently forecloses California's claims because "[n]o determination, finding, action, or omission under th[e CRA]" is subject to judicial review. 5 U.S.C. § 805. California's own Complaint confirms that EPA made the very determination the CRA shields from review. *See* Dkt. 1 ¶ 9 (challenging EPA's "determin[ation] that each of [four] waivers is . . . a rule . . . under the Congressional Review Act") (citation and quotation omitted). EPA's submission of the waivers is both a "determination" and an "action" under the CRA. California attempts to recharacterize EPA's actions as a "reclassification" somehow outside the CRA so that it can argue that the "reclassification" was erroneous. But the D.C. Circuit has already rejected an attempt to use a merits challenge to circumvent Section 805. In *Montanans for*

*Multiple Use v. Barbouletos*, the D.C. Circuit held that the CRA precludes even judicial review of an agency's compliance with CRA submission requirements. 568 F.3d 225, 229 (D.C. Cir. 2009). The same rule applies here.

Last, while the Court need not look further than California's lack of standing or Section 805's jurisdictional bar, California's claims still fail. The waivers are rules, and California identifies no separately reviewable final agency action.

The Court should dismiss this case.

## ARGUMENT

**I.      California lacks standing.**

> **A.      California has not identified a cognizable injury caused by EPA's determinations that is sufficient to support standing under Article III.**

California claims that EPA's actions threaten the enforceability of four of its regulatory programs. *See* Dkt. 36 at 7. But California's own preliminary-injunction motion admits that "the purported change from orders to rules has not (yet) altered the enforceability of the State's laws." Dkt. 13-1 at 3. California also alleges that EPA's submission caused it to "divert[] resources to start planning now for the heightened possibility that certain state regulations may become unenforceable." Dkt. 27 at 23. But expending resources to plan for some *potential* future harm that is dependent on the actions of an independent third party is not sufficient for Article III injury in fact. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The crux of California's asserted future injury depends on what Congress or the President may do next. California describes EPA's actions as "*invit[ing]* Congress" to disapprove the waivers. Dkt. 13-1 at 28 (emphasis added). Correct. Congress may legislate to disapprove the waivers (or not) based on its own views. But the possibility that Congress may later take action does not

2

establish a present Article III injury for claims against EPA. *See Clapper*, 568 U.S. at 410 (rejecting standing based on a "speculative chain of possibilities" dependent on independent decisions of third parties).

California's own briefing makes the point clearer. California admits that Congress "can pass legislation regardless of whether EPA withdraws the reports." Dkt. 26 at 21 (citation omitted). If so, EPA's actions cannot themselves constitute the injury. Whatever Congress ultimately does will result from Congress's independent exercise of its legislative authority.

Reliance on Intervenor-Defendants' intervention arguments does not help California. Dkt. 36 at 7; *contra* Dkt. 33 at 3 (explaining that Proposed Intervenors' interest under Rule 24 "does not require the future approval or disapproval of the waivers" and "is fully consistent with Proposed Intervenors' challenge to California's standing"). This Court held that Intervenor-Defendants possess "a legally protected interest in the litigation" because "[t]he *outcome of this lawsuit* may directly affect [their] members, who manufacture fuels, operate refineries, and distribute and sell fuel nationwide." Minute Order Aug. 4, 2026 (citation omitted) (emphasis added). The Court separately acknowledged California's materially different theory of injury—that "submission of the waivers [to Congress] threatens their continued effectiveness. . . ." *Id.* (citation omitted).

The two interests are materially different. Intervenor-Defendants' interest arises from currently operative California regulations and from the relief California asks this Court to enter in this litigation. California's alleged injury, by contrast, rests on the possibility that EPA's submission of the waivers will increase the risk that some future congressional action will impair California's ability to enforce those regulations. *See, e.g.*, Dkt. 27 at 21–23 (noting the "*elevated risk*" of possible future action and that California needs to "divert[] resources to start planning now for the *heightened possibility* that certain state regulations may become unenforceable" (emphasis

3

added)). The Court's conclusion that California's requested relief may impair Intervenor-Defendants' existing economic interests therefore does not establish that EPA has inflicted a present Article III injury on California. It supports, rather than undermines, Intervenor-Defendants' standing argument.

> **B.    California cannot establish redressability because this Court cannot undo Congress's review process.**

Even setting injury aside, California has not shown that the relief it seeks would redress its alleged injuries. The claimed harm remains even if the Court assumes that California is presently diverting resources or suffering the mission impairment it alleges. That is because even an order "setting aside" EPA's submission of the waivers would have no effect on Congress. There is nothing that an order of the Court here can do to alter congressional actions or any subsequent legislation.

California asks the Court to declare EPA's actions unlawful, enjoin EPA from treating the waivers as rules, and require EPA to withdraw its submissions to Congress. *See* Dkt. 1 at 28–29. But the CRA establishes procedures through which Congress may review and disapprove the waivers. 5 U.S.C. §§ 801–808. EPA cannot dictate whether Congress considers them or what Congress does with them. Dkt. 20-1 at 3–4 (explaining that Congress may and has "enacted joint resolutions under the CRA even when an agency did not submit the report to Congress, *based on Congress's own determination that the agency action was subject to the CRA*." (emphasis added)). Nor can an injunction against EPA make Congress "unreceive" the waivers, erase those materials from congressional proceedings, prevent Members from considering the waivers, or dictate the procedure under which either House may act.

This point is even more salient now that Congress has acted on the waivers. Both the House and Senate have introduced resolutions of disapproval that, together, cover all four waivers at issue

in this case. *See* H.R.J. Res. 202, 119th Cong. (2026); S.J. Res. 205, 119th Cong. (2026); S.J. Res. 206, 119th Cong. (2026); S.J. Res. 207, 119th Cong. (2026); S.J. Res. 208, 119th Cong. (2026). The Court of course cannot repeal or suspend Congress's own procedural rules or actions. *See, e.g.*, *United States v. Ballin*, 144 U.S. 1, 5 (1892) ("The Constitution empowers each house to determine its rules of proceedings."); *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171–72 (9th Cir. 2007) ("In short, the Constitution textually commits the question of legislative procedural rules to Congress. Thus, whether Congress decides to hold a hearing on legislation applicable to the general public is a non-justiciable political question beyond our power to review.").

Because, as California has acknowledged, Congress "can pass legislation regardless of whether EPA withdraws the reports," Dkt. 26 at 21 (citation and quotation marks omitted), California cannot establish that an order of this Court can redress its claimed injury. And even if California could satisfy the injury-in-fact requirement due to the need to presently divert resources to address a potential future threat, an order from this Court to EPA would still not remove those asserted injuries because Congress would remain free to proceed under its own rules and legislative judgments. Article III requires that a favorable decision be at least "likely" to redress the complained-of injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation and quotation marks omitted). Here redress is not merely unlikely, it is not possible. And courts may not issue mere advisory opinions. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 673 (2021) (warning that "unelected judges [do not have] general authority to conduct oversight of decisions of the elected branches of Government").

California attempts to avoid the foregoing problems by characterizing EPA's conduct as first "Reclassification" and then "Submissions." *See* Dkt. 36 at 9. But the distinction California

5

contrives has no practical or legal significance. EPA's determination that the waivers were report-able under the CRA was made for the purposes of, and embodied in, the reports EPA sent to Congress. There is no freestanding agency action that exists apart from those transmission reports. California cannot manufacture two independently reviewable actions, and two independent theories of redressability, out of what is, by its own pleading, *see* Dkt. 1 ¶ 9, a single determination for each of the four waivers.

In any event, the more fundamental problem for California is that the requested relief would not eliminate the asserted threat. EPA need not "submit" the waivers in order for Congress to take them up under the CRA. *See supra* at 4 (explaining that Congress may and has enacted joint resolutions even when an agency did not submit the report to Congress based on its own determination that the agency action was subject to the CRA). And Congress has now taken these waivers up. Vacating the supposed "reclassification" would not eliminate the congressional process that California says threatens its interest.

California also argues that present expenditures and mission impairment injuries exist because EPA increased the risk that the waivers will be invalidated. Dkt. 36 at 7–9. But if California must continue preparing for possible congressional action even after receiving the relief it seeks against EPA, then its expenditures are not redressable merely because they began before Congress acts. Relief that leaves the allegedly harmful contingency intact cannot satisfy Article III simply because it may alter California's assessment of the risk. Indeed, California's purported injuries would be no different if Members of Congress had introduced a bill outside of the CRA process to revoke the waivers, or, for that matter any other bill that California dislikes.

Section 558(c) does not supply a separate redressable injury either. As explained below, EPA has not commenced a withdrawal proceeding, denied California any procedural protection,

or determined that Section 558(c) would not apply in a future proceeding. There is therefore no present procedural deprivation for the Court to restore. California is ultimately left only with the threatened invalidation of its waivers. That is the very injury that relief directed at EPA cannot prevent.

Moreover, California stresses, as it must, that it seeks relief only against EPA, not Congress. Dkt. 36 at 9–12. But that framing underscores rather than cures the problem. Congress is not a party, and an injunction against EPA cannot bind Congress. *See* Fed. R. Civ. P. 65(d)(2). Whatever the Court may order EPA to do, Congress remains free to consider the waivers, apply its own procedural rules, and *legislate*. Fundamentally, Congress's consideration of the waivers is a legislative act that this Court cannot superintend or control. California cannot establish redressability by deliberately limiting its requested relief to an actor that does not control the outcome of a third-party's action that it wishes to prevent.

In sum, a declaration that EPA acted unlawfully would do no more than expound upon the legality of past conduct without providing effective relief, but that is a function Article III does not assign to federal courts. *See California*, 593 U.S. at 673 (explaining that where no injunction or other effective relief is available, the requested relief "could amount to no more than a declaration" and that such declaratory relief cannot itself establish Article III jurisdiction); *Steel Co. v. Citizens*

7

*for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").[1]

## II.     The CRA's jurisdiction-stripping provision bars review of California's claims.

California's claims challenge precisely the conduct Section 805 places beyond judicial review. Section 805 of the CRA provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. California's Complaint challenges EPA's "determin[ation] that each of [four] waivers is . . . a rule . . . under the Congressional Review Act." Dkt. 1 ¶ 9 (citation and quotation marks omitted). Because California seeks judicial review of a "determination," "finding," or "action" under the CRA, the CRA forecloses review. *See Montanans*, 568 F.3d at 229 (holding CRA precludes review of agency compliance with submission requirements); *see also* Dkt. 22-5 at 6–7 (collecting several cases applying Section 805's jurisdictional bar); Dkt. 32 at 2–3 (explaining the definitions of "determination" and "under" in the CRA).

California never answers the reasoning of the D.C. Circuit in *Montanans* or the other cases enforcing Section 805's jurisdictional bar in similar situations. In *Montanans*, the plaintiffs sought to invalidate United States Forest Service plan amendments based on the agency's alleged failure to comply with the CRA's reporting requirement. *See* 568 F.3d at 226. The D.C. Circuit held that Section 805 "denies courts the power to void rules on the basis of agency noncompliance with the

---

[1] California's invocation of the court's equitable flexibility, Dkt. 36 at 9–10 (citing *Hecht Co. v. Bowles*, 321 U.S. 321 (1944)), misunderstands Intervenor-Defendants' argument. The problem is not that this Court lacks equitable power over EPA, or that relief is unavailable absent a statutory withdrawal procedure. The problem is that no exercise of that power—however flexibly molded—can reach the actor whose conduct California fears. Equity's flexibility is a principle of remedial *form*, not a license to dispense with Article III's requirement that the remedy actually redress the injury. An order directing EPA to "withdraw" its reports would leave Congress exactly where it stands today: in possession of the waivers, with pending resolutions of disapproval, and free to legislate.

Act." *Id.* at 229. The court found Section 805's language "unequivocal" and held that it precluded judicial review "even assuming that the plan amendments qualify as rules subject to the Act in the first place." *Id.*; *see also* Dkt. 22-5 at 6–7 (collecting similar cases from across the country). That same preclusion applies here.

California instead attempts to avoid Section 805. California emphasizes of Intervenor-Defendants' acknowledgement that the CRA applies to "rules." Dkt. 36 at 2 (citing Dkt. 22-5 at 7) (explaining that the CRA applies because the waivers are rules). The plain text of the statute is clear on that point. But that acknowledgment does not somehow concede California's desired framing—that a court may decide whether these waivers are rules before determining whether Section 805 bars review of that very question. Such reasoning would functionally write out of the statute the jurisdiction stripping provision embedded in Section 805.

At base, California asks this Court to reach the merits question in order to then determine that the jurisdiction stripping provision does not apply. That is improper. *See, e.g.*, *Kans. Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1230, 1235–36 (10th Cir. 2020) (interpreting the text of Section 805 itself, specifically, the words "omission" and "under," and holding that Section 805 "precludes judicial review" of a claim that an agency violated the CRA without addressing the merits of whether the agency violated the CRA); *Montanans*, 568 F.3d at 229 (holding that § 805 "denies courts the power to void rules on the basis of agency noncompliance with the [CRA]" and "precludes review" of such a claim).

The proper threshold question is whether EPA made a "determination, finding, action, or omission under" the CRA. 5 U.S.C. § 805. EPA determined that the waivers were rules subject to the CRA and accordingly submitted them to Congress. Congress has now taken up these waivers, introducing legislation. *See supra* at 4. Whether EPA was correct says nothing about the threshold

9

jurisdictional question. Section 805 does not make judicial review available whenever a plaintiff alleges that an agency got its CRA determination wrong. *Cf. Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) (explaining that when the question of arbitrability has been delegated to the arbitrator, "a court possesses no power to decide the arbitrability issue").

As noted above, to hold otherwise would gut Congress's decision to remove determinations, actions, and omissions under the CRA from judicial review. The D.C. Circuit agrees. *See Montanans*, 568 F.3d at 229; *see also Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018). This Court should dismiss California's claims as barred by Section 805.[2] In any event, and as discussed more fully below, EPA and Congress are correct that the waivers are rules.

**III.      EPA acted consistently with the CRA, and California identifies no reviewable agency action.**

Even if the Court reaches the merits, California's claims fail. California's response depends heavily on dividing each of EPA's June 12 determinations into two supposedly independent agency actions. California characterizes EPA's determinations as separate freestanding "reclassifications" followed by separate "submissions." *E.g.*, Dkt. 36 at 13–17. Notably, California cites no statutory or regulatory authority for these supposed separate agency actions or for the procedures that would govern them. Regardless of how California attempts to relabel EPA's determinations, EPA's determinations were still correct, because the waivers have the prospective legal operation that the APA's broad definition of "rule" encompasses. California cannot manufacture a separately reviewable agency action merely by attaching the label "reclassification" to the determination embodied in EPA's CRA submissions.

---

[2] California is wrong that Intervenor-Defendants have "conceded" its ultra vires claims by failing to separately address the elements of an ultra vires claim. Dkt. 36 at 13, 15. That claim rests on the same theory as California's APA claim—that EPA lacked authority to treat the waivers as rules subject to the CRA. It therefore implicates judicial review of the same CRA "determination" and "action" that Section 805 bars.

**A.      EPA's waiver determinations are rules subject to CRA review.**

California argues that the waivers are adjudicatory licenses and therefore cannot be rules subject to the CRA. *See* Dkt. 36 at 3–4. But the CRA incorporates the APA's broad definition of "rule" as an agency statement designed to implement, interpret, or prescribe law or policy. 5 U.S.C. §§ 551(4), 804(3). Whether an agency action constitutes a rule is a functional inquiry that looks to the effect of the agency action, not its label or characterization. *See Safari Club Int'l v. Zinke*, 878 F.3d 316, 332–34 (D.C. Cir. 2017). An agency cannot avoid treating an action as a rule merely by labeling it an adjudication. *Id.*

The waivers here satisfy the CRA definition of rule. Whatever adjudicatory or licensing features the waiver proceedings may possess, the resulting waiver changes the federal legal regime governing the covered standards. Clean Air Act Section 209 requires EPA to determine whether California's standards are consistent with section 202(a). 42 U.S.C. § 7543(b)(1)(C). Section 202(a), in turn, is the provision under which EPA prescribes the federal emission standards applicable to classes of motor vehicles and engines. *Id.* § 7521(a). EPA thus determines whether an entire state regulatory program is consistent with statutory requirements, and thereby implements, interprets, and prescribes law and policy. Its determination therefore has prospective legal effect. Moreover, absent a waiver, Section 209 prohibits California from "adopt[ing] or attempt[ing] to enforce" emissions standards for new vehicles and engines. 42 U.S.C. § 7543(a). A waiver "waive[s] application of this section" and permits California's standards to operate notwithstanding that prohibition. *Id.* § 7543(b)(1). EPA thus determines whether the statutory conditions for "waiv[ing] application of this section" are satisfied and, once it does, a different legal regime governs future enforcement of the covered standards. That prospective federal legal effect falls comfortably within Section 551(4).

11

In addition, the waivers have sweeping regulatory consequences. They permit California to enforce standards barred by Section 209(a) and establish the requirements manufacturers must satisfy in California. They also trigger the statutory regime under which other States "may adopt and enforce" standards "identical to the California standards for which a waiver has been granted." 42 U.S.C. § 7507.[3] And, once EPA grants a waiver for California's regulatory standards, the Clean Air Act expressly provides that "compliance with such State standards shall be treated as compliance with applicable Federal standards." *Id.* § 7543(b)(3). California responds that these consequences arise from Congress's statutory choices rather than EPA's waiver itself. Dkt. 36 at 4–5. But that misses the point. Congress made EPA's grant of the waiver the predicate for those statutory consequences. The fact that Congress prescribed the consequences of EPA's determination does not make the agency determination that triggers them any less consequential or any less a rule.

California's characterization of the waivers as licenses does not change that result. Dkt. 36 at 3–4. Even if the waivers possess some features of a license or adjudication, the question under the CRA remains whether the agency action also satisfies Congress's definition of a rule. *Safari Club* makes clear that the form of the proceeding does not control where the agency action functions as a rule. 878 F.3d at 332–34. Here, EPA applies federal statutory requirements to determine whether an entire state regulatory program may operate notwithstanding Section 209(a), and the resulting waiver establishes the regulatory regime governing an open class of manufacturers and future vehicle sales. That is the kind of "broad application[] of more general principles," rather

---

[3] California implies that Intervenor-Defendants made a "false" statement in that other States may adopt California's standards. *See* Dkt. 36 at 4. Not so. Intervenor-Defendants explicitly noted at Dkt. 22-1 at 1 n.1 that "California maintains that the Small Off-Road Engine regulation cannot be adopted and enforced by other states." That does not change the point that other states can and "have adopted *many* of California's waived standards." Dkt. 22-5 at 3 (emphasis added).

12

than a "case-specific individual determination," that *Safari Club* identifies with rulemaking. 878 F.3d at 332–33.

California tries to distinguish *Safari Club* because the findings there applied across the board to all future imports whereas the waivers resolved requests by California. *See* Dkt. 36 at 5–6. But that attempted distinction again elevates the identity of the applicant over the function of the agency action. *Safari Club* instructs courts to examine whether the resulting action functions prospectively as a rule rather than simply how the proceeding began. 878 F.3d at 332–34. California similarly emphasizes that some of the standards covered model years that had already begun by the time EPA granted the waivers. Dkt. 36 at 5. That does not eliminate their future effect. The waivers authorize continuing enforcement of those standards and govern future sales and manufacturer compliance. Whatever retrospective effect they may also possess, their continuing prospective operation independently satisfies Section 551(4)'s "future effect" requirement.

California's attempt to downplay *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994), fares no better. Dkt. 36 at 6–7. That decision illustrates the same functional inquiry required by *Safari Club*. *See* Dkt. 22-5 at 22 (discussing and citing *Yesler*, 37 F.3d at 448–49). The relevant question is what EPA's waiver determination does. Here, it determines whether an entire regulatory program complies with federal law and whether California may prospectively enforce standards that the Clean Air Act would otherwise preempt, with statutory consequences for regulated manufacturers, adopting states, and national markets. That is comfortably within the CRA's broad definition of a rule.

## B.    California identifies no reviewable agency action.

California argues that EPA changed what it had classified as an "order" to a "rule," and that supposed "reclassification" independently altered California's legal rights. *See* Dkt. 36 at 13–15. But California's argument begins by manufacturing a freestanding agency action that did not

13

occur. EPA did not reopen or amend the waivers, change their terms, or issue a new order purporting to alter California's rights. It determined, for purposes of the CRA, that the existing waivers satisfy the statutory definition of "rule" and submitted them to Congress on that basis. *See* Dkt. 20-1 at 7. California cannot create a separately reviewable agency action merely by attaching the label "reclassification" to that predicate CRA determination.

California leans on Intervenor-Defendants' statement that "EPA had a statutory obligation to transmit" the waivers once it determined they were rules. Dkt. 36 at 14 (citing Dkt. 22-5 at 3). That does not establish the separate agency action California posits. It shows the opposite. EPA made a determination under the CRA, and the statutory consequence of that determination was the report to Congress. California's effort to split that determination and its prescribed consequence into two independently reviewable actions is artificial. In any event, review of the CRA determination itself is precisely what Section 805 forecloses. *See supra* Sec. II.

California's Section 558(c) argument once again fails. Section 558(c) supplies notice-and-correction procedures before an agency "withdraw[s], suspen[ds], revo[kes], or annul[s] a license." 5 U.S.C. § 558(c). But EPA has not determined that Section 558(c) is inapplicable to any waiver proceeding, denied California notice or an opportunity to correct in any such proceeding, or announced that California would receive fewer procedural protections if such a proceeding occurs. California instead asks the Court to infer, from EPA's treatment of the waivers as "rules" for CRA purposes, that the resolution of a different legal question about what procedures would govern a hypothetical future administrative withdrawal or revocation.

California's reliance on *United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016), does not help it. In *Hawkes*, the jurisdictional determination stripped the landowner of a defined, immediately effective five-year safe harbor from civil enforcement. 578 U.S. at 597–

14

600. That loss was concrete the moment the Corps acted. Here, by contrast, EPA has not denied California any presently existing procedural protection. California retains the waivers and may enforce its regulations today exactly as before. Any dispute over Section 558(c) would arise only if EPA later initiates a withdrawal proceeding and takes a position on what procedures govern that proceeding after Congress and the President have acted. *Hawkes* involved a legal consequence fixed by the challenged agency action itself. California, in contrast, points only to a possible future procedural dispute that EPA has not yet created.

California's own framing shows that there is no concrete or quantifiable loss to California today. California describes EPA's June 12 determinations as designed to "smooth" pathways toward invalidation, not as actions that themselves invalidate anything. Dkt. 13-1 at 28. And the Supreme Court has distinguished agency steps that merely feed into a statutory process from the later act that actually produces legal consequences. *See Dalton v. Specter*, 511 U.S. 462, 469–70 (1994). In *Dalton*, agency recommendations were necessary to the statutory process but were not final because the President, not the agency, took the action that affected the plaintiff's legal position. *Id.*; *see also Bennett v. Spear*, 520 U.S. 154, 178 (1997) (contrasting an action that "alter[s] the legal regime" and thus constitutes final agency action with the "purely advisory" transmissions to Congress in *Dalton* and *Franklin v. Massachusetts*, 505 U.S. 788 (1992)). The same principle applies here. EPA's CRA determination and transmission may place the waivers before Congress, but any invalidation through the CRA would occur only through subsequent legislative action and presentment to the President. The waivers themselves remain effective unless and until that happens.

California therefore identifies no separately reviewable "reclassification." EPA made a determination under the CRA and communicated it to Congress. Section 805 bars review of that

15

determination, and California has identified no distinct agency action that itself altered its substantive or procedural rights.

## CONCLUSION

The Court should dismiss this case.

Dated: August 10, 2026

Respectfully submitted,

*/s/ Michael B. Schon*
Michael B. Schon
mike@lehotskycohn.com
Lehotsky Cohn LLP
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001
Tel.: (512) 693-8350
Fax: (512) 727-4755

Katherine C. Yarger* (CO 40387)
Lehotsky Cohn LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lehotskycohn.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

*Counsel for American Fuel & Petrochemical Manufacturers and American Petroleum Institute*

* Application for admission *pro hac vice* pending; application for admission to D.D.C. submitted.

16

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with Local Civil Rule 7(e) because it does not exceed 25 pages.

Dated: August 10, 2026

Respectfully submitted,

*/s/ Michael B. Schon*
Michael B. Schon

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2026, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.


Dated: August 10, 2026                                  Respectfully submitted,

                                                        */s/ Michael B. Schon*
                                                        Michael B. Schon

18