# EXHIBIT B

**American Fuel & Petrochemical Manufacturers**

1800 M Street, NW
Suite 900 North
Washington, DC
20036

202.457.0480 office
202.457.0486 fax
afpm.org

July 6, 2021

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

***Via eRulemaking Portal:* *www.regulations.gov***

Re: Docket No. EPA-HQ-OAR-2021-0257 -- Request for Public Comment on California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption

Dear Administrator Regan:

The American Fuel & Petrochemical Manufacturers ("AFPM") submit these comments in response to the U.S. Environmental Protection Agency's ("EPA") request for comment on the proposed California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption ("Notice").[1]

AFPM is a national trade association representing most U.S. refining and petrochemical manufacturing capacity. These industries provide jobs, directly and indirectly, to more than three million Americans, contribute to our economic and national security, and enable the production of thousands of vital products used by families and businesses throughout the United States.

AFPM acknowledges climate change is real and is committed to the development of sound policies that enable our members to supply the fuel and petrochemicals that growing populations need to thrive in an environmentally sustainable way. Global emission reductions will not be achieved by political rhetoric or hyperbole. In that regard, there is no such thing as a Zero Emission Vehicle ("ZEV"). ZEVs have no tailpipe emissions; however, they have significant emissions during charging and other phases of their lifecycle.[2]

AFPM supports technology neutral, free market solutions that provide consumer choice for purchasing vehicles, including electric vehicles ("EVs"), but opposes government mandates for EVs and subsidies that create an unlevel playing field and fail to achieve cost-effective

---

[1] 86 Fed. Reg. 22,421 (Apr. 28, 2021).
[2] ZEVs cause criteria pollutant and GHG emissions and environmental impacts throughout their lifecycle, including from minerals mining, component production, assembly, electricity generation, and other processes. *See, e.g.*, Reuters, *This is how many kilometres it takes for an EV to become cleaner than a petrol car*, Sunday Times (Jun 29, 2021) ("Jarod Cory Kelly, principal energy systems analyst at Argonne, said making EVs generates more carbon than combustion engine cars, mainly due to the extraction and processing of minerals in EV batteries. . . .").

emission reductions.[3] The consumer stands in the best position to determine how much efficiency and other vehicle features should factor into vehicle selection. Absent government mandates, manufacturers produce vehicles responsive to consumer needs, whether those involve performance, passenger capacity, cargo capacity, aesthetics, safety, or other configuration options. There is no reason to believe that manufacturers would not respond to consumer demand for greater fuel efficiency and reduced emissions.

## Executive Summary

AFPM opposes EPA's proposed action—rescinding The Safer Affordable Fuel Efficient Vehicles Rule Part One: One National Program ("SAFE I") rule and granting a waiver for the greenhouse gas ("GHG") and ZEV aspects of California's Advanced Clean Car Program ("ACCP"),[4] which purports to reinstate California's prior wavier for those programs. The proposal should be rejected because: (1) The California ACCP is preempted by the Energy Policy & Conservation Act ("EPCA") and void *ab initio* – there is no lawful waiver application for EPA to approve; (2) ACCP fails to meet the Clean Air Act ("CAA") Section 209 criteria for a waiver of preemption and is unconstitutional; and (3) The "whole program" approach is contrary to the Clean Air Act and produces absurd results.

First, California's GHG standards and ZEV mandate are void *ab initio* because EPCA preempts states from enacting regulations related to fuel economy. In a 2006 rulemaking, NHTSA concluded that state GHG regulations are "expressly preempted" by EPCA because they have "the direct effect of regulating fuel consumption."[5] NHTSA, in the SAFE I rule, correctly reached the same conclusion.[6] EPA cannot ignore that California's proposed GHG standards and ZEV mandate are preempted under EPCA. This is especially true in these circumstances given the Agency's recent joint rule with NHTSA on this very subject.

Second, EPA cannot reinstate California's waiver application. CAA Section 209(a) also preempts states from adopting or enforcing new motor vehicle emission standards.[7] EPA may waive Section 209 preemption for a validly issued California regulation, but it must first consider each of the Section 209(b) waiver criteria, which it has not done. Even under the requisite analysis, EPA must conclude that California's ACCP fails to meet CAA Section 209 criteria for

---

[3] *See, e.g.*, ConservAmerica, *Slow Down: The Case for Technology Neutral Transportation Policy*, (Dec. 2020), https://static1.squarespace.com/static/5d0c9cc5b4fb470001e12e6d/t/5fd1580999fe644e8a504a54/1607555090612/CA+Tech+Neutral+Paper+-+12.20+%281%29.pdf. A recently completed research review by ConservAmerica (ConservAmerica Review) examines five unique studies that assess the GHG emissions from a variety of powertrain technologies. Each study uses a life cycle analysis approach to analyze the vehicles emissions based upon "… vehicle size and performance, battery size and lifetime, the carbon intensity of electricity generation and fuel production, and the state of technology advancements." Recognizing these differences, the review concludes that "a variety of automotive technologies and powertrains deliver comparable GHG emission reductions," and that all vehicle technologies should be examined based on the entire lifecycle of the vehicle and their energy sources as all vehicles produce GHG emissions.
[4] Hereinafter, references to the ACCP refer to the ACCP's GHG standards and ZEV mandate.
[5] 71 Fed. Reg. 17,566, 17,654 (Apr. 6, 2006).
[6] 84 Fed. Reg. 51,310, 51,314 (Sept. 27, 2019).
[7] 42 U.S.C. § 7543(a).

a waiver of preemption because California does not "need" its GHG standards and ZEV mandate to meet "compelling and extraordinary conditions." California does not face compelling and extraordinary conditions due to GHG emissions, since climate change is a global phenomenon that does not uniquely affect California. Nor is ACCP needed for California to ensure compliance with the National Ambient Air Quality Standards ("NAAQS"). EPA's proposed "reinstatement" of California's waiver would compound these legal infirmities to the extent that it reimposed requirements for past model years, a retroactive decision that would be contrary to due process and fair notice.

Additionally, considering California's "whole program" rather than individually evaluating the program's particular components (*e.g.*, ZEV mandate) is arbitrary and produces absurd results. Nowhere in the text of Section 209(b) did Congress tie EPA's hands and force EPA to grant or deny California's entire proposed program, rather than consider each new CARB regulation on the merits. Such an extraordinary constraint on the Agency's discretion is found nowhere else in the CAA – or other federal environmental laws. And that is for a good reason: the "whole program" approach would effectively force EPA to grant a waiver for any later standard California proposes once EPA decided initially that California "needs" its own motor vehicle program to address criteria pollution. EPA decisions made in the 1970s would tie EPA's hands more than 50 years later and force approval of whatever new regulation CARB proposes for a waiver. The CAA does not authorize intergenerational bootstrapping.

The SAFE I rule restored Congress's intent to have one national standard. The rule recognized that EPCA's statutory text and purpose signal a robust preemption program for fuel economy. And EPA appropriately scrutinized whether California needs separate GHG tailpipe standards and a ZEV mandate to address compelling and extraordinary conditions. Rescinding SAFE I and purporting to reinstate California's waiver without expressly examining California's modified ACCP and applying the Section 209 criteria is an unlawful and arbitrary political rush to judgment. Therefore, we respectfully request that EPA neither rescind the SAFE I rule nor reinstate California's waiver.

## **<u>Analysis</u>**

### I. EPA Does Not Have a Proper Waiver Application Before It

EPA cannot reinstate California's waiver application because California's GHG standards and ZEV mandate are preempted by EPCA. EPCA prohibits states from *adopting* or enforcing regulations "related to" fuel economy.[8] Since California's GHG tailpipe standards and ZEV mandate are related to fuel economy, they are not lawfully adopted and void *ab initio*—and there is nothing for EPA to reinstate. Contrary to EPA's Notice,[9] nothing in the text or history of

---

[8] 49 U.S.C. § 32919(a).
[9] *See* 86 Fed. Reg. at 22,424, 22,424 n.8 ("Prior to SAFE 1, EPA has consistently declined to consider other potential bases for denying a waiver such as Constitutional claims or the preemptive effect of other Federal statutes.").

CAA Section 209(b)(1) permits EPA to close its eyes to the fact that California's GHG standards and ZEV mandate are unconstitutional under the Supremacy Clause.[10]

EPCA broadly preempts State regulations that are "related to" fuel economy standards,[11] whether or not EPA grants a CAA Section 209 waiver for such regulations. Congress chose the broadest possible preemption language: "related to." As the Supreme Court has noted, "related to" preemption provisions have a "broad scope,"[12] are "deliberately expansive,"[13] and are "conspicuous for [their] breadth."[14] The provision's breadth derives from its plain meaning: "related" means "connected in some way; having relationship to or with something else."[15] At the very least, EPCA's preemption provision preempts state laws that *directly* or *substantially* affect corporate average fuel economy, since such laws lie at the preemption clause's core under any reasonable reading of "related to."[16] Moreover, EPCA does not authorize NHTSA (or EPA) to waive this preemption.

EPCA preempts state tailpipe GHG standards. Such standards are, to say the least, "connected in some way" to federal fuel economy standards, given the direct mathematical relationship between CO2 emissions and fuel economy[17]—a relationship Congress, NHTSA, and EPA recognized such as in EPCA's methodology for measuring fuel economy and EPA's fuel economy labeling program.[18] As NHTSA and EPA explained in the SAFE I proposed rule, "[i]mproving fuel economy is the only feasible method of achieving full compliance" with the state standards.[19] Thus, EPCA expressly preempts state tailpipe GHG standards. Additionally, EPCA impliedly preempts state tailpipe GHG standards because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in creating a national framework for fuel economy regulation.[20] The obstacle is obvious: to the extent a state imposes more onerous standards than the federal government, it has effectively voided NHTSA's

---

[10] *See infra*, pages 5-6.
[11] 49 U.S.C. § 32919(a) ("When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.").
[12] Morales v. *Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).
[13] *Pilot Life Ins. Co, v. Dedeaux*, 481 U.S. 41, 46 (1987).
[14] *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990), *accord Shaw v. Delta Air Lines, Inc.*, 463 U.S. 86, 97 (1983) (concluding that a state law "relates to" a federal law if it has a connection with or "refers to" the subject of the federal law).
[15] *Related*, Black's Law Dictionary (11th ed. 2019).
[16] 84 Fed. Reg. at 54,313.
[17] 84 Fed. Reg. at 51,315; 71 Fed. Reg. at 17,654 ("A State requirement limiting CO2 emissions is such a law or regulation because it has the direct effect of regulating fuel consumption. CO2 emissions are directly linked to fuel consumption because CO2 is the ultimate end product of burning gasoline. Moreover, because there is but one pool of technologies for reducing tailpipe CO2 emissions and increasing fuel economy available now and for the foreseeable future, regulation of CO2 emissions and fuel consumption are inextricably linked.").
[18] *See, e.g.*, 49 U.S.C. §§ 32901–32919; 40 C.F.R. Part 600.
[19] 83 Fed. Reg. 42,986, 43,236 (Aug. 24, 2018); *see Metro. Taxicab Bd. Of Trade v. City of New York*, 615 F.3d 152, 157 (2d Cir. 2010) (EPCA preempts state rules that "make fuel economy standards essential to the operation of those rules.").
[20] *Int'l Paper Co. v. Ouelette*, 479 U.S. 481, 491-92 (1987) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67(1941)).

determination as to the "maximum feasible" standard and disrupted the national program envisioned by Congress.[21]

EPCA preempts ZEV mandates too. ZEV mandates "requir[e] manufacturers to eliminate fossil fuel use in a portion of their fleet,"[22] and thus directly and substantially affect manufacturers' average fuel economy.[23] Therefore, ZEV mandates are expressly preempted under EPCA. ZEV mandates are also impliedly preempted because they conflict with Congress's determination that the "maximum feasible" fuel economy standard should be set without regard to ZEVs.[24] Congress relied on incentives rather than mandates for ZEVs, which "involve[] [the] implementation of some of the most expensive and advanced technologies in the automotive industry."[25] Allowing states to countermand that determination by mandating ZEVs—on top of the "maximum feasible" fuel economy standards set by NHTSA—necessarily "interfere[s] with NHTSA's balancing of statutory factors in establishing maximum feasible fuel economy standards."[26] Simply put, state ZEV mandates require manufacturers to apply and sell the most expensive fuel-reducing technologies first, thus frustrating the economic practicability consideration assessed by NHTSA in determining "maximum feasible" standards.

The D.C. Circuit's holdings in *Motor & Equipment Manufacturers Ass'n v. EPA* (D.C. Cir. 1979) ("*MEMA I"*)[27] and *Motor & Equipment Manufacturers Ass'n v. Nichols* (D.C. Cir. 1998) ("*MEMA II"*)[28] do not forbid EPA from considering whether California's GHG standards or ZEV mandate are preempted under EPCA. These cases involved EPA's scope of review under CAA Section 209. Unlike in *MEMA II*, where industry challenged EPA's failure to consider certain technical requirements beyond the statutory criteria,[29] considering the elemental Constitutional question of whether California's standards are legal under EPCA's express preemption provision is a necessary and proper prerequisite to granting or reinstating a waiver. Moreover, the Court in *MEMA II* thought Section 209(b)(1)'s enumerated factors were not exclusive: "the agency may not evaluate California's waiver application based on factors other than those Congress expressly *or impliedly* intended the agency to consider."[30] Similarly, in *MEMA I* the Court explained that Section 209 "[does not] … forbid[] the Administrator from listening to constitutionally-based challenges."[31] Indeed, while EPA did not consider EPCA preemption until the SAFE I rule, EPA has solicited comments concerning EPCA preemption in

---

[21] 49 U.S.C. § 32902(a). In other words, the statutory language "maximum feasible" must not be treated as a floor.
[22] 84 Fed. Reg. at 51,314.
[23] *See* 49 U.S.C. §§ 32904(a)(2), 32905 (providing for inclusion of EVs' "fuel economy" in calculating corporate average fuel economy). EPCA preempts fuel economy standards regardless of whether the standards are expressed in miles per gallon or some other metric, since Congress intended the preemption provision to apply broadly. S. Rep. No. 93-526 at 66 ("State or local fuel economy standards would be preempted, regardless of whether they were in terms of miles per gallon or some other parameter such as horsepower or weight.").
[24] *See* 49 U.S.C. § 32902(h)(1); 84 Fed. Reg. at 51,320-21.
[25] 83 Fed. Reg. at 43,239.
[26] *Id.*
[27] 627 F.2d 1095 (D.C. Cir. 1979).
[28] 142 F.3d 449, 462-63 (D.C. Cir. 1998).
[29] *MEMA II*, 142 F.3d at 459.
[30] *MEMA II*, 142 F.3d at 467 (internal quotation marks omitted and emphasis added).
[31] *See Motor & Equipment Manufacturers Ass'n v. EPA*, 627 F.2d 1095, 1115 (D.C. Cir. 1979) ("*MEMA I*").

past waiver proceedings.[32] Therefore, *MEMA I* and *MEMA II* do not preclude EPA from considering whether California standards are preempted under EPCA.

In this instance, EPA is required to consider EPCA preemption. While *MEMA I* held that the Administrator was not required to hear due process and First Amendment Constitutional challenges during waiver proceedings, and "[t]he waiver proceeding produces a forum ill-suited to the resolution" of these Constitutional claims,[33] that holding sounded in the comparative competence of agencies versus courts. However, whether emission standards "relate to" fuel economy *is* within the agency's competence, as this relationship is mathematical and based in science rather than understandings of Constitutional law and precedent.[34] As such, *MEMA I*'s reasoning does not apply here.

CAA Section 209(b)(1)(B) waiver criteria support EPA considering EPCA preemption before granting a waiver. For example, California's determination that its state standards would be "at least as protective of public health and welfare as applicable Federal standards" necessarily would be arbitrary and capricious under Section 209(b)(1)(A) if its standards were preempted under EPCA, since its standards cannot protect at all if they are unlawful and thus unenforceable.[35] Nor can California "need" unlawful standards under Section 209(b)(1)(B). As a result, the Section 209 criteria prevent EPA from reinstating a waiver for an application proposing unlawful regulations.

EPA's attempt to bifurcate the SAFE I joint rulemaking and proceed separately from NHTSA does not insulate EPA from having to analyze whether California acted arbitrarily in adopting a state emission standard that is related to fuel economy and therefore preempted.[36]

An agency reversing course "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[37] While agencies "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate," agencies must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy."[38] An agency must therefore address why it is "disregarding facts and circumstances that underlay or were

---

[32] 74 Fed. Reg. 32,744, 32782-83 (July 8, 2008).
[33] *MEMA I*, 627 F.3d at 1114-15.
[34] Even if it were not within EPA's competence, NHTSA's EPCA regulation is still in the Code of Federal Regulations, and reflects that agency's judgment that GHG standards are inextricably related to fuel economy and thus preempted by EPCA. Moreover, the only way for EPA to administer its vehicle emission standard authority consistent with EPCA is to refuse to grant a Section 209 waiver for standards that are related to fuel economy. *See Mass. v. EPA*, 549 U.S. 497, 521 (2006) ("The two obligations [for NHTSA to set fuel economy standards under EPCA and for EPA to regulate motor vehicle GHG emissions under CAA section 202] may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.").
[35] 42 U.S.C. § 7543 (b)(1), (b)(1)(A). *MEMA I* did not address this reasoning and is therefore inapposite here.
[36] *See* 84 Fed. Reg. at 51,338.
[37] *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins.* Co., 463 U.S. 29, 43 (1983); *see also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981-82 (2005).
[38] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

engendered by the prior policy."[39] Because EPA applied EPCA preemption in the SAFE I rule, it would be arbitrary and capricious for EPA to now ignore EPCA preemption by taking no position whether EPCA preempts California's GHG standards and ZEV mandate because that was of central relevance to EPA's revocation of California's waiver. Unlike CAA Section 209, EPCA does not contain a preemption waiver; thus, Congress did not authorize NHTSA (or EPA) to waive EPCA preemption. California's GHG tailpipe standards and ZEV mandate are void *ab initio*. As such, EPA does not have a valid waiver request to grant or reinstate.

## II. California Does Not Qualify for a CAA Section 209 Waiver for GHGs

EPA has not provided a proper legal and factual basis for rescinding the SAFE I rule and purporting to reinstate California's 2013 waiver for the ACCP, including the ZEV mandate. California must resubmit its application because, as a matter of state law, it has changed important underlying requirements of the original 2012 waiver application, including removing the ACCP's deemed to comply provision that ensured compliance with the federal standards would be deemed compliance with California's regulations. Even without this significant amendment, the passage of time and changed circumstances require EPA to fully evaluate the CAA Section 209 waiver criteria prior to reinstating California's waiver.[40] It has not. Moreover, as shown below, California fails to satisfy the CAA Section 209 waiver criteria, so EPA's Notice proposing to rescind the SAFE I rule and purporting to reinstate California's waiver is arbitrary, capricious, and contrary to law.

### A. EPA Must Analyze Each CAA Section 209 Factor to Reinstate California's Waiver

EPA, in its Notice, refuses to analyze the waiver criteria in Section 209(b) beyond what was addressed in the SAFE I rule.[41] This refusal is unlawful because the CAA compels EPA to review the factors in Section 209(b) in deciding whether California's program should remain preempted or be granted a waiver.[42] This is a mandatory obligation; EPA does not have the discretion to ignore this duty.

First, the SAFE I rule withdrew California's waiver, so rescinding SAFE I does not automatically reinstate California's waiver. Reinstating the waiver at this point would violate due process because the ZEV and GHG tailpipe mandates would be reinstated for prior model years

---

[39] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Fox*, 556 U.S. at 516).
[40] *Note* EPA has limited authority to waive preemption under the CAA; however, neither EPA nor NHTSA have the authority to waive EPCA preemption.
[41] 86 Fed. Reg. at 22,423 ("EPA is not soliciting comments on the 2013 ACC program waiver decision, and therefore has not reopened that decision for comments. Specifically, EPA is not soliciting comments on issues addressed in the ACC program waiver decision beyond those issues addressed in the final SAFE I action. EPA will treat any other comments it receives as beyond the scope of this reconsideration proceeding."); *id.* at 22,428-29.
[42] 42 U.S.C. § 7543 ("No such waiver shall be granted if the Administrator finds that— (A) the determination of the State is arbitrary and capricious, (B) such State does not need such State standards to meet compelling and extraordinary conditions, or (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.").

(MYs). Such a retroactive agency action offends principles of fair notice.[43] And granting California's waiver application prospectively would require EPA to effectively re-write the state's application to apply only to MY 2022-2025, an action outside of the agency's authority under Section 209(b). Indeed, applying the waiver prospectively to those future MYs would arbitrarily ignore statutory lead-time requirements for developing and setting emission standards.[44] Since EPA is effectively operating on a blank slate, EPA must again consider each statutory factor to grant California's waiver application. EPA cannot simply declare that its 2013 decision to grant California's waiver is beyond the scope of this proposal and outside the boundaries of formal rulemaking.

Second, EPA must review each of the Section 209(b) preemption waiver criteria because California's original 2012 waiver application no longer exists. California modified its ACCP to no longer allow manufacturers of federally-compliant vehicles to be deemed to comply with the California standards. Similarly, in July 2019, California announced a "framework" agreement with certain automakers establishing an emissions program entirely different from the one approved by EPA in 2013 — again failing to seek any within-the-scope determination.[45]As a result, California's standards requiring this waiver differ materially from 2012. California must therefore resubmit its waiver application and EPA must review the statutory criteria in assessing that application.[53] Nothing in Section 209(b) grants EPA the authority to put a "red pen" to California's application. It needs to be approved or rejected as submitted, as EPA has done for decades. Otherwise, the regulated community would be deprived notice of what EPA might decide to revise as part of a waiver request.[46]

Third, while an agency ordinarily need not consider new justifications or reopen the administrative record when it reconsiders a decision, here EPA's 2013 decision granting California's waiver decision is of central relevance to EPA's reconsideration of the SAFE I rule. It could not be otherwise—the SAFE I rule itself reconsidered the 2013 waiver decision.[47] This "Notice" concerns whether California qualified for a CAA Section 209 waiver, just as the SAFE I rulemaking and the 2013 waiver decision did.

---

[43] *Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994) ("The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact."); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that agencies may not give their new statutory interpretations "retroactive effect unless [the statutory] language requires this result").

[44] *See* 42 U.S.C. 7543(b)(1)(C)("No such waiver shall be granted if the Administrator finds that - such State standards and accompanying enforcement procedures are not consistent with Section 7521(a) of this title"); *id.* § 7521(a) (requiring EPA to consider lead time in setting emission standards for motor vehicles).

[45] 78 Fed. Reg. at 2113; *see* also CARB Res. 18-35, at 12 (Sept. 28, 2018), https://tinyurl.com/y55xslh4 (acknowledging that CARB "shall … forward the regulations to [EPA] with a request for a waiver or confirmation that the regulations are within the scope of an existing waiver").

[46] *See* 78 Fed. Reg. at 2113 ("If California acts to amend a previously waived standard or *accompanying enforcement procedure*, the amendment may be considered within the scope of a previously granted waiver[,] provided that it … *raises no new issues* affecting EPA's previous waiver decisions.") (emphases added).

[47] *See* 42 U.S.C. § 7607(d)(8) ("In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.").

Here, EPA is taking comment on and revisiting the legal and factual foundations of the SAFE I rule,[48] which itself revisited the legal and factual foundations of the 2013 waiver decision.[49] EPA is therefore reopening its 2013 decision granting California's waiver application.[50] EPA must take comment and evaluate California's waiver application under the statutory criteria, just as it did when EPA denied California's waiver application in 2008,[51] granted California's waiver application in 2009, [52] and revoked California's waiver in the SAFE I rule.[53] Under these circumstances, EPA cannot simply declare its decision granting California's waiver beyond the scope of the rulemaking.[54]

Finally, failing to fully analyze California's waiver petition flies in the face of President Biden's call for transparency in his "Day One" memorandum.[55] Evaluating the underlying waiver may not be politically expedient, but it would help the public understand changes in the data and assumptions underlying California's original waiver request, such as predictions

---

[48] 86 Fed. Reg. at 22,421 ("EPA believes that there are significant issues regarding whether SAFE 1 was a valid and appropriate exercise of agency authority, including the amount of time that had passed since EPA's 2013 waiver decision, the novel approach and legal interpretations used in SAFE 1, and whether EPA took proper account of the environmental conditions in California and the environmental consequences from the waiver withdrawal in SAFE 1."); *id.* at 22,422 ("EPA has conducted a review of both the legal and factual predicates for SAFE I. EPA now believes that there are significant issues with the SAFE 1 action, including the time elapsed since EPA's 2013 waiver decision (and associated reliance interests), the novel statutory interpretations set forth in SAFE 1, and whether EPA took proper account of the environmental conditions in California and the environmental consequences of the waiver withdrawal in SAFE 1."); *id.* at 22,429 ("EPA is also interested in any new or additional information or comments regarding whether it appropriately interpreted and applied section 209(b)(1)(B) in SAFE 1."); *id.* at 22,429 ("EPA's decision to withdraw the ACC program waiver as it relates to California's ZEV mandate, based on the same new interpretation and application of the second waiver prong, rested heavily on the conclusion that California only adopted the ZEV program to achieve GHG emission reductions. EPA recognizes that this conclusion, in turn, rested solely on a specific reading of CARB's ACC program waiver request. EPA requests comment on these specific conclusions and readings as well as within the context of environmental conditions in California whether the withdrawal of the ACC program waiver as it applied to the ZEV mandate was permissible and appropriate, under applicable factors identified above and in relevant caselaw.").

[49] 84 Fed. Reg. at 51,328 ("[S]ubsection D, separate and apart from the determinations in subsection C with regard to the effect of EPCA preemption on the January 2013 waiver, finalizes EPA's reconsideration of, and its proposed determination that it is appropriate to withdraw, its January 2013 grant of a waiver of CAA preemption for the GHG and ZEV standards in California's ACC program for model years 2021 through 2025, based on a determination that California "does not need [those] standards to meet compelling and extraordinary conditions" within the meaning of CAA section 209(b)(1)(B)."); *id.* at 51,339-50.

[50] *See CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006) ("The general principle is that if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable.") (citation omitted)).

[51] 73 Fed. Reg. 12,156 (March 6, 2008).

[52] 74 Fed. Reg. 32,744 (July 8, 2009).

[53] 84 Fed. Reg. 51,310 (Sept. 27, 2019).

[54] EPA cannot simultaneously reinstate fuel economy regulations and then brush off comments that EPCA, which concerns fuel economy standards governed by NHTSA, preempts the fuel economy regulations. *See Delaware Dep't of Nat'l Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015) (vacating an EPA decision establishing new source performance standards for certain power generators because EPA "simultaneously rel[ied] on grid reliability concerns" to justify the rule while "brush[ing] off comments about those concerns"—such as that FERC, not EPA, regulated grid reliability—"as beyond its purview").

[55] Memorandum for the Heads of Executive Departments and Agencies, "Modernizing Regulatory Review" (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/modernizing-regulatory-review/ (directing the OMB director to develop recommendations that "identify reforms that will promote the efficiency, transparency, and inclusiveness of the interagency review process, and determine an appropriate approach with respect to the review of guidance documents").

relating to the cost of ZEVs, the emissions impact of fuels, significant investments needed to improve the electricity grid capacity, California's progress towards NAAQS attainment, national security interests associated with EV battery minerals, and changes to national climate change strategies. As discussed above, EPA may consider these issues and should not sweep these important considerations under the rug in its rush to force a transition to electric vehicles. Transparency necessarily involves looking at and reporting on all aspects of the issue.[56]

### B. EPA Cannot Reinstate California's Waiver Because the ACCP's GHG Standards and ZEV Mandate Fail the CAA Section 209 Waiver Criteria

CAA Section 202(a)[57] provides EPA with the exclusive authority to promulgate standards "applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines" for their full useful life. With one exception, all state regulation over motor vehicle tailpipe emissions is preempted.[58] The one exception is that EPA may issue a preemption waiver to California under CAA Section 209(b)(1) to establish its own motor vehicle emission standards if certain conditions are met. If EPA grants California a waiver, other states may adopt and enforce California's emission standards under CAA Section 177.[59]

EPA must grant a California waiver request if, "after notice and opportunity for public hearing," "the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards,"[60] unless EPA makes one or more of three findings:

(1) California's determination regarding its state standards is arbitrary and capricious;
(2) California does not need its standards to meet "compelling and extraordinary conditions;" or
(3) California standards and accompanying enforcement procedures are not consistent with 42 U.S.C. § 7521(a).[61]

The ACCP's GHG Standards and ZEV mandate do not meet the Section 209 waiver criteria for several reasons. First, California does not face compelling and extraordinary local air quality conditions from GHG emissions and EPA should not presume that the waiver designed by Congress for criteria pollutants also applies to GHGs. Second, even if California faced compelling and extraordinary air quality conditions, it does not need the GHG Standards and ZEV mandate to address these conditions because these programs would not meaningfully address California's alleged harms from climate change. Third, California arbitrarily determined that its standard was at least as protective as the federal standard, despite failing to present a full lifecycle assessment of vehicle GHG emissions to include emissions arising out of battery production and disposal. Fourth, the ZEV mandate contradicts EPA's emissions standards

[56] *See* footnotes 27-35 and accompanying text.
[57] 42 U.S.C. § 7521(a).
[58] 42 U.S.C. § 7543.
[59] 42 U.S.C. § 7507.
[60] 42 U.S.C. § 7543(b)(1).
[61] 42 U.S.C. § 7543(b)(1)(A)-(C).

program by mandating a particular technology. Fifth, criteria pollutant problems do not justify California's waiver. Finally, EPA's "whole program" approach to reviewing CARB's program – that the statute ties EPA's hands to approve or reject CARB's entire emissions program – is illogical, unlawful, and creates a never-ending bootstrap. Therefore, the ACCP's GHG Standards and ZEV mandate do not meet the Section 209 waiver criteria and EPA cannot reinstate California's Section 209 waiver.

As EPA explained in the SAFE I rule, "compelling and extraordinary conditions" mean environmental conditions presenting a significant air-quality problem with causes or effects particular or unique to California.[62] The ACCP's GHG standards and ZEV mandate fail this test. Neither the causes nor effects of GHG emissions are compelling and extraordinary conditions, as they are global rather than local conditions, and California's GHG standards and ZEV mandate will not meaningfully address the causes or effects of these GHG emissions.

EPA's interpretation in the SAFE I rule gives concrete expression to Congress's use of the word "extraordinary," which presupposes that the problems California seeks to address are atypical in some way—not the sort of "usual, regular, [or] common" problems from a global pollutant with which other regions, and our nation as a whole, are currently grappling.[63] To argue otherwise is to read "extraordinary" out of the statute entirely.[64] Additionally, the terms "compelling" *and* "extraordinary" denote the highest possible burden on California, since these terms denote occurrences that are especially grave and unique.[65] The terms lack sufficient ambiguity for EPA to interpret them to mean something similar to "routine," "as a matter of course," or "perfunctory" as it did in its 2009 and 2013 waiver decisions.[66] Instead of requiring a showing of grave or paramount *and* uncommon concern, these waiver decisions transformed the term "compelling and extraordinary" into a rubber stamp, burdening *opponents* of the waiver, instead of California, with disproving a nearly non-rebuttable presumption of "compelling and extraordinary conditions."[67]

EPA's interpretation in SAFE I captured the historical and contextual backdrop against which Section 209(b) was enacted. Congress did not give California special treatment so that it

---

[62] *See* 84 Fed. Reg. at 51,344/1; 83 Fed. Reg. at 43,247/1-2. *See also* 73 Fed. Reg. at 12,163 ("Atmospheric concentrations of greenhouse gases are an air pollution problem that is global in nature, and this air pollution problem does not bear the same causal link to factors local to California as do local or regional air pollution problems."). The comments submitted by AFPM, then known as the National Petrochemical and Refiners Association, in support of EPA's reconsideration of its previous denial of a waiver of preemption, EPA-HQ-OAR-0173-8915, are hereby incorporated by reference.
[63] *Extraordinary*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 1961).
[64] *See Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) ("[W]hen construing a statute courts 'give effect, if possible, to every clause and word.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).
[65] *Cf. Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (a "compelling state interest" is not a "showing merely of a rational relationship to some colorable state interest" but involves "the gravest abuses, endangering paramount interests") (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)); *Ex parte Fahey*, 332 U.S. 258, 260 (1947) (writs of *mandamus* are "extraordinary remedies … reserved for really extraordinary causes.").
[66] 74 Fed. Reg. at 32,746; 78 Fed. Reg. 2112, 2126-28 (Jan. 9, 2013).
[67] 86 Fed. Reg. at 22,424 ("EPA, given the text, legislative history and judicial precedent, has consistently interpreted section 209(b) as placing the burden on the opponents of a waiver to demonstrate that one of the criterion for a denial has been met."). *See also* 74 Fed. Reg. at 32,746; 78 Fed. Reg. at 2,116.

could address problems that are global rather than local in nature—just the opposite. Congress sought to empower California to deal with "circumstances sufficiently different from the nation as a whole."[68] Only these sort of "unique problems . . . as a result of [California's] climate and topography"[69] could "justify standards on automobile emissions . . . more stringent than national standards."[70] Indeed, just one year before Section 209(b) was adopted, the Supreme Court specifically explained that diversions from equal sovereignty require "exceptional conditions"[71]—language repeated in Section 209(b). EPA's interpretation in the SAFE I rule reflected these objectives. It did not read "extraordinary conditions" as stagnant from the time of enactment, but rather appropriately limited that term to the type of conditions that Congress, in 1967, found justified a special exemption from an otherwise uniform scheme of national regulation: conditions resulting from local emissions and local pollution concentrations interacting with California's peculiar topographical or other features.

Compelling and extraordinary conditions should be interpreted in this manner because a laxer definition would violate the equal sovereignty doctrine.[72] The doctrine of equal sovereignty presumes that federal laws will not favor or disfavor different states.[73] As the Supreme Court has explained, disparate treatment is permissible only after "a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets."[74] Section 209 bars states other than California from regulating vehicle emissions,[75] so it is paramount that Section 209 is interpreted so that California's preferential treatment under federal law is "sufficiently related to" its peculiar local conditions to avoid violating the equal sovereignty doctrine.[76] California's vague gestures at its internal police power and Section 177[77] are insufficient to overcome the equal sovereignty doctrine's strictures.

This definition of compelling and extraordinary conditions is consistent with Section 177.[78] Section 177 allows qualifying states to adopt and enforce certain California "standards relating to control of emissions" from new motor vehicles.[79] "Standards" means emission

---

[68] S. Rep. No. 90-403, at 32; *see also Ford Motor Co. v. EPA*, 606 F.2d 1293, 1303 (D.C. Cir. 1979) ("[T]he intent of the Act … [was to] focus on local air quality problems that may differ substantially from those in other parts of the nation.") (emphasis added).
[69] H.R. Rep. No. 90-728, at 22 (1967).
[70] S. Rep. No. 90-403, at 32.
[71] *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966).
[72] 86 Fed. Reg. at 22,428.
[73] *See* 84 Fed. Reg. 51,310, 51,347 (Sept. 27, 2019).
[74] *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).
[75] At most, states can adopt "identical" requirements to California's under Section 177. But this limit applies to every state other than California, which is the only state than may set its own emission standards.
[76] It is a settled rule, the Supreme Court has explained, "that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring)).
[77] Petition for Reconsideration of the Safer, Affordable Fuel-Efficient (SAFE) Vehicles Rule, Part One: One National Program 21-22, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0257-0029.
[78] 86 Fed. Reg. at 22,429 ("EPA seeks comment on whether section 177 was properly interpreted.").
[79] 42 U.S.C. § 7507.

standards for criteria pollutants, not GHGs, for several reasons.[80] First, Section 177 is located in a part of the CAA dealing with criteria pollutants.[81] Second, Section 177 applies to states in nonattainment, and states can only be in nonattainment of the NAAQS.[82] Since there are no GHG NAAQS—given the global nature of GHG concentrations—states cannot adopt California's GHG standards and ZEV mandate, as EPA properly explained in the SAFE I rule.[83]

#### 1. No Compelling and Extraordinary Conditions Exist Due to GHG Emissions

California adopted its GHG standards and ZEV mandate to address climate change.[84] However, California does not face the type of "compelling and extraordinary conditions" that Congress intended for a waiver. The impacts of climate change on California are not unique than in any other state. California lacks heightened local GHG concentrations attributable to in-state emissions or local conditions, such as its climate or topography that uniquely or particularly exacerbate the effects of GHGs on California's air quality.

California's alleged harms from climate are not extraordinary because they are not unique to California. GHGs are global, not local, pollutants. As such, other regions of the United States are similarly situated.[85] Because California's alleged climate-related effects "are not sufficiently different from the conditions in the nation as a whole to justify separate State standards under . . . Section 209(b)(1)(B)," California does not face extraordinary conditions with respect to climate change compared to the rest of the nation. In fact, in granting the waiver for California's ZEV mandate in 2013, EPA did not identify any record evidence that California would experience harms from global GHG emissions that would differ from any other coastal state.[86]

Additionally, unlike criteria pollutant emissions, California's GHG emissions "bear no particular relation" to "California-specific circumstances" like thermal inversions resulting from

---

[80] 84 Fed. Reg. at 51,350/2.
[81] *See* 42 U.S.C. §§ 7501-7515.
[82] *See* 42 U.S.C. § 7407(d)(1)(A).
[83] *See* 84 Fed. Reg. at 51,328, 51,350-51. Given that Section 209 and 177 are inextricably related, EPA properly included an interpretation of Section 177 in the SAFE I rulemaking.
[84] CARB, Clean Air Act § 209(b) Waiver Support Document at 1 (May 2012), https://downloads.regulations.gov/EPA-HQ-OAR-2012-0562-0004/content.pdf ("Waiver Request"); 84 Fed. Reg. at 51,344/1.
[85] 84 Fed. Reg. at 51,348/2-3; 83 Fed. Reg. at 43,249/1. It has never been shown how California's alleged climate change concerns—fires, heatwaves, storm surges, sea-level rise, and water shortages—are "out of the ordinary" compared with the rest of the country. Other states have expressed similar concerns. These concerns are not, in other words, "extraordinary." *See*, *e.g.*, *Mass. v. EPA*, 549 U.S. at 521 (group of 12 states including California alleging the same losses of coastal property, reduced snowpack and other harms alleged by California); 73 Fed. Reg. at 12,164-65 (comments by states supporting California claiming that they are subject to the same or similar effects of GHG emissions as California); *id.* at 12,167 ("California is expected to experience many of the key risks and impacts" from global GHG emissions as "the U.S. as a whole.").
[86] 78 Fed. Reg. at 2,129. EPA's analysis of the effects of global GHG emissions was provided as an alternative analysis. 83 Fed. Reg. at 43,421. EPA should be wary of providing any detailed analysis of such effects as it will be difficult, if not impossible, to separate the effects of global GHG emissions on natural resources, such as water availability or wildfires, from any adverse effects stemming from California's management of those resources, which has been subject to long-standing criticism.

local geography and wind patterns (which Congress specifically identified when enacting Section 209),[87] local pollution, or local vehicle emissions. Rather, GHGs globally mix in the upper atmosphere, leaving the same concentration over California as over the rest of the country.[88] Thus, California vehicle GHG emissions are no more connected to California GHG concentrations than emissions from anywhere else.[89] At bottom, California has failed to show that its faces compelling and extraordinary conditions pertaining to GHG emissions.

### 2. California Does Not "Need" the ACCP's GHG Standards and ZEV Mandate

Even if California were to face compelling and extraordinary air quality conditions from GHGs, it does not "need" the ACCP to address these conditions, since the ACCP will not meaningfully address California's alleged climate harms.

Courts have already held that emissions from sources within a single state cannot alleviate any harms from global GHG emissions.[90] In denying standing to an environmental group alleging harm from Washington state agencies' failure to regulate GHG emissions from in-state petroleum refineries, the Ninth Circuit in *Washington Environmental Council v. Bellon* held that "[w]hile Plaintiffs need not connect each molecule [of carbon dioxide] to their injuries, simply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way to some undefined degree) to their injuries, relies on an attenuated chain of conjecture insufficient to support standing."[91] The court also held:

> This is so because there is a natural disjunction between Plaintiffs' localized injuries and the greenhouse effect. Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime … But there is limited scientific capability in assessing, detecting, or measuring the relationship between a certain GHG emission source and localized climate impacts in a given region. As the U.S. Geological Survey observed, "[i]t is currently beyond the scope of existing science to identify a specific source of CO2 emissions and designate it as the cause of specific climate impacts at an exact location."[92]

[87] 84 Fed. Reg. at 51,341/2, 51,343/2-3.
[88] 84 Fed. Reg. at 51,346/3; 73 Fed. Reg. at 12,160 ("In contrast to local or regional air pollution problems, the atmospheric concentrations of these greenhouse gases is [sic] basically uniform across the globe.").
[89] 73 Fed. Reg. at 12,160.
[90] *See generally Wash. Envtl. Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013); *Barnes v. DOT*, 655 F.3d 1124 (9th Cir. 2011).
[91] *Bellon*, 732 F.3d at 1142-43 (internal quotations omitted).
[92] *Id.* (quoting Letter from Dir., U.S. Geological Survey, to Dir., U.S. Fish & Wildlife Service, The Challenges from Linking Carbon Emissions, Atmospheric Greenhouse Gas Concentrations, Global Warming, and Consequential Impacts (May 14, 2008)).

Thirteen years has passed since the letter relied upon by the *Bellon* court was drafted, yet California has failed to demonstrate that scientific evidence had evolved to demonstrate how the ZEV mandate will actually alleviate an injury to California. On the contrary, California has acknowledged that its regulations were never designed to alleviate either global GHG emissions or their asserted effects.[93] As such, California cannot meet its burden for a waiver of preemption under CAA Section 209.

Under CAA Section 209(b)(1)(B), the EPA Administrator "shall" deny a preemption waiver if California "does not need such State standards to meet compelling and extraordinary conditions." California's GHG standards, according to EPA, "would result in an indistinguishable change in global temperatures and . . . likely no change in temperatures or physical impacts" in California.[94] Indeed, California has clearly communicated that its standards were part of a "movement to commercialize"[95] uneconomic technologies, by forcing every new U.S. car buyer to unknowingly subsidize California's preferred technology through a new currency created and mandated by California: ZEV credits. As EPA determined in SAFE I, more stringent standards "would only reduce global temperature by 0.02 degrees Celsius in 2100,"[96] which cannot be considered meaningful incremental progress in mitigating California's alleged harms.

EPA cannot consider GHG reductions, if any, attributable to "opt-in" states under Section 177, as these are out of the scope of a waiver application. Indeed, EPA has no legal role in reviewing opt-in states, as the statute grants the agency no role in reviewing opt-in by other states. If California cannot meaningfully alter the in-state GHG concentration or ambient temperature—the source of its alleged harms—it does not need its separate GHG standards.[97] California's lack of "need" was further underscored by the fact that, until recently, California endorsed the deemed-to-comply option, allowing compliance with EPA's GHG standards in lieu of CARB's standards. This option constituted a frank admission that CARB's standards are no better equipped than federal standards to combat California's alleged climate change problems.[98]

---

[93] *See, e.g.*, CARB, Final Statement of Reasons, Regulations to Control Greenhouse Gases from Motor Vehicles (Aug. 4, 2005) at 376 ("[T]he reductions in climate change associated with individual policies or the actions of individual regions will not be identifiable…."); CARB, Final Statement of Reasons for Rulemaking, Mandatory Reporting of Greenhouse Gas Emissions (Dec. 6, 2007) at 136 ("GHG emissions have global rather than local impacts….").

[94] 84 Fed. Reg. at 51,341/1, 51,340/3.

[95] *See* CARB, Initial Statement of Reasons, Advanced Clean Cars, 2012 Proposed Amendments to the California Zero Emission Vehicle Program Regulations at ES-1 ("This movement to commercialize advanced clean cars has occurred in large part because of the ZEV regulation.").

[96] 84 Fed. Reg. at 51,340. *See also Bellon*, 732 F.3d at 1145-1146.

[97] This interpretation of "need" does not conflict with the Supreme Court's valuation of incremental progress. *See Mass. v. EPA*, 549 U.S. at 524.

[98] The same could be said of the reduced emissions standards at the center of California's July 2019 agreement with certain automakers, permitting them to meet those less-stringent standards on a nationwide basis if they refrained from challenging California's regulatory authority. *See* Press Release, Office of Gov. Newsom, California and Major Automakers Reach Groundbreaking Framework Agreement on Clean Emission Standards (July 25, 2019), https://tinyurl.com/yxp4q57d ("Framework Agreement Press Release").

This is evident by California's own concession that its ZEV mandate is incapable of limiting either global GHG emissions or any of their effects.[99]

Practical considerations also support this understanding of need. If federal and state standards achieve the same goal to the same degree, and the state can pursue their goals through alternative means, it is arbitrary to demand that industry members shoulder the burden of complying with two distinct and often conflicting regulatory frameworks and that nationwide consumers are forced to cross-subsidize one state's whims. "Need" should require a showing of significantly greater incremental progress over the status quo in order to justify a separate emissions program, and all the costs to industry and consumers that come with it.

### 3. California has not Appropriately Quantified the Relative Performance of ZEV Mandate to Demonstrate it is As Protective As the Federal Standard

Finally, the ACCP slows California's progress toward NAAQS attainment relative to the federal standards because ZEV mandates slow fleet turnover, so California's ACCP is not as protective as the federal standards. Since California would be better off without the ACCP, the ACCP is not needed, even if there are compelling and extraordinary air quality problems.

Liquid fuels and internal combustion engines have an exceptional history of delivering increased efficiency and reduced emissions. As EPA has reported, from model year 2004 to model year 2016, the average vehicle delivered improved fuel economy of 5.4 MPG while also increasing horsepower by 9.2%.[100] Only 0.1 MPG of this benefit came from alternative fuel vehicles,[101] which includes electric vehicles, plug in hybrids, fuel cell vehicles, and compressed natural gas vehicles. EIA data reveals that households that own BEVs and PHEVs tend to have more vehicles per household, owning 2.7 vehicles compared with the household average of 2.1 vehicles. BEVs and PHEVs owned and operated in California also tend to be used about 50% less than other vehicles in terms of annual mileage per vehicle. California and EPA have ignored this real-world data by assuming gasoline vehicles and EVs are driven the same distance. This error alone requires that all of California's cost estimates must be roughly doubled and all of California's benefits estimates halved.[102]

While vehicle emission standards directly regulate tailpipe emissions, they affect emissions more broadly through their impact on consumer choice. More stringent vehicle tailpipe emission standards require regulated parties to rely more heavily on certain technologies

[99] *See, e.g.*, CARB, Final Statement of Reasons, Regulations to Control Greenhouse Gases from Motor Vehicles (Aug. 4, 2005) at 376 ("the reductions in climate change associated with individual policies or the actions of individual reasons will not be identifiable…."); CARB, Final Statement of Reasons for Rulemaking, Mandatory Reporting of Greenhouse Gas Emissions (Dec. 6, 2007) at 136 ("GHG emissions have global rather than local impacts….").
[100] EPA, Light-Duty Automotive Technology, Carbon Dioxide Emissions, and Fuel Economy Trends: 1975 Through 2017 (Jan. 2018) at 9, Table 2-2, https://fueleconomy.gov/feg/pdfs/420r16010.pdf.
[101] *Id.* at 53.
[102] *See* Burlig et al.. *Electric Vehicle Owners Drive Less Than We Thought*, Energy Institute Blog, UC Berkeley (Feb. 16, 2021), https://energyathaas.wordpress.com/2021/02/16/electric-vehicle-owners-drive-less-than-we-thought/.

to comply, such as EVs, which are more expensive and less popular than traditional internal combustion engine vehicles.

Automobile manufacturers therefore implement cross-subsidies to encourage consumers to buy EVs while paying for the artificially low price of EVs through charging higher prices on non-EVs.[103] California's ZEV mandate, in particular, will exacerbate cross-subsidies due to weak demand for EVs. This means that all vehicle purchasers, even those who are completely unwilling to pay for these vehicles, still pay for ZEVs in part by absorbing a markup on internal combustion engine vehicle costs. These cross-subsidies are effectively a tax imposed on all those choosing *not* to purchase electrified vehicles. Further, imposing cross-subsidies on new vehicle purchasers shoulders states who choose not to adopt California's ZEV mandate with a significant portion of the mandate's cost. Those states lack any power to reduce or block the cross-subsidies imposed on their citizens that are necessary to comply with California regulations. Nor will they have any power to control future California actions, such as increasing the magnitude of the ZEV mandate or even banning the sale of new vehicles powered by internal combustion engines.

Overall, this mechanism drives up vehicle prices and incentivizes car owners to hold onto their vehicles longer,[104] slowing fleet turnover[105] and delaying the introduction of vehicles with better fuel efficiency, improved emission control technologies, and added safety features.[106] As EPA and NHTSA explained in the Final Regulatory Impact Analysis[107] for SAFE II,[108] "[e]conomic literature and theory indicate that the retirement (or scrappage) rates of existing vehicles slows when new vehicle fuel economy standards increase and cause new vehicle price

[103] 83 Fed. Reg. at 43,084-85, 43,224. McKinsey & Company found that EV manufacturers "do not make a profit from the sale of EVs. In fact, these vehicles often cost $12,000 more to produce than comparable vehicles powered by internal-combustion engines (ICEs) in the small- to midsize-car segment and the small-utility-vehicle segment. What is more, carmakers often struggle to recoup those costs through pricing alone. The result: apart from a few premium models, OEMs stand to lose money on almost every EV sold, which is clearly unsustainable." McKinsey & Company. March 2019. https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/making-electric-vehicles-profitable.
[104] Jacobsen, M. and van Benthem, A., "Vehicle Scrappage and Gasoline Policy", American Economic Review (2015) Vol. 105, No. 3, 1312-1338.
[105] Gruenspecht, Howard "Differentiated Regulation: The Case of Auto Emissions Standards", American Economic Review, (1982) Vol. 72(2): 328-31.
[106] Recently introduced safety features include blind spot monitoring, lane departure warning, and electronic stability control. By 2020, NHTSA estimated an 8% reduction in fatality rates from vehicle crashes due to the introduction of electronic stability control alone." Blincoe, L. and Shankar, U., "The Impact of Safety Standards and Behavioral Trends on Motor Vehicle Fatality Rates," National Highway Traffic Safety Administration, DOT HS 810 777, Washington, D.C., Jan. 2007. Two recent studies from the Insurance Institute for Highway Safety found significantly lower crash rates for vehicles equipped with blind spot monitoring or lane departure warning. It found that cars equipped with lane departure warning are 24% less likely to be involved in accidents with injuries and 86% less likely to be involved in fatal accidents, while cars with blind spot detection are 23% less likely to be involved in lane-change accidents with injuries. Cicchino, J. "Effects of lane departure warning on police-reported crash rates". *Journal of Safety Research*, September 2018. Cicchino, J. "Effects of blind spot monitoring systems on police-reported lane-change crashes" Insurance Institute for Highway Safety, August 2017.
[107] Final Regulatory Impact Analysis, The Safer Affordable Fuel Efficient Vehicles Rule for Model Year 2021-2026 Passenger Cars and Light Trucks (March 2020) ("RIA"), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/final_safe_fria_web_version_200701.pdf.
[108] 85 Fed. Reg. 24,174 (April 30, 2020).

increases. Slower retirement rates result in an older distribution of the on-road fleet."[109] By slowing fleet turnover, the agencies explained, fuel economy standard increases "thus slow[] improvements in fleet-wide fuel economy, reductions in CO2 emissions, reductions in criteria pollutant emissions, and advances in safety" because "older vehicles are, on average, less safe and less fuel efficient."[110] One analysis has shown that "the share of new vehicle fuel savings lost to the used vehicle fleet due to delayed scrappage [was] between 13 and 16 percent."[111] It would be arbitrary and capricious to deem California's ACCP necessary to achieve NAAQS compliance and at least as protective as the federal standard without analyzing fleet turnover impacts. California has not demonstrated that its GHG standards and ZEV mandate will not undermine the protectiveness of the federal standard or slow NAAQS attainment by reducing fleet turnover.[112]

ZEV mandates turn their back on technology improvements to the internal combustion engine and the potential benefits from near-zero emission vehicles. A recent technical paper delivered at the Society of Automotive Engineers ("SAE") conference suggests that the cleanest gasoline- and diesel-powered vehicles use aftertreatment systems to remove criteria pollutants from the air taken into the vehicle along with treating the vehicle's own emissions.[113] EPA must fully evaluate this new SAE paper. Failing to do so while purporting to reinstate California's waiver would be arbitrary and unlawful.[114]

---

[109] RIA at 887.

[110] RIA at 62. *See also* RIA at 889 ("[S]ince fuel economy standards affect only new vehicles, any increase in price (net of the portion of reduced fuel savings valued by consumers) will increase the expected life of used vehicles and reduce the number of new vehicles entering the fleet." (citing Gruenspecht, H. "Differentiated Regulation: The Case of Auto Emissions Standards." American Economic Review, Vol. 72(2), pp. 328-331 (1982))).

[111] RIA at 889 (citing M. Jacobsen and A. van Benthem, "Vehicle Scrappage and Gasoline Policy," American Economic Review, Vol. 105, pp. 1312-38 (2015)).

[112] In the context of California's Advanced Clean Trucks Regulation, the South Coast Air Quality Management District has indicated "there is and will remain a critical need for near-zero technologies (*e.g.* Internal Combustion Engines . . .)" to achieve pollutant emissions reductions. South Coast Air Quality Management District, Comment Letter on Proposed Advanced Clean Trucks Regulation (Dec. 6, 2019), https://www.arb.ca.gov/lists/com-attach/60-act2019-VzYHYlciWVUBZFM8.pdf.

[113] Gary Yowell, How Do ZEV Emissions Stack Up Against Super-Clean Gasoline and Diesel Engines? (Aug. 29, 2019). https://stillwaterassociates.com/how-do-zev-emissions-stack-up-against-super-clean-gasoline-and-diesel-engines/; Stillwater Associates, How Do ZEV Emissions Stack Up Against Super Clean Gasoline and Diesel Engines? (April 12, 2021), https://stillwaterassociates.com/wp-content/uploads/2021/04/Gary-Yowell-SAE-2021-How-Do-ZEV-Emissions-Stack-Up-Against-Super-Clean.pdf.

[114] Having a vehicle clean the air is not necessarily a new development. In the past, CARB has granted approval for Volvo passenger cars to take measures such as coating radiators with chemicals that removed pollution from the air. *See* Gary Tracy, *How Volvo Once Used a Catalyst-Coated Radiator to Remove Pollution From the Air*, JALOPNIK (Jan. 2, 2019), https://jalopnik.com/how-volvo-once-used-a-catalyst-coated-radiator-to-remov-1831438959; Petersson et al., PremAir ® Catalyst System – Long-term On-road Aging Results, 109 J. FUELS & LUBRICANTS 2809 (2000), https://www.jstor.org/stable/44746070.

### 4. The ACCP is Inconsistent with EPA's Vehicle Emissions Program under CAA Section 202(a) Because it Mandates the Use of Specific Technologies

EPA has authority under CAA Section 202(a) to prescribe vehicle emission standards for new motor vehicles and new motor vehicle engines.[115] Nothing in CAA Section 202(a) gives EPA authority to mandate particular vehicle technologies or waive EPCA preemption. These standards must "reflect the greatest degree of emission reduction available through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology,"[116] and "shall not become effective until the introduction of the model year for which it would be feasible to implement such standards, taking into consideration the restraints of an adequate lead time for design and production."[117] EPA is thus required to set emission standards for each type of new vehicle or engine, rather than forbid or mandate any type of new vehicle or engine. Standards must "reflect" technology, not mandate it, as standards allow regulated parties to select the mix of technologies they will use to comply with the standard. Since Section 209 only allows California to seek a waiver for vehicle emission standards, and a ZEV mandate is not a "standard," EPA cannot grant California's waiver application for its ZEV mandate.

### 5. Criteria Pollutant Problems Do Not Justify the ACCP's GHG Standards or ZEV Mandate

California's criteria pollutant problems do not justify a waiver for ACCP's GHG standards and ZEV mandate either. Even if climate-related rising temperatures exacerbate the formation of ground-level ozone, a criteria pollutant, this problem is caused by global GHG concentrations and lacks a particularized nexus to local GHG emissions leading to elevated local GHG concentrations and local temperature changes. As EPA reasonably explained, the multi-link causal chain between California's standards and ground-level criteria pollution was too attenuated to allow California to purport that they address local, as well as global, pollution problems. And this causal chain assumes that California's standards would reduce air temperatures in the first place—an assumption that EPA has found to be false. Indeed, California's own State Implementation Plan ("SIP") lacked tailpipe GHG standards.[118] This would be quite an anomaly if California needs its GHG standards, since SIPs must include "all emission limitations, control measures, means, and techniques on which the state relies to ensure compliance with the" CAA.[119] But most importantly, California failed to argue that its GHG and ZEV standards would meaningfully reduce criteria pollution on top of California's other, criteria-pollution specific programs. Moreover, whatever criteria-pollution "co-benefits" might also be attained by California's standards should be excluded from EPA's analysis because

[115] 42 U.S.C. § 7521(a).
[116] 42 U.S.C. § 7521(a)(3)(A)(i).
[117] 42 U.S.C. § 7521(a)(5)(B).
[118] 81 Fed. Reg. 39,424, 39,427 (June 16, 2016); see 84 Fed. Reg. at 51,355/2.
[119] *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1175-78 (9th Cir. 2015) (discussing 42 U.S.C. § 7410(a)(2)(A)).

California did not rely on these co-benefits in its 2012 waiver request and has not analyzed and quantified them as required under CAA Section 209.

California's ZEV mandate fares far worse. The mandate grew out of a CARB Resolution issued shortly after the enactment of the California Global Warming Solutions Act of 2006, more commonly known as "A.B. 32." CARB's "Initial Statement of Reasons"[120] to adopt its revised ZEV mandate (packaged as part of an "Advanced Clean Car" program), was dedicated almost exclusively to GHGs, and even boasted of California's impact on federal agency policies. It was not until page 13 that CARB made passing reference to other air quality issues and there, it only lumped the ZEV mandate in with its discussion of unrelated Low Emission Vehicle ("LEV") standards.[121] The document never connected the ZEV mandate independently to any improvement of PM or ozone; in fact, it describes them inseparably: "The ZEV element of the Advanced Clean Cars program also fulfills California's third commitment towards the development of the 2017 through 2025 model year national greenhouse gas program."[122]

Similar to the Initial Statement of Reasons, CARB's Final Statement of Reasons[123] never connected the ZEV mandate with air quality. CARB repeatedly states: "The purpose of these regulatory changes is merely to allow manufacturers to demonstrate compliance with the final national passenger motor vehicle *greenhouse gas regulations* for the 2017 through 2025 model years, as an alternative option to achieve compliance with California's regulations and to make specified minor corrections to the LEV III criteria pollutant and ZEV regulations."[124] CARB's discussion of air quality is limited to their admittedly "minor" changes to their LEV standards. Unsurprisingly, California conceded in its waiver application to EPA for the ZEV program that

> *[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank to-wheel or TTW) emissions.* The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles.[125]

---

[120] CARB, "Staff Report: Initial Statement Of Reasons For Rulemaking. Proposed Amendments to New Passenger Motor Vehicle Greenhouse Gas Emission Standards For Model Years 2017-2025 To Permit Compliance Based On Federal Greenhouse Gas Emission Standards And Additional Minor Revisions to the LEV III and ZEV Regulations" (Sept. 2012), https://www.arb.ca.gov/regact/2012/leviiidtc12/dtcisor.pdf.
[121] *Id.* at 13.
[122] *Id.* at 4.
[123] CARB, "Final Statement of Reasons: Amendments to New Passenger Motor Vehicle Greenhouse Gas Emission Standards for Model Years 2017-2025 to Permit Compliance Based on Federal Greenhouse Gas Emission Standards and Additional Minor Revisions to the LEV III and ZEV Regulations" (Dec. 2012), https://www.arb.ca.gov/regact/2012/leviiidtc12/leviiifsorrev.pdf.
[124] *Id.* at 8-11 (emphasis added).
[125] Waiver Request at 15-16. While California included its ZEV mandate in its SIP, the fact remains that California's waiver application deemed its ZEV mandate superfluous.

Because the same criteria-pollutant reductions will be achieved with or without the ZEV mandate, the ZEV mandate will not reduce vehicle emissions or criteria pollutants.[126] California has not met its CAA Section 209 burden to show a ZEV mandate is needed to address compelling and extraordinary circumstances, and EPA is without statutory authority to waive preemption in these circumstances.

The structure of the ZEV mandate further demonstrates that the program is unnecessary to address extraordinary and compelling air quality conditions for criteria pollutants *in California.* The ZEV mandate provides credits to large and intermediate volume manufacturers for ZEVs sold in Section 177 states.[127] The fact that California's ZEV mandate provided OEMs with credit for *out-of-state* sales demonstrates that California's ZEV mandate is disconnected from any purported "compelling and extraordinary conditions" in California.

Fundamentally, California never links the effects it purports to its GHG standards or ZEV mandate.[128] Therefore, California does not "need" the ZEV mandate even if "compelling and extraordinary conditions" existed. To the extent that any doubt exists about whether Congress intended to grant California authority over GHGs, Section 209(b) should be interpreted to cover only criteria pollutants to avoid serious constitutional questions.[129] The "presumption against extra-territoriality" is a canon of statutory construction that requires courts to interpret federal statutes to avoid extra-territorial application absent a clear congressional statement to the contrary. That canon reflects the commonsense notion that Congress is "primarily concerned with domestic conditions"[130] and seeks to guard against clashes with foreign laws.[131]

California's view of its waiver authority shreds these prudent constraints. Any global issue—including climate change—would be fair game for California to address through its unconstrained automobile emissions standard-setting authority. California has even entered into formal partnership agreements with foreign governments in order to implement its ZEV mandate, stating "[w]e aren't going to get there until Chinese business people, Chinese

[126] *See infra*, Section II.B.3.
[127] 13 C.C.R. §§ 1962.2(d)(5)(E)(1) (credits for hydrogen fuel cell vehicles "delivered for sale and placed in service in California or in a Section 177 state"); *id.* § 1962.2(d)(5)(E)(2) ("Optional Section 177 Compliance Path" providing up to 50% credits for certain types of ZEVs sold in Section 177 states).
[128] 73 Fed. Reg. at 12,162 ("California does not link these [GHG] emission standards with such effects [from GHGs].").
[129] *See, e.g.*, *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) (applying the doctrine of constitutional avoidance, which "resolve[s] statutory questions at the outset where to do so might obviate the need to consider a constitutional issue.").
[130] *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).
[131] *RJR Nabisco v. European Community*, 136 S. Ct. 2090 (2016). In a related vein, courts have held preempted state laws and regulations that attempted to intrude upon the Executive Branch's authority over foreign affairs. *Japan Line, Ltd. v. County of Los Angeles*, 441 U. S. 434, 449 (1979) (negative Foreign Commerce Clause protects the National Government's ability to speak with "one voice" in regulating commerce with foreign countries); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) (striking down a California law that attempted to regulate companies that sold insurance in Germany during World War II, finding that the law intruded into the President's conduct of foreign affairs).

government leaders make it a priority to develop batteries and electric cars. And we will too."[132] Congress never envisioned that Section 209(b)'s grant of authority to address *local* air quality would empower California to regulate *global* issues and disrupt the orderly conduct of the nation's foreign affairs.

**6. Interpreting "such State standards" to Allow EPA to Consider California's Whole Program, rather than Individually Assess California's Standards, is Arbitrary and Nonsensical**

In prior reviews of California applications for preemption waivers, EPA has interpreted its duty under CAA Section 209(b) as determining whether California needs its own motor vehicle emissions control program—its "program as a whole"[133]—to meet compelling and extraordinary conditions, not whether a particular emissions standard is needed to meet compelling and extraordinary conditions related to state air quality concerns.[134]

By contrast, in the SAFE I rule, EPA interpreted the phrase "such State standards" as permitting the individual consideration of the standards proposed in California's waiver application, rather than the binary, all-or-nothing determination that California generally needs a separate state program.[135] The latter "whole program" approach produces absurd results, implicates the equal sovereignty doctrine, undermines Congress's intent, and conflicts with the statutory text and structure. EPA should not finalize any determination reinstating California's waiver that fails to individually assess California's standards.[136]

Congress *already decided* that California needs its own motor vehicle pollution control program. The entire purpose of the waiver is to create a mechanism for California to retain and further develop its own motor vehicle pollution control program, but only to the extent necessary to address a compelling and extraordinary local pollution problem. By shifting EPA's responsibilities under CAA Section 209(b) from reviewing the preemption waiver applicability for individual standards to considering merely whether California should have *any type* of motor vehicle emission control program, the agency's "whole program" interpretation renders all of CAA Section 209(b) surplusage.

---

[132] Jessica Meyers, Governor Jerry Brown Says California Wants China's Help on Electric Vehicles, *Los Angeles Times* (June 5, 2017), *available at* http://www.latimes.com/politics/essential/la-pol-ca-essential-politics-updates-gov-jerrybrown-says-california-wants-1496685564-htmlstory.html.

[133] 73 Fed. Reg. at 12,160.

[134] 73 Fed. Reg. at 12,159; *see also* 74 Fed. Reg. at 32,759 (question is "whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions."); 49 Fed. Reg. at 18,889 (question is whether "California needs its own motor vehicle pollution control program to meet compelling and extraordinary conditions, and not whether any given standard (*e.g.*, the instant particulate standards) is necessary to meet such conditions.") (footnote omitted).

[135] 84 Fed. Reg. 51,310, 51,344/3; *see* 83 Fed. Reg. 42,986, 43,246/2-3 (Aug. 24, 2018).

[136] 86 Fed. Reg. at 22,426-22,427 ("EPA has consistently interpreted and applied the second waiver criterion by considering whether California needed a separate mobile source program as compared to the individual standards at issue to meet compelling and extraordinary conditions.").

EPA has generally provided the same answer for over 40 years: California needs its own motor vehicle emission control program. No other answer is possible under EPA's "program as a whole" interpretation, as once EPA has determined that California requires a "program," there is nothing left to evaluate under further preemption waiver applications. Once having decided that California "needs" its own motor vehicle program to address criteria pollution, EPA would be forced to grant a waiver for any later standards that California proposes—even if the standards are different in kind from those previously approved, and even if they are not the sort of localized standards that Congress has authorized California to adopt.[137] The statute requires the Administrator to undertake a substantive evaluation of "standards." The "program as a whole" approach is an abdication of that statutory duty and allows EPA to bootstrap *forever any* new CARB regulation based on EPA's prior approval of the program. Nothing in Section 209(b) requires such an absurd result.[138]

The "whole program" reading would also implicate the equal sovereignty doctrine because it would eviscerate the particularized nexus between California's standards and any compelling and extraordinary air quality problem. No longer would there be a sufficient relationship to any extraordinary conditions existing in California that would justify legislation treating the states differently if California was not required to show that it needs the *particular standard* at issue.

Additionally, Congress sought to strike a balance between giving California latitude to address its "compelling and extraordinary conditions" and promoting national uniformity and certainty.[139] The resulting compromise allowed California standards only when necessary to address California's unique local conditions. By interpreting the phrase "such State standards" to require review of California's need for the particular standards in a given waiver request, EPA in the SAFE I rule reflected this balance and ensured that California's waiver did not extend to pollution problems California merely shares with the nation at large.

By the same token, the fact that Congress included the phrase "in the aggregate" in Section 209(b)(1)—but not in Section 209(b)(1)(B)—does not show that Congress required an aggregate determination in the latter provision. Quite the contrary. If Congress had meant for Section 209(b)(1)(B)'s "need" inquiry to mirror Section 209(b)(1)'s "protectiveness" inquiry, one might presume it would have replicated the same text.[140] It did not.

---

[137] "[O]nce EPA determined that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver." 84 Fed. Reg. at 51,341/3; *see id.* at 51,342/1.

[138] Statutes should be read so as not to "produce an absurd result." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252 (2010). *See also K Mart Corp. v. Cartier*, 486 U.S. 281, 324 (1988) (Scalia, J., concurring) ("[I]t is a venerable principle that a law will not be interpreted to produce absurd results.").

[139] 84 Fed. Reg. at 51,347/3 to 51,348/1.

[140] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally[.]" (brackets omitted)).

By addressing proposed GHG and ZEV standards separately from the standards in the rest of California's program in the SAFE I rule, EPA was not "assigning different meanings to the same statutory text." Rather, EPA's interpretation remained consistent: "such State standards" means whatever standards are submitted as part of California's waiver-request package. The SAFE I rule reflected the determination that criteria-pollutant standards satisfy Section 209(b)(1)(B), whereas GHG-related standards do not because they bear no relation to the "extraordinary" conditions justifying a California-specific preemption waiver.

## III. EPA Properly Withdrew California's Waiver

In several determinations granting California's preemption waiver applications, EPA has unnecessarily limited the scope of its review and provided unwarranted deference to the state. These limitations include at least two self-imposed restraints that operate to improperly remove the burden on California to justify the departure from national standards and demonstrate that a unique state standard is necessary to address compelling and extraordinary conditions. EPA's Notice rehashes these errors,[141] despite these restraints lacking any support in the text or structure of the Clean Air Act.

*First*, EPA has declared that it will only perform a limited review of California waiver applications because it believed that Congress did not want "the federal government" to "second-guess state policy choices."[142] This has resulted in a reversal of the burden of proof required under CAA Section 209(b) so that anyone opposed to a California waiver application must produce "'clear and compelling' evidence to show that the proposed procedures undermine the protectiveness of California standards."[143] This heightened burden *in favor* of approval not only contravenes CAA Section 209(b) but imposes a standard on challenging parties that is inconsistent with the Administrative Procedure Act.[144]

In addition, such deferential review, at least for EPA's approval and any purported reinstatement of the 2013 ZEV mandate waiver, conflicts with Executive Order 12866's requirement to conduct a cost-benefit analysis for significant rulemakings.[145] Nothing in Executive Order 12866 exempts EPA's evaluation of California waiver applications from its

[141] *See* 86 Fed. Reg. at 22,423, n.7.
[142] 78 Fed. Reg. 44,111, 44,114 (July 23, 2013) (California Urban Bus standards); *id.* at 44,115 (EPA will "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."); 86 Fed. Reg. at 22,424 ("EPA's practice has been to defer and not to intrude in policy decisions made by California in adopting standards for protecting the health and welfare of its citizens.").
[143] 77 Fed. Reg. 9,239, 9,241 (Feb. 16, 2012) (approval of waiver for California non-road engine standards and truck idling requirements) (citing *MEMA I*). In the SAFE I rule, EPA concluded that it was ""not necessary to resolve this issue as regardless of whether a preponderance of the evidence or clear and compelling evidence standard is applied, the Agency was concluding that withdrawal of the waiver was appropriate." 84 Fed. Reg. at 51,344 n.268.
[144] *See* 5 U.S.C. § 706 (barring agency action that is unlawful, arbitrary and capricious, or an abuse of discretion).
[145] The 2013 waiver decision incorrectly asserted that granting a Clean Air Act preemption waiver for the ZEV mandate was not a "rule" as defined under the Regulatory Flexibility Act. 5 U.S.C. § 601(2). *See* 78 Fed. Reg. at 2,145. The 2013 waiver does not fall under any exemption to the definition of a "rule" identified in the Regulatory Flexibility Act. Further, due to the costs imposed by the ZEV mandate on new vehicle purchasers nationwide, it should be considered a "significant regulatory action" subject to Executive Order 12866's requirements.

responsibilities to perform a cost-benefit analysis; however, EPA did not perform one in issuing the 2013 ZEV mandate waiver.[146] The ZEV mandate imposes substantial costs, well exceeding $100 million, on all new vehicle purchasers, not just on new vehicle purchasers in California and states that choose to adopt the ZEV mandate. As such, the issuance of a waiver is also a "major rule" as defined under the Congressional Review Act. EPA's failure to treat a waiver as a rule subject to the APA, E.O. 12866, and the requirements of the Congressional Review Act, inappropriately denies the public the opportunity to provide informed comment on the implications of the waiver and blocks Congress from taking expedited action to withdraw an unlawfully issued waiver.

*Second*, EPA has traditionally declined to review the actual regulations that are the subject of a California waiver application. Instead, it only reviews the question of whether California requires a separate motor vehicle emissions control program. This creates a never-ending bootstrap approval where prior waivers automatically justify departures from federal standards and converts the Administrator's duty to review California preemption waiver applications into a *pro forma* rubber stamp. EPA should adhere to the language of CAA § 209(b) and avoid reverting to these prior misinterpretations.

### A. The CAA Does Not Permit EPA to Defer to California on Whether it May Deny an Application

Section 209(b)(1) states that "[n]o such waiver shall be granted if the *Administrator* finds that" California "does not need such State standards to meet compelling and extraordinary conditions…."[147] Defying this statutory duty, the Administrator has often deferred to California on whether there are grounds to deny its own application,[148] as well as "on ambiguous and controversial matters of public policy."[149] Further, whenever there is any question of whether the Administrator should find that the grounds for denial under CAA § 209(b)(1) are present, it has *reversed* the burden of proof by placing it upon objectors.[150] There is nothing in the statute even hinting at either policy and the statutory language unambiguously fails to justify these interpretations.

Nothing in the Clean Air Act supports deference to California regarding the CAA Section 209 criteria. The language unambiguously charges "the Administrator" with "find[ing]" whether or not any of the listed grounds exist. Despite claiming "that the text, [and] structure … of the California waiver provision" demand deference to California,[151] EPA has never actually identified any aspect of the text or structure supporting this claim. Instead, it has always relied on a statement in a House Committee report as an indication of Congressional intent for the Administrator "to afford California the broadest possible discretion" in approving preemption

[146] Nor did the 2013 ZEV mandate waiver undergo inter-agency or Small Business Administration review under Executive Order 12866 and the Regulatory Flexibility Act.
[147] 42 U.S.C. § 7543(b)(1)(B) (emphasis added).
[148] 78 Fed. Reg. at 2,115-16.
[149] 73 Fed. Reg. at 12,158.
[150] 78 Fed. Reg. at 2,116.
[151] *Id.* at 2,115.

waiver applications.[152] Yet, EPA has never identified any ambiguity in CAA Section 209(b)(1) allowing it to resort to the legislative history in the first place.[153] Here, the statute unambiguously commands the "Administrator" to "find[]" whether there are grounds to deny a preemption waiver application.

### B. No Valid Reliance Interests Derive from EPA's 2013 Waiver Grant

EPA urges in the Notice that "the amount of time that had passed since EPA's 2013 waiver decision" raises "significant issues regarding whether SAFE I was a valid and appropriate exercise of agency authority,"[154] and questions whether "EPA properly identif[ied] and consider[ed] any relevant reliance interests, such as the inclusion of GHG emission standards and ZEV mandates in approved SIPs, in its SAFE 1 action."[155] However, timing and reliance interests do not derive from EPA's 2013 waiver grant, which itself followed a 2008 denial of a waiver when the issue was first presented. There is no statutory limit on timing to reconsider a decision, and the timing of a decision is not an independent basis to reconsider the SAFE I rule. And no reliance interests derive from this decision because one could not reasonably expect that the standards approved in that waiver would remain untouched. As part of the 2013 waiver decision, EPA and CARB committed to a 2018 mid-term evaluation of the federal standards for MYs 2022-2025.[156] Because California's deemed-to-comply provision linked those standards to compliance with its own state program, any change in federal standards from the mid-term review would have required an equal overhaul of California's emissions program for those future MYs[157]—a program that was not carved in stone in 2013. Reconsidering a waiver decision five years later, at the very time CARB and EPA committed to a mid-term evaluation of the standards, is nothing short of reasonable. What's more, California pledged to conduct a 2016 "mid-term review" of its own state standards for MYs 2022-2025, separate from EPA and CARB's mid-term evaluation of federal standards for those same years.[158]

Thus, the public had ample notice that California's emissions program would be revisited (and likely revised) several years after California obtained the waiver to enforce that program. To the extent any individual or entity affected by EPA's waiver withdrawal rooted their long-term plans in the expectation that California's standards for MYs 2022-2025 would not change, knowing that the emissions program would be reexamined in 2016 (by CARB) and in 2018 (by

---

[152] *Id.* at 2,115-16.
[153] *See Dept' of Housing & Urban Devel. v. Rucker*, 535 U.S. 125, 132-133 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."); *Chicago v. Envt'l Defense Fund*, 511 U.S. 328, 337 (1994) ("But it is the statute, and not the Committee Report, which is the authoritative expression of the law.").
[154] 86 Fed. Reg. at 22,421; *id.* at 22,429 ("[W]as it permissible for EPA to withdraw elements of the ACC program waiver over five years after it was issued?").
[155] 86 Fed. Reg. at 22,429.
[156] *See* 78 Fed. Reg. at 2137.
[157] *See* 77 Fed. Reg. 62,624, 62,785 (Oct. 15, 2012); 78 Fed. Reg. at 2132 n. 99.
[158] *See* CARB Res. 12-11 (Jan. 26, 2012), https://tinyurl.com/y679m95m; CARB, 2017 Midterm Review Report, https://tinyurl.com/yxt6qaoh (last visited Sept. 21, 2020).

EPA), they did so at their own peril: the possibility of change was baked into the waiver.[159] Plainly, these "reliance interests"—stemming from the public's own misplaced assumption that California's emissions program would remain intact even after the anticipated midterm reviews—cannot defeat EPA's reconsideration authority exercised in the SAFE I rule.[160]

Additionally, the argument that if EPA has reconsideration authority at all, it must be limited to waiver denials because "reconsideration of a waiver denial implicates none of the reliance interests implicated by withdrawal of a granted waiver," makes little sense.[161] There is no basis in the CAA, nor any other cogent reason, to view EPA's reconsideration power as a one-way ratchet. Whatever "reliance interests" are disturbed when EPA reverses a waiver grant are no more real, and no more serious for the parties involved, than the reliance interests upended by reversal of a waiver denial (which the 2013 waiver decision was)—including the reliance interests of AFPM members, who incur real, considerable costs when EPA changes direction. At any rate, almost all agency decisions create reliance interests. If that were sufficient to defeat reconsideration authority, then such authority would be the exception, not the "normal[]" rule.[162]

### C. EPA Must Consider the Environmental Justice Harms of California's ACCP

California's ZEV mandate will inflict harms on environmental justice communities, such as low-income Americans, which EPA must address in this proceeding.

About one-third of all households have annual incomes higher than $100,000. However, about two-thirds of households with BEVs or PHEVs have incomes higher than $100,000.[163] University of California researchers determined that EV penetration is "taking hold" in the very highest income category ($200K+/year).[164] EV mandates and subsidies benefit wealthier Americans, while imposing new costs on all other vehicle purchasers through cross-subsidies that put new vehicles out of reach of low- or even middle-income Americans. This contradicts the Administration's commitments to advancing environmental justice and socioeconomic equity.[165]

---

[159] *Cf. Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1205 (D.C. Cir. 1996) ("In 1990, the Commission announced its plan to conduct a performance review in 1994 to assess how well the price cap system had worked. Petitioners made all of their … elections with that in mind. Petitioners could not have reasonably assumed that the price cap index would not be altered." (citation omitted))
[160] *See Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) ("[R]eliance interests [can]not … undo agency action … [unless they are] specifically identified, reasonably incurred, and causally tied to the delay.").
[161] *See* Letter from Mary Nichols, Chairman, CARB, to Lisa Jackson, Adm'r, EPA (Jan. 21, 2009) (urging EPA to exercise its "inherent authority to reconsider" the 2008 waiver denial).
[162] *New Jersey v. EPA*, 517 F.3d 574, 582-83 (D.C. Cir. 2008).
[163] *See* U.S. Energy Information Administration, Today in Energy, "Electrified vehicles continue to see slow growth and less use than conventional vehicles," May 22, 2018, https://www.eia.gov/todayinenergy/detail.php?id=36312.
[164] Davis & Lucas, *An Electric Vehicle in Every Driveway?* Energy Institute Blog, UC Berkeley (May 13, 2019), https://energyathaas.wordpress.com/2019/05/13/an-electric-vehicle-in-every-driveway/.
[165] Executive Order 13,990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/; Executive Order 13,985, Advancing Racial Equity and Support for Underserved Communities

California's ZEV mandate could result in utilities raising the rates of all households to pay for the electric vehicle service equipment (EVSE) needed to service the mandated volumes of BEVs that would have to be sold. Indeed, the California PUC has approved requests from state-regulated electric utilities to do just that. Southern California Edison (SCE), for example, established an EV rate that eliminates demand charges for EV charging through at least March 2024, cutting typical EV cost of service by approximately 60%, and transferring those costs to other ratepayers.[166] California's other major utilities have sought and received approval for similar preferential utility rate treatment of EV owners.

Even small utility rate hikes in good economic times can have a disproportionate impact on less wealthy households. Nearly 1 in 3 American households reported difficulty paying their energy bill, according to a 2018 Energy Information Administration report.[167]

## Conclusion

AFPM appreciates EPA's consideration of its comments on the Notice. AFPM opposes EPA's proposed action—rescinding the SAFE I rule and purporting to reinstate a waiver for the GHG and ZEV aspects of California's ACCP. Withdrawing of the Notice is neither a referendum nor a prohibition on the sale of EV's in California. Instead, it is an outcome compelled by the rule of law that recognizes EPA does not have the authority to waive EPCA preemption and cannot make a regulatory decision without applying the required statutory criteria. Should you have questions concerning these comments, please contact Richard Moskowitz at 202-844-5474.

Respectfully submitted,

Richard Moskowitz, General Counsel

---

Through the Federal Government (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[166] "For the first five years, commencing March 1, 2019, no Demand Charge shall apply to Customers receiving service under this Schedule. After the five-year introductory period, and commencing on March 1, 2024, Demand Charge on Option D shall be phased-in unless otherwise authorized by the Commission." Southern California Edison, Schedule TOU-EV-7, General Service Time-of-Use, Electric Vehicle Charging (Mar. 22, 2019). https://library.sce.com/content/dam/sce-doclib/public/regulatory/tariff/electric/schedules/general-service-&-industrial-rates/ELECTRIC_SCHEDULES_TOU-EV-7.pdf. SCE's arguments in favor of below-market rates for EV customers were outlined in testimony to the PUC. *See* http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/F5582C9D0A9A3659882580AE007F74A4/$FILE/A1701XXX-SCE%20TE%20Testimony%201-20-17.pdf.

[167] EIA, *One in three U.S. households faces a challenge in meeting energy needs*, Today in Energy (Sept. 19, 2018), https://www.eia.gov/todayinenergy/detail.php?id=37072.