**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF CALIFORNIA,
1300 I Street
Sacramento, CA 95814-2919;

*Plaintiff,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,

*Defendants,*

and

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, and
AMERICAN PETROLEUM INSTITUTE,

*Defendant-Intervenors.*

Case No.: 1:26-cv-02185-BAH

**SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. When Congress directed the United States Environmental Protection Agency (EPA) to regulate harmful emissions from new motor vehicles, 42 U.S.C. § 7521(a), it also preempted States from setting such standards, *id.* § 7543(a). Recognizing that California had already developed deep expertise in vehicle emissions control and that the State suffers from severe air pollution challenges, Congress then directed EPA to "waive" this preemption for California, unless record evidence supports one of three limited bases for declining to do so. *Id.* § 7543(b)(1).

2. Congress's decision to allow California "to continue and expand its pioneering efforts" (pursuant to preemption waivers granted by EPA) means that the State "act[s] as a kind of laboratory for innovation" for vehicular emission controls, thereby advancing a core value of federalism while encouraging technological innovation for the protection of public health and welfare. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1111 (D.C. Cir. 1979); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

3. This Clean Air Act waiver provision was enacted in 1967. Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967). Since then, new motor vehicles have been "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996).

4. As Congress anticipated, this two-program structure allows the federal government to "draw[] heavily on the California" laboratory "to fashion and to improve the national efforts at emissions control." *MEMA I*, 627 F.2d at 1110. For example, "California first required automobile manufacturers to install" emission-system monitoring "in new cars sold in the state in 1988—two years before Congress mandated [such systems] in cars sold nationwide." *Motor & Equip. Mfrs. Ass'n v. Nichols* (*MEMA II*), 142 F.3d 449, 454 (D.C. Cir. 1998). Similarly, the

federal emission standards for passenger cars that were "phased in beginning in model year 1994" were "based on standards adopted in 1989 by the state of California." Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Env't L. 1947, 1956 (1991).

5. This two-program structure was so successful with respect to the regulation of new motor vehicles that Congress effectively replicated the same structure for the regulation of off-road vehicles and engines (e,g., tractors, bulldozers, and ships). In 1990, Congress enacted a provision of the Clean Air Act that preempts all States (including California) from setting emission standards for two categories of new off-road vehicles and engines, 42 U.S.C. § 7543(e)(1), and requires EPA to authorize California to regulate emissions from all other off-road vehicles and engines, absent limited conditions, *id.* § 7543(e)(2)(A). *See also* Pub. L. 101-549 § 222(b), 104 Stat. 2399, 2502 (1990); 59 Fed. Reg. 36,969, 36,973-74 (July 20, 1994).[1]

6. EPA has granted California more than seventy-five preemption waivers for updates to the State's emissions control programs, which have allowed California to "improve on 'its already excellent program,'" to foster technological advancements, and to protect Californians from harmful pollution. *See MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)); *see also MEMA II*, 142 F.3d at 454; *Am. Trucking Ass'ns, Inc. v. EPA*, 600 F.3d 624, 626 (D.C. Cir. 2010).

7. This case concerns six preemption waivers, granted in 2009, 2013, 2022, 2023, 2024, and 2025.

8. During the proceedings for each of these waivers, and at the time the agency took its final actions, EPA maintained its longstanding position that Clean Air Act preemption waivers are adjudicatory orders, not rules. *E.g.*, 74 Fed. Reg. 32,744, 32,784 (July 8, 2009) ("[T]his action is not a rule…."). That position reflects the Administrative Procedure Act's (APA)

[1] While EPA's actions under this off-road provision are sometimes referred to as "authorizations" based on statutory text, 42 U.S.C. § 7543(e)(2)(A), these actions waive preemption just like actions under the on-road provision. Accordingly, this Complaint refers to actions under either provision as "waivers."

bifurcation of agency proceedings as either rulemakings that lead to rules, 5 U.S.C. § 551(4), (5), or adjudications that lead to orders, *id.* § 551(6), (7); and the APA's definitions that place grants of "statutory exemptions" squarely in the latter category, *id.* § 551(6), (8), (9).

9. Nonetheless, in press releases issued on June 12, 2026 and July 22, 2026, EPA now asserts it has "determined that each of these waivers is now a rule" and claims that determination obligates the agency to submit the waivers to Congress for review under the Congressional Review Act (CRA). EPA, *EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress* (June Press Release) at 1 (June 12, 2026)[2]; EPA, *EPA Again Fulfills Its Statutory Obligation by Transmitting Two Additional California Waiver Rules to Congress* (July Press Release) at 1 (July 22, 2026) (claiming that EPA has "determined that each of" two additional waivers "is a rule under the CRA" and therefore must be transmitted to Congress for review).[3]

10. EPA's actions continue a campaign of hostility toward these previously granted waivers (and others), during which the Executive Branch generally, and EPA specifically, have indicated their intention to nullify these waivers. EPA's attempt to reclassify these waivers advances that end in two ways.

11. First, EPA is attempting to invoke the CRA as a way to invalidate waivers previously granted to California, although the CRA was enacted to facilitate congressional review of certain federal agency rules and has applicability only as to such actions. *E.g.*, 5 U.S.C. § 801(a)(1)(A); *id.* § 804(3) (incorporating and then cabining APA definition of "rule").

12. Indeed, while all fifty States consented—through their Senators—to expedited procedures for congressional disapproval of *federal rules*, no State consented to the CRA as a means for Congress to negate *state rules*, such as California's emission regulations. Nor would

[2] Available at https://www.epa.gov/newsreleases/epa-fulfills-statutory-obligation-transmitting-four-california-waiver-rules-congress, last visited June 18, 2026.
[3] Available at https://www.epa.gov/newsreleases/epa-again-fulfills-its-statutory-obligation-transmitting-two-additional-california, last visited August 14, 2026.

any State have done so. States do not so easily surrender "the dignity … of sovereignty" they retain in our system of government. *Alden v. Maine*, 527 U.S. 706, 715 (1999).

13. EPA has done this once before. In February 2025, the agency similarly claimed it had reclassified three other Clean Air Act preemption waivers into "rules," although they were finalized as adjudicatory orders.[4] As EPA notes in its recent press release, those previous actions ultimately led to congressional resolutions purporting to disapprove of the three targeted waivers under the CRA. June Press Release at 1. EPA seeks the same result here. *Id.*[5]

14. Second, EPA's reclassifications, if allowed to stand, would streamline the process for administrative revocation of these waivers—a process EPA attempted during the first Trump Administration. Specifically, if these waivers are now rules and are no longer orders granting California a license (as they were when granted), EPA has eviscerated California's right to an advance opportunity to correct any bases EPA might assert for an administrative withdrawal. 5 U.S.C. § 558(c). EPA will likely proceed down this administrative path, as both the agency and the President have suggested. And EPA has now smoothed the way for such actions with its purported reclassifications.

15. No agency has the power to wave a magic wand and transform an action that was finalized as an adjudicatory order into a rule, and certainly not without a public process in which the agency acknowledges and explains its change in position. Yet, that is exactly what EPA has attempted to do here.

16. California is injured by EPA's attempts to reclassify those waivers and its implementation of that "determination." EPA's purported reclassifications set up a two-pronged attack on California's ability to enforce its own, longstanding regulations, inviting Congress to

[4] EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* (February 14, 2025), available at https://www.epa.gov/newsreleases/trump-epa-transmit-california-waivers-congress-accordance-statutory-reporting, last visited June 18, 2026.

[5] California and ten other States challenged these resolutions, and the EPA conduct that led to them, in a suit filed in the Northern District of California. *See infra* at ¶ 71.

disapprove the authorizing waivers or, alternatively, paving the way for streamlined agency actions to revoke those waivers.

17. California thus asks this Court to vacate EPA's unlawful actions and restore the status quo that preceded them.

## PARTIES

18. Plaintiff State of California is a sovereign state in the United States of America. California is represented by and through Attorney General Rob Bonta, the chief law enforcement officer of California; Governor Gavin Newsom, the chief executive officer of the State; and the California Air Resources Board (CARB), the state agency that developed and promulgated the state regulations authorized by the four waivers at issue.

19. Defendant EPA is a federal agency.

20. Defendant Lee Zeldin is the EPA Administrator. He is sued in his official capacity.

## JURISDICTION AND VENUE

21. This Court has jurisdiction under 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States, including but not limited to the APA, 5 U.S.C. § 551, *et seq*.

22. Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are an agency of the United States and an officer of the United States sued in his official capacity and reside in this district for venue purposes and because Defendants' actions, which give rise to the claims, took place in this district.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

### I. CONGRESS ENACTED THE CLEAN AIR ACT WAIVER PROVISION TO ALLOW CALIFORNIA'S REGULATION OF NEW MOTOR VEHICLE EMISSIONS TO CONTINUE WITH MINIMAL FEDERAL OVERSIGHT

23. From the inception of efforts to limit vehicular air pollution, California led the way. The State's "interest in pollution control from motor vehicles dates to 1946," *MEMA I*, 627 F.2d at 1109 n.26, and California's Legislature mandated statewide motor vehicle emission standards beginning in the 1950s, *see* 1959 Cal. Stat. 2091. By contrast, "[n]o federal statute purported to

regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

24. When Congress took up the mantle of federal vehicle emission regulation, it recognized California's extraordinary air pollution challenges, the State's leadership in this field, and the value of state-level experimentation. Congress therefore opted to allow the State to continue and "improve on 'its already excellent program.'" *MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)). Accordingly, while it preempted other States from regulating emissions from new motor vehicles, Congress required EPA to waive that preemption for California except in narrow circumstances. Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967).[6]

25. Under this waiver provision, California promulgates its own standards through a state rulemaking proceeding, determines that its state program is at least as protective as EPA's, and requests a waiver of preemption from EPA. *See* 42 U.S.C. § 7543(b)(1). EPA must then waive preemption unless evidence provided by waiver opponents establishes one of three limited bases for denial. 42 U.S.C. § 7543(b)(1)(A)-(C); *MEMA II*, 142 F.3d at 453.

26. By *requiring* EPA to grant the waiver, absent one of the limited bases for declining to do so, Congress "consciously chose to permit California to blaze its own trail with a minimum of federal oversight." *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

27. This decision reflected a careful congressional compromise, balancing the benefits—for the State and "the entire country"—of preserving "a kind of laboratory for innovation," *Engine Mfrs. Ass'n*, 88 F.3d at 1080, against manufacturers' fears of "having to meet fifty-one separate sets of emissions control requirements," *MEMA I*, 627 F.2d at 1109-10. This compromise ensured that California's "government will represent and remain accountable to its own citizens," *Printz v. United States*, 521 U.S. 898, 920 (1997), while also ensuring manufacturers must meet no more than two different sets of emission standards—California's

[6] The 1967 Act gave this authority to the Secretary of Health, Education, and Welfare. In 1970, Congress transferred this authority to the Administrator of the newly created EPA. Pub. L. No. 91-604, § 15(c)(2), 84 Stat. 1676, 1713 (1970).

state standards and EPA's federal ones. As intended, this two-program structure has allowed California to continue addressing the "harsh reality" of the State's pollution problems using its expertise in regulating vehicular emissions. *See* H.R. Rep. No. 90-728, at 96-97 (1967); *see also* S. Rep. No. 90-403, at 33 (1967).

28. As part of the 1977 Clean Air Act Amendments, Congress noted with approval that EPA had been readily granting waivers to California, consistent with Congress's intent. H.R. Rep. No. 94-1175 at 247 (1976); *see also MEMA I*, 627 F.2d at 1110 n.32. Congress nonetheless sought to "ratify and strengthen" the waiver provision in order "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." H.R. Rep. No. 95-294, at 301-02 (1977). Specifically, Congress amended the waiver provision's text, removing the original requirement that *each* California standard be more stringent than its federal counterpart and allowing the protectiveness of the state's program to be measured by viewing all the "state standards*, in the aggregate*." 42 U.S.C. § 7543(b)(1) (emphasis added).

29. Congress also opted to permit other States to choose to adopt "standards … identical to the California standards for which a waiver has been granted" under certain conditions, 42 U.S.C. § 7507, thereby respecting state authority to protect residents and natural resources while maintaining the commitment that manufacturers would be subject to no more than two sets of standards.

30. Thirteen years later, in 1990, Congress again amended Section 209 of the Clean Air Act. It made no changes to the waiver provision concerning new motor vehicle emissions (Section 209(b), 42 U.S.C. § 7543(b)). Rather, it enacted a new and nearly identical provision (Section 209(e)(2)(A)) concerning off-road vehicles and engines—i.e., mobile sources of pollution that do not operate on roads (such as bulldozers, ships, and lawnmowers). *Id.* § 7543(e)(2)(A). Under this provision (as with the original), EPA must "authorize"—i.e., waive preemption for—California's regulation of emissions from these off-road sources, unless EPA can make one of three limited findings that permit denial of California's request. *Id.*

31. EPA has granted California more than seventy-five Clean Air Act preemption waivers as the State has expanded and strengthened its emission control requirements for new motor vehicles sold in the State and for off-road engines sold or operated in the State. *See* EPA, *Vehicle Emissions California Waivers and Authorizations*.[7]

32. Among these waivers are the six at issue here:

- A 2009 waiver authorizing enforcement of California's first greenhouse gas (GHG) emissions standards for new motor vehicles, 74 Fed. Reg. 32,744 (July 8, 2009);
- A 2013 waiver authorizing enforcement of California's Advanced Clean Cars I regulation—a collection of regulatory amendments that, among other things, tightened existing emission standards for passenger cars and light trucks (across a range of pollutants) and increased existing requirements that manufacturers sell zero-emission vehicles in California, 78 Fed. Reg. 2211 (Jan. 9, 2013);[8]
- A 2022 waiver action that reinstated parts of the 2013 waiver referenced above that EPA had taken action to withdraw in 2019 under the first Trump Administration—specifically, the parts that authorized enforcement of California's more stringent GHG standards and zero-emission-vehicle requirements, 87 Fed. Reg. 14,332 (Mar. 14, 2022);
- A 2023 waiver authorizing enforcement of amendments to California's ocean-going vessels at-berth regulations, which are designed to reduce emissions from such vessels when they are docked at specified California ports, 88 Fed. Reg. 72,461 (Oct. 20, 2023);
- A 2024 waiver authorizing enforcement of the State's amended Small Off-Road Engine (SORE) regulations—which apply to small equipment (such as leaf blowers and lawnmowers) and require manufacturers to transition to zero-

[7] Available at https://perma.cc/9F5K-QC79, last visited June 18, 2026.

[8] A zero-emission vehicle is one that—like an electric or hydrogen vehicle—has zero tailpipe emissions of any pollutant.

emission equipment as to their California sales, 90 Fed. Reg. 640 (Jan. 6, 2025) (signed December 2024);[9] and

- A 2025 waiver authorizing enforcement of the State's emission regulations applicable to commercial harbor craft, including requirements for upgrade to cleaner engines and other technologies to reduce emissions of a host of pollutants from the diesel engines that typically power these boats, 90 Fed. Reg. 1998 (Jan. 10, 2025).

33. Like California's other emission control measures, these regulations were designed to protect Californians from the adverse health and welfare effects of harmful pollution.

34. Unfortunately, despite decades of progress, tens of millions of Californians live, study, work, or play in regions that continue to experience some of the worst air quality in the Nation. American Lung Association, *State of the Air 2025 Report* 15-16, 18-19.[10] The State faces particularly severe challenges to meet public health standards for ozone (or smog) and fine particulate matter, *id.*, due in part to "geographical and climatic conditions" as well as "large numbers and high concentrations of automobiles" and other mobile sources of pollution (including off-road engines), *Am. Trucking*, 600 F.3d at 627 (cleaned up).

35. Many of the regulations listed above are either already part of the State's approved plan to meet federal, health-based National Ambient Air Quality Standards or are proposed to become part of that plan. For example, California has asked EPA to approve the amended SORE regulations into the State's plan because those amended regulations would dramatically reduce smog-forming emissions in California from equipment that currently emits more of that pollution in the State than all the passenger cars on the State's roads combined.[11]

---

[9] California's SORE regulation cannot be adopted and enforced by any other State. Pub. L. 108-199 § 428(c), 118 Stat. 3, 418 (2004); 40 C.F.R. § 1074.110(b). Other States may adopt and enforce different California off-road regulations not at issue here. 42 U.S.C. § 7543(e)(2)(B).

[10] Available at https://perma.cc/G2RK-V9BM, last visited June 20, 2026.

[11] *See* CARB, *Staff Report: Initial Statement of Reasons*, at 2 (Oct. 12, 2021) ("SORE Initial Statement of Reasons"), available at https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2021/sore21/isor.pdf, last visited June 19, 2026.

36. Standards covered by the waivers listed above are (or were) also part of the State's plans to meet its own, state-level air pollution goals.

37. These regulations, and the waivers that authorize their enforcement, are thus important components in comprehensive plans to meet public health and welfare goals, including improving the air Californians breathe. CARB, *2022 State Strategy for the State Implementation Plan* 55, 65 (Sept. 22, 2022).[12]

## II. Clean Air Act Preemption Waivers Have Always Been Understood to Be Adjudicatory Orders, Not Rules

38. From the beginning, EPA understood that its role under the waiver provision "is modest in scope" and does not encompass "authority to modify California regulations" or to promulgate federal rules. *MEMA I*, 627 F.2d at 1119. Rather, EPA's role is to adjudicate California's requests by determining whether "the parties opposing the waiver request" have met their "burden of persuading the Administrator that the waiver request should be denied." *Id.* at 1121. The D.C. Circuit has long agreed this is the proper approach, *id.*, and Congress itself "expressed general approval" of EPA's waiver practices after the first ten years of agency implementation, *id.* at 1122.

39. EPA's practice of adjudicating waiver requests and issuing orders disposing of them is consistent with the text of the Clean Air Act. Where Congress delegated rulemaking power over vehicle emissions to EPA, it directed the agency to "prescribe … standards," 42 U.S.C. § 7521(a)(1), consistent with the APA's definition of rules as agency actions that "prescribe law," 5 U.S.C. § 551(4). The waiver provision, by contrast, anticipates that *California* will prescribe "State standards" and determine whether its standards "will be, in the aggregate, at least as protective" as EPA's. 42 U.S.C. § 7543(b)(1).

40. The waiver provision then empowers EPA only to "waive application" of the Act's preemption provision, *id.*, not to prescribe rules. Or in APA terms, the waiver provision requires EPA to undertake a "licensing"—an "agency process respecting the grant [or] denial … of

---

[12] Available at https://perma.cc/X2Y9-LQ4N, last visited June 20, 2026.

a license," where license is defined to include a "statutory exemption or other form of permission." 5 U.S.C. § 551(8), (9). And a "licensing" proceeding is, by definition, an adjudication that produces an "order," not a "rule." *Id.* § 551(6), (7).

41. Congress confirmed as much when it omitted waiver decisions from the list of EPA Clean Air Act actions to which the Act's "[r]ulemaking" requirements apply. 42 U.S.C. § 7607(d)(1).

42. EPA consistently maintained its position that these waiver decisions are not rules when Executive Order 12866 and statutes—like the CRA and the Regulatory Flexibility Act (5 U.S.C. § 601(2))—imposed additional requirements on rules (but not orders). *E.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The [CRA] does not apply because this action is not a rule."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past waiver decisions, this action is not a rule…."); 75 Fed. Reg. 70,237, 70,241 (Nov. 17, 2010) ("this action is not a rule"); 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent with its previous actions on waiver requests…."); 88 Fed. Reg. 72,461, 72,476 (Oct. 20, 2023) ("[T]he [CRA] . . . does not apply because this action is not a rule for purposes of 5 U.S.C. 804(3)."); 90 Fed. Reg. 1998, 2000 (Jan. 10, 2025) ("The [CRA] . . . does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3).").

43. The Government Accountability Office (GAO)—the non-partisan entity on which Congress relies for CRA applicability determinations—has agreed that waivers are not rules under that statute (or the APA). When asked by a member of Congress whether the 2022 waiver action at issue here was a "rule" subject to the CRA (which incorporates the APA definition), the GAO concluded that the action "meets the statutory definition of an order," rather than a rule. GAO Decision B-334309, *Environmental Protection Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* (GAO 2023 Decision) 5 (Nov. 30, 2023).[13]

---

[13] Available at https://www.gao.gov/assets/870/863746.pdf, last visited June 20, 2026.

44. Members of both the Senate and the House then embraced and acted on the GAO's view, indicating that they, too, understood that EPA's preemption waiver decisions are not rules. For example, when he introduced a bill to repeal the Clean Air Act's waiver provision, in September 2024, Senator Mike Lee expressly acknowledged that Clean Air Act preemption waivers "cannot be reviewed under the Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the CRA." Mike Lee, *Stop CARB Act One Pager* (118th Congress) (emphasis omitted).[14] That bill—S.5038, 118th Cong. (2024)—had five co-sponsors in the Senate.[15] Representative Troy Nehls likewise acknowledged that "none of [California's waivers] are subject to congressional review" when he introduced the companion bill in the House. *Rep. Troy Nehls Introduces the Stop CARB Act* (Sept. 12, 2024).[16] That bill—H.R. 9574, 118th Cong. (2024)—had nine co-sponsors in the House.[17]

## III. The CRA Is Not Implicated in the Absence of a Rule

45. When Republicans took control of both chambers of Congress after the 1994 midterm elections, they credited their election victory to the "Contract with America," which contained a promise to push for federal regulatory reform, including shrinking the size of the federal government. *See* S. Rep. No. 104-15, at 3 (1995) (describing 1994 elections as sending "a clear message to Washington that [Americans] want a smaller, more efficient, and more effective government").

46. Once in office, the Republican majority in the House attempted to impose a moratorium on all new federal regulations "to ensure economy and efficiency of Federal Government Operations." H.R. Rep. No. 104-39, at 1 (1995). That effort failed.

47. The push for federal regulatory reform then evolved into what became known as the Small Business Regulatory Enforcement Fairness Act and the CRA, both of which were incorporated into a broader, bipartisan bill: the Contract with America Advancement Act of

---

[14] Available at https://perma.cc/LNG5-45AW, last visited June 20, 2026.
[15] *See* https://www.congress.gov/bill/118th-congress/senate-bill/5038/cosponsors.
[16] Available at https://perma.cc/55TB-737M, last visited June 20, 2026.
[17] *See* https://www.congress.gov/bill/118th-congress/house-bill/9574/cosponsors.

1996. Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996). That Act also contained an increase to the Nation's debt limit and an increase to the limit on income Social Security recipients may earn without losing benefits. 110 Stat. at 847, 875. That broader bill passed the House by a bipartisan vote of 328 to 91. The House bill then passed, without amendment, by unanimous consent in the Senate. 142 Cong. Rec. S3114 (Mar. 28, 1996).

48. The CRA requires a "Federal agency" that has promulgated a "rule" to submit the rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[*b]efore* a rule can take effect." 5 U.S.C. § 801(a)(1)(A) (emphasis added).

49. The CRA defines the federal agency actions to which it applies by way of the APA's definition of "rule." 5 U.S.C. § 804(3) (cross-referencing 5 U.S.C. § 551); *see also id.* § 551(1) (limiting the definition of "agency" to "authorit[ies] of the Government of the United States"). The CRA then narrows the APA definition by, among other things, excluding "any rule of particular applicability." *Id.*

50. Congress has 60 session-days from the agency's submission of a qualifying report to adopt a resolution to disapprove a particular rule. 5 U.S.C. § 802(a). The text of such resolutions is prescribed by the statute as follows: "That Congress disapproves the rule submitted by the __ relating to __, and such rule shall have no force or effect." *Id.* The first blank is filled in with the agency's name and the second is typically filled in with the title of the Federal Register notice announcing the final rule. *E.g.,* H.J. Res. 35 (approved Mar. 14, 2025). After a CRA joint resolution of disapproval is enacted, "a new rule that is substantially the same … may not be issued, unless [it] is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." 5 U.S.C. § 801(b)(2).

51. If an agency fails to submit an action that one or more members of Congress believe is a "rule" subject to the CRA, those members may ask the GAO for a determination. Congressional Research Service, *The Congressional Review Act: Determining Which "Rules"*

*Must Be Submitted to Congress* 23 (updated Oct. 22, 2024).[18] In that case, if the GAO concludes the agency action is subject to the CRA, members of Congress may introduce resolutions of disapproval. *Id.* ("Thus, the question of whether Congress may use the CRA's fast-track parliamentary disapproval mechanism generally hinges upon the determination reached in GAO's opinion in such cases."). With three exceptions discussed below, the opposite has also been true: if the GAO concludes an agency action is *not* a rule within the CRA's definition, members do not introduce resolutions of disapproval.

52. In the Senate, the consideration of CRA resolutions is highly expedited. The CRA creates an exception to the filibuster, so that resolutions of disapproval require only a simple majority to pass. 5 U.S.C. § 802(d)(1). Motions, amendments, and even debate are all severely limited. *Id.* §§ 802(d)(1), 802(d)(2). Specifically, debate about the resolution and any "debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing the joint resolution." *Id.* § 802(d)(2). Although other motions are not "in order" and thus not permitted, "[a] motion further to limit debate"—to less than 10 hours—"is in order and not debatable." *Id.*

53. The CRA also provides that "no determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. That provision only applies to the referenced actions "under" the CRA. *E.g.*, *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-06 (D.C. Cir. 2019) (recognizing that "[w]hen Congress provides that there shall be no administrative or judicial review of specified agency actions," courts must determine "whether the challenged action falls within the preclusive scope of the statute") (cleaned up).

54. The text of the CRA is exclusively concerned with federal rules promulgated by federal agencies. *E.g.*, 5 U.S.C. § 801(a)(1)(B) (referring to "the Federal agency promulgating the rule"). So, too, were other parts of the broader bill that contained the CRA. *E.g.*, Pub. L. 104-121, 110 Stat. at 857 ("fundamental changes … are needed in the regulatory and enforcement culture of Federal agencies").

[18] Available at https://www.congress.gov/crs-product/R45248, last visited June 20, 2026.

## IV. THE 2025 CONGRESSIONAL RESOLUTIONS PURPORTING TO DISAPPROVE OF THREE OTHER PREEMPTION WAIVERS DID NOT CHANGE THE DEFINITION OF A RULE

55. Nonetheless, the Executive and Legislative branches purported to invoke the CRA in 2025 to target three Clean Air Act preemption waivers previously granted to California.

56. On February 14, 2025, President Trump and EPA Administrator Zeldin "announced in the Oval Office … that the EPA [would] transmit[] to Congress" and the GAO three waiver decisions because EPA had purportedly determined those decisions were rules, subject to the CRA, although they had each been finalized as orders.[19] The announcement neither acknowledged nor explained EPA's change of position, much less justified how an agency could alter the nature of a long-ago finalized action.

57. Upon receipt of EPA's submissions, the GAO observed that the waiver "notices themselves stated that CRA did not apply" and that EPA had not explained "why the agency was submitting the notices under CRA." GAO Letter B-337179, *Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* (GAO 2025 Decision) 2, 6 (March 6, 2025).[20]

58. Regardless, some members of Congress indicated they were prepared to take EPA's word that these waivers were rules, subject to the CRA.[21]

59. On February 21, 2025, three Senators—including both Senators from California—requested that the GAO provide its legal opinion about whether these three waivers were rules subject to the CRA. GAO 2025 Decision at 1.

---

[19] EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirement* (Feb. 14, 2025), available at https://perma.cc/GDF5-HVM2, last visited June 20, 2026.

[20] Available at https://www.gao.gov/assets/880/875948.pdf, last visited June 22, 2026.

[21] @EPWGOP ("EPW Republicans"), X, https://perma.cc/5WMM-DQVJ (Feb. 14, 2025), last visited June 20, 2026; *see also* Times of San Diego*, Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito: "Once they submitted it to us, it's a rule. … [And] we can take it down."), available at https://perma.cc/9VHE-RTB4, last visited June 20, 2026.

60. On March 6, 2025, the GAO issued its legal analysis, concluding (as before) that waiver actions are not subject to the CRA. GAO 2025 Decision at 9. The GAO concluded that the three submitted waivers meet "the APA definition of an order," not of a rule, because they make preemption determinations—i.e., "'final disposition[s]' granting California a 'form of permission' as described in the APA definition" of "order." *Id.* at 6 (quoting 5 U.S.C. § 551(6)).

61. The GAO also reiterated its prior conclusion that, even if waiver decisions were rules, they would still not be subject to the CRA because they are not rules of general applicability. Instead, the GAO concluded, waiver decisions "concern[] a specific entity—California—and address[] a statutory waiver specific to California's [program]." GAO 2025 Decision at 6.

62. Industry advocates maintained that the GAO's determination and, indeed, the statutory definition of "rule," were all irrelevant. Buschbacher & Conde, *Congress Has the Authority to Review EPA "Waivers" of Clean Air Act Preemption*, Yale J. Reg. (Mar. 5, 2025) (arguing "that the CRA's text … do[es] not bind").[22] Under that view, the only thing that mattered was EPA's submission of the waiver decisions to Congress because "the CRA gives Congress unchallengeable power to invalidate any action that an agency submits for review." *Id.*

63. The question of the CRA's applicability was then presented to the Senate Parliamentarian, "the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber. Congressional Research Service, *The Congressional Review Act (CRA): Frequently Asked Questions*, 18 (Updated Nov. 12, 2021);[23] *see also* Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1959 (2020) ("The parliamentarians are the primary interpreters of the rules governing Congress.").

---

[22] Available at https://perma.cc/C8V5-9KFY, last visited June 20, 2026.
[23] Available at https://www.congress.gov/crs-product/R43992, last visited June 20, 2026.

64. After hearing arguments on both sides, the Senate Parliamentarian agreed with the GAO that the waiver decisions are not subject to the CRA. Lisa Friedman, *Republican Plan to Kill California's E.V. Policies Hits Senate Snag* (April 4, 2025).[24]

65. "[I]n the ordinary course of business, Congress's procedural rules—and the parliamentarians' interpretations of those rules—are as good as binding." Gould, *Law Within Congress*, 129 Yale L. J. at 1958. The House nonetheless proceeded, voting to approve resolutions of disapproval on April 30 and May 1 of 2025. Congressional leadership and other members continued to attribute their purported ability to invoke the CRA solely to the actions of the Executive Branch. *E.g.*, Congressmen Brett Guthrie, John Joyce, John James, and Jay Obernolte, *How Congress Is Fighting Biden's Disastrous EV Mandate* (May 2, 2025).[25]

66. In the Senate, however, waiver opponents faced a hurdle because several of them did not want to override the Senate Parliamentarian who had concluded the CRA did not apply. *E.g.*, Russell Payne, *The Senate parliamentarian could block some of Trump's agenda — and be a scapegoat for Republicans* (January 9, 2025).[26] In fact, the Senate had never previously "overruled the Parliamentarian regarding the CRA." 171 Cong. Rec. S3031 (daily ed., May 21, 2025) (Sen. Durbin).

67. Senate leadership got around this problem by changing not the statutory definition of a "rule" but the Senate's internal procedural rules so that an Executive Branch denomination as a "rule" in a submission to Congress would now suffice to trigger CRA-like, expedited procedures, whether or not the agency action actually *was* a rule. *See e.g.*, 171 Cong. Rec. S3087 (daily ed., May 21, 2025) (Senator Capito describing agency submission as sufficient to "trigger[] my right as a Senator to introduce this resolution to block California's EV mandate"); 171 Cong. Rec. S3099, S3140 (daily ed., May 22, 2025) (Sen. Lankford). Indeed, Senate leadership exclusively credited "President Trump and EPA Administrator Lee Zeldin … submitting the approved

[24] Available at https://www.nytimes.com/2025/04/04/climate/california-ev-waiver-senate.html, last visited June 20, 2026; *see also* https://perma.cc/A47L-KQEJ, last visited June 20, 2026.
[25] Available at https://perma.cc/DUL5-3VQS, last visited June 20, 2026.
[26] Available at https://perma.cc/B8K5-CLCZ, last visited June 20, 2026.

California waiver[s]" for the opportunity to enact resolutions. 171 Cong. Rec. S3087 (Senator Capito); *see also* 171 Cong. Rec. S3140 (Senator Lankford) ("So we worked to make sure that we were clarifying one simple thing . . . this one simple question: When an Agency says it is a rule, is it a rule? . . . . The answer is, yes, it is a rule. And then we acted on that."). Put another way, the Senate modified its procedural rules to substitute the term "Agency-submitted rule" in place of "rule" as defined in the CRA. 171 Cong. Rec. S3018 (Sen. Barrasso); *id.* at S3088 (Sen. Capito).

68. Although the Senate changed its internal procedural rules so that any action an agency submits to Congress as a "rule" is a "rule" for purposes of "what qualifies for [a] fast-track procedure" in the Senate, 171 Cong. Rec. S3048 (Sen. Thune), the statutory definitions of a "rule" in both the APA and the CRA remain unchanged.

69. Relying on its internal rule change, the Senate voted, by slim majorities, to enact three resolutions of disapproval—one for each of the three waivers EPA had purported to reclassify and submit. *E.g.*, 171 Cong. Rec. S3052 (Senator Capito introducing the first resolution "pursuant to the precedent just established" by the internal rule change). H.J. Res. 87 (119th Congress); H.J. Res. 88 (119th Congress); H.J. Res. 89 (119th Congress).

70. The President signed the three resolutions on June 12, 2025.

71. California and ten other States filed suit in the Northern District of California, alleging that the resolutions violate separation of powers and federalism principles and that EPA's reclassifications and submissions of the waivers violated the APA or were ultra vires. *California v. United States*, Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025), ECF 1 (complaint), 157 (amended complaint).[27]

[27] On February 19, 2026, the Northern District of California court heard oral argument on the Federal Government's motion to dismiss all claims. *See California v. United States*, ECF 234. That court took the motion under submission. *See id.*

## V. EPA CANNOT LAWFULLY RECLASSIFY THESE SIX WAIVERS FROM ORDERS INTO RULES YEARS AFTER THE ACTIONS WERE FINALIZED, AND ITS EFFORTS TO DO SO ARE IRREPARABLY INJURING CALIFORNIA

72. EPA did not follow rulemaking procedures when considering California's requests for the six waivers the agency now claims are rules. EPA did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment. *Cf.* 5 U.S.C. § 553(b). Instead, EPA followed its traditional practice, simply announcing that it had received a waiver request from California and was "accepting written comment on the request." *E.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007); *see also* 77 Fed. Reg. 53,199 (Aug. 31, 2012); 88 Fed. Reg. 33,143 (May 23, 2023); 88 Fed. Reg. 16,439 (Mar. 17, 2023); 89 Fed. Reg. 32,422 (Apr. 26, 2024).

73. When it finalized the waiver decisions at issue, EPA confirmed it had not followed rulemaking procedures and was not promulgating rules, reiterating its longstanding position that "the Congressional Review Act, 5 U.S.C. 801 et seq., … does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3)." *E.g.*, 74 Fed. Reg. 32,744, 32,784 (July 8, 2009); *see also* 78 Fed. Reg. 2211, 2145 (Jan. 9, 2013); 87 Fed. Reg. 14,332, 14,379 (Mar. 14, 2022); 90 Fed. Reg. 640, 642 (Jan. 6, 2025); 88 Fed. Reg. 72,461, 72,476 (Oct. 20, 2023); 90 Fed. Reg. 1998, 2000 (Jan. 10, 2025).

74. EPA did not prepare a regulatory impact analysis, as required for major rules by Executive Order 12866. 58 Fed. Reg. 51,735 (Oct. 4, 1993). Nor did EPA submit these waivers to Congress and the GAO before they took effect or when they were published in the Federal Register, as the CRA requires for rules.

75. In fact, because EPA did not submit the 2022 waiver action to Congress or the GAO, Senator Capito asked the GAO to determine if that action is a rule. The GAO concluded it is not. GAO 2023 Decision at 1, 7. Accepting that conclusion, Senator Capito did not attempt to introduce a resolution of disapproval. No other member of either the House or the Senate did so either.

76. EPA now asserts that these six waivers are "rules" and that the agency is "statutorily required" to give Congress the "opportunity to review" them. June Press Release at 1; July Press Release at 1.

77. EPA's reclassifications are erroneous, but, regardless, the agency has no authority to transform these actions into rules—many years after finalizing and publishing them as orders. EPA certainly cannot do so without any public process, simply by issuing a press release that, far from explaining the agency's change in position, fails even to acknowledge the reversal.

78. On information and belief, EPA intends its purported reclassifications to facilitate overturning these waivers and, with them, California's ability to enforce its own laws. EPA indicated as much when it recently asked the Ninth Circuit for an extension in litigation challenging the SORE waiver. EPA stated it was "currently considering taking action that could obviate the need for further litigation here"—i.e., action that would overturn the SORE waiver. *Outdoor Power Equip. Inst. v. EPA*, 9th Cir. Case No. 25-881, Dkt. 82.1 at 2 ¶ 6 (May 14, 2026). EPA purported to reclassify that waiver as a rule and submitted it to Congress for "review" approximately one month later.

79. EPA has expressed similar intentions regarding the 2022 waiver action also purportedly reclassified by the June Press Release. In 2025, EPA told the Supreme Court it had "determined that the agency should reassess the basis for and soundness of" that action. Motion of Fed. Respondents to Hold Briefing Schedule in Abeyance at 3 (January 24, 2025), *Diamond Alternative Energy, LLC v. EPA* (Supreme Court Case No. 24-7). More recently, EPA sought continued abeyance of that same litigation challenging the 2022 waiver action (now on remand at the D.C. Circuit), indicating the agency was "reviewing the challenged action and considering its next steps." *Ohio v. EPA* (D.C. Cir. Case No. 22-1081), Dkt. 2163655. EPA's June 12, 2026 press release and purported reclassification notably came just weeks before abeyance of those consolidated cases was set to end, with motions to govern due on June 29, 2026. *Id.*, Dkt. 2166283.

80. Other parts of the Executive Branch have also conveyed a strong desire to see parts of the 2013 waiver and all of the 2022 waiver action undone. The United States and the National Highway Traffic Safety Administration (part of the Department of Transportation) have sued the California Air Resources Board and its Executive Officer, claiming that the state standards authorized by these EPA actions are preempted by the Energy Policy and Conservation Act of 2007. *United States v. CARB*, E.D. Cal. Case No. 2:26-cv-00847-DJC-SCR, ECF 1 (complaint), 27 (amended complaint).

81. EPA has also conveyed hostility to these waivers. June Press Release at 1 (incorrectly describing the waivers as "supplanting EPA authority"); *contra MEMA I*, 142 F.3d at 453 ("The effect of the Clean Air Act is that new motor vehicles must be either 'federal cars' designed to meet EPA's standards or 'California cars' designed to meet California's standards.") (cleaned up); *see also* July Press Release at 1 (stating without substantiation that "standards that raise costs to the maritime industry operating in the state have a negative trickle-down effect to costs of goods across America").

82. EPA appears to believe it has two paths to its ultimate goal of invalidating these waivers, and its reclassification and submission actions are designed to facilitate both.

83. First, EPA aims to take advantage of Congress's willingness to let the Executive Branch—not the CRA's definition, not the GAO, and not the Senate Parliamentarian—determine which agency actions may be subject to congressional disapproval through expedited procedures. EPA took these actions to give Congress the "opportunity" to disapprove these waivers, in the way it did with the three other waivers EPA submitted in 2025. June Press Release at 1; July Press Release at 1. The prior resolutions are, in fact, a key reason for EPA's actions. *See id.*

84. EPA's attempt to ease the path to congressional invalidation is evident from its press releases, and the past actions of both EPA and congressional leadership, *supra* ¶¶ 57, 59, 68-70.

85. Second, EPA will likely attempt to take administrative action to invalidate these waivers, especially if Congress declines EPA's invitation or appears likely to do so. The first Trump Administration attempted such administrative action, 84 Fed. Reg. 51,310 (Sept. 27,

2019), and both the President and EPA have already indicated the agency would try again. Executive Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 §§ 2(e), 3 (Jan. 29, 2025); *supra* ¶¶ 79-80. In fact, two of the waivers at issue here appear to be prime targets for this course: one is the very same waiver the first Trump Administration purported to withdraw (in part) and another is the Biden Administration's reversal of that action.[28]

86. EPA's purported reclassifications are designed to facilitate and streamline this alternative, administrative path. Specifically, to the extent previously granted licenses can be revoked, the APA protects licensees, like California, from revocation actions by requiring agencies to provide "notice … in writing of the facts or conduct which may warrant" a withdrawal, and an "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c). Rules come with no such protection. So, if EPA's reclassifications stand, the agency may initiate withdrawal proceedings without giving California the notice and opportunity to correct to which it was entitled before those reclassifications.

87. California is injured by EPA's actions. Indeed, preventing California from enforcing its state laws and otherwise disrupting the State's program is the goal of these actions.

88. Just as States have a congressionally recognized interest when "the constitutionality of any statute of that State affecting the public interest is drawn in question," 28 U.S.C. § 2403, California has an interest impaired by a federal agency threatening to impair enforcement of state laws designed to protect public health and welfare from harmful pollution, *see Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 278 (2022) ("The importance of ensuring that States have a fair opportunity to defend their laws in federal court has been recognized by Congress.").

89. EPA's actions are intended to draw the enforceability of California's regulations into question and, ultimately, to facilitate an end to that enforceability—whether through expedited

[28] Even when EPA reversed its unlawful 2019 withdrawal action, the agency maintained that it has authority to withdraw other previously granted waivers under certain conditions. 87 Fed. Reg. at 14,344.

congressional action (for which the clock is already ticking) or through administrative action (to which EPA is attempting to remove threshold barriers).

90. Moreover, the increased threat to these six waivers—and thus to the State's authority to enforce the underlying emissions regulations—is forcing the State to expend resources preparing for the possibility that it will not obtain the emission reduction benefits of those regulations. The amended SORE regulation, for example, is anticipated to reduce smog-forming emissions by nearly 60,000 tons of NOx and more than 400,000 tons of reactive organic gases by 2043.[29] Similarly, the amended commercial harbor craft regulation is projected to reduce a cumulative total of 34,340 tons of NOx and 1,680 tons of diesel particulate matter by 2038.[30] Because California contains several regions that have been unable to meet state or federal air quality standards for smog, the State *must* reduce those emissions. An increased risk that California will be unable to enforce the amended SORE regulation means the State will have to identify other reductions. Regulations to do so typically take years of information-gathering, regulatory development, and stakeholder engagement, not to mention that some require lead-time before they can take effect. In other words, it can be years before new regulations would produce the benefits California anticipates the amended SORE regulation to provide.

91. California cannot, therefore, sit idly by, waiting to see whether it can continue to enforce its existing regulations. California must begin to plan *now*. The increased risk EPA has created is thus costing the State money and redirecting resources intended to be deployed to other priorities. Those costs and missed opportunities to advance the State's other priorities are not recoverable.

92. Finally, any reclassification of these waivers from orders into rules without any process injures California, both procedurally and substantively. Like other parties, the State is

---

[29] SORE *Initial Statement of Reasons* at ES-5.

[30] *See* CARB, *Staff Report: Initial Statement of Reasons*, at 2 (Oct. 12, 2021) ("Commercial Harbor Craft Initial Statement of Reasons"), available at https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2021/chc2021/isor.pdf, last visited August 28, 2026.

injured when it is deprived of its right to participate in agency proceedings—all the more so when the agency decision in question deprives the State of rights it would otherwise have, as EPA's action here does.

93. This Court can and should redress those injuries by eliminating the threats EPA's actions have created and restoring the status quo that existed before those actions.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the Administrative Procedure Act as to Actions Announced in June Press Release

94. Plaintiff incorporates each and every one of the preceding allegations as if alleged herein.

95. Congress "enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (cleaned up).

96. EPA is an "agency" as defined in 5 U.S.C. § 551(1).

97. EPA's June 2026 purported reclassifications of four preemption waivers from adjudicatory orders into "rules" and the agency's submissions of those orders as "rules" to Congress are all final agency actions.

98. Both actions "mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Indeed, EPA itself claims it "has *determined* that each of these waivers is a rule" and acted on that final determination. June Press Release at 1 (emphasis added). There is likewise nothing remaining to EPA's submission process.

99. Both actions are also "one[s] by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178.

100. EPA's reclassifications, if given effect, have changed California's procedural rights under the APA, denying the State the particular notices and opportunities to correct to which it was previously entitled as a licensee. *See* 5 U.S.C. § 558(c).

101. Moreover, EPA itself claims the reclassifications "alter[ed] the legal regime to which the [EPA is] subject." *Bennett*, 520 U.S. at 169. EPA asserts its actions created "statutory obligation[s]" for the agency that would not exist without the purported reclassifications. June Press Release at 1.

102. Finally, both the reclassification and submission actions "deprive[]" California of the "safe harbor" afforded to licensees in 5 U.S.C. § 558(c) and afforded to adjudicatory orders by their exclusion from the CRA. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016).

103. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). The actions of EPA and its Administrator run afoul of all of these prohibitions.

104. EPA's reclassifications are arbitrary and capricious. 5 U.S.C. § 706(2)(A). An agency must always "offer[] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (second alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency may not … depart from a prior policy *sub silentio*" and must "provide a more detailed justification … when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Post-hoc rationalizations are "impermissible." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).

105. Yet here, EPA neither acknowledged it was changing positions nor offered any explanation, despite the substantial reliance interests that attach to waiver decisions—including the State's longstanding reliance on the underlying regulations to meet federal and state air pollution targets. *See* June Press Release at 1. EPA thus also failed to consider that important part of the problem: the impact its actions would have on California's ability to meet those targets.

106. Defendants also took these actions "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Indeed, EPA and its Administrator observed no public process at all when they changed position on the nature of already finalized actions.

107. Defendants' actions were also outside the agency's authority. EPA and its Administrator are "creatures of statute" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). No law authorizes EPA or its Administrator to declare by fiat—and without process or reasoning—that actions already finalized as "orders" through adjudicatory procedures are instead "rules," much less "rules" of general applicability subject to the CRA.

108. The waiver provisions of the Clean Air Act—Section 209(b) and Section 209(e)(2)—only empower EPA to "waive application" of preemption to California through review of a request from that State. 42 U.S.C. § 7543(b)(1). They provide no authority to declare post-hoc changes in the nature of the action, much less authority to slap a new and unexplained label on an already finalized action as part of an effort to trigger a separate statute or streamline administrative revocation.

109. The APA likewise does not provide EPA with authority to reclassify an already finalized agency action, without any process or explanation. To the contrary, agencies must determine, *at the outset of a proceeding*, whether the action they contemplate taking is an order or a rule because that determination governs the procedural requirements to be followed. Moreover, as noted above, these efforts at post-hoc reclassification epitomize violations of the APA's reasoned decision-making requirements.

110. Nor does the CRA authorize EPA's actions here. That statute establishes a definition of "rule," borrowing from, and then narrowing, the APA's definition. 5 U.S.C. § 804(3). The CRA requires agencies to submit to Congress and the GAO a "report" for each "rule" the agency promulgates "[b]efore [the] rule can take effect." *Id.* § 801(a)(1)(A). The CRA does not empower EPA to relabel actions after finalization or to submit a "report" years after the actions have taken effect. Defendants cannot claim to have acted "under" the CRA here, as these waivers were not rules when finalized and are not rules under any statutory definition (including the one in the CRA).

111. Defendants' actions were also "not in accordance with law," 5 U.S.C. § 706(2)(A) and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(D), because these waiver actions are not rules within the APA's definition. EPA's waiver decisions do not "implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Rather, such decisions constitute "a final disposition," *id.* § 551(6), of a request from California that either grants or denies California a "statutory exemption or other form of permission," *id.* § 551(8) (defining "license"). That is a license, *id.*, and licenses are "orders," not "rules," *id.* § 551(6).

112. If the definitions left any doubt (and they do not), the nature of waiver proceedings is also clear from the Clean Air Act's text. These proceedings do not begin with notices of proposed rulemaking. Rather, by congressional design, a waiver proceeding commences with a request from California that includes the State's finding that its emission standards "will be, in the aggregate, at least as protective of public health and welfare" as EPA's federal standards. 42 U.S.C. §§ 7543(b)(1), (e)(2)(A). EPA then has no discretion. It must grant California's waiver request, unless evidence supports one of three factual determinations that could support a denial. *Id.* at §§ 7543(b)(1), (e)(2)(A).

113. In contrast with its power to "prescribe" federal vehicle emission standards under a separate provision of the Clean Air Act (42 U.S.C. § 7521(a)(1)), EPA's role "in a waiver proceeding" is thus "sharply restricted," *MEMA I*, 627 F.2d at 1121. EPA does not determine the pollutants to be regulated, the stringency of the standards, or the speed with which standards

increase in stringency. California makes all those choices in a state rulemaking proceeding, before it submits a waiver request to EPA. For its part, EPA determines only whether any "parties favoring denial of the waiver" have met their evidentiary burden to obtain that result. *Id.*

114. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the purported reclassifications and submissions actions are unlawful, that these four waivers are not "rules," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

115. Pursuant to 5 U.S.C. § 706, Plaintiff is entitled to vacatur of EPA Defendants' purported reclassification and submission actions. Plaintiff is also entitled to an injunction requiring EPA to restore the status quo that existed prior to these reclassification and submission actions and prohibiting EPA from taking similar actions in the future.

116. Pursuant to 5 U.S.C. § 705, Plaintiff is also entitled to all relief necessary and appropriate "to preserve status or rights pending conclusion of [the courts'] review proceedings."

117. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015), including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll v. Safford,* 3 How. 441, 463, 11 L.Ed. 671 (1845)).

**COUNT II**
***Ultra Vires* – Conduct in Excess of Statutory Authority as to Actions Announced in June Press Release**

118. Plaintiff incorporates each and every one of the preceding allegations as if alleged herein.

119. If EPA's actions are "not subject to review under the judicial-review provisions of the APA," the actions are nonetheless *ultra vires*. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

120. EPA acted in excess of the agency's delegated powers when it purported in June to reclassify four waivers as "rules," both because these waivers are *not* rules, under any statutory

definition, and because no statute authorizes EPA to make any such post-hoc reclassifications without any public process or explanation.

121. EPA likewise acted in excess of the agency's delegated powers when it submitted documents to Congress and the GAO labeling these four waiver decisions as "rules" and claiming the documents were "reports" under 5 U.S.C. § 801(a)(1)(A). No statute empowers EPA to take those actions either. Certainly, no statute empowers EPA to invoke a statute that is inapplicable—as declared expressly in EPA's own actions—simply because that statute would provide a faster or easier, but unlawful, means to a desired end.

122. EPA is expressly prohibited from taking these actions.

123. The APA prohibits agencies from creating "a moving target" by attempting to alter their actions after they are final. *DHS*, 591 U.S. at 23. Even more specifically, the APA prohibits agencies from claiming a finalized "order" is suddenly a "rule" because that classification determination controls which procedures the agency must follow and therefore cannot be made after the fact. For example, to promulgate a rule, the agency must provide notice of the proposed rule that satisfies 5 U.S.C. § 553(b) and a final rule that satisfies 5 U.S.C. § 553(c). EPA did nothing of the sort here, and the APA expressly prohibits promulgation of a "rule" in such circumstances and likewise prohibits post-hoc reclassification.

124. Separately, the APA prohibits an agency from "depart[ing] from a prior policy *sub silentio*." *Fox Television*, 556 U.S. at 515. Yet, that is exactly what EPA did here—depart from its longstanding position, as expressly reiterated in these very actions, that these four waivers are not rules.

125. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the June purported reclassification and submission actions are *ultra vires*, that these four waivers are not "rule[s]," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

126. Plaintiff is also entitled to an injunction requiring EPA to restore the status quo that existed prior to its June reclassification and submission actions and prohibiting EPA from taking similar actions in the future.

127. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll,* 3 How. at 463).

**COUNT III**
**Violations of the Administrative Procedure Act**
**as to Actions Announced in July Press Release**

128. Plaintiff incorporates each and every one of the preceding allegations as if alleged herein.

129. Congress "enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (cleaned up).

130. EPA is an "agency" as defined in 5 U.S.C. § 551(1).

131. EPA's July 2026 purported reclassifications of two preemption waivers from adjudicatory orders into "rules" and the agency's submissions of those orders as "rules" to Congress are all final agency actions.

132. Both actions "mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Indeed, EPA itself claims it "has *determined* that each of these waivers is a rule" and acted on that final determination. July Press Release at 1 (emphasis added). There is likewise nothing remaining to EPA's submission process.

133. Both actions are also "one[s] by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178.

134. EPA's reclassifications, if given effect, have changed California's procedural rights under the APA, denying the State the particular notices and opportunities to correct to which it was previously entitled as a licensee. *See* 5 U.S.C. § 558(c).

135. Moreover, EPA itself claims the reclassifications "alter[ed] the legal regime to which the [EPA is] subject." *Bennett*, 520 U.S. at 169. EPA asserts its actions created "statutory obligation[s]" for the agency that would not exist without the purported reclassifications. July Press Release at 1.

136. Finally, both the reclassification and submission actions "deprive[]" California of the "safe harbor" afforded to licensees in 5 U.S.C. § 558(c) and afforded to adjudicatory orders by their exclusion from the CRA. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016).

137. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). The actions of EPA and its Administrator run afoul of all of these prohibitions.

138. EPA's July reclassifications are arbitrary and capricious. 5 U.S.C. § 706(2)(A). An agency must always "offer[] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (second alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency may not … depart from a prior policy *sub silentio*" and must "provide a more detailed justification … when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Post-hoc rationalizations are "impermissible." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).

139. Yet here, EPA neither acknowledged it was changing positions nor offered any explanation, despite the substantial reliance interests that attach to waiver decisions—including the State's longstanding reliance on the underlying regulations to meet federal and state air

pollution targets. *See* July Press Release at 1. EPA thus also failed to consider that important part of the problem: the impact its actions would have on California's ability to meet those targets.

140. Defendants also took these actions "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Indeed, EPA and its Administrator observed no public process at all when they changed position on the nature of already finalized actions.

141. Defendants' actions were also outside the agency's authority. EPA and its Administrator are "creatures of statute" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). No law authorizes EPA or its Administrator to declare by fiat—and without process or reasoning—that actions already finalized as "orders" through adjudicatory procedures are instead "rules," much less "rules" of general applicability subject to the CRA.

142. The waiver provisions of the Clean Air Act—Section 209(b) and Section 209(e)(2)—only empower EPA to "waive application" of preemption to California through review of a request from that State. 42 U.S.C. § 7543(b)(1). They provide no authority to declare post-hoc changes in the nature of the action, much less authority to slap a new and unexplained label on an already finalized action as part of an effort to trigger a separate statute or streamline administrative revocation.

143. The APA likewise does not provide EPA with authority to reclassify an already finalized agency action, without any process or explanation. To the contrary, agencies must determine, *at the outset of a proceeding*, whether the action they contemplate taking is an order or a rule because that determination governs the procedural requirements to be followed. Moreover, as noted above, these efforts at post-hoc reclassification epitomize violations of the APA's reasoned decision-making requirements.

144. Nor does the CRA authorize EPA's actions here. That statute establishes a definition of "rule," borrowing from, and then narrowing, the APA's definition. 5 U.S.C. § 804(3). The CRA requires agencies to submit to Congress and the GAO a "report" for each "rule" the agency promulgates "[b]efore [the] rule can take effect." *Id.* § 801(a)(1)(A). The CRA does not

empower EPA to relabel actions after finalization or to submit a "report" years after the actions have taken effect. Defendants cannot claim to have acted "under" the CRA here, as these waivers were not rules when finalized and are not rules under any statutory definition (including the one in the CRA).

145. Defendants' actions were also "not in accordance with law," 5 U.S.C. § 706(2)(A) and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(D), because these waiver actions are not rules within the APA's definition. EPA's waiver decisions do not "implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Rather, such decisions constitute "a final disposition," *id.* § 551(6), of a request from California that either grants or denies California a "statutory exemption or other form of permission," *id.* § 551(8) (defining "license"). That is a license, *id.*, and licenses are "orders," not "rules," *id.* § 551(6).

146. If the definitions left any doubt (and they do not), the nature of waiver proceedings is also clear from the Clean Air Act's text. These proceedings do not begin with notices of proposed rulemaking. Rather, by congressional design, a waiver proceeding commences with a request from California that includes the State's finding that its emission standards "will be, in the aggregate, at least as protective of public health and welfare" as EPA's federal standards. 42 U.S.C. §§ 7543(b)(1), (e)(2)(A). EPA then has no discretion. It must grant California's waiver request, unless evidence supports one of three factual determinations that could support a denial. *Id.* at §§ 7543(b)(1), (e)(2)(A).

147. In contrast with its power to "prescribe" federal vehicle emission standards under a separate provision of the Clean Air Act (42 U.S.C. § 7521(a)(1)), EPA's role "in a waiver proceeding" is thus "sharply restricted," *MEMA I*, 627 F.2d at 1121. EPA does not determine the pollutants to be regulated, the stringency of the standards, or the speed with which standards increase in stringency. California makes all those choices in a state rulemaking proceeding, before it submits a waiver request to EPA. For its part, EPA determines only whether any "parties favoring denial of the waiver" have met their evidentiary burden to obtain that result. *Id.*

148. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the purported reclassifications and submissions actions are unlawful, that these four waivers are not "rules," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

149. Pursuant to 5 U.S.C. § 706, Plaintiff is entitled to vacatur of EPA Defendants' July purported reclassification and submission actions. Plaintiff is also entitled to an injunction requiring EPA to restore the status quo that existed prior to its July reclassification and submission actions and prohibiting EPA from taking similar actions in the future.

150. Pursuant to 5 U.S.C. § 705, Plaintiff is also entitled to all relief necessary and appropriate "to preserve status or rights pending conclusion of [the courts'] review proceedings."

151. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015), including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll v. Safford,* 3 How. 441, 463, 11 L.Ed. 671 (1845)).

**COUNT IV**
***Ultra Vires* – Conduct in Excess of Statutory Authority**
**as to Actions Announced in July Press Release**

152. Plaintiff incorporates each and every one of the preceding allegations as if alleged herein.

153. If EPA's actions are "not subject to review under the judicial-review provisions of the APA," the actions are nonetheless *ultra vires*. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

154. EPA acted in excess of the agency's delegated powers when in July it purported to reclassify two additional waivers as "rules," both because the waivers are *not* rules, under any statutory definition, and because no statute authorizes EPA to make any such post-hoc reclassifications without any public process or explanation.

155. EPA likewise acted in excess of the agency's delegated powers when it submitted documents relating to these waivers to Congress and the GAO labeling these waiver decisions as

"rules" and claiming the documents were "reports" under 5 U.S.C. § 801(a)(1)(A). No statute empowers EPA to take those actions either. Certainly, no statute empowers EPA to invoke a statute that is inapplicable—as declared expressly in EPA's own actions—simply because that statute would provide a faster or easier, but unlawful, means to a desired end.

156. EPA is expressly prohibited from taking these actions.

157. The APA prohibits agencies from creating "a moving target" by attempting to alter their actions after they are final. *DHS*, 591 U.S. at 23. Even more specifically, the APA prohibits agencies from claiming a finalized "order" is suddenly a "rule" because that classification determination controls which procedures the agency must follow and therefore cannot be made after the fact. For example, to promulgate a rule, the agency must provide notice of the proposed rule that satisfies 5 U.S.C. § 553(b) and a final rule that satisfies 5 U.S.C. § 553(c). EPA did nothing of the sort here, and the APA expressly prohibits promulgation of a "rule" in such circumstances and likewise prohibits post-hoc reclassification.

158. Separately, the APA prohibits an agency from "depart[ing] from a prior policy *sub silentio*." *Fox Television*, 556 U.S. at 515. Yet, that is exactly what EPA did here—depart from its longstanding position, as expressly reiterated in these very actions, that these two additional waivers are not rules.

159. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the July purported reclassification and submission actions are *ultra vires*, that these two waivers are not "rule[s]," and that EPA's submissions of these two waivers are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

160. Plaintiff is also entitled to an injunction requiring EPA to restore the status quo that existed prior to its July reclassification and submission actions and prohibiting EPA from taking similar actions in the future.

161. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–

27, including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll,* 3 How. at 463).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Vacate EPA's June and July 2026 reclassification and submission actions;

B. Declare that EPA's June and July 2026 reclassification and submission actions violate the APA;

C. Declare that these six waivers are not "rules" within the meaning of the APA;

D. Declare that EPA's submissions of these waivers to Congress and the GAO are not "report[s]" under 5 U.S.C. § 801(a)(1)(A);

E. Declare that EPA's reclassification and submission actions are *ultra vires*;

F. Preliminarily enjoin EPA to withdraw its reclassification and submission actions, restoring the status quo that existed before those actions and enjoin EPA from repeating these or similar actions during the pendency of this litigation;

G. Permanently enjoin EPA from repeating these reclassification and submission actions with respect to these waivers and other previously granted waivers;

H. Award Plaintiff its costs, expenses, and reasonable attorneys' fees; and

I. Grant such other relief as the Court deems just and proper.

Dated: September 4, 2026

Respectfully Submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
DAVID ZAFT
Supervising Deputy Attorneys General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
NATALIE COLLINS
KATHERINE GAUMOND
CAITLAN MCLOON
*Deputy Attorneys General*

Office of the Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0299
Email: Elaine.Meckenstock@doj.ca.gov

*Counsel for Plaintiff State of California*