**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF CALIFORNIA,

*Plaintiff,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, and LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,

*Defendants*,

and

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, and AMERICAN PETROLEUM INSTITUTE,

*Defendant-Intervenors*.

Case No. 1:26-cv-02185-BAH

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**HEARING REQUESTED**

## TABLE OF CONTENTS


**Page**

INTRODUCTION ....1

BACKGROUND ....2

I. California Has Been Regulating Vehicle and Engine Emissions for More Than Half a Century ....2

II. The Congressional Review Act Facilitates Disapproval of Federal Agency Rules....5

III. All Branches of the Federal Government Have Long Understood that Clean Air Act Preemption Waivers Are Adjudicatory Orders and Are Not Subject to the CRA ....6

IV. In 2025, the Executive and Legislative Branches Nonetheless Purported to Invoke the CRA to "Disapprove" Three Section 209 Waivers....9

V. EPA Has Now Purported to Reclassify Six Additional Waivers from "Orders" Into "Rules" ....11

VI. Procedural Background....13

LEGAL STANDARD....14

ARGUMENT....15

I. California Has Standing....15

II. The CRA, the CAA, and *Hodel* Do Not Deprive this Court of Jurisdiction ....21

A. The Congressional Review Act Does Not Withdraw Federal Jurisdiction....21

1. EPA Did Not Act Under the CRA ....22

a. Waivers are not APA rules ....23

b. Waivers are actions of particular applicability ....26

c. The CRA does not contemplate or condone reclassifying past orders as rules ....26

2. The Illegal Reclassifications Do Not Subject the Illegal Submissions to Section 805 ....26

B. The Clean Air Act Does Not Withdraw this Court's Jurisdiction ....29

C. *Hodel* Does Not Revoke or Limit Federal Jurisdiction to Review EPA's Actions ....30

III. California Is Entitled to Summary Judgment on Its APA Claims ....32

A. The Reclassifications Are Final and Unlawful ....32

1. Each of the Six Reclassifications Is Final Agency Action ....32

2. Each Reclassification Is Unlawful Under the APA ....35

a. The Reclassifications are contrary to law ....35

b. The Reclassifications are arbitrary and capricious ....36

B. The Submissions Are Also Final and Unlawful ....39

C. The Reclassifications Are Not Subsumed into the Submissions ....40

**TABLE OF CONTENTS**
**(continued)**

**Page**

IV. Alternatively, California Is Entitled to Summary Judgment on Its Ultra Vires Claims ....................41

CONCLUSION....................42

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adamo Wrecking Co. v. United States*
434 U.S. 275 (1978)....22

*Akiachak Native Cmty. v. Jewell*
995 F. Supp. 2d 7 (D.D.C. 2014)....16

*Alaska v. DOT*
868 F.2d 441 (D.C. Cir. 1989)....18

*Allina Health Serv. v Sebelius*
746 F.3d 1102 (D.C. Cir. 2014)....20

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*
934 F.3d 649 (D.C. Cir. 2019)....14

*Am. Bar Ass'n v. DOE*
370 F.Supp.3d 1 (D.D.C. 2019)....33

*Am. Rivers v. FERC*
895 F.3d 32 (D.C. Cir. 2018)....39, 40

*Am. Wild Horse Campaign v. Bernhardt*
442 F.Supp.3d 127 (D.D.C. 2020)....34

*Amgen, Inc. v. Smith*
357 F.3d 103 (D.C. Cir. 2004)....28

*Ardelyx, Inc. v. Kennedy*
179 F.4th 947 (D.C. Cir. 2026)....27

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*
118 F.Supp.3d 388 (D.D.C. 2015)....14

*Arizona v. EPA*
77 F.4th 1126 (D.C. Cir. 2023)....16

*Bennett v. Spear*
520 U.S. 154 (1997)....31, 33, 34, 39

*Bowsher v. Merck & Co., Inc.*
460 U.S. 824 (1983)....5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*California v. United States*
Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025) ....10, 11

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ....15

*Centro de Trabajadores Unidos v. Bessent*
167 F.4th 1218 (D.C. Cir. 2026) ....30

*Chamber of Com. of U.S. v. EPA*
642 F.3d 192 (D.C. Cir. 2011) ....3, 7

*Chamber of Com. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996) ....41

*Ciba-Geigy Corp. v. EPA*
801 F.2d 430 (D.C. Cir. 1986) ....33

*Ctr. for Taxpayer Rts. v. IRS*
815 F.Supp.3d 1 (D.D.C. 2025) ....37, 38

*DHS v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020) ....38, 41

*Diamond Alternative Energy, LLC v. EPA*
606 U.S. 100 (2025) ....24

*Double R Ranch Trust v. Nedd*
284 F.Supp.3d 21 (D.D.C. 2018) ....19

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) ....37

*Engine Mfrs. Ass'n v. EPA*
88 F.3d 1075 (D.C. Cir. 1996) ....3, 4, 24

*Escobar Molina v. DHS*
811 F. Supp. 3d 1 (D.D.C. 2025) ....18

*EPA v. Calumet Shreveport Refin., L.L.C.*
605 U.S. 627 (2025) ....29, 41

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*FCC v. Fox Television Stations*
556 U.S.502 (2009) ........ 38, 41

*FDA v. All. for Hippocratic Med.*
602 U.S. 367 (2024) ........ 18

*Fed. Express Corp. v. U.S. Dep't of Com.*
39 F.4th 756 (D.C. Cir. 2022) ........ 41

*Ford Motor Co. v. EPA*
606 F.2d 1293 (D.C. Cir. 1979) ........ 26

*Garcia v. San Antonio Metro. Transit Auth.*
469 U.S. 528 (1985) ........ 42

*Kansas Nat. Res. Coal. v. Dep't of Interior*
971 F.3d 1222 (10th Cir. 2020) ........ 22

*Martinez-Andino v. DHS*
No. 26-cv-01208-BAH, 2026 WL 1801137 (D.D.C. June 23, 2026) ........ 32

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*)
627 F.2d 1095 (D.C. Cir. 1979) ........ *passim*

*Motor & Equip. Mfrs. Ass'n v. Nichols*
142 F.3d 449 (D.C. Cir. 1998) ........ 4

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ........ 24

*Mullin v. Doe*
609 U.S. 324 (2026) ........ 28

*Narragansett Indian Tribe v. Bhatt*
No. CV 22-2299 (RC), 2024 WL 3509491 (D.D.C. July 23, 2024) ........ 18, 19

*Nat. Res. Def. Council v. EPA*
643 F.3d 311 (D.C. Cir. 2011) ........ 34

*Nat. Res. Def. Council v. Wheeler*
955 F.3d 68 (D.C. Cir. 2020) ........ 33, 39

**TABLE OF AUTHORITIES**
**(continued)**


**Page**

*Nat'l Ass'n of Clean Air Agencies v. EPA*
489 F.3d 1221 (D.C. Cir. 2007) ....................17

*Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*)
583 U.S. 109 (2018) ....................22, 28, 29

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*
26 F.4th 960 (D.C. Cir. 2022) ....................41

*Nat'l Black Police Ass'n v. District of Columbia*
108 F.3d 346 (D.C. Cir. 1997) ....................19

*Nat'l Lifeline Ass'n v. FCC*
921 F.3d 1102 (D.C. Cir. 2019) ....................37, 39

*Natural Resources Defense Council v. Hodel*
865 F.2d 288 (D.C. Cir. 1988) ....................1, 21, 29, 30, 31

*NB ex rel. Peacock v. D.C.*
682 F.3d 77 (D.C. Cir. 2012) ....................17, 19

*New Jersey v. EPA*
989 F.3d 1038 (D.C. Cir. 2021) ....................16

*New York Stock Exch. LLC v. SEC*
962 F.3d 541 (D.C. Cir. 2020) ....................36

*Ohio v. EPA*
98 F.4th 288 (D.C. Cir. 2024) ....................3

*Payne Enterprises, Inc. v. United States*
837 F.2d 486 (D.C. Cir. 1998) ....................20

*Planned Parenthood of Greater N.Y. v. DHHS*
No. 25-cv-02453-BAH, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ....................33

*Ramirez v. U.S. Immigr. & Customs Enf't*
568 F.Supp.3d 10 (D.D.C. 2021) ....................21

*Safari Club Int'l v. Jewell*
842 F.3d 1280 (D.C. Cir. 2016) ....................32, 33

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*San Luis Obispo Mothers for Peace v. NRC*
789 F.2d 26 (D.C. Cir. 1986) (en banc)....25

*SEC v. Chenery Corp.*
332 U.S. 194 (1947)....14

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*
357 F.Supp.3d 30 (D.D.C. 2019)....37

*Sw. Airlines Co. v. DOT*
832 F.3d 270 (D.C. Cir. 2016)....33

*Transmission Agency of N. Cal. v. FERC*
495 F.3d 663 (D.C. Cir. 2007)....35

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*
578 U.S. 590 (2016)....34, 35

*Walpin v. Corp. for Nat'l & Cmty. Servs.*
630 F.3d 184 (D.C. Cir. 2011)....32

*Western Watersheds Project v. Haaland*
850 Fed.Appx. 14 (D.C. Cir. 2021)....33

*Whitman v. Am. Trucking Ass'ns*
531 U.S. 457 (2001)....30

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*
485 F. Supp. 3d 1 (D.D.C. 2020)....18

## TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

5 U.S.C.
§ 551(4) ........ 5, 8, 26, 40
§ 551(5) ........ 5, 8, 23
§ 551(6) ........ 5, 8, 24, 39
§ 551(7) ........ 5, 8, 23
§ 551(8) ........ 5, 8, 15, 24
§ 551(9) ........ 5, 8, 24
§ 551(13) ........ 30
§ 553 ........ 35, 40
§ 553(b) ........ 16, 25, 35, 41
§ 553(c) ........ 41
§ 554 ........ 35, 40
§ 558(c) ........ 15, 16
§ 601(2) ........ 6
§ 603 ........ 6
§ 701(a)(2) ........ 32
§ 702 ........ 20, 30
§ 703 ........ 20
§ 704 ........ 21, 30, 40
§ 706 ........ 24, 38
§ 801(a)(1) ........ *passim*
§ 801(a)(2)(A) ........ 22
§ 801(c)(2) ........ 22
§ 802(a) ........ 5, 23, 31
§ 802(d) ........ 5, 6
§ 804(2) ........ 22
§ 804(3) ........ *passim*
§ 805 ........ *passim*
§ 808 ........ 22

8 U.S.C.
§ 1254a ........ 28

28 U.S.C. § 1331 ........ 21, 29

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


42 U.S.C.
§ 7401 ....38
§ 7408 ....11
§ 7506(c)(1) ....38
§ 7507 ....3, 26
§ 7521(a) ....6, 24
§ 7543(b) .... *passim*
§ 7543(e) .... *passim*
§ 7604 ....29
§ 7607(b)(1) ....28, 29

43 U.S.C. § 1349(c) ....29

Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996) ....5

Pub. L. 108-199 § 428(c), 118 Stat. 3, 418 (2004) ....12

Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965) ....2, 25

Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967) ....2

Pub. L. No. 99-591, § 111, 100 Stat. 3341-262 (1986) ....30

Cal. Health & Safety Code § 43000(a) ....2


**REGULATIONS**


40 C.F.R. Chapter I, at 614-15, 623-27 ....37

40 C.F.R. § 52.220a(c) ....37

40 C.F.R. § 1074.110(b) ....12

Cal. Code Regs., Title 13, § 1962.2(i)(18) ....11


**FEDERAL REGISTER**


36 Fed. Reg. 8172 (Apr. 30, 1971) ....3

59 Fed. Reg. 36,969 (July 20, 1994) ....5, 7

69 Fed. Reg. 59,920 (Oct. 6, 2004) ....6

72 Fed. Reg. 21,260 (Apr. 30, 2007) ....7, 24, 36

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

73 Fed. Reg. 12,156 (Mar. 6, 2008) ... 6

74 Fed. Reg. 32,744 (July 8, 2009) ... 11, 37

77 Fed. Reg. 53,199 (Aug. 31, 2012) ... 8, 24

78 Fed. Reg. 2112 (Jan. 9, 2013) ... 8, 11, 37

79 Fed. Reg. 23,414 (Apr. 28, 2014) ... 8

81 Fed. Reg. 95,982 (Dec. 29, 2016) ... 13

84 Fed Reg. 51,310 (Sept. 27, 2019) ... 3, 6

87 Fed. Reg. 14,332 (Mar. 14, 2022) ... 3, 12, 38

88 Fed. Reg. 16,439 (Mar. 17, 2023) ... 8

88 Fed. Reg. 33,143 (May 23, 2023) ... 8, 24

88 Fed. Reg. 72,461 (Oct. 20, 2023) ... 6, 12

90 Fed. Reg. 640 (Jan. 6, 2025) ... 12, 38

90 Fed. Reg. 1996 (Jan. 10, 2025) ... 6, 12, 13

90 Fed. Reg. 8353 (Jan. 29, 2025) ... 12, 13, 20

**Congressional Record**

142 Cong. Rec. S3114 (daily ed. Mar. 28, 1996) ... 5

171 Cong. Rec. S3020 (daily ed. May 21, 2025) ... 10

171 Cong. Rec. S3087 (daily ed. May 21, 2025) ... 39

171 Cong. Rec. S3099 (daily ed. May 22, 2025) ... 10

**Other Authorities**

Attorney General's Manual on the Administrative Procedure Act (1947) ... 23, 24, 25, 39

H.R. Rep. No. 104-500 (1996) ... 5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Env't L. 1947, 1956 (1991)........................................4

Jonathan S. Gould, Law Within Congress, 129 Yale L. J. 1946, 1959 (2020)..............................10

## INTRODUCTION

By congressional design, California and the United States Environmental Protection Agency (EPA) have been operating parallel, but distinct, regulatory programs to control vehicle and engine emissions for nearly sixty years. Seeking to upend California's role, EPA declared that six preemption waivers granted, years earlier, as adjudicatory orders were suddenly rules—as defined in the Administrative Procedure Act (APA) and, by incorporation, the Congressional Review Act (CRA). EPA provided no explanation for these post-hoc Reclassifications beyond its naked desire to invoke expedited congressional review procedures and the CRA's judicial review bar. Indeed, EPA's very next move was to submit the six waivers to Congress with cover sheets labeling these orders as "rules" subject to the CRA, despite the fact that the waiver grants published in the Federal Register—and attached to the submissions—stated precisely the opposite. And EPA's Reclassifications had another consequence, too: they terminated California's rights, as a licensee, to notice and an opportunity to correct *before* any waiver withdrawal proceeding may commence.

When California moved for a preliminary injunction, EPA declined to defend its actions on the merits. Instead, EPA argued this Court cannot review any of the agency's actions or, alternatively, that there is nothing of consequence to review. This Court rightly rejected those contentions as to EPA's Reclassifications, along with Intervenors' attempts to justify EPA's actions. California is entitled to summary judgment and permanent relief (including declaratory relief) as to those Reclassifications to undo the damage EPA's actions have caused and prevent further, significant injury to the State. California is also entitled to summary judgment and permanent relief as to EPA's Submissions to Congress and respectfully asks this Court to reconsider its preliminary conclusion that those actions are off-limits to judicial review. No agency action—including a submission to Congress—is "under" any statute simply because the agency says so. Nor does *Natural Resources Defense Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), foreclose review here because the APA provides the "express provision for judicial review" that was lacking in that case, *id.* at 318 n.33. Moreover, California does not ask this

Court to probe the content of EPA's Submissions; the State asks the Court only to interpret statutory text: a quintessential function of the Judiciary.

California respectfully requests that the Court grant summary judgment to the State; vacate EPA's unlawful actions; declare that these six preemption waivers are licensing orders, not rules; enjoin EPA to treat these and other waivers under Section 209 of the Clean Air Act as licensing orders; and declare that EPA's Submissions are not "reports" under the CRA.

## BACKGROUND

### I. CALIFORNIA HAS BEEN REGULATING VEHICLE AND ENGINE EMISSIONS FOR MORE THAN HALF A CENTURY

California has long faced severe air pollution challenges, thanks in part to its unique topography, climate, and density of population and vehicles. ECF 13-5 at 1-2; ECF 13-6 at 15-16.[1] Motor vehicles are substantial sources of pollution, Cal. Health & Safety Code § 43000(a), and California skies were regularly choked with smog in the mid-20th century as automobiles became commonplace.[2] To address the grave threat to public health from such pollution, California has been setting emission standards for vehicles since the 1950s. *See Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979) (describing history).

When Congress began requiring federal vehicle emission standards in 1965, it did not initially preempt the States. Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965). Two years later, after manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory programs," *MEMA I*, 627 F.2d at 1109, Congress responded by generally preempting States from setting emission standards for new motor vehicles, Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967). But Congress also enacted a provision that requires EPA to waive that preemption for California, upon request, unless EPA makes one of three limited factual findings. *Id.* § 208(b), 81 Stat. 501; *see* 42 U.S.C. § 7543(b)(1). With that provision, "Congress intended the

---

[1] This Court granted California's request to take judicial notice of these and other exhibits, filed as ECF 13-5 through 13-29, as well as certain facts, ECF 14 ¶¶ 5-8, 23-24. Minute Order (Aug. 4, 2026).

[2] *See* CARB, *History*, available at https://ww2.arb.ca.gov/about/history, last visited October 12, 2026.

State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation." *MEMA I*, 627 F.2d at 1111. Congress anticipated that allowing California to "improve on 'its already excellent program'" would benefit both the State and the Nation through "experiments in the field of emissions control" which "might 'require new control systems and designs,'" thereby facilitating reductions in harmful pollution. *Id.* at 1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)).[3]

The waiver provision—often referred to as Section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b)—operated as designed for nearly sixty years. Since 1967, California has requested, and EPA has granted, more than seventy-five preemption waivers, as the State has amended its regulatory program to further reduce pollution in light of technological advancements and improved understandings of the health and welfare threats from vehicular emissions. ECF 68 (EPA Answer) ¶ 31; *Ohio v. EPA*, 98 F.4th 288, 296 (D.C. Cir. 2024), *rev'd in part and remanded sub nom. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025). In fact, "in the history of EPA waiver decisions, it has only denied a waiver once," in an action that EPA promptly reversed. 87 Fed. Reg. 14,332, 14,337 & n.26 (Mar. 14, 2022); *see also Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 197 (D.C. Cir. 2011) (describing this history).[4] Congress has "expressed general approval of the Administrator's waiver decisions," including this practice of regularly granting California's requests. *MEMA I*, 627 F.2d at 1122 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301 (1977)); *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080-81 (D.C. Cir. 1996) (describing "massive[]" CAA amendments in 1990 that left untouched "the

[3] Although California is the only State that may request and obtain one of these waivers, *MEMA I*, 627 F.2d at 1100 n.1, the Clean Air Act allows other States to enforce state standards identical to California's, if the other States so choose and subject to certain conditions, 42 U.S.C. § 7507. Other States may not, however, enforce state standards that would create a different (third) regulatory regime for manufacturers—beyond EPA's or California's. *Id.*

[4] EPA has, on rare occasions, partially denied California's waiver requests, finding that the State had provided inadequate lead time for manufacturers to meet the state standards and effectively postponing those requirements. *E.g.*, 36 Fed. Reg. 8172 (Apr. 30, 1971). EPA also once purported to withdraw parts of a previously granted waiver, 84 Fed Reg. 51,310 (Sept. 27, 2019), but later reversed, 87 Fed. Reg. 14,332 (Mar. 14, 2022).

federal-state partnership over … control of motor vehicle emissions" and even effectively replicated the motor-vehicle waiver provision for non-road vehicles and engines).

Pursuant to these waivers, California's state standards have operated continuously alongside EPA's federal standards for more than half a century, such that new motor vehicles have been "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Id.* at 1080. As Congress anticipated, this two-program structure has allowed the federal government to "draw[] heavily on the California" program "to fashion and to improve the national efforts at emissions control." *MEMA I*, 627 F.2d at 1110. For example, "California first required automobile manufacturers to install" emission-system monitoring "in new cars sold in the state in 1988—two years before Congress mandated [such systems] in cars sold nationwide." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 454 (D.C. Cir. 1998). Similarly, the federal emission standards for passenger cars that were "phased in beginning in model year 1994" were "based on standards adopted in 1989 by the state of California." Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Env't L. 1947, 1956 (1991).

In 1990, when Congress decided emissions from off-road mobile sources—such as tractors, bulldozers, and ships—also needed to be controlled, Congress effectively replicated the motor-vehicle waiver provision, applying it to these other sources in a new provision, Section 209(e). 42 U.S.C. § 7543(e). That provision preempts all States (including California) from setting emission standards for two categories of new off-road vehicles and engines, *id.* § 7543(e)(1), but requires EPA to authorize California to regulate emissions from all other off-road vehicles and engines, absent limited conditions, *id.* § 7543(e)(2)(A).[5] *See also Engine Mfrs. Ass'n*, 88 F.3d at 1081 ("In the case of any nonroad vehicles or engines other than those referred to in § 209(e)(1), the EPA was required in § 209(e)(2) to authorize California to adopt standards and other requirements relating to emissions, under similar conditions to those governing the

[5] As with the original waiver provision, this off-road provision generally permits other States to choose to adopt and enforce California's emission standards. *Id.* § 7543(e)(2)(B).

motor vehicle preemption waiver." (cleaned up)). In EPA's words, "Congress intended the preemption provisions of section 209, as applied to nonroad engines, to be analogous to the preemption provisions as applied to motor vehicles, except [as to the categorically preempted vehicles and engines]." 59 Fed. Reg. 36,969, 36,973-74 (July 20, 1994).[6]

## II. THE CONGRESSIONAL REVIEW ACT FACILITATES DISAPPROVAL OF FEDERAL AGENCY RULES

In 1996, Congress enacted the CRA as part of a broad, bipartisan bill. Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996); 142 Cong. Rec. S3114 (daily ed. Mar. 28, 1996). The CRA was designed to "provide[] an expedited procedure whereby Congress may review rules to determine whether they should be 'vetoed' prior to taking effect." H.R. Rep. No. 104-500, at 3 (1996). To that end, the CRA requires a "Federal agency" that has promulgated a "rule"—as defined, 5 U.S.C. § 804(3)—to submit that rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[b]efore [the] rule can take effect." *Id.* § 801(a)(1)(A).[7]

The CRA borrows (and then further limits) the definition of "rule" from the APA, *id.* § 804(3), which classifies federal agency proceedings and actions into rulemakings that produce rules and adjudications that produce orders, *id.* § 551(4)-(9). A federal agency's submission of a rule report triggers a 60 session-day window for Congress to adopt a resolution disapproving of that rule. *Id.* § 802(a). The text of these resolutions is prescribed in the statute as follows: "That Congress disapproves the rule submitted by the [agency name] relating to [title of rule], and such rule shall have no force or effect." *Id.*; *see e.g.*, H.R. J. Res. 35, 119th Congress. Consideration of CRA resolutions is highly expedited, especially in the Senate. The "filibuster" does not apply, meaning that CRA resolutions require only a simple majority to pass. 5 U.S.C. § 802(d). Motions, amendments, and even debate are all severely limited. *Id.* § 802(d)(1), (d)(2). The CRA

[6] While non-road preemption waivers under Section 209(e)(2) are sometimes referred to as "authorizations" because of the statutory language, 42 U.S.C. § 7543(e)(2)(A), such waivers have the same effect on preemption as waivers under Section 209(b) for on-road regulations. Accordingly, this brief refers to actions under either subsection as Section 209 waivers.

[7] "The GAO is an independent agency within the Legislative Branch that exists in large part to serve the needs of Congress." *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983).

also provides that "no determination, finding, action, or omission under [the CRA] shall be subject to judicial review." *Id.* § 805.

If an agency fails to submit an action, any member of Congress may ask the GAO for a determination as to whether the agency action is a "rule" subject to the CRA. ECF 13-7 at 23. Congress has treated the GAO's conclusions as dispositive. *Id.* at 23, 26-27. If the GAO determines an unsubmitted agency action is a "rule," under the CRA's definition, that determination opens the 60 session-day window for resolutions. *Id.* at 23. On the other hand, if the GAO determines the action is not a rule, no resolutions are introduced. *Id.* at 23, App. B.

## III. All Branches of the Federal Government Have Long Understood that Clean Air Act Preemption Waivers Are Adjudicatory Orders and Are Not Subject to the CRA

From the enactment of the CRA in 1996 through February 2025, EPA maintained its consistent position that Clean Air Act preemption waivers are adjudicatory orders, not rules, and are thus not subject to a host of requirements that apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. §§ 601(2), 603), and the CRA. *E.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The [CRA] … does not apply because this action is not a rule …."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past waiver decisions, this action is not a rule …."); 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent with its previous actions on waiver requests…."); 88 Fed. Reg. 72,461, 72,476 (Oct. 20, 2023) (The CRA "does not apply because this action is not a rule …."); 90 Fed. Reg. 1998, 2000 (Jan. 10, 2025) (same).

EPA's position concerning application of the CRA reflected its understanding—from the earliest days of waiver proceedings—that the agency's role under the waiver provision is "modest in scope" and does not encompass "authority to modify California regulations" or to promulgate federal rules. *See MEMA I*, 627 F.2d at 1119; *compare* 42 U.S.C. § 7543(b) (requiring EPA to waive application of preemption to California), *with id.* § 7521(a) (authorizing EPA to promulgate federal standards). Instead, EPA's role is to adjudicate California's requests by carrying out its mandatory duty to issue a waiver unless opponents of that waiver prove that

one of the three, limited bases for denial exists. *MEMA I*, 627 F.2d at 1120-21. For this reason, the D.C. Circuit had to decide who bears the burden of proof in a waiver proceeding—a question that would arise in an adjudication but not in a rulemaking. *Id.* The Court concluded that "[t]he language of the statute and its legislative history indicate" that California is "presumed to satisfy the waiver requirements" and that "the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied." *Id.* at 1121. As the Court observed, EPA had "consistently adhered" to this adjudicatory practice since the enactment of the waiver provision in 1967, and "Congress expressed general approval" of EPA's practices ten years later. *Id.* at 1122; *see also Chamber of Com.*, 642 F.3d at 198 (describing 2009 determination that "waiver opponents had not met their burden of demonstrating" basis for denial of California request).

Because Section 209 waivers are not rules, EPA has not followed rulemaking procedures when considering California's requests. For instance, instead of developing and issuing a notice of proposed rulemaking whenever the agency deems such action appropriate, EPA must wait for a waiver request from California. 42 U.S.C. § 7543(b)(1), (e)(2)(A). Put another way, *a California rulemaking* occurs, according to the State's administrative procedures, and then California submits a waiver request for EPA's adjudication of *California's determination* concerning the protectiveness of the state's standards, in the aggregate, and of any evidence submitted by waiver opponents concerning the limited bases for denial. *See id.*; 59 Fed. Reg. at 36,982 ("EPA has consistently interpreted sections 209(a) and (b) to provide that the waiver process commences after state regulatory adoption."). When EPA receives a request from California, it issues a notice that opens a public comment period, but that notice is not a proposal to promulgate rules (or even to take a particular action on California's request). EPA Answer ¶ 72. Instead, EPA merely announces it is accepting comments on the narrow questions EPA must answer in adjudicating whether any statutory bar to issuing an otherwise-mandatory waiver applies. *E.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007) ("This notice announces that EPA has scheduled a public hearing concerning California's request and that EPA is accepting written

comment on the request."); 77 Fed. Reg. 53,199 (Aug. 31, 2012) (same); 88 Fed. Reg. 33,143 (May 23, 2023) (same); 88 Fed. Reg. 16,439 (Mar. 17, 2023) (same).

And when EPA finalizes a waiver action, the result is not federal emission standards promulgated in the Code of Federal Regulations. *Compare* 78 Fed. Reg. 2112 ("The Environmental Protection Agency (EPA) is granting the California Air Resources Board's (CARB's) request for a waiver of Clean Air Act preemption…."), *with* 79 Fed. Reg. 23,414, 23,630-23,886 (Apr. 28, 2014) (finalizing EPA rule and identifying amendments to federal standards in Code of Federal Regulations). Instead, an EPA preemption decision operates similarly to a court order in a preemption case, determining that preemption does not apply and the State may enforce the state law(s) at issue. 42 U.S.C. § 7543(b)(1) (directing EPA to "waive application" of preemption provision).

In 2022, Senator Capito asked the GAO to determine whether a Section 209(b) waiver was a "rule" subject to the CRA. ECF 13-8 at 1. The GAO agreed with EPA's longstanding view, concluding the waiver met "the statutory definition of an order," rather than a rule. *Id.* at 5. The GAO recognized that the APA's definitions (which the CRA incorporates, 5 U.S.C. § 804(3)), classify agency action as either "rule[s]" produced through "rule making," *id.* § 551(4), (5), or "order[s]" produced through "adjudication," *id.* § 551(6), (7). ECF 13-8 at 4. The GAO then observed that the "APA defines an order as 'the whole or a part of a final disposition … in a matter other than rule making but including licensing"; that a waiver decision is "a 'final disposition'" of a request from a single party (California); and that a waiver "grant[s] California a 'form of permission,'" meaning it is a "license" and thus an "order," not a rule. *Id.* at 4-5 (quoting 5 U.S.C. § 551(6), (8), (9)). Indeed, under the APA, "the grant" of a "statutory exemption" constitutes a "license," 5 U.S.C. § 551(8), (9); Section 209(b) directs EPA to exempt California from statutory preemption, 42 U.S.C. § 7543(b)(1); and "licensing" proceedings are categorically "adjudication[s]" that produce "order[s]," not "rule[s]," 5 U.S.C. § 551(6), (7), (9). Thus, the GAO concluded, the CRA had no application to the 2022 Section 209(b) waiver action. ECF 13-8 at 7. Members of Congress adopted the GAO's conclusion. In fact, some members

introduced legislation based on it. Senator Mike Lee—and five co-sponsors—introduced a bill to repeal the Clean Air Act's waiver provision entirely, arguing the bill was needed in part because Section 209(b) waivers "cannot be reviewed under the Congressional Review Act (CRA)" since they are not "rule[s] as that term is defined in the CRA." ECF 13-9; ECF 14 (RJN) (RJN) ¶ 6. The author of the companion bill in the House—which had nine co-sponsors—similarly asserted that "none of [California's waivers] are subject to congressional review." ECF 13-10; RJN ¶ 8.

## IV. In 2025, the Executive and Legislative Branches Nonetheless Purported to Invoke the CRA to "Disapprove" Three Section 209 Waivers

After the change in Presidential Administrations in January 2025, both the Executive and Legislative branches of the Federal Government charted a different—and unprecedented—course, purporting to invoke the CRA to disapprove three Section 209(b) preemption waivers that had been granted to California in 2023 and 2024. First, President Trump and EPA Administrator Zeldin announced that EPA had reclassified the three waivers into "rules" and would later transmit them to Congress as though they were subject to the CRA. ECF 13-11. In so doing, the President and EPA Administrator appeared to be following a plan first publicized a month earlier as to "how the incoming Trump administration" could purportedly use the CRA to "stop" the State's efforts to reduce vehicular pollution, without following "the administrative process" which could "take years," and without employing "ordinary legislation" which "would have to overcome the 60-vote filibuster in the Senate." ECF 13-12, 13-13.

The Administration's announcement of its reclassifications provided no explanation for the change in EPA's longstanding position—reiterated in each of the three waiver actions—that Section 209 waivers are orders, not rules. *See* ECF 13-11. Nor was there any opportunity for public comment or participation. *See id.* When EPA later submitted these three waivers to Congress, labeling them as "rules" subject to the CRA, the agency again provided no explanation for the disconnect between that position and the one EPA had taken in the very notices of final agency action attached to its submissions. See ECF 13-14, 13-15.

When asked for its opinion, the GAO concluded that these three Section 209 waivers are not "rules" and are not subject to the CRA, consistent with GAO's 2022 determination. ECF 13-10 at 10; *see also* ECF 69 ¶ 56 (AFPM Answer). The Senate Parliamentarian—"the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber, ECF 13-16 at 18; *see also* Jonathan S. Gould, Law Within Congress, 129 Yale L. J. 1946, 1959 (2020)—agreed. *See* 171 Cong. Rec. S3020 (daily ed. May 21, 2025) (Sen. Schumer); *id.* at S3048 (parliamentary inquiry from Senator Schumer and response from Presiding Officer Senator Capito); ECF 13-17, 13-18; AFPM Answer ¶ 64. Nonetheless, first the House and then the Senate passed resolutions purporting to disapprove the three waivers, employing expedited, CRA-like procedures to do so. Throughout, the members who advocated for these resolutions credited EPA's submissions of the waivers as "rules" as the basis for invoking those CRA-like procedures. ECF 13-19 at 1 (crediting EPA with "giving Congress the opportunity to reject California's" regulations); Ex. 13-20 at 2 ("Once they submitted it to us, it's a rule. Zeldin did. Then we can take it down.") (quoting Senator Capito); ECF 13-21 at 2 (crediting "Administrator Zeldin [with] ensuring that Congress has oversight"); ECF 13-23 at 1 (same). Indeed, the Senate went so far as to change its internal procedural rules so that an Executive Branch denomination as a "rule" in a submission to Congress would now suffice to trigger CRA-like procedures, whether or not the action is a rule as defined by law. 171 Cong. Rec. S3099, S3140 (daily ed. May 22, 2025) (Sen. Lankford).

On June 12, 2025, the President signed the Resolutions. H.R.J. Res. 87, 119th Congress; H.R.J. Res. 88, 119th Congress; H.R.J. Res. 89, 119th Congress; *see also* RJN ¶ 23. At the signing ceremony, President Trump stated "[I]n a few moments, I'll sign three pieces of legislation that will kill, totally kill [California's regulations], can't do anything about it; they can't take us to court…." RJN ¶ 24. Administrator Zeldin hailed the resolutions, noting that he and President Trump had initiated the process. ECF 13-25.

California and ten other States filed suit in the Northern District of California, alleging that the Resolutions violate separation of powers and federalism principles and that EPA's reclassification and submission of the waivers violated the APA or were ultra vires. *California v.*

*United States* ("N.D. Cal. Case"), Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025), ECF 1 (complaint), 157 (amended complaint).[8]

## V. EPA HAS NOW PURPORTED TO RECLASSIFY SIX ADDITIONAL WAIVERS FROM "ORDERS" INTO "RULES"

On Friday, June 12, 2026, one year after the President signed the three resolutions discussed above, EPA issued a press release announcing that it had "determined" that four additional Clean Air Act preemption waivers granted to California were "rule[s]" (Reclassifications) and that EPA had "transmitted" these four waivers to Congress as though they were subject to the CRA (Submissions). ECF 13-26. On July 22, 2026, EPA issued an additional press release announcing that it had "determined" that two additional Clean Air Act preemption waivers granted to California were "rule[s]" (Reclassifications) and had transmitted the waivers to Congress as though they were subject to the Congressional Review Act (CRA) (Submissions). ECF 30-1.

The six waivers are:

- A 2009 waiver authorizing enforcement of the State's first greenhouse gas (GHG) emissions standards for new motor vehicles, 74 Fed. Reg. 32,744 (July 8, 2009), AR2-42;[9]
- A 2013 waiver authorizing enforcement of the Advanced Clean Cars I regulation— a collection of amendments to California's program that, among other things, tightened the standards for "criteria" pollutants and GHGs from light-duty vehicles and increased the percentage sales requirements under California's longstanding zero-emission-vehicle sales standards, 78 Fed. Reg. 2112 (Jan. 9, 2013), AR93-126;[10]

[8] The Federal Government's motion to dismiss all claims remains pending before the district court. *See* N.D. Cal. Case, ECF 234.

[9] Citations to documents in the certified administrative record, ECF 58-1, provided to California by EPA are designated by their Bates-stamped page numbers beginning with "AR." California will file the appendix of these pages with the Court, after meeting and conferring with the other parties, pursuant to Local Rule 7(n).

[10] "Criteria" pollutants are those for which EPA has established National Ambient Air Quality Standards. See 42 U.S.C. § 7408 (referring to "air quality criteria"). A zero-emission vehicle is one that produces zero exhaust emissions of any pollutant—e.g., a battery-electric vehicle. Cal. Code Regs., tit. 13, § 1962.2(i)(18).

- The 2022 reinstatement of the parts of that 2013 waiver that EPA had purported to withdraw in 2019—the parts that authorized enforcement of California's more stringent GHG standards and zero-emission-vehicle sales requirements, 87 Fed. Reg. 14,332 (Mar. 14, 2022), AR44-91;

- A 2024 waiver authorizing enforcement of the amended Small Off-Road Engine (SORE) regulations, applicable to small equipment (such as leaf blowers and lawnmowers) sold in California, 90 Fed. Reg. 640 (Jan. 6, 2025) (action signed in December 2024), AR128-130;[11]

- A 2023 waiver authorizing enforcement of amended regulations requiring emission reductions from ocean-going vessels when "at-berth" (i.e., docked) at certain California ports, 88 Fed. Reg. 72,461 (Oct. 20, 2023), AR138-153;

- A 2025 waiver authorizing enforcement of amended regulations requiring emission reductions from commercial harbor craft operating in California, 90 Fed. Reg. 1998 (Jan. 10, 2025), AR134-136.

EPA's actions, and other actions and statements by Executive Branch officials, appear designed to open up two fronts of attack against these waivers—one in Congress and one in the agency. EPA's press release makes clear it is inviting Congress to disapprove these waivers, as it did with three others last year. ECF 13-26 at 1. EPA's actions also suggest it is intending to pave the way to administrative withdrawal of these waivers by removing barriers—specifically, procedural protections to which California is entitled as a licensee—to taking such actions. While the Administration might prefer Congress to pass resolutions on the theory that California "can't do anything about it," *see* ECF 14 (RJN) ¶ 24, EPA nonetheless has a reason to want to streamline administrative withdrawals. The President has directed EPA to "suspend, revise, or rescind" certain "state emissions waivers." 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025). And EPA's reclassification press releases describe these six waivers in terms that appear to bring them within the scope of that presidential directive. ECF 13-26; ECF 30-1. Notably, the same

[11] By statute, the SORE regulation cannot be adopted and enforced by other States, Pub. L. 108-199 § 428(c), 118 Stat. 3, 418 (2004); 40 C.F.R. § 1074.110(b), although other States may adopt other California off-road regulations pursuant to Section 209(e)(2)(B).

Executive Order directed EPA to request stays in litigation to allow the intended suspensions or rescissions to occur. 90 Fed. Reg. at 8354. EPA has done so in litigation challenging the 2022 and 2024 waivers. ECF 13-28 at 2 ¶ 6; ECF 13-29 at 1-2.

To date, EPA has reclassified nine of the more than seventy-five Section 209 waivers it has granted to California. *See* ECF 13-11 (announcing reclassification of three waivers); ECF 13-26 (announcing reclassification of four more); ECF 30-1 (announcing reclassification of two more); ECF 68 (EPA Answer) ¶ 31 (admitting "EPA has issued more than 75 waivers to California"). As with the six at issue here, when EPA granted these other waivers, it expressly stated the actions were not "rules" and not subject to a host of requirements applicable only to "rules." *E.g.*, 90 Fed. Reg. 2000, 2001 (Jan. 10, 2025); 90 Fed Reg. 1996, 1998 (Jan. 10, 2025); 81 Fed. Reg. 95,982, 95,987 (Dec. 29, 2016). EPA has not explained why it selected these nine waivers, but not others, for reclassification and submission to Congress. *See generally* ECF 58-1 (certified index of administrative record).

## VI. PROCEDURAL BACKGROUND

California filed this suit challenging EPA's actions on June 22, 2026, and moved, shortly thereafter, for a preliminary injunction. ECF 1, 13. Defendant EPA and Defendant-Intervenors opposed and moved to dismiss. ECF 20; ECF 25. On September 2, 2026, this Court denied those motions to dismiss, and granted California's motion for preliminary injunction, concluding that California was likely to prevail on the merits because "California is able to overcome the various grounds presented by EPA and defendant intervenors for dismissal of this lawsuit: the judicial review bar created by the Congressional Review Act does not preclude judicial review, and California has established Article III standing and also demonstrated that EPA's decisions to reclassify the waivers constitute final agency action." ECF 46 (Op.) at 5. The Court ordered EPA to restore the status quo as it existed before the June 12, 2026 press release as to the four preemption waiver orders referenced in that order and to withdraw or correct the reclassification of those four waiver orders and other such reclassifications. ECF 45. The Court also enjoined

and stayed EPA from giving effect to the reclassification of the four waiver orders and other such reclassifications. *Id.*

On September 4, 2026, California moved to supplement the Complaint with facts concerning EPA's July reclassifications and submissions and with two additional claims that mirror the claims stated in the original Complaint concerning EPA's June actions. This Court granted leave, and California filed a supplemental Complaint. ECF 48. Although, as noted above, the Court's September 2 order granted California relief with respect to "other such reclassifications," ECF 45 at 2, California also moved for a preliminary injunction that expressly addressed EPA's July actions and expressly requires EPA to restore the status quo as to the July reclassifications to the same, full extent it must do as to the June Reclassifications. ECF 49. This Court granted California's motion. ECF 55.

Defendants and Intervenors have appealed these orders. ECF 56, 59. They have also moved to stay proceedings in this Court, ECF 65, 66, which California has opposed, ECF 70.

California now moves for summary judgment.

## LEGAL STANDARD

When "the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015). "Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (cleaned up). Courts "'decide all relevant questions of law' and 'interpret ... statutory provisions.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin*., 934 F.3d 649, 662 (D.C. Cir. 2019) (quoting 5 U.S.C. § 706.). And the courts must judge the propriety of the agency's action based "solely [on] the grounds invoked by the agency" when it made the challenged decision. *SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947).

As to California's *ultra vires* claims, summary judgment is appropriate if "there is no genuine issue as to any material fact and [California] is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

### I. California Has Standing

As this Court correctly concluded, California has already demonstrated, with evidence, that EPA's actions have injured the State in at least two ways that are redressable here and are thus sufficient to establish Article III standing. Op. 47-58. The evidence in support of this summary judgment motion underscores those bases for standing and establishes others as well.

First, EPA's Reclassification of these six waivers from licensing orders to rules "has deprived California of procedural protections" afforded licensees under the APA. Op. 49; *see* 5 U.S.C. § 558(c). A Clean Air Act preemption waiver is a "license" under the APA because it provides California a "statutory exemption" from CAA Section 209(a). *Id.* § 551(8); *see also* 42 U.S.C. § 7543(b)(1) (EPA must "waive application of this section"). APA section 558(c) requires agencies to provide licensees with "notice … in writing of the facts or conduct which may warrant" withdrawal of the license and an "opportunity to demonstrate or achieve compliance with all lawful requirements," 5 U.S.C. § 558(c)(1), (2), "*before* the institution" of any withdrawal proceeding, *id.* § 558(c). By contrast, agencies are not required to provide any opportunity to correct before initiating a rulemaking to withdraw or otherwise alter a rule. Thus, EPA's reclassification of licensing orders into rules means the agency no longer needs to treat California as a licensee—and afford the State notice of alleged non-compliance and an opportunity to explain or correct—but can instead initiate a withdrawal rulemaking at any time. *See* Op. 51 ("only the procedures applicable to … licenses appears to provide California with the protection of requiring a pre-withdrawal, pre-hearing opportunity to correct"); Op. 52.

EPA has previously argued that the public notice it would provide initiating a waiver withdrawal proceeding provides California with sufficient protection. *See* Op. at 51 (discussing EPA's arguments). But Congress concluded otherwise, opting to provide particularized and *pre-*

*proceeding* protections to licensees, 5 U.S.C. § 558(c)—protections Congress declined to provide to the public vis a vis rulemakings, *id.* § 553(b) (requiring "[g]eneral notice of proposed rule making"). *See also* Op. 53. The loss of those protections is an immediate injury to California caused by EPA's Reclassifications. *See Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (State injured where agency "could begin the process" that would cause sovereign harm). This injury is redressable through vacatur of EPA's actions, a declaration that Section 209 waiver grants are licensing orders (not rules) under the APA, and injunctive relief requiring EPA to treat these and other Section 209 waivers as such.

Second, California has established that EPA's Reclassifications and Submissions are causing the State to have to expend its funds and divert its resources to plan now for the significantly increased possibility that these waivers will be invalidated and California will be unable to enforce regulations it is relying on to meet its state and federal air pollution obligations and to protect public health and welfare. Op. 54-57; *see also Arizona v. EPA*, 77 F.4th 1126, 1130 (D.C. Cir. 2023) (courts recognize standing when a federal rule leaves States "practically if not legally compelled to engage in conventional exercises of their police power" to avoid injury.). Despite decades of progress, California still faces severe air pollution challenges. For example, California has the only areas in the nation designated as in "extreme" non-attainment for federal air quality standards for ground-level ozone (or smog). Second Hicks Decl., ¶ 15. Over 20 million Californians call those areas home. *Id.* To achieve compliance with federal air quality standards, emissions of certain pollutants must be reduced in one region *by 82%* below 2018 levels (which already reflected decades of emissions reductions from earlier regulations). *Id.* ¶ 16. The consequences of not achieving air pollution reduction obligations are costly in terms of public health and environmental impacts. *Id.* ¶ 26. For federal air quality standards, non-attainment can also lead to significant sanctions, including the loss of federal highway funds. *Id.* ¶ 27; Op. 54; *New Jersey v. EPA*, 989 F.3d 1038, 1042 (D.C. Cir. 2021). EPA's actions put California in jeopardy of not coming "into compliance with [federal standards] by attainment deadlines," and that is cognizable injury. *Id.* at 1047.

It generally takes years to identify the necessary measures, model their impacts, and put measures in place to meet air pollution objectives, Second Hicks Decl. ¶¶ 17, 25—all the more so when, as here, the easiest reduction measures have already been deployed, *id.* ¶16. Thus, as a consequence of EPA elevating the risk that California will be unable to rely on multiple regulations to meet the State's goals and obligations, the California Air Resources Board (CARB) must start the work of identifying alternative measures that could potentially replace the emission-reduction work of the regulations EPA's actions put at risk. *Id.* ¶¶ 17; 19-24 *see also Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (agency action that "makes it more difficult and onerous for the states to devise an adequate SIP" causes injury-in-fact (cleaned up)). This injury is further exacerbated by the threat that EPA will reclassify and submit to Congress *even more* waivers—a risk only underscored by EPA reclassifying and submitting two additional waivers after California filed this suit. *See* ECF 30-1; *NB ex rel. Peacock v. D.C.*, 682 F.3d 77, 84 (D.C. Cir. 2012) ("past wrongs may" support injunctive relief to prevent "real and immediate threat of repeated injury") (cleaned up)). The extensive and expensive work to plan for replacement emission reductions must begin now; and, indeed, has already begun. Second Hicks Decl., ¶¶ 17, 30-32.

CARB will be able to at least reduce these backup efforts if EPA's actions are declared unlawful, and if EPA is permanently required to treat these and other Section 209 waivers as the licensing orders they are. *Id.* ¶ 33-34. For example, if EPA is required to provide CARB with the opportunity to refute any alleged basis for administrative withdrawal before initiating a proceeding, that would significantly mitigate against the withdrawal risk to these (and other) waivers, particularly as CARB believes it could readily make the case that facts-on-the-ground support leaving the waivers in place. *Id.* ¶ 33.[12] Additionally, if the Court declares that Section 209 waiver grants are licensing orders, not rules, and enjoins EPA from reclassifying other waivers, *see NB ex rel. Peacock*, 682 F.3d at 84, that would substantially reduce the threat to

[12] Moreover, if EPA were to proceed to withdraw even after such a showing from CARB, CARB would be well-positioned to seek a stay of EPA's action from the appropriate court.

California's remaining waivers, thereby significantly decreasing the need to plan for replacement of even more emission-reductions. Second Hicks Decl., ¶ 34.

Third, EPA's actions are inhibiting CARB's "daily operations" and impairing its ability to carry out its mission. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020); *id.* at 56 ("Obstacles that unquestionably make it more difficult for an organization to accomplish its primary mission ... provide injury for purposes *both* of standing and irreparable harm." (emphasis original, cleaned up)). At the preliminary injunction stage, this Court concluded that California had not sufficiently "developed or supported" this injury. Op. 48 n.12. California now supplements its showing. For example, since EPA's Reclassifications and Submissions, CARB staff have noticed parties conducting business in California as though certain regulations are unenforceable—*e.g.*, selling non-compliant equipment. Dilbeck Decl., ¶ 10. This conduct requires CARB to devote significant resources to investigation, enforcement, and other follow-up activities, taking resources away from other work that advances CARB's mission. *Id.* ¶ 11. This conduct is also likely contributing to *increases* in harmful emissions, hampering CARB's mission to *reduce* pollution and protect public health. *Id.* ¶ 12. In both respects, and by diverting resources to planning for the possibility of waiver invalidation, *supra* 16-17, EPA's actions have made CARB's "*activities* more difficult," perceptibly impairing its programs. *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 51 (D.D.C. 2025). These injuries began after EPA's actions, Dilbeck Decl., ¶¶ 8, 10-11; *supra* 16-17, and relief as to those actions would reduce or eliminate the harms, *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("causation and redressability—are often flip sides of the same coin" (cleaned up)); *Narragansett Indian Tribe v. Bhatt*, No. CV 22-2299 (RC), 2024 WL 3509491, at *7 (D.D.C. July 23, 2024) ("[T]he likelihood of even partial redress is enough to support standing." (cleaned up)), *aff'd sub nom. Narragansett Indian Tribe v. McMaster*, 176 F.4th 671 (D.C. Cir. 2026).

Fourth, EPA's reclassifications threaten the State's ability to enforce its own laws by facilitating the invalidation of the waivers. *See Alaska v. DOT*, 868 F.2d 441, 443 (D.C. Cir.

1989) (recognizing "sovereignty interests" in power "to enforce state law"). This Court previously concluded this injury could not support standing because it "stems from the risk that Congress will act to enact Joint Resolutions of Disapproval" and thus "lacks redressability." Op. 48-49. But this is not a case where no "evidence show[s] that Congress regularly acts upon [agency] recommendations." *Double R Ranch Trust v. Nedd*, 284 F. Supp. 3d 21, 31 (D.D.C. 2018). Rather, Congress has disapproved waivers based on similar EPA actions and, indeed, has only ever done so in response to such EPA actions. *See supra* Background II, III.[13] This Court could therefore conclude that the relief sought here against EPA—*e.g.*, vacatur of EPA's actions and a declaration that Section 209 waivers are orders, not rules, under the APA—would make congressional action less likely, even though the Court's order would not operate on Congress or affect that body's constitutional powers. In a different Article III context (mootness), courts sometimes do assess the likelihood that a legislative body will act one way or another—or even whether voters will take legislative action of a particular sort. *E.g.*, *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 350 (D.C. Cir. 1997) ("There is also no reason to conclude that D.C. voters are likely to enact a new initiative that imposes contribution limits akin to those found in Initiative."). In any event, even if there were no redress available here as to the congressional risk to the California regulations underlying the six waivers already submitted, a permanent injunction preventing EPA from reclassifying *additional* waivers would reduce this risk to *other* California regulations. *See NB ex rel. Peacock*, 682 F.3d at, 84.

Moreover, this injury is also redressable, at least in part, because it stems not just from the risk of congressional action but also from the risk that EPA will move to administratively withdraw the waiver. *Narragansett Indian Tribe*, 2024 WL 3509491, at *7 (partial redress suffices). The reclassifications streamlined that withdrawal process, and vacatur and other relief can undo that streamlining and prevent it from recurring with other waivers. Importantly, this administrative-withdrawal risk is far from speculative. The President has directed EPA "to

[13] *Double R Ranch Trust* is further distinguishable because redressability there required speculative agency action *on top of* hypothetical congressional action. 284 F. Supp. 3d at 31.

suspend, revise, or rescind," 90 Fed. Reg. 8353, 8354 § 3(b) (Jan. 29, 2025), certain "state emissions waivers," *id.* at 8353 § 2(e); *see also id.* at 8354 § 3. EPA has described all six of these waivers in terms that indicate the agency thinks they qualify for suspension, revision, or rescission under that Executive Order. *Compare id.* at 8353 § 2(e) (discussing "electric vehicle[s]," "true consumer choice," and vehicle prices), *id.* at 8354 § 3 (discussing "undue burden on the … use of … oil [and] biofuels"); *with* ECF 13-26 (June Press Release) at 1 (discussing "consumer choice" and "affordable vehicles"), *id.* at 2 (discussing "electric vehicles," "electrification," and vehicle prices), ECF 30-1 (July Press Release) at 2 (discussing "electrification" and costs). Thus, to conclude that EPA will not seek to administratively withdraw these waivers—particularly if Congress takes no action on them—would require the Court to assume that EPA will either disregard the Executive Order or disavow the agency's own characterization of the waivers. And, as discussed above, an order requiring EPA to treat these waivers (and all Section 209 waivers) as licensing orders would ensure that any attempt to administratively withdraw could not commence unless or until EPA provides California with an opportunity to correct any alleged problems with continued operation of the waivers. That opportunity would naturally reduce the risk that EPA would withdraw at all. Second Hicks Decl., ¶ 33. Indeed, there would be little point to Congress requiring agencies to provide that opportunity if doing so could not, at least in a number of cases, avoid withdrawal proceedings entirely.

Finally, all forms of relief requested in California's proposed order are both available and appropriate here. California requests vacatur which is "the normal remedy" for APA violations. *Allina Health Serv. v Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Declaratory and injunctive relief is also available and warranted. 5 U.S.C. §§ 702, 703; *e.g.*, *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021), *modified sub nom.* 2026 WL 2719808 (D.D.C. Sept. 15, 2026) ("[T]he APA explicitly contemplates that injunctive relief may be proper when an APA violation is identified."). Indeed, injunctive relief is particularly appropriate where, as here, the defendant shows no sign of ending an unlawful "practice for which it offers

no justification" and vacatur alone will not remedy or prevent injuries to the plaintiff. *See Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1998). As shown above, California satisfies the requirements for both injunctive and declaratory relief; indeed, no other remedies will redress the State's injuries, and the balance of the equities and the public interest plainly support this relief given that neither the federal government nor the public has an interest in the government acting unlawfully.

## II. THE CRA, THE CAA, AND *HODEL* DO NOT DEPRIVE THIS COURT OF JURISDICTION

The Court has statutory subject-matter jurisdiction because Plaintiff's claims "aris[e] under the … laws … of the United States," 28 U.S.C. § 1331, namely, the APA and common law *ultra vires* review. The APA makes "final agency action for which there is no other adequate remedy in a court … subject to judicial review." 5 U.S.C. § 704. EPA's Reclassifications and Submissions are each final agency actions. *See infra*, Sec. III. If this Court holds otherwise, then *ultra vires* review is available. *See infra,* Sec. IV. Neither the CRA nor the Clean Air Act withdraws jurisdiction, and the reasoning in *Natural Resources Defense Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), does not apply here.

### A. The Congressional Review Act Does Not Withdraw Federal Jurisdiction

Section 805 of the CRA states that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. This provision does not withdraw jurisdiction to review EPA's Reclassifications *or* Submissions. This Court's first preliminary-injunction opinion concluded that Section 805 does not preclude review of the Reclassifications but does preclude review of the Submissions. Op. 34-46. Plaintiff respectfully submits that this Court's preliminary conclusion as to the Reclassifications was correct but its conclusion as to the Submissions was incorrect. EPA's Submissions could not have been "under this chapter"—and thus barred from judicial review—if, as here, what was submitted was not a "rule" in the first place. EPA's illegal attempt to reclassify past waiver orders as rules did not *make* those orders rules within the meaning of the CRA. *See id.* at 63 ("[A]gencies have not been empowered to transmogrify … an order into a rule without the appropriate form of process.").

The inapplicability of Section 805 to all of EPA's conduct in this case, Submissions included, follows directly from the Court's already-reached conclusion that waivers are not rules.

Section 805 applies solely to activities "under this chapter." When used in a jurisdictional or forum-channeling statute, the best reading of the phrase "under this chapter" is "'pursuant to' or 'by reason of the authority of'" that chapter. *Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*), 583 U.S. 109, 124 (2018) (citing *St. Louis Fuel & Supply Co. v. FERC*, 890 F.2d 446, 450 (D.C. Cir. 1989) (R.B. Ginsburg, J.)). Here, because "this chapter" is the CRA, *see* 5 U.S.C. ch. 8 (5 U.S.C. §§ 801-808), "'[u]nder this chapter' refers to duties the CRA imposes on various actors," *Kansas Nat. Res. Coal. v. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020)—i.e., "action[s]," "determination[s]," or "finding[s]," the CRA requires, 5 U.S.C. § 805. For instance, the President or a rulemaking agency may "determine[]" that a rule will take effect sooner than usual, 5 U.S.C. §§ 801(c)(2), 808; the White House Office of Management and Budget may "find" that the rule is "major," *id.* § 804(2); or GAO may take action by "report[ing] each major rule" to Congress, *id.* § 801(a)(2)(A). *See also* Op. 36 (listing other examples). Section 805 precludes judicial review of any of those steps (or a failure to perform them) because each is authorized, or even required by, the CRA with respect to a "rule."

Section 805 does not apply to any action challenged here because no authorized step or legal requirement "under" the CRA is present as there is no "rule" to trigger any part of that statute. Absent such an obligation or requirement, "the challenged agency action[s]" are not "the sort of action shielded from review by the judicial review bar." Op. 40. That was true before the unlawful Reclassifications, and it remained true after them. No law—not the CRA, the APA, or the Clean Air Act—"empower[ed] the Administrator, after the manner of Humpty Dumpty in Through the Looking-Glass," to transform waivers into rules (and thereby trigger Section 805) "by his mere designation." *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 283 (1978).

### 1. EPA Did Not Act Under the CRA

There are three independent reasons why EPA did not act "under" the CRA. First, only a "rule" within the meaning of the APA can trigger the CRA (and its preclusion-of-review bar);

and, as this Court preliminarily determined, the "at-issue waivers … cannot be rules." Op. 63-64; *accord* ECF 55 at 2-3. Second, even when an APA "rule" is present, the CRA does not apply to any action of "particular applicability," 5 U.S.C. § 804(3)(A), and Section 209 waivers apply particularly to one applicant: California. Third, the CRA does not direct, much less authorize, EPA to reclassify agency orders finalized long ago.

**a. Waivers are not APA rules**

The CRA does not impose any duty on anyone unless and until a federal agency issues a rule. It is the promulgation of a rule that triggers the federal agency's duty to submit to Congress and GAO a report containing "a copy of the rule," "a concise general statement relating to the rule," and "the proposed effective date of the rule." 5 U.S.C. § 801(a)(1)(A). The agency's submission of a report about that rule then triggers, *inter alia*, the agency's duty to submit a further report if "the rule is made ineffective," *id.* § 801(a)(1)(D), as well as the time window for Congress to pass the special type of "joint resolution" to "disapprove[] the rule" that the statute contemplates, *id.* § 802(a). Absent a Section 804(3) "rule," there is no "determination, finding, action, or omission under [the CRA]," *id.* § 805, for which judicial review is precluded.

The CRA provides that, "[f]or purposes of this chapter," "[t]he term 'rule' has the meaning given such term in section 551 [of the APA], except" for certain categories of rules that the CRA exempts. 5 U.S.C. § 804(3). In other words, "the same agency action cannot be a 'rule' under the CRA without also being a 'rule' under the APA." Op. 38-39.

Section 209 preemption waivers fail the APA's definition of "rule." The statute divides the universe of agency proceedings into rulemakings and adjudications. Attorney General's Manual on the Administrative Procedure Act 14 (1947) (AG's Manual) ("[T]he entire Act is based upon a dichotomy between rule making and adjudication."). A "rule making" leads to a "rule," 5 U.S.C. § 551(5), and an adjudication leads to an "order," *id.* § 551(7); *see also id.* § 551(6) (defining "order" as "final disposition … in a matter other than rule making"). "Section 209(b) waivers," and Section 209(e) authorizations, "are properly considered adjudicatory orders under the APA." Op. 63; *accord* ECF 55 at 2.

For one thing, an "order" means "a final disposition … in a matter … *including licensing*." 5 U.S.C. § 551(6) (emphasis added). Licensing is an "agency process respecting the grant, … denial, [or] revocation … of a license." *Id.* § 551(9). In other words, "[l]icensing proceedings constitute adjudication by definition." AG's Manual 41. And the waivers that EPA issues under Section 209 of the Clean Air Act fit the APA definition of "license" to a T. A "license" includes "a statutory exemption or other form of permission." 5 U.S.C. § 551(8). When California gets a waiver under Section 209, EPA indisputably is granting the State a statutory exemption from preemption by "approv[ing]" the State's request. *See id.*; *see also* 42 U.S.C. § 7543(b)(1) (directing EPA to waive statutory preemption for California); *id.* § 7543(e)(2)(A) (same for non-road authorizations); *Diamond Alt. Energy*, 606 U.S. at 105 ("[T]he Act's preemption provision exempts California."); *Engine Mfrs. Ass'n*, 88 F.3d at 1079 (same). As the GAO correctly concluded, waivers are licenses. ECF 13-8 at 5-6; ECF 13-14 at 6-8.

Even apart from the ready fit with the APA's definition of "license," EPA's Section 209 waiver proceedings have the hallmarks of adjudications, not rules. *See* Op. 63-65; ECF 55 at 2-3. That is clear from the outcome of a waiver proceeding—which, like a court decision in a preemption case, applies law to fact to determine whether enforcement of certain state laws is preempted. EPA's adjudicatory role is also clear from the fact that EPA does not make policy when it takes action on California's waiver requests. *Cf.* AG's Manual 14 ("Rule making … is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations."). Congress instructed that EPA "shall" exempt the single, named waiver requestor (California) from application of Clean Air Act preemption, 42 U.S.C. § 7543(b)(1), unless "certain facts exist," *MEMA I*, 627 F.2d at 1120. EPA's action is not policy prescription. *Compare* 42 U.S.C. § 7521(a). Underscoring the point, one criterion directs EPA to apply "arbitrary and capricious" review to California's fact-finding, *id.* § 7543(b)(1)(A), (e)(2)(A)(i)—a standard of review typically applied by courts and that does not make policy of any kind, *see* 5 U.S.C. § 706; *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and

capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

Indeed, California's requests "are presumed to satisfy the waiver requirements and … the burden of proving otherwise is on whoever attacks them." *MEMA I*, 627 F.2d at 1121. *Compare San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc) ("[T]he party challenging an agency's action [in court] as arbitrary and capricious bears the burden of proof."). No such analog or burdens of proof are found in actual federal rulemaking. EPA issues no proposed determination, as would be required for a substantive rule. *See* 5 U.S.C. § 553(b); EPA Answer ¶ 72. The agency only gives notice that it received California's request before holding a hearing. 42 U.S.C. § 7543(b)(1), (e)(2)(A); *e.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007); 77 Fed. Reg. 53,199 (Aug. 31, 2012); 88 Fed. Reg. 33,143 (May 23, 2023). EPA must then grant the waiver unless "parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended denial of the waiver." *MEMA I*, 627 F.2d at 1122. In summary, "the purposes of the statute involved and the considerations which the agency is required to weigh in granting or withholding its approval," AG's Manual 14, confirm that Section 209 waivers are adjudicatory orders, not rules. *See also* ECF 13-8 at 5-6; ECF 13-14 at 6-8.

AFPM (but not EPA) previously argued that waivers are APA rules, invoking Section 209(b)(3) of the Clean Air Act—a provision that relieves manufacturers from overlapping but different emissions regulation of the same products by California and the federal government. 42 U.S.C. § 7543(b)(3) ("In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver …, compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter."). That choice by Congress does not make a federal-agency rule out of EPA's waiver of preemption for California's standards. Section 209(b)(3) is a directive imposed on EPA by Congress as to how the agency should administer federal rules it promulgates under Section 202, 42 U.S.C. § 7521. Section 209(b)(3) does not empower EPA with rulemaking (or any other) authority.

**b. Waivers are actions of particular applicability**

EPA waivers are also actions "of particular applicability" that, even if they were rules, would fall outside the CRA's ambit. 5 U.S.C. § 804(3)(A) (exempting "rule[s] of particular applicability"). California is, and only California can be, the recipient of EPA's Section 209 waivers. To be sure, in most cases (SORE is an exception, *see supra*, 12 n.11) certain other States can adopt and enforce standards identical to California's. *See* 42 U.S.C. §§ 7507, 7543(e)(2)(B). But those other States act of their own volition and do not receive waivers from EPA, either directly or indirectly. *See* ECF 13-18 at 6; *Ford Motor Co.*, 606 F.2d at 1301 n.58 ("The statute provides for no [EPA] determination at all as to the effect of the California standards on other parts of the country.").

**c. The CRA does not contemplate or condone reclassifying past orders as rules**

Even if this Court had concluded that waivers are APA rules, *contra* Op. 63-64; ECF 55 at 2-3, and even if it further concluded that waivers are rules of general applicability, the Court could still find that EPA's Reclassifications were not "under" the CRA. Nothing in "this chapter," 5 U.S.C. § 805, envisions reclassifying finalized orders into rules after the fact. *See* Op. 62. Even if EPA could somehow accomplish that feat, *but see infra*, Sec. III.A.2, logically it would have to complete the task *before* the CRA could be implicated in any way. An order-to-rule conversion, if such a thing is even possible, "is agency action that is independent of any concomitant or subsequent determination by the agency to submit the rule to Congress under the CRA, and thus falls outside the Section 805 judicial review bar." Op. 42; *accord id.* at 41 ("Section 805 does not sweep so broadly as to insulate from judicial review … an agency's decision to treat an action as a rule, an order or a license.").

**2. The Illegal Reclassifications Do Not Subject the Illegal Submissions to Section 805**

California seeks, among other things, an order declaring "that EPA's submissions of these waivers to Congress … are not 'report[s]' under 5 U.S.C. § 801(a)(1)(A)." ECF 48 at 36 (cleaned up). In its first preliminary-injunction opinion, the Court appeared to find that Section 805

"leave[s] to Congress alone the assessment of whether [EPA's] transmitted report properly invoked the CRA or instead ignored limitations embodied by the CRA's definition of 'rule' in 5 U.S.C. § 804(3)." Op. 38; *see also id.* at 40 n.10 (indicating that Section 805 precludes judicial review of "the transmittal of the reports or the contents therein to Congress"). In California's view, whether EPA's Submissions "properly invoked the CRA," *id.* at 38, is a question that must be answered to determine whether Section 805's jurisdictional bar applies to the Submissions in the first place. And this Court's jurisdiction to determine its own jurisdiction encompasses deciding whether the predicates that would trigger Section 805 are present. *E.g.*, *Ardelyx, Inc. v. Kennedy*, 179 F.4th 947, 954-55 (D.C. Cir. 2026).

"The term 'rule' has the meaning given" in the APA, 5 U.S.C § 551(4), incorporated by the CRA, 5 U.S.C. § 804(3), and that definition turns on what an agency does, not what it says. EPA can say a waiver was a rule all along, or that it was an order but has now been reclassified as a rule, but whether a waiver *is* a rule under the law—whether it meets Congress's precise definition—always turns on what a waiver actually did. Here, EPA *did* "test the boundaries of the CRA by submitting Clean Air Act Section 209(b) waiver orders to Congress." Op. 41. True, in order to do that, EPA first had to reverse its contemporaneously stated view that each waiver is not a rule. But that positional reversal is not dispositive of the question whether waivers meet Section 804(3)'s definition of a rule. *See id.* at 38 ("EPA has no authority to call whatever action it wants a 'rule' for purposes of a CRA report to Congress."). "On questions of statutory interpretation, this court 'must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority.'" *Ardelyx*, 179 F.4th at 953 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)). Because waivers fail the statutory definition, regardless what EPA's view of the matter happens to be at a given moment, the Submissions are (and always would have been) reports of orders, not rules. And a report to Congress about a non-rule is not a report sent "'pursuant to' or 'by reason of the authority of'" the CRA, *NAM*, 583 U.S. at 124, because CRA "report[s]" concern only rules, 5 U.S.C. § 801(a)(1)(A).

The bottom line is that Section 805 imposes "a judicial review bar as to agency reports sent to Congress under the CRA," Op. 45 n.11, but it does not impose a judicial review bar as to agency reports sent to Congress *not* under the CRA, even if the agency says they were sent under the CRA.[14] *Cf. NAM*, 583 U.S. at 125 n.8 (explaining that agency's "invocation" of a jurisdiction-channeling statutory provision "does not control [the] interpretive inquiry"). EPA's manifestly unlawful attempt to reclassify these waivers cannot shield from review the unlawful Submissions that flowed from that attempt. In Section 805, as in comparable provisions, "the preclusion on review of" actions taken under the CRA "extends no further than [the agency's] statutory authority" under the CRA. *Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004).

Allowing a federal agency to immunize a downstream action from judicial review based on an unlawful upstream action would have frightening results. Take, for example, the Immigration and Nationality Act's bar on "judicial review of any determination of the [Secretary of Homeland Security] with respect to the … termination … of a [Temporary Protected Status] designation[] of a foreign state under [8 U.S.C. § 1254a(b)]." *Mullin v. Doe*, 609 U.S. 324, 338-339 (2026) (quoting 8 U.S.C. § 1254a(b)(5)(A)). Anyone "provided temporary protected status … shall not be detained … on the basis of … immigration status," 8 U.S.C. § 1254a(d)(4), and a termination of a country's designation cannot take effect before 60 days after notice is published in the Federal Register, *id.* § 1254a(b)(3)(B). Suppose the Secretary claimed to "reclassify" an unrelated, long-ago Federal Register notice as a termination of a country's status and immediately began detaining nationals of that country on the basis of immigration status. Would the reclassification, illegal as it was, nonetheless bar statutory challenges to the detentions? Of course not. The judicial-review bar would not apply to the Secretary's reclassification *or* his detentions, because the former were without legal effect. The court would

[14] To be clear, as this Court has correctly observed, California does not claim that "EPA's transmittal of the waiver orders as a report to Congress was *a violation of the CRA*." Op. 40 (emphasis added). The CRA says nothing one way or the other about agencies submitting reports of non-rules, and Congress may do whatever it wishes (within constitutional limits) upon receipt of such reports. Whether a report is a CRA report or not, "how Congress decides to address" it is normally nonjusticiable. *Id.* at 38. But whether a report is a CRA report dictates whether Section 805 shields the underlying *agency* conduct—including submission of the report—from review.

hold the reclassification both unlawful *and* ineffectual, and then consider the propriety of detentions without regard to the inapplicable judicial-review bar.

This Court should proceed likewise. EPA's Reclassifications are reviewable, unlawful, and ineffectual. The Submissions are reviewable because, notwithstanding the unlawful and impotent Reclassifications, their subjects are not "rules," and thus they are not the reports referred to in the CRA or any other "action" required by it.

### B. The Clean Air Act Does Not Withdraw this Court's jurisdiction

To ensure that the deadline for challenging EPA's actions would not lapse, *see* 42 U.S.C. § 7607(b)(1), California protectively petitioned for review of the actions in both the D.C. Circuit and the Ninth Circuit. *See* ECF 39; ECF 40; ECF 63. As the Court explained in its preliminary-injunction opinion, however, the Clean Air Act does not vest courts of appeals with exclusive original jurisdiction to review EPA's Reclassifications or Submissions, none of which were taken "under" that statute. 42 U.S.C. § 7607(b)(1); *see* Op. 34 n.8. No party has argued here, even in the alternative, that the Clean Air Act withdraws this Court's jurisdiction under 28 U.S.C. § 1331.[15] It does not.

The word "actions" in 42 U.S.C. § 7607(b)(1) "refer[s] to particular exercises of EPA authority undertaken pursuant to particular CAA provisions." *EPA v. Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 637 (2025); *see also NAM*, 583 U.S. at 124. The only Clean Air Act provisions implicated at all here are Section 209(b)(1) and (e)(2)(A), 42 U.S.C. § 7543(b)(1), (e)(2)(A). The EPA actions challenged here are neither a finding specified in Section 209(b)(1)(A)-(C) or 209(e)(2)(A)(i)-(iii) nor a grant or denial of a waiver request from the State. EPA did not act here "pursuant to" or "by reason of the authority of" Section 209, or any other part of the Clean Air Act. *See NAM*, 583 U.S. at 124. EPA instead purported to reclassify long-

[15] In ongoing litigation brought by California and ten other States in the Northern District of California, EPA has presented this argument in the alternative. *See* ECF 42 at 7.

settled waiver orders into rules, declared the CRA appliable to them, and submitted them to Congress. Nothing in the Clean Air Act contemplates, much less authorizes, any of that.[16]

### C. *Hodel* Does Not Revoke or Limit Federal Jurisdiction to Review EPA's Actions

At the preliminary injunction stage, this Court determined that that EPA's Submissions are "insulated from judicial review" under *Hodel*. Op. 40 n.10. However, the Court did not have full briefing on the issue because EPA raised *Hodel* "for the first time in reply." *See id.* California respectfully submits that *Hodel* does not control here, for several reasons.

In that case, petitioners sued the Secretary of the Interior under a specialized judicial-review provision restricted to "action of the Secretary to approve [an offshore] leasing program." 43 U.S.C. § 1349(c). The D.C. Circuit held that it could not review a claim that the Secretary violated an uncodified appropriations rider directing him to "detail" in a report to Congress about the leasing program "why" he rejected certain "proposals" from Congressional negotiators, Pub. L. No. 99-591, § 111, 100 Stat. 3341-262 (1986); *see also* Pub. L. No. 99-190, § 111, 99 Stat. 1185, 1243 (1985). This claim, the court explained, "d[id] not fall within the ambit of" the review provision for leasing programs, *Hodel*, 865 F.2d at 317; and, because of the nature of the action and the complaint petitioners made about it, they could not rely on "the general presumption of reviewability of agency action," *id.* at 318.

Here, the APA is exactly the "express provision for judicial review" that was missing in *Hodel*. *Id.* at 318 n.33. Its term "agency action," 5 U.S.C. § 551(13), "cover[s] comprehensively every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001), including reports of actions to Congress, *see Hodel*, 865 F.2d at 99 (describing report of leasing program as "agency action"). "The bite" in the phrase "final agency action" is "in the word 'final,'" *Whitman*, 531 U.S. at 478, and many agency reports will not

---

[16] The citizen-suit provision of the Clean Air Act does not apply either. *See* 42 U.S.C. § 7604. California "does not allege a Clean Air Act violation of or seek to enforce any Clean Air Act requirement." ECF 42 at 1-2.

meet the APA standard for finality.[17] But those that *do* "mark the consummation of [a] decisionmaking process," and are also actions "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). A submission to Congress that satisfies those criteria is a "prototypical exercise of agency power." *Hodel*, 865 F.2d at 318.

*Hodel* "obviously decide[d] only the issue before" it. *Id.* at 318 n.33. The D.C. Circuit did not graft atextual limitations onto the term "agency action," amend the test for finality, or decide that every report sent to Congress is non-final. The APA is "a congressional directive for judicial review of claims by non-congressional parties" aggrieved by final agency actions. Op. 40 n.10 (quoting *Hodel*, 865 F.2d at 319); *see* 5 U.S.C. §§ 702, 704. Insofar as the Submissions are final agency actions, *see infra* Sec. III.B, they are subject to APA review, and Plaintiff need not "seek refuge in the general presumption of reviewability of agency action," *Hodel*, 865 F.2d at 318.

But even if this Court were to determine that the Submissions are not final, or that *Hodel* otherwise forbids application of the APA to the Submissions, the presumption of reviewability still applies here. The answer to the question *Hodel* expressly reserved—"the broad, theoretical question whether an interbranch reporting requirement can *ever* be reviewable in the absence of an express provision for judicial review," *id.* at 318 n.33 (emphasis added)—is yes.

EPA's Submissions are "an entirely different sort of agency action" than the agency report that *Hodel* confronted. *Id.* at 318. The *Hodel* report was but a single step in "an on-going process of give and take in various negotiating sessions" between the political branches about a program. *Id.* at 319. "[T]he Secretary's apparent mandate [was] to work toward political consensus," *id.* at 319 n.34, so the sufficiency of his explanations for rejecting negotiators' proposals was a matter "singularly committed to *congressional* discretion in measuring [his] fidelity … to legislatively mandated requirements" for explanatory reports, *id.* at 318. In this case, by contrast, EPA was not negotiating with Congress. Each Submission is a one and done, as highlighted by the paucity

[17] Finality under Section 704 of the APA is not a jurisdictional requirement. *See Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026).

of the administrative record. EPA's task was not to facilitate an inter-Branch consensus achieved through a series of negotiations, but solely to report a qualifying "rule" to Congress and GAO "[b]efore [the] rule can take effect." 5 U.S.C. § 801(a)(1)(A).

Further, in *Hodel*, "the contention [was] not that the Secretary failed entirely to report back to Congress …, but that [his] response lacked the requisite 'detail.'" 865 F.2d at 318. The circuit "despair[ed] at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response" to Congress's mandate. *Id.* at 319. *Cf.* 5 U.S.C. § 701(a)(2). But here there is a manageable standard by which to judge whether the Submissions are "report[s] referred to in section 801(a)(1)(A)" of the CRA. 5 U.S.C. § 802(a). *Cf. Walpin v. Corp. for Nat'l & Cmty. Servs.*, 630 F.3d 184, 187 (D.C. Cir. 2011) (finding that President's report to Congress "satisfie[d] the minimal statutory mandate" but refusing to second-guess its level of detail). That statutory standard—whether the actions that are the subject of EPA's Submissions are "rule[s]," 5 U.S.C. § 804(3); *see id.* § 801(a)(1)(A)—has already been elaborated, *supra*, Sec. II.A.1.a.

Nothing in *Hodel* constrains this Court's jurisdiction or rebuts the strong presumption that EPA's Reclassifications and Submissions are each reviewable.

## III. California Is Entitled to Summary Judgment on Its APA Claims

California is entitled to summary judgment on its APA claims because EPA's Reclassifications are final agency actions and violate the APA, as this Court already held at the preliminary injunction stage. The same is true of the Submissions.

### A. The Reclassifications Are Final and Unlawful

#### 1. Each of the Six Reclassifications Is Final Agency Action

Under the APA, courts may generally only review a final agency action that "meets two conditions." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016). First, the action "must 'mark the consummation of the agency's decisionmaking process,' *i.e.*, it is not 'merely tentative or interlocutory.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Second, the action must also "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178). This "finality inquiry is a

pragmatic and flexible one." *Id.* (cleaned up). The Reclassifications satisfy both prongs of this inquiry.[18]

As to the first, EPA itself announced the agency "*has determined* that each of these waivers is a rule under the CRA." ECF 13-26 at 1 (emphasis added); ECF 30-1 at 1 (same). That is quintessential consummation. When the U.S. Fish and Wildlife Service "had determined and publicly announced" its position on certain permits, the D.C. Circuit easily concluded that was the agency's final conclusion. *Safari Club*, 842 F.3d at 1285 (describing agency action); *id.* at 1289 ("As explained above, … the findings represented the agency's final decision" as to the permits). Similarly, when EPA "unequivocally stated [its] position on the question whether [pesticide] registrants were entitled to a cancellation hearing before labeling changes could be required," that was the consummation of the agency's decisionmaking. *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). The same is true here. Op. 59-60.

There is nothing "tentative," *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020), about EPA's "determin[ation]" that these six waivers are rules, ECF 13-26 at 1; ECF 30-1 at 1. *See also Am. Bar Ass'n v. DOE*, 370 F. Supp. 3d 1, 20 (D.D.C. 2019) (focusing on "the relevant language of the challenged agency decision"). Nor has EPA given any "indication that the [Administrator] intends to reconsider this decision or to vacate" it. *Wheeler*, 955 F.3d at 79 (D.C. Cir. 2020) (quoting *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017)) (modification in original). To the contrary, EPA has already implemented the Reclassifications, asserting they required the agency to "transmit" the waivers to Congress. ECF 13-26 at 1; ECF 30-1 at 1; *see also Sw. Airlines Co. v. DOT*, 832 F.3d 270, 275 (D.C. Cir. 2016) (courts "look[] to the way in which the agency subsequently treats the challenged action" when considering finality's first prong). EPA cannot now credibly argue it "contemplate[s] further deliberation or subsequent iteration." *Planned Parenthood of Greater N.Y. v. DHHS*, No. 25-cv-02453-BAH, 2025 WL 2840318, at *18 (D.D.C. Oct. 7, 2025).

[18] That EPA announced this action in a press release does not undermine finality. *Martinez-Andino v. DHS*, No. 26-cv-01208-BAH, 2026 WL 1801137, at *14 (D.D.C. June 23, 2026) ("[A]gency action may be final despite expression in a more 'informal' form.").

The Reclassifications also had legal consequences and determined rights and obligations, satisfying the second finality prong. EPA itself asserts these actions created "statutory obligation[s]" for the agency that would not exist without the purported Reclassifications. ECF 13-26 at 1; ECF 30-1 at 1; *see also* Op. 60. "*Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); *see also Bennett*, 520 U.S. at 169 (second prong satisfied where action "alter[ed] the legal regime to which the action *agency* is subject") (emphasis added). For example, the Bureau of Land Management's "conversion of the Caliente Complex HMAs [herd management areas] into HAs [herd areas]," *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 147, met the second prong because it "determined *the Bureau's obligation* to round up the wild horses," *W. Watersheds Project*, 850 F. App'x at 15 (emphasis added). Here, EPA asserts that its Reclassifications—its conversion of these waivers from order to rules—determined its *obligations* to transmit these waivers to Congress. It cannot then credibly argue that the Reclassifications were of no consequence. *See also Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 319-20 (D.C. Cir. 2011) (second prong satisfied where action left agency with no discretion); *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 150 (same).

If that were not enough (and it is), the Reclassifications also changed California's rights under the APA, and that injury to California is a legal consequence. Op. 60 ("the loss of procedural protection … compounds the fact that EPA's reclassification … constitutes an action with appreciable legal consequences"). As discussed above, prior to EPA's Reclassifications, these six waivers were licenses, and the licensee (California) was entitled to notice and an opportunity to correct should EPA intend to withdraw. *Supra* Sec. I. The loss of those rights establishes finality. *See Bennett*, 520 U.S. at 178.

Finally, the Reclassifications have "deprive[d]" California of the "safe harbor" afforded to waivers, as orders, by their exclusion from the CRA. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016). In *Hawkes*, the Court concluded that negative "jurisdictional

determinations" or JDs under the Clean Water Act satisfied the second finality prong because a negative JD would reduce a property owner's litigation risk by "narrow[ing] the field of potential plaintiffs and limit[ing] the potential liability." *Id.* at 599. "It follow[ed] that affirmative JDs have legal consequences as well: they represent the denial of the safe harbor that negative JDs afford." *Id.* The same is true here. EPA's original (and correct) conclusion that these waivers are not rules, and thus not subject to the CRA, narrowed the pathways to potential invalidation. In fact, in the thirty years since the CRA was enacted, Congress has *only* purported to invoke the CRA to disapprove Section 209 waivers *after* EPA reclassified them into rules. *Supra* Background II, III. By design, EPA's Reclassifications eliminated safe harbor from the invocation of the CRA, and that renders them final. *Hawkes*, 578 U.S. at 599.

**2. Each Reclassification Is Unlawful Under the APA**

EPA's Reclassifications are unlawful as a matter of statutory interpretation and also arbitrary and capricious due to the complete absence of any acknowledgment or explanation for the agency's change in position.

**a. The Reclassifications are contrary to law**

To start, the Reclassifications are contrary to law because under statute these waivers are not rules. As established, EPA's Reclassifications of waivers as "rules" are not in accordance with the best reading of the APA's definition. *See supra* Sec. II.A.1.a. Put simply, "Section 209(b) waivers are properly considered adjudicatory orders under the APA." Op. 63. EPA's newfound "rules" position is thus untenable, and the Reclassifications are unlawful. *E.g., Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 673 (D.C. Cir. 2007) (holding "FERC acted contrary to law" where action was based on "impermissible" interpretation of statute). Moreover, even if the waiver provision provided EPA with discretion to engage in rulemaking (which it does not), EPA did not do so here. EPA did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment. EPA Answer ¶ 72; *cf.* 5 U.S.C. § 553(b). Instead, EPA followed its traditional practice, simply announcing that it had received a waiver request from California and was "accepting written

comment on the request." *E.g.*, 72 Fed. Reg. 21,260 (Apr. 30, 2007); *see also* EPA Answer ¶ 74 ("EPA did not prepare a regulatory impact analysis" for these waivers).

Second, the Reclassifications are contrary to law because no statute—not the APA, the CAA, or the CRA—gives EPA the power to reclassify already final actions, much less to do so years after finalization. Op. 62 ("No statutory authority for the agency to take this [Reclassification] action is apparent."); *see also New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015)). To the contrary, where the relevant statutory framework provides agencies with a choice between rulemaking and adjudication, the distinct procedural requirements for these two types of proceedings require agencies to decide at the beginning how they intend to act. *E.g., compare* 5 U.S.C. § 553 with *id.* § 554. Here, the waiver provision provides no such discretion, limiting EPA to adjudicating whether waiver opponents have met their burden of proof and established one of the limited bases for denying a California request. *MEMA I*, 627 F.2d at 1121-22. "As the Supreme Court has reminded, '[a]dministrative agencies are creatures of statute[, and] [t]hey accordingly possess only the authority that Congress has provided.'" Op. 62 (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam)). Yet neither in the administrative record nor elsewhere has EPA identified statutory authority supporting the ability to reclassify final actions. There is no such authority for EPA to now alter the nature of its actions, many years later, by simple fiat.

**b. The Reclassifications are arbitrary and capricious**

The Reclassifications are also arbitrary and capricious.

To begin, the record provides no reasoning or process for EPA's change in position. Indeed, the record does not even show EPA acknowledging that the change took place. *See also* Op. 62 ("EPA not only supplies no explanation for this abrupt change in long-standing policy but also denies the fact that a change in the classification of the waivers occurred at all."). An agency

action is "arbitrary and capricious" if an agency "abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so.'" *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 55 (D.D.C. 2025) (quoting *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001)). Here, as in *Center for Taxpayer Rights*, the agency "did not even display an awareness that it was changing its position." *Id*. at 56; Op. 61-62. The record includes EPA's previous statements that each of the six waivers are orders, not rules. AR42, 91, 126, 130, 136, 153. Yet neither EPA's press release announcements nor its Submissions to Congress mention this previous longstanding position, instead just stating that the waivers are now rules. ECF 13-26; ECF 30-1; AR1, 43, 92, 127, 131, 133, 137, 154.[19]

Having failed to acknowledge its prior position, the record also does not and cannot show EPA's "reasoned explanation for its change of policy," let alone a reasoned explanation "that is supported by record evidence." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1105-06 (D.C. Cir. 2019).[20] The omission of any explanation further underscores that waivers are not rules. *See supra* Sec. II.A.1.a. It is also independently arbitrary and capricious. *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 36 (D.D.C. 2019) ("A central principle of administrative law is that, when an agency decides to depart from ... past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it.") (*quoting Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017)); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (cleaned up)).

---

[19] EPA's counsel has informed California's counsel that the agency does not have copies of the letters designated R-1, R-10, R-12, and R-17 in the certified index of the administrative record but has certified that those documents are the same, or have the same "body text," as other documents provided to California or filed with this Court. Thus, documents R-1, R-10, R-12, and R-17 would also fail to acknowledge or explain EPA's change in position. California plans to include EPA's certification in the appendix to be filed pursuant to Local Rule 7(n).

[20] Thus, any explanation EPA might now offer as to why it believes Section 209 waivers fit the statutory definition of a "rule" will be impermissible post-hoc rationalizations. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).

This lack of justification is all the more arbitrary and capricious given the higher bar for reasoned explanation required where reliance interests are at stake. *FCC v. Fox Television Stations*, 556 U.S.502, 515 (2009). "When an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of California*, 591 U.S. at 30 (cleaned up). Yet once again nothing in the record shows EPA's consideration of the States' reliance interests at all. *See also* Op. 55 ("Nowhere does EPA acknowledge the significant reliance interests attached to the at issue Section 209(b) waivers—two for more than a decade—that have been shaken by the challenged agency action."). EPA cannot claim it was unaware of these interests. EPA itself approved several state regulations authorized by these waivers into California's plan to meet federal air quality standards, 40 C.F.R. § 52.220a(c); reprinted at 40 C.F.R. ch.I, at 614-15, 623-27 (July 2025 ed.). And the record includes EPA's recitation of the California emission reduction benefits of these state regulations when it granted the waivers, 74 Fed. Reg. at 32,750 n.38 (AR8); 78 Fed. Reg. at 2114 (AR95); 87 Fed. Reg. at 14,338 (AR50), 14,363-66 (AR75-78); 90 Fed. Reg. at 641 (AR129). EPA can hardly claim it had no idea the State was relying on these regulations for those benefits. *See also* Answer ¶ 35. Nor can EPA claim that emission reduction benefits are unimportant both because reducing harmful pollution is the purpose of the Clean Air Act, 42 U.S.C. § 7401, and because Congress has expressly instructed federal agencies (including EPA) not to interfere with the States' efforts to meet federal air quality standards, *id.* § 7506(c)(1) ("No department, agency, or instrumentality of the Federal Government shall engage in [or] support in any way … any activity which does not conform to an implementation plan after it has been approved."). "It was arbitrary and capricious for the [EPA] to ignore these significant reliance interests." *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 58.

Finally, EPA failed to provide any process at all to undertake the Reclassifications. Even assuming that EPA could plausibly interpret the APA as categorizing waivers as "rules" and that EPA could reclassify an already-final action from an order into a rule, it could not do so without "observance of procedure required by law." 5 U.S.C. § 706(2)(D). Yet, the record demonstrates

no process at all—no advance notice and no opportunity to comment. *See* ECF 58-1 (record index). Courts have found "non-harmless procedural deficiencies" when agencies failed to provide enough process, such as when the comment period was inadequate. *E.g., Nat'l Lifeline Ass'n*, 921 F.3d at 1105–06. Providing no process at all even more obviously crosses the line.

**B. The Submissions Are Also Final and Unlawful**

Each of EPA's Submissions is also final action because there is no indication of any further step EPA plans to take and "no indication that the [Administrator] intends to reconsider" its Submissions or vacate them. *Wheeler*, 955 F.3d at 79. The Submissions also "alter[ed] the legal regime to which [each waiver] is subject," *Bennett*, 520 U.S. at 178—under the 2025 Senate rule that treats "Agency-submitted rules" as triggering expedited review procedures, regardless of whether the action meets the statutory definition of a rule. Indeed, members themselves have attributed their "right" to "introduce [such] resolution[s]" to EPA's "submission." *E.g.*, 171 Cong. Rec. S3087 (daily ed. May 21, 2025) (Sen. Capito); *see also supra* Background IV.

The Submissions are independently unlawful because the obligation EPA claims it had to transmit these waivers only arises with respect to "rules," as that term is defined in the CRA. 5 U.S.C. § 801(a)(1)(A); *see also id.* § 804(3); ECF 13-26; ECF 30-1. Section 209 preemption waivers are not rules. *Supra* Sec. II.A.1.a; Op. 63 ("Section 209(b) waivers are properly considered adjudicatory orders."). EPA cannot hide behind its predicate Reclassifications because those were also unlawful and provide no authority or reasoned basis for the Submissions. *Am. Rivers v. FERC*, 895 F.3d 32, 55 (D.C. Cir. 2018); Op. 62 ("No statutory authority for the agency to take this action is apparent or has been presented to the Court so far in this case."). EPA's transmittal of actions finalized as orders in a report erroneously characterizing the actions as "rules" is in excess of its authority and not in accordance with the law. Nor does the record demonstrate any reasoned explanation or process provided for the Submissions. In addition, the Submissions are unlawful because the errors in the

Reclassifications "fatally infect[]" actions, like the Submissions, that rest on them. *Am. Rivers*, 895 F.3d at 55.

### C. The Reclassifications Are Not Subsumed into the Submissions

EPA has previously argued that the Reclassifications and Submissions are not, in fact, separate actions because, EPA claims, the former are subsumed into the latter. This Court correctly rejected that contention. Op. 31-33. It is worth nothing that, when EPA took these same actions with respect to three other waivers in 2025, EPA announced its reclassification days before it submitted the waivers to Congress, underscoring that each was a distinct action. ECF 13-11; ECF 13-15. EPA cannot collapse these two distinct actions into one simply because, this time, it opted to take both actions on the same day.

Nor does any statutory text support EPA's attempt to subsume the Reclassifications into the Submissions. Whether an agency action is an "order" or a "rule" is a determination under the APA. 5 U.S.C. § 551(4), (6). The CRA does not change this fundamental aspect of administrative law. AG's Manual at 14. ("[T]he entire Act is based upon a dichotomy between rule making and adjudication."). The CRA expressly provides that "rule" "has the meaning given such term in section 551, except that such term does not include" certain rules—*e.g.*, any that are not generally applicable. *Id.* § 804(3). By congressional design, then, an agency action cannot be a "rule" under the CRA unless it is first a "rule" under the APA, and classification under the APA is a precursor act. Underscoring the point, where an agency has a choice as to the form its action may take (rule or order), that determination must be made *before* proceedings commence; otherwise, the agency could not decide which procedures to follow. *See* 5 U.S.C. §§ 553, 554. By contrast, all obligations under the CRA arise only after the agency promulgates a rule. 5 U.S.C. § 801(a)(1)(A). And if that were not enough (and it is) to refute any subsuming argument, as shown above, the Reclassifications and Submissions are separate final agency actions with different consequences. *See also* Op. 59 ("[T]hese reclassification decisions are stand-alone actions that may sustain a viable claim under the APA so long as they meet the criteria for a final agency action." (cleaned up)). Each "final agency action" is separately "subject to judicial

review" under 5 U.S.C. § 704. EPA cannot alter that result by lumping multiple actions together and claiming they are one. *Cf. Calumet Shreveport*, 145 S. Ct. at 1748 (rejecting EPA's effort to determine venue by "group[ing] decisions into a single 'action'").[21]

## IV. ALTERNATIVELY, CALIFORNIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS ULTRA VIRES CLAIMS

Ultra vires review "is available where (i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (alteration in original) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

As established, there is no express statutory preclusion of all judicial review. *See supra* Sec. II.A. If this Court determines that the Reclassifications or Submissions are not final agency action, then APA review is unavailable and there is no alternative procedure for review of the statutory claim. Op. 62-63. And EPA has plainly acted in excess of its delegated powers for both the Reclassifications and Submissions. *See supra* Secs. III.A, B. Regarding the Reclassifications, no law delegates to EPA the power to declare by fiat that actions finalized years ago as "orders" through adjudicatory procedures are instead "rules." *See* Op. 62. Nor does any law delegate to EPA the power to declare actions that meet the APA definition of an "order" to be "rules." Regarding the Submissions, no law delegates to EPA the power to submit documents to Congress purporting to be "report[s]" under 5 U.S.C. § 801(a)(1)(A) of the CRA based on an ultra vires reclassification. That provision only applies to a "rule," *id.*, and EPA's unlawful post-hoc Reclassifications cannot bring these licensing orders within the provision's ambit. *See* Op. at 38 ("EPA has no authority to call whatever action it wants a 'rule' for purposes of a CRA report

[21] Even if EPA could credibly claim its Reclassifications and Submissions are six different actions (one per waiver), rather than twelve (two per waiver), those six actions would still carry the same consequences and would still be final agency action. And, for the reasons explained earlier, they would likewise remain outside the scope of the CRA and would not be shielded from judicial review by *Hodel*.

to Congress"). Put simply, no statute empowers EPA to target state regulations in this way—and that is far from surprising given that the Federal Government was designed to be "disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985).

And finally, EPA's actions are specifically prohibited by the APA. That statute prohibits agencies from claiming a finalized "order" is suddenly a "rule" because that classification controls which procedures the agency must follow and therefore cannot be made after the fact.[22] For example, to promulgate a rule, the agency must provide notice of the proposed rule that satisfies 5 U.S.C. § 553(b) and a final rule that satisfies 5 U.S.C. § 553(c), and neither is present anywhere in the record here. *See* EPA Answer ¶¶ 72, 74; ECF 58-1 (record index). The APA thus prohibits agencies from revisiting its classification after the procedures are complete and the action is final, all the more so because the statute prohibits agencies from creating "a moving target" for judicial review through post-hoc alterations. *DHS*, 591 U.S. at 23. Moreover, the APA prohibits an agency from "depart[ing] from a prior policy sub silentio," *Fox Television*, 556 U.S. at 515, as EPA did here.

For these reasons, any challenged action that this Court may conclude is not final agency action under the APA is ultra vires.

## CONCLUSION

California respectfully requests that the Court grant the State summary judgment.

---

[22] Cases interpreting the APA's requirements are relevant to the specific prohibition inquiry. *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970–971 (D.C. Cir. 2022) (relying on precedent interpreting statutory provisions to find agency had acted contrary to a specific statutory prohibition); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) ("Nor do we think it can possibly matter for purposes of [ultra vires] reviewability whether the alleged statutory right or mandate is found in the statute in so many words or has been so interpreted by the Supreme Court as appellants claim in this case.").

Dated: October 14, 2026

Respectfully Submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
DAVID ZAFT
Supervising Deputy Attorneys General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
NATALIE COLLINS
KATHERINE GAUMOND
Deputy Attorneys General
Office of the Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0299
Email: Elaine.Meckenstock@doj.ca.gov

*Counsel for Plaintiff State of California*